1    <u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

2    Name ___JAY_____MATTHEW_____A._____

3        (Last)        (First)        (Initial)

    Prisoner Number ___D-55653___

4    Institutional Address ___Correctional Training Facility___

5        ___P.O. Box 689, Soledad, CA 93960___

6    _____

7    UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

8    MATTHEW ADAM JAY,_____

    (Enter the full name of plaintiff in this action.)

9        vs.                          Case No. _____

                                     (To be provided by the clerk of court)

10   BEN CURRY (Warden),_____

11   _____   **PETITION FOR A WRIT
                                        OF HABEAS CORPUS**

12   _____

13   _____

14   (Enter the full name of respondent(s) or jailor in this action.)

15   _____

16        <u>**Read Comments Carefully Before Filling In**</u>

17   <u>When and Where to File</u>

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Los Angeles County Superior Court    Los Angeles

          Court                         Location

    (b)   Case number, if known _____ AB11060

    (c)   Date and terms of sentence 3/13/1987 - 15 years to life

    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes XX    No _____

          Where?

          Name of Institution: Correctional Training Facility

          Address: _____ P.O. Box 689, Soledad, CA 93960

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second degree murder and attempted murder, 187 & 664/187

_____

_____

_____

PET. FOR WRIT OF HAB. CORPUS      - 1 -

3. Did you have any of the following?

    Arraignment:                         Yes _____    No _____

    Preliminary Hearing:              Yes _____    No _____

    Motion to Suppress:             Yes _____    No __/__

4. How did you plead?

    Guilty _____     Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____     Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment              Yes _____    No _____

    (b)    Preliminary hearing       Yes _____    No _____

    (c)    Time of plea            Yes _____    No _____

    (d)    Trial                 Yes _____    No _____

    (e)    Sentencing             Yes _____    No _____

    (f)    Appeal               Yes _____    No _____

    (g)    Other post-conviction proceeding    Yes _____    No _____

8. Did you appeal your conviction?          Yes _____    No _____

    (a)    If you did, to what court(s) did you appeal?

          Court of Appeal            Yes _____    No _____

          Year: _____     Result:_____

          Supreme Court of California    Yes _____    No _____

          Year: _____     Result:_____

          Any other court            Yes _____    No _____

          Year: _____     Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

*N. A. PAROLE HEARING*

PET. FOR WRIT OF HAB. CORPUS       - 2 -

1    petition?                                             Yes _____    No _____

2    (c)    Was there an opinion?                          Yes _____    No _____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                          Yes _____    No _____

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?       Yes **XX**    No _____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: **Los Angeles County Superior Court**

19          Type of Proceeding: **habeas corpus**

20          Grounds raised (Be brief but specific):

21          a. **SAME AS RAISED HEREIN**

22          b._____

23          c._____

24          d._____

25          Result: **denied**                    Date of Result **5/16/2007**

26    II.   Name of Court: **App. Ct. of Calif., 2nd App. Dist.**

27          Type of Proceeding: **habeas corpus**

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 3 -

a. __SAME AS RAISED HEREIN_____

b. _____

c. _____

d. _____

Result: __denied_____ Date of Result: __10/26/2007__

III. Name of Court: __California Supreme Court_____

Type of Proceeding: ____Petition for Review_____

Grounds raised (Be brief but specific):

a. __SAME AS RAISED HEREIN_____

b. _____

c. _____

d. _____

Result: __denied_____ Date of Result: __1/3/2008__

IV. Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes __XX__   No_____

Name and location of court: __This Court, re 2004 parole decision__

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS     - 4 -

need more space.  Answer the same questions for each claim.

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION WHEN THE BOARD OF PAROLE
HEARINGS DECISION FINDING HIM UNSUITABLE FOR PAROLE WAS
NOT SUPPORTED BY ANY EVIDENCE THAT PETITIONER IS A
CURRENT THREAT TO PUBLIC SAFETY TWENTY-ONE YEARS AND
SEVEN PAROLE HEARINGS AFTER THE COMMITMENT OFFENSE, THE
DECISION BEING ARBITRARY AND CAPRICIOUS.

---

A.  Jurisdiction of the Court.

B.  Liberty Interest in Parole.

C.  There Is No Evidence Petitioner, Being Convicted of Second
    Degree Murder and Sentenced to an Indeterminate Term of 15
    Years to Life, is CURRENTLY Dangerous Twenty-One Years After
    the Commitment Offense.

a.  The Commitment Offense Twenty-One Years After the Fact
    Is Not "Some Evidence" Petitioner Is A CURRENT Threat
    to Public Safety.

b.  The Board's Failure to Consider and Weigh Petitioner's
    Adolescence at the Time of the Commitment Offense
    Denied Him of the Individualized Consideration
    Guaranteed by Due Porcess.

c.  The Board's Failure to Consider and Weigh the "Significant
    Stress" Petitioner was Under at the Time of the Commitment
    Offense Denied Him the Individualized Consideration
    Guaranteed by Due Process.

d.  Petitioner Was Denied Equal Protection Under the Law.

## Supporting Facts

Petitioner Matthew Adam Jay (hereafter Petitioner) was barely 18 years old at the time of the commitment offense; he is now 40 years old. Petitioner attended his <u>seventh</u> parole suitability hearing on January 26, 2006, at which time his minimum eligible parole date was affirmed to be October 18, 1995 (EXHIBIT 1, HT 1:17-18).[1]/

For a picture of who Petitioner was at the time of the commitment offense and to provide a complete order of events related to the offense itself, relevant facts will be taken from the probation officer's report (POR) (EXHIBIT 2), which was in the "Board packet" furnished and used by the Board of Parole Hearings (hereafter Board).

## The commitment offense

The facts of the commitment offense, in chronological order, are (EXHIBIT 2):

"On the evening of October 13, 1985, Defendant Meir, at that time, age 16, was at his place of employment, and apparently decided to kill his mother that night. He was able to obtain a promise of assistance from [Petitioner]. Later, while still at work, Defendant Meier told Defendant Parker, age 23 of his plans and Parker agreed to assist him. At some point, the three defendants went to a nearby restaurant where they discussed how they would kill Defendant Meier's mother. Defendant Meier produced a rope that he had fashioned into a noose, and it was decided (Meier had already "decided" and told Petitioner and Parker what they would do) that they would strangle her in Meier's bedroom and then transport her body, in her car, to the Malibu Canyon area, light the car on fire, and push it over a cliff in order to make it appear an accident (EX. 2, pp. 2-3).

"The three defendants then proceeded to the home of Defendant Meier in Canoga Park. Meier let his two co-defendant's into his bedroom through a window. While Parker and [Petitioner] laid in wait, Defendant Meier lured his mother into the room. Parker placed a noose around the neck of Shirley Rizk, Defendant Meier's mother and began to strangle her. Parker pulled on the rope around her neck, while the other co-defendants pulled on her legs. At some point during the strangulation, her eight year old son, Rory, awakened to her screams and went to invesigate. He was able to look in Meier's bedroom and observed [Petitioner] and Defendant Parker in that room and his mother on the floor. While Parker and [Petitioner] continued to attempt the strangulation, Defendant Meier took victim Rory away from the room in an effort to keep him from knowing what was

---

1. References to parole hearing transcript, EXHIBIT 1, will be noted by HT followed by page number and line number, e.g., (HT 1:1).

happening. Meier told his half brother to watch television and then returned
to his bedroom. The three defendants then apparently strangled Shirley Rizk
for approximately 15 minutes before she died. During this period of time,
Defendant Meier repeatedly left the room to deal with his brother who wanted
to know what was going on. The defendants (Meier) came to the realization that
Rory was a potential witness and then it was determined (by Meier) that he must
also be killed. It was decided by (Meier) that they would poison him and
Defendant Meier gave [Petitioner] some money to go to a store and purchase Snarol
snail poison and D-Con rat poison. While [Petitioner] went to get he poison,
Parker and Meier placed Shirley Rizk's body in the trunk of her car and Defendant
Meier cleaned blood off the floor of his bedroom rug." (EX. 2, pp. 3-4).

Petitioner reported that during the commission of the offense,

that "he held the victim's right shoulder and her right arm while

Defendants Parker and Meier strangled her with a noose. [Petitioner]

commented, 'I was too scared to just get out (before) completion

of the strangling ... I froze.' Further, he recalls crying while

it was happening. He asked to leave and go home while the victim

was struggling, and according to [Petitioner], Meier told him that

no, he could not, as 'we still need you.'" (EX. 2, p. 12).

After purchasing the poison requested by Meier, upon returning

to the Meier residence, Petitioner "told Torry that he needed to

leave. Torry replied that it was all right to leave, but they (co-

defendants) would pick him up in about two hours" (EX. 2, p. 12).

After Petitioner departed from the Meier residence (EXHIBIT 1, HT

14:20-15:5), Torry Meier then attempted to poison his brother, but

failed (EX. 2, p. 4).

"Defendant Meier then asked Rory if he wanted to go for a ride in Malibu
Canyon. Rory agreed. With his mother's body in the trunk and Rory in the back
seat, Defendant Meier and the co-defendant (Parker) then drove away from the
family home. En route they stopped at a gas station and purchased a gallon of
gas. After driving through the Malibu Canyon and finding a good location to
push the car over a cliff, they drove back to [Petitioner's] house. [Petitioner]
then followed them to the agreed-upon location in Malibu Canyon" (EX. 2,
pp. 4-5). Petitioner "stopped about twenty yards behind. The co-defendants
told him that victim Rory was in the car asleep. While Petitioner sat in his
father's vehicle (Ex. 2, p. 13), "Defendant Meier then poured gasoline on a rag
and stuffed the rag into the gas tank filler of Shirley Rizk's car. Meier then
blindfolded Rory, tied his hands behind his back, and put him in the back seat

of the car. Defendant Parker then placed the body of Shirley Rizk behind the steering wheel. The car was then pushed over the embankment as Defendant Parker lit the rag on fire" (EX. 2, p. 5). Petitioner only observed the car being pushed over a cliff (EX. 2, p. 13). "With the car burning, the defendants then left in [Petitioner's] car. As the car became consumed by flames, Rory was able to untie himself and remove his blindfold. He saw his deceased mother in the front seat and blood on her face. After opening a window, he climbed out of the burning car and began yelling for help" (EX. 2, p. 5).

Petitioner drove Meier and Parker to Meier's residence, dropped them off, and went home and went to bed (EX. 2, p. 13). "The next day (Petitioner) had no idea what had happened. It did not register until he saw it in the news. He then told his brother and 'someone else' what he had done. Later, the police arrived and arrested him" (EX. 2, p. 13).

Factors related to the commitment offense

The above sums up the commitment offense. There are additional facts, however, set out in the POR that were instrumental to offering Petitioner a plea agreement to second degree murder, sentencing, and parole suitability.

Petitioner "was barely eighteen years-of-age at the time of the offense (EX. 2, p. 9; EX. 1, HT 75:18), the Board acknowledging Petitioner was "a juvenile when this happened" (HT 17:10-12). Petitioner was described as "very easy-going and friendly, as not a strong person, but instead a follower. He just likes to say yes and wants no 'hassles'. He wants to get along with everyone. He was a church Alter Boy and B-plus student until his senior year. He broke up with his girlfriend about that time and was using a lot of drugs" (EX. 2, p. 19). At the time of the offense, Petitioner was described as looking like a "Zombie" (EX 2, p. 20).

Investigating officers and Parole Officers who interviewed Meier's report that "Defendant Meier had the ability to lead others

and influenced the co-defendants to help him kill his mother (EX.
4, p. 18); being "a rather imposing figure, quite sophisticated ,
poised, and apparently persuasive. He was always calm and seemed
in command of everything, even while incarcerated at juvenile hall
where he seemed to have already established rapport with the staff.
He seemed and looked much older than his years" (EX. 2, pp.20-21).

    A court ordered psychiatrist evaluation was prepared for
sentencing consideration.  Dr. David Sheffner, the court appointed
forensic expert, as recorded in the POR, reported that Petitioner
had been abusing drugs and alcohol since 1981 or 1982.  Petitioner
was described "as passing-dependant personality and being a follower
verses an instigator, self-sacrificing in interpersonal relationships.
He was not considered to be socially or physically an aggressive
person.  [¶] "There was evidence of chronic childhood depression
which increased even more when [Petitioner] broke up with his
girlfriend in 1984 (EX. 2, pp. 15-16).  It was Dr. Sheffner's expert
opinion that "dependency, drugs and depression all combined in a
spiraling psychiatric deterioration resulting in apathetic, severely
depressed, severely drug-dependent, non-functioning adolescent.
Doing drugs became the focal point of his life and drug depression-
dependency were intertwined, each reinforcing the other" (EX. 2,
p. 16).

    The sentencing expert who signed off on the POR agreed, writing:
"By the time [Petitioner] began his association with Torran Meier,
[Petitioner] was rapidly deteriorating.  Meier had a plan, but needed
help.  It was not easy to recruit others to help strangle his mother,
but eventually the strong, persuasive Meier found acquiescence from

- 9 -

Parker, a homeless drifter and thief, and the drug-dazed [Petitioner],
whom Meier described to parole authorities as being out of his mind
from the results of chronic drug abuse at the time of the offense"
(EX. 2, p. 23).

It was the sentencing expert's opinion that the following
mitigating circumstances applied to Petitioner: (1) "while his role
cannot be said to be a minor one, it was the most minor of the three";
(2) "The [Petitioner] participated in the crime under circumstances
of extreme drug use.... This would indicate the [Petitioner's]
conduct was partially excusable for some other reason not amounting
to a defense"; (3) Petitioner, "with no apparent pre-disposition
to do so, was induced by Defendant Meier to participate in the crime";
(4) Petitioner "has no prior record"; and (5) Petitioner "voluntarily
acknowledged committing the crime before he was apprehended, thus
insuring his eventual arrest and conviction" (EX. 2, p. 24).   In
aggravation, the sentencing expert found: "The crime involved great
violence, disclosing a high degree of cruelty and callousnes" (Id.).

In light of the above evidence, the Los Angeles County District
Attorney's Office offered a plea agreement to Petitioner to plead
guilty to one count of second degree murder in violation of Penal
Code § 187,[2/] and attempted murder in violation of Penal Code §§
664/187, to run concurrent.  After accepting the offer, and on January
12, 1987, pleading guilty, on March 13, 1987 Petitioner was sentenced
to an indeterminate term of 15 years to life plus 7 years to run
concurrent (EXHIBIT 3, sentencing transcript).

---

2.  All statutes and regulations are California, unless otherwise noted.

Post-conviction history and rehabilitation

Petitioner was received by the Department of Corrections on June 10, 1987 and has "a classification score of 19, which is the lowest score that a life inmate can obtain" (HT 44:16-21). In reference to Petitioner's post-conviction behavior: "To say that you have been programming in an exemplary way doesn't do you justice. Your programming far exceeds what this Panel or I'm sure most other Panels would see. Since you've been incarcerated you have had no disciplinary actions, 115's or 128s. And we realize that, in and of itself, is quite an accomplishment, it is not an easy thing to do" (HT 44:24-45:4).

The Board reviewed Petitioner's plethora of self-help rehabilitative programs he has completed as well as his job assignments in which he has received all satisfactory to excellent work evaluations (HT 45:5-49:9; EXHIBIT 4). Petitioner, at the time of the hearing, had also completed 81 units toward a four year degree through the University of Iowa (HT 50:15-51:17). (Petitioner has continued with his education and is currently 31 units from his degree.)

In an unusual step toward rehabiltation, Petitioner felt compelled to write Ms. Rizk's parents, the VanHove's, and Rory Rizk and tell them how sorry he was for the pain and suffering he caused them, not asking forgiveness, but "grateful" when they responded that they did forgive him (HT 15:12-16:23), and have been supportive of Petitioner being paroled (HT 41:2-11).

When asked the important question how Petitioner feels about the commitment offense today (HT 25:7-9), he answered (HT 25:11-26:19:

- 11 -

"I'm devaststed by it.  I'm - it moved me in ways that I never would have been
moved it it hadn't happened.  And let me say this: Because I committed this crime.
becuase I caused the pain I did, and because I was sent to prison with this
sentence, it enabled me to become a good human being again.  It enabled me to
answer for my wrongs.  It gave me an opportunity to pay the debt as much as
I can to both the family and society.  It is so outside who I am, what I did,
it really was an aberration.  The crime, the pain that I caused, I live with
it daily.  I know that people say that all the time, I mean, I'm sure that you
guys hear that all the time.  But, You know, I do, I — because of that I try
to do everything — everyday I wake up I try to make the right decisions.
I try to do the best that I can.  I try to bring goodness to life.  I mean,
I know that I caused pain to so many people, that I don't even realize.  I mean,
the neighbors, their trust.  The neighbors are the victims, I'm saying.  Their
trust in that community was probably shattered.  To my family and obviously,
to the victim's — to Rory, to the grandparents, and my family and myself, and
my potential in life. .... So, when you asked me how I feel about this crime,
I'm devastated.  I'm devastated on all accounts.  I'm devastated that you guys
have to sit here and read about it and know that this happened and that they
do.  I know I affected untold lives, and the D.A."

When asked the equally important question how Petitioner is
different today (HT 26:21-26), the Board "perceiving this is a
transformation, obviously"; asking, "What point do you think that
you changed?" (HT 28:6-9), Petitioner answered (HT 28:10-24):

"Well, I changed at different times in different ways.  I changed immediately
as soon as the crime happened in untold ways.  I mean, it just — I think as
far as what you're speaking about right now, it started in the County jail
I made a decision that I either could kill myself or I could, what I figured
at the time, take the hard road and try to make something of my life and realize
what I did and correct what I could.  And at that point I started trying to come
out of the blackness.  And everyday I try — and I realize, I could live for
another hundred years and would never, you know, come close to correcting what
I did, but that's when it began."

When Petitioner was asked why he thought he has not "gotten
a date yet" he answered: "Because of the crime.  They have told me,
past Board members, if I may say, have told that my parole plans
are perfect -- [] My institutional programming is very good.  I have
psych clearances and so, it's very clear why" (HT 29:22-30:4).

Forensic evaluations

The Board relied on Petitioner's forensic evaluation dated
December 2005, prepared by Dr. Macomber (EXHIBIT 5).  The Board

- 12 -

stated: "It is a positive evaluation" (HT 53:7-8). Germane to issue
at bench, "intellectually, your judgment is sound and you have good
self-awareness and insight, you have a GAF (Global Assessment of
Functioning) score of 90, which is extremely high" (HT 53:23-25).
The Board read directly from Dr. Macomber's forensic evaluation
(HT 53:26-58:7). Petitioner will quote directly from the evaluation.
Petitioner has remained entirely disciplinary-free during the last
20 years of his incarceration. Although drugs and alcohol are readily
available in the prison environment, Petitioner "has significantly
changed his lie, and he has avoided any involvement with drugs or
alcohol during the last 20 years. In addition, he has participated
extensively in therapy groups, and ongoing Alcoholics Anonymous"
(EX. 5, p. 2). On this point, it is the expert opinion of Dr.
Macomber that "[d]ue to the fact that drugs and alcohol are available,
and he could have used them if he had chosen to, it is clear that
drugs and alcohol are no longer a problem in his life. Therefore,
this cannot be listed as a current diagnostic problem" (Id.).

In reviewing the commitment offense (EX. 5, pp.2-3), Dr. Macomber
writes:

"In addressing the question of causative factors, the Caliornia Youth Authority
psychiatric evaluation, dated 06/24/87, does lend some insight into his
functioning at the time of the commitment offense. Quoting a prior psychiatric
evaluation, the defendant was described as a passive-dependent personality, and
there was evidence of a chronic childhood depression, which increased the demands
of adolescence, and developed a strong dependence on drugs, which combined in
a spiraling psychiatric deterioration, resulting in an 'apathetic, severely
depressed, severely drug-dependent, nonfunctioning adolescent.' Drug use was
seen as a significant precipitant of his behavior. [¶] "At the time of the
commitment offense, [Petitioner] was severely intoxicated on LSD, which he had
taken for the first time in conjunction with hashish and alcohol." .... [¶] "The
last psychological evaluation by Dr. Howlin on 10/15/02 (EXHIBIT 6), reported
that [Petitioner] felt his heavy, ongoing drug use significantly interfered with
his ability to know right from wrong. .... Prior to the offense, [Petitioner]
had been struggling with low self-esteem and occasional depression, coupled with
heavy drug use."

Petitioner accepts "responsibility for this offense, and stated that if he had not participated in it, it could not have happened." Petitioner's "feelings of remorse appear to be sincere and genuine. He was very happy with the victim's parents forgiving him, and he does correspond with them regularly" (EX. 5, p. 4).

Most importantly, addressing CURRENT threat to public safety, "assessment of dangerousness," it is Dr. Macomber's expert opinion that Petitioner "has grown significantly over his 20 years of incarceration. He is no longer the immature, drug-dependant individual that he was at the time of the commitment offense. He demonstrates strong prosocial values. There are no antisocial values or thinking in this case. His violence potential is definitely below average in comparison to other inmates" (EX. 5, p. 4).

"In considering his potential for dangerous behavior if released on parole to the community," using objective actuarial measuring instruments that assess several factors, Petitioner's "score indicated a 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better than 98% of them. This indicates an extremely low risk level" (EX. 5, p. 4).

Taking many factors into consideration, it is the expert opinion of Dr. Macomber that Petitioner's CURRENT "potential for violence is no more than the average citizen in the community, and <u>is probably less than the average citizen in the community due to his life experience</u>" (EX. 5, p. 4, emphasis added).

Relative to time and rehabilitation, it is Dr. Macomber's expert opinion: "At the time of the commitment offense, risk factors were his immaturity and his severe substance dependence. After 20 years

of drug and alcohol abuse programming, and maturity that comes with
age and experience, this is no longer a factor. There is no
significant risk factors at this time" (EX. 5, p. 4).

Dr. Macomber concludes: "There are no mental or emotional
problems in this case that would interfere with parole plans. ....
The prognosis for successful adjustment to the community is excellent
in this case" (EX. 5, p. 5).

Dr. Macomber's forensic evaluation and expert opinion echoes
that of Dr. Howlin's forensic evaluation (EX. 6), which Dr. Macomber
stated is "still quite current and valid" (EX. 5, p. 1). After a
review of the evidence and an interview with Petitioner, Dr. Howlin
agreed with the previous assessment by Dr. Reed (EXHIBIT 7); that
is, "the idea that the crime was quite violent, and quite removed
from both [Petitioner's] history and functioning since being
incarcerated" (EX. 6, p. 6; see EX. 7, p. 4 ["The crime did appear
markedly violent, and is significantly inconsistent with the inmate's
current demeanor and nonviolent history within CDC"]).

Addressing Petitioner's "struggling with low self-esteem and
on-and-off-gain depression, coupled with the heavy drug
use...increasingly conflictual relationship with family members
preceding the crime" it was Dr. Howlin's expert opinion that "[t]he
above-diagnosed psychopathology would likely be directly related
to the crime" (EX. 6, p. 6).

Under assessment of dangerousness, germane to Petitioner's
CURRENT threat to public safety, it was Dr. Howlin's expert opinion
that Petitioner's violence potential "is estimated to be well below
average relative to this Level II inmate population" and "[i]f

released to the community, his violence potential is estimated to
be no more than the average citizen in the community" (EX. 6, p.
7), with no "mental health disorder which would necessitate treatment"
(EX. 6, p. 8).

As far back as 2001 it was Dr. Reed's expert opinion that
"[h]eavy drug abuse does appear to be directly related to the instant
offense, and the inmate appears to have an adequate understanding
of this relationship and the need to maintain abstinence from drug
and alcohol use"(EX. 7, pp. 4-5). It was also Dr. Reed's expert
opinion that if Petitioner were released to the community, "his
violence potential is considered to be no more than that of the
average citizen in the community, if he remains free from substance
abuse" (EX., 7, p. 6).

The foregoing facts unequivocally substantiate that Petitioner
was barely 18 years of age at the time of the commitment offense,
has been imprisoned for 21 years, and is rehabilitated, no longer
being a danger to society.

### D E C I S I O N

In finding Petitioner unsuitable for parole, the Presiding
Commissioner stated: "We really struggled with trying to balance
the commitment offense and your significant and undeniable strides
that you have made since coming to prison. However, the severity
of the crime and our duty to the public interest, we are going to
deny you parole today" (HT 89:8-13). The Board then stated the
obvious: "I usually say at this point that I'm going to read the
decision and give you some recommendations, but I don't have any
recommendations for you. You are doing an excellent program. You

- 16 -

are doing everything that we could ever ask somebody to do..."
(HT 89:15-20).

The Commissioner continued, concluding that Petitioner "is not
yet suitable for parole and would pose an unreasonable risk of danger
to society or a threat to public safety if released from prison"
(HT 90:3-7); (1) "there were multiple victims and one was killed
and one was attacked" (HT 90:8-9); (2) "the offense was carried out
in a dispassionate and calculated manner, in that they discussed how
they would kill the victim and proceeded to strangle her then..."
(HT 90:25-26); and (3) "the offense was carried out in a manner that
demonstrates a callous disregard for human suffering, in that Mrs.
Rizk was vulnerable, she was in her own home, and I am assuming she
was unarmed and defenseless, and it took approximately 15 minutes
to strangle her" (HT 91:6-10). "These conclusions are drawn from
the Statement of Facts as they appear in the May 2005 Board Report"
(HT 91:14-16). It was also expressed that by one Commissioner, "I
think the opportunities...that there were for you to stop, and I
counted seven" (HT 89:21-24).

Then, in rote fashion, the Board "make[s] the following findings:
that the inmate continues to need self-help in order to face, discuss,
understand and cope with stress in a non-destructive manner" (HT
92:13-16).

Petitioner was then told: "It's just, you know, somebody has
to get over this crime, okay, and obviously nobody has been able
to do that yet" (HT 92:24-93:2). Petitioner asks, logically, who
is going to get over it, and when?
///////

- 17 -

## J U D I C I A L   P R O C E E D I N G S

The decision to deny Petitioner parole on January 26, 2006,
became final May 24, 2006.  Through counsel, on November 6, 2006,
Petitioner filed a habeas corpus in the Superior Court of California,
County of Los Angeles, and, although being denied on May 16, 2007,
was not filed until June 15, 2007 (Ex. 8).

The trial court affirmed the Board's decision, finding that "there
is some evidence that 'multiple victims were attacked, injured or
killed in the same or separate incidents.' (Cal. Code Regs., tit.
15, §2402(c)(1)(A))") (EX. 8, p. 1).  The court continued, "The record
reflects that there is some evidence that, 'the offense was carried
out in a manner which demonstrates an exceptionally callous disregard
for human suffering.' (Cal. Code Regs., tit. 15, §2402(c)(1)(D).
This means that 'the offense in question must have been committed
in a more aggravated or violent manner than that ordinarily shown
in the commission of that offense" (In re Scott (2004) 119 Cal.App.4th
871, 891)."  The court opined an offense "is more aggravated or
violent when it involves severe trauma, 'as when death resulted from
severe trauma inflicted with deadly intensity; e.g. beating, clubbing,
stabbing, strangulation, suffocation, burning, multiple wounds
inflicted with a weapon not resulting in immediate death or actions
calculated to induce terror in the victim.' (Id. at 892)" (EX. 8,
p. 2), referring to Cal. Code Regs., tit. 15, § 2403(c)(C), a term
fixing factor, not an unsuitability factor.  The court then cited
the facts that the victim was strangled, the strangulation lasting
for 15 minutes, and the attempted murder of Meier's little brother
by "tying him up and leaving him in a car, which they set on fire

- 18 -

and pushed off a cliff" (EX. 8, p. 2).

The court concluded, "Based on these actions, there is some evidence that the crime committed in a more aggravated and violent manner than that ordinarily shown in the commission of second degree murder." The petition being denied.

On October 13, 2007, Petitioner filed his writ of habeas corpus in the Appellate Court of California, Second Appellate District. On October 26, 2007, the writ was summarily denied (EXHIBIT 9).

On or about November 3, Petitioner filed in the Supreme Court of California a Petition for Review. Said Petition for Review was summarily denied on January 3, 2008 (EXHIBIT 10).

Total days from date of the Board's decision becoming final and State court remedies being exhausted is 599 days, with 295 of those days tolled, for a total of 304 untolled days.

\* \* \* \* \* \* \*

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

All grounds were presented in state court.

Subclaim "d", however, "Petitioner Was Denied Equal Protection Under the Law," has become an issue in that the state courts failed to address subclaims "b" and "c" when others similarly situated to Petitioner were granted relief on those claims; thus, subclaim "d" is against the highest state court and could not be raised until now.

- 19 -

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4   PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO, pp. 21-28

5   _____

6   _____ _____

7   Do you have an attorney for this petition?          Yes_____    No XX

8   If you do, give the name and address of your attorney:

9   _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _01/29/08___         _____

14              Date        Matthew Adam Ja[y]
                              Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS    - 20 -

### M E M O R A N D U M   O F   L A W

#### A.  Jurisdiction of the Court

As of February 1, 2008, there were approximately 314 untolled days in the state courts.  Whether Petitioner is limited to 365 days after the Board's decision becomes final minus tolled time while exhausting state remedies, or 365 days, or 365 days plus 60 days to file certiorari after the California Supreme Court decision is final, Petitioner's federal writ is timely filed, thus the Court has jurisdiction.

#### B.  Liberty Interest in Parole

It is crystallized, California's indeterminately sentenced prisoners have a liberty interest in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Grenholtz), 441 U.S. 1 (1979); In re Rosenkrantz, 29 Cal.4th 616, 654-656 (2002); Sass v. California Board of Prison Terms (hereafter Sass), 461 F.3d 1123 (9th Cir. 2006); Irons v. Carey, 479 F.3d 658 (9th Cir. 2007)).  Respondent should be warned from raising or making any meritless and frivolous argument to the contrary and wasting the Court's limited time and resources.

#### C.  There Is No Evidence Petitioner, Being Convicted of Second Degree Murder and Sentenced to an Indeterminate Term of 15 Years to Life, is CURRENTLY Dangerous Twenty Years After the Commitment Offense.

Petitioner's minim eligible parole date (MEPD) was fixed to be October 18, 1995 (HT 1:16-18), thus at the time of the hearing at bench, Petitioner was 10 years past his MEPD, and five years past his minimum term of 15 years.  Petitioner was merely 18 years and two months old at the time of the offense, who, in the expert opinion of Dr. Sheffner, suffered from "chronic childhood depression which

increased even more when [Petitioner] broke up with his girlfriend in 1984" and "dependency, drugs and depression all combined in a spiraling psychiatric deterioration resulting in an apathetic, severely depressed, severely drug-dependent, non-functioning adolescent" (EXHIBIT 2, pp. 15-16). The sentencing expert agreed in the POR, writing: "By the time [Petitioner] began his association with Torran Meier, [Petitioner] was rapidly deteriorating. Meier had a plan, but needed help. It was not easy to recruit others to help strangle his mother, but eventually the strong, persuasive Meier found acquiescence from Parker, a homeless drifter and thief, and the drug-dazed [Petitioner], whom Meier described to parole authorities as being out of his mind from the results of chronic drug abuse at the time of the offense" (EXHIBIT 2, p. 23).

Petitioner has no prior criminal history, an exemplary postconviction history, family and community support, and by all accounts is rehabilitated, and, in Dr. Macomber's expert opinion, "potential for violence is no more than the average citizen in the community, and is probably less than the average citizen in the community due to his life experience" (EXHIBIT 5, p. 4). Thus, if Petitioner has served the maximum punishment for second degree murder according to the legislatively prescribed predetermined matrix proportionate and uniform to the commitment offense, and he is fully rehabilitated and no longer a threat to public safety, for what legitimate penological interest is Petitioner not suitable for parole and still imprisoned?

a.  The Commitment Offense Twenty-One Years After the Fact Is Not "Some Evidence" Petitioner Is A CURRENT Threat to Public Safety.

"The Governor's assumption that a prisoner may be deemed

- 22 -

unsuitable for release on the basis of the commitment offense 'alone' is correct (citation), [] but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change" (In re Scott II, 133 Cal.App.4th 573, 594-595 (2005)). "Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (citation), and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (Biggs v. Terhune, [] 334 F.3d [910], 917 [9th Cir. 2003])" (In re Scott II, 133 Cal.App.4th, at 595, supra; In re Elkins, 144 Cal.App.4th 475, 496 (2006)). "Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date" (In re Rosenkrantz, 29 Cal.4th, at 683, supra, citation omitted, emphasis added). However, although initially the egregiousness of the offense may be used to deny parole, after 15 to 20 years the commitment offense in and of itself loses probative value in predicting current or future dangerousness (In re Roderick, 154 Cal.App.4th 242, 277 (2007); In re Lee, 143 Cal.App.4th 1400, 1412 (2006); In re Scott II, 133 Cal.App.4th, at 595, supra; Rosenkrantz v. Marshall, 444 S.Supp.2d 1063, 1084 (C.D. Cal. 2006)).

The Ninth Circuit Court of Appeals recently concluded the suitability and unsuitability factors set out in Cal. Code Regs., tit. 15, § 2402(c) and (d), in the precedent setting case of Hayward v. Marshall, ___ F.3d ___, 2008 U.S. App. LEXIS 40, *17-18 (9th Cir. 2008):

"Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made it clear

- 23 -

that the 'findings that are necessary to deem a prisoner unsuitable for parole,'
Irons [v. Carey], 505 F.3d [846,] at 851 [(9th Cir. 2007)], 2007 WL 2927359,
at *3, are not that a particular factor or factors indicating unsuitability
exists, but that a prisoner's release will unreasonably endanger public safety.
In re Dannenberg, 156 Cal.App.4th 1387, 2007 WL 3408290, *9 (Cal. Ct. App. 2007),
modified, 2007 Cal. App. LEXIS 1985, 2007 WL4227229 (Cal. Ct. App. Dec. 3, 2007);
In re Lee, 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal. Ct. App. 2006);
In re Scott, 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Cal. Ct. App. 2005);
see Cal. Penal Code § 3041(b) (providing that the Board 'shall set a release
date unless...consideration of the public safety requires a more legthy period
of incarceration for this individual'). For our purposes, then, '[t]he test
is not whether some evidence supports the reasons the Governor cites for denying
parole, but whether some evidence indicates a parolee's release unreasonably
endangers public safety. Some evidence of the existence of a particular factor
does not necessarily equate to some evidence the parolee's release unreasonably
endangers public safety.' Lee, 143 Cal. App.4th at 1408 (citations and footnotes
omitted); see also In re Elkins, 144 Cal.App.4th 475, 499, 50 Cal.Rptr.3d 503
(Cal. Ct. App. 2006) (holding that the 'governor, in reviewing a suitability
determination, must remain focused...on facts indicating that release currently
poses 'an unreasonable risk of danger to society'" (citing Cal. Code Regs. tit.
15, § 2402(a))); Scott, 133 Cal.App.4th at 591 ('The factor statutorily required
to be considered and the overarching consideration, is "'public safety.'" (citing
Cal. Penal Code § 3041(b))) (emphasis and ellipses in original).

Petitioner has never attempted to minimize the seriousness or
heinous nature of the commitment offense, however, although the
offense may have been especially grave, the record "lacks any evidence
that now, more than two decades after his offense, the nature of
[Petitioner's] offense alone continues to support a conclusion that
he poses an unreasonable risk of danger to society if released"
(In re Dannenberg, 156 Cal.App.4th, at 1400-1401, supra, emphasis
in original).

What the state courts are attempting to do, and what the Ninth
Circuit has done in Hayward, is remove politics from the parole
decision and restore fairness and justice to the decisionmaking
process. Two decades after the fact, the Board has nothing but the
commitment offense and words to find Petitioner unsuitable for parole,
but no evidence to support that unsuitability finding, violating
Petitioner's right to due process.

- 24 -

b. <u>The Board's Failure to Consider and Weigh Petitioner's
Adolescence at the Time of the Commitment Offense
Denied Him of the Individualized Consideration
Guaranteed by Due Process.</u>

"[T]ne decision must reflect an individualized consideration
of the specified criteria and cannot be arbitrary or capricious"
(<u>In re Rosenkrantz</u>, 29 Cal.4th, at 677, <u>supra</u>).  Important to
Petitioner's "individualized consideration" in considering his
suitability for parole was his age at the time of the commitment
offense, having just turned 18 years old, still being an adolescent
who was, by all accounts and expert opinions, immature for even an
18 year old, resulting in, what was opined by one expert, and the
sentencing expert agreeing, "dependency, drugs and depression all
combined in a spiraling psychiatric deterioration resulting in an
apathetic, severely depressed, severely drug-dependent,
non-functioning adolescent" (EXHIBIT 2, pp. 15-16).

    Petitioner was, at the time of the commitment offense, the same
age as <u>Rosenkrantz</u>, having just turned 18 (<u>Rosenkrantz v. Marshall</u>,
444 F.Supp.2d, at 1085, <u>supra</u>).  As one state appellate court opined
(<u>In re Barker</u>, 151 Cal.App.4th 346, 376):

> "Last, but by no means incidentally, the Board failed to consider Barker's age
> at the time he committed the crimes.  In <u>Elkins</u>, <u>supra</u>, 144 Cal.App.4th 475,
> [], we agreed with the observations of the federal district court in <u>Rosenkrantz
> v. Marshall</u> (C.D. Cal. 2006) 444 F.Supp.2d 1063, that "'the general unreliability
> of predicting violence is exacerbated in [a] case by ... petitioner's young age
> at the time of the offense [and] the passage [in that case] of nearly twenty
> years since that offense was committed....'" (<u>Elkins</u>, <u>supra</u>, at p. 500, [].)
> There, granting the petition for habeas corpus, the district court talked of
> Rosenkrantz's age, one month past 18. (<u>Rosenkrantz v. Marshall</u>, <u>supra</u>, 444
> F.Supp.2d at p. 1085.)  This fact, the district court noted, 'further diminished'
> the 'reliability of the facts of [Rosenkrantz's] crime as a predictor for his
> dangerousness.' (<u>Ibid.</u>)  Stating that '[w]hile [Rosenkrantz] was not legally
> a minor, he was very close to being one,' the district court confirmed the
> recognition by the United States Supreme Court that the 'evidentiary/predictive
> value of the conduct of such a young person is diminished.' (<u>Ibid.</u>)"

    The <u>Barker</u> court then goes on to cite <u>Roper v. Simmons</u>, 543

- 25 -

U.S. 551 (2005); <u>Stanford v. Kentucky</u>, 492 U.S. 361 (1989), Brennan,
J., dissenting; <u>Johnson v. Texas</u>, 509 U.S. 350 (1993); and <u>Thompson</u>
<u>v. Oklahoma</u>, 487 U.S. 815 (1988).

    The Board's failure to consider and weigh Petitioner's young
age against the severity of the offense, and state courts' failure
to grant relief on this claim, not only violated Petitioner's right
to due process, but his right to equal protection under the law,
the equal protection claim which could not be raised until now, after
the highest state court failed to grant relief on the claim.

c.   <u>The Board's Failure to Consider and Weigh the "Significant
Stress" Petitioner was Under at the Time of the Commitment
Offense Denied Him the Individualized Consideration
Guaranteed by Due Process.</u>

    A second important factor that was not considered and weighed
in the Board's decision, and the state courts failed to address,
was that Petitioner was under significant stress at the time of the
commission of the offense (Cal. Code Regs., tit. 15, § 2402(c)(4)),
denying him the "individualized consideration" constitutionally due
him (<u>In re Rosenkrantz</u>, 29 Cal.4th, at 677, <u>supra</u>).

    It was the expert opinion of Dr. Sheffner that Petitioner, at
the time of the offense, was in a state of "spiraling psychiatric
deterioration resulting in an apathetic, severely depressed, severely
drug-dependent, non-functioning adolescent" (EXHIBIT 2, p. 16).
The Board acknowledged that stress when finding "that the inmate
continues to need self-help in order to face, discuss, understand
and cope with stress in a nondestructive manner" (HT 92:13-16).
The record is devoid of any evidence that Petitioner cannot now cope
with stress in a nondestructive manner, as he has been doing for
over 20 years, thus, such was either a boilerplate finding unsupported

by any evidence to justify a decision already made, or the Board
was relying on evidence of the stress Petitioner was under at the
time he gave in to participate in the instant offense.

In that "the Board failed to acknowledge that the crime was
the result of significant stress in [Petitioner's] life...[t]his
it is bound to do" (In re Weider, 145 Cal.App.4h 570, 590 (2006);
In re Scott II, 133 Cal.App.4th, at 596, supra; In re Rosenkrantz,
29 Cal.4th, at 679, supra; Pirtle v. California Board of Prison Terms,
Slip Copy, 2007 WL 1140817, *14, (E.D. Cal.) [findings and
recommendations], Slip Copy, 2007 WL 1544620 (E.D. Cal.) [findings
and recommendation adopted in full, 4/17/07]), Petitioner's right
to due process and equal protection under the law was violated.

d.  Petitioner Was Denied Equal Protection Under the Law.

Petitioner presented evidence to the state courts that he was
(1) an adolescent at the time of the commitment offense and (2) he
was under significant stress at the time of the offense.  Although
state courts have granted relief in similar cases where evidence
was presented, prisoner was a juvenile (18 or younger) at the time
of the offense (In re Elkins, 144 Cal.App.4th, at 500, supra [Elkins
was 19, yet afforded this consideration by the appellate court];
In re Barker, 151 Cal.App.4th, at 376-377), or under significant
stress (In re Scott II, 133 Cal.App.4th, at 597, supra; In re Gray,
151 Cal.App.4th 379, 406-407 (2007); In re Cooper, 153 Cal.App.4th
1043, 1066 (2007); In re Staben, Slip Copy, 2007 WL 3257191, *9
(Cal.App. 4 Dist., 11/6/07); In re Weider, 145 Cal.App.4th, at 590,
supra ["the Board failed to acknowledge that the crime was the result
of significant stress in Weider's life....  The regulation requiring

- 27 -

the Board to consider the role that such stress may have played in the commission of the crime reflects the law's awareness of human nature. .... But it does not appear the Board considered this evidence at all. This it is bound to do"]).

The Fourteenth Amendment's equal protection clause "is essentially a direction that all persons similarly situated should be treated alike" (Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985; Caswell v. Calderon, 363 F.3d 832, 837 (9th Cir. 2004)). Petitioner posits that the Board's continued failure, and the state courts failure to address these equal protection claims, is a deliberate intent because they are mitigating factors that weigh heavily in Petitioner's favor of predicting his current threat to public safety, being less than the average citizen. When Petitioner's young age and life's stressors he was unable to cope with at that time are factored into the suitability equation, plus time and rehabilitation, the predictability factor of the commitment offense is further eroded; thus, the state courts simply will ignore the factors and, by subterfuge, pass it on to the federal courts.

The equal protection part of this claim could not be raised until the highest state court failed to rule on the claim, thus the claim is properly before the Court. Petitioner's right to due process and equal protection under the law was violated, the decision being arbitrary and capricious.

### C O N C L U S I O N

"Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard

- 28 -

might be quite low, but it does require the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision" (Willis v. Kane, 458 F.Supp.2d 1126, 1130 (N.D. Cal. 2007); In re Roderick, 154 Cal.App.4th, at 277, supra). As warned by the Ninth Circuit: "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes" (Irons v. Carey, 505 F.3d 846, 854 (9th Cir. 2007); Hayward v. Marshall, 2008 U.S. App. LEXIS 40, *23, supra). After 21 years, Petitioner's rehabilitation and uncontroverted forensic evidence cogently favorable to parole, Petitioner being less of a threat than the average citizen, the Board, and state court, abused its discretion, denying Petitioner due process of law. Petitioner is entitled to relief.

WHEREFORE, it is respectfully requested that the writ be GRANTED and the Board ordered, unless there is new evidence since Petitioner's 2006 parole suitability hearing that would preponderate toward unsuitability, to conduct a new hearing within ten (10) days and fix Petitioner's term proportionate and uniform to his culpability for second degree murder, and, that any and all excess custody credits be applied to his period of parole he may serve. Moreover, in that the Governor is bound by the same factors the Board is bound by, it is requested that the Court hold, if there is no evidence Petitioner is a current threat for the Board based on the evidence and factors, that neither can there be evidence for the Governor, therefore expecting Petitioner to be paroled.

- 29 -

DATED: 01/29/08

Respectfully submitted,

Matthew Adam Ja
Petitioner in pro se

# Exhibit
# 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number D-55653
                          )
MATTHEW JAY               )
                          )      **INMATE**
_____)      **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 26, 2006

9:05 A.M.

PANEL PRESENT:

Ms. Tracey St.Julien, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner

OTHERS PRESENT:
Mr. Matthew Jay, Inmate
Mr. Steve DeFilippis, Attorney for Inmate
Mr. Paul Turley, Deputy District Attorney, Los
Angeles County
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum

**Judy K. Farncomb**        **Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings........................................ | 1 |
| Case Factors...................................... | 10 |
| Pre-Commitment Factors............................ | 17 |
| Post-Commitment Factors........................... | 44 |
| Parole Plans...................................... | 30 |
| Closing Statements................................ | 68 |
| Recess............................................ | 88 |
| Decision.......................................... | 89 |
| Adjournment....................................... | 95 |
| Transcriber Certification......................... | 96 |

--oOo--

1

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER SMITH:**  We're on the

3    record.

4          **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

5    good morning the time is 9:05.  This is a

6    Subsequent Parole Consideration Hearing for

7    Matthew Jay, CDC Number D-55653.  Today is

8    January 26, 2006.  We are at CTF, Soledad.  The

9    inmate was received on June 10, 1987, the life-

10   term starting the same day.  Count One, murder-

11   second, violation of Penal Code Section 187.

12   And there is also Count Two, attempted murder,

13   Penal Code Section violated 664 and 187, that's

14   how it is on the sheet.  Okay.  And these are

15   from the County of Los Angeles, Case

16   Number A811060.  The inmate received a term of

17   15 years to life with a minimum eligible parole

18   date of October 18, 1995.  Is that correct, sir?

19         **INMATE JAY:**  That is correct.

20         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

21   We are tape-recorded the Hearing today, so we

22   are going to introduce ourselves, and say our

23   first and last names, spell our names.  And then

24   after you spell your name, if you would also say

25   your CDC number.  And my name is Tracey

26   St.Julien, T-R-A-C-E-Y, S-T, capital

27   J-U-L-I-E-N, Commissioner.

2

1    **DEPUTY COMMISSIONER SMITH:**  My name is

2    Dennis Smith, S-M-I-T-H, Deputy Commissioner.

3    **DEPUTY DISTRICT ATTORNEY TURLEY:**  My name

4    is Paul Turley, T-U-R-L-E-Y, I represent the

5    District Attorney's Office in Los Angeles

6    County.

7    **ATTORNEY DEFILIPPIS:**  My name is Steve

8    DeFilippis, D-E-F, as in Frank, I-L-I-P-P-I-S,

9    I'm the attorney for Mr. Jay.

10    **INMATE JAY:**  I am inmate Matthew Jay,

11    M-A-T-T-H-E-W, capital J-A-Y, Delta- 55653.

12    **PRESIDING COMMISSIONER ST.JULIEN:**  And we

13    also have two correctional officers in the room

14    who are here for security purposes.  Okay, and

15    Mr. Jay, are you familiar with your ADA rights?

16    **INMATE JAY:**  Yes, I am.

17    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

18    I'm looking at the BPT Form 1073 that you signed

19    on February 7, 2005, and you have the box marked

20    that you do not have any disabilities and also

21    that you do not need any help for your Parole

22    Hearing.  And is that still accurate?

23    **INMATE JAY:**  That is.

24    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

25    now, did you have any trouble walking into the

26    room today?  Can you go up and down stairs?

27    **INMATE JAY:**  Everything is fine.

3

1    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
2  What about hearing?
3    **INMATE JAY:**  My hearing is good.
4    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
5  Vision?  No glasses, I see.
6    **INMATE JAY:**  No glasses.
7    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,
8  at least not yet.
9    **INMATE JAY:**  Yeah.
10    **PRESIDING COMMISSIONER ST.JULIEN:**  Have
11  you ever been the Triple CMS or EOP Programs?
12    **INMATE JAY:**  No, I haven't.
13    **PRESIDING COMMISSIONER ST.JULIEN:**  And do
14  you know what those are?
15    **INMATE JAY:**  I do.
16    **PRESIDING COMMISSIONER ST.JULIEN:**  And
17  what are they?
18    **INMATE JAY:**  They are for those
19  individuals who need medication to function.
20    **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
21  huh.
22    **INMATE JAY:**  Properly.
23    **PRESIDING COMMISSIONER ST.JULIEN:**  Right.
24  If they are mental health, okay.
25    **INMATE JAY:**  That's right.
26    **PRESIDING COMMISSIONER ST.JULIEN:**  And
27  have you ever been in one of those programs?

4

1        **INMATE JAY:**  No, I haven't.

2        **PRESIDING COMMISSIONER ST.JULIEN:**  And

3   are you on any medicines now?

4        **INMATE JAY:**  None that you have

5   mentioned, other than for Asthma.  I'm on

6   Albuterol.

7        **PRESIDING COMMISSIONER ST.JULIEN:**  An

8   inhaler.

9        **INMATE JAY:**  Yes.

10       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

11   do you have that with you?

12       **INMATE JAY:**  No, I don't.  It's seasonal,

13   so I very rarely use it.

14       **PRESIDING COMMISSIONER ST.JULIEN:**  Oh,

15   okay.  So, it's -- you're not asthmatic?

16       **INMATE JAY:**  No, I'm not.

17       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

18   if you get nervous.

19       **INMATE JAY:**  No, I'm fine.

20       **PRESIDING COMMISSIONER ST.JULIEN:**  And is

21   there any reason for you cannot participate in

22   the Hearing today?

23       **INMATE JAY:**  No, everything is good.

24       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

25   Mr. DeFilippis, are you satisfied that your

26   client's ADA rights have been met?

27       **ATTORNEY DEFILIPPIS:**  Yes, I am.

5

1   **PRESIDING COMMISSIONER ST.JULIEN:**   Okay.
2   I'm going to give you an outline of the Hearing
3   procedures.  We are conducting the Hearing
4   pursuant to Penal Code Sections 3041 and 3042,
5   and the Rules and Regulations of the Board of
6   Parole Hearings that govern Parole Consideration
7   Hearings for life inmates.  The purpose of the
8   Hearing today is to consider your suitability
9   for parole, and in doing so we are conduct the
10  Hearing in two parts.  First will be discussions
11  with my colleague and I and then the others in
12  the room will have an opportunity to speak as
13  well.  I will be discussing with you the number
14  and the nature of the crimes that you were
15  committed for, your prior criminal and social
16  history, your parole plans and support and
17  opposition letters.  Then Commissioner Smith
18  will discuss with you behavior and programming
19  since your commitment, your counselor's report
20  and psychological evaluation.  If at any point
21  during our discussion that you need to correct
22  or clarify the record, please feel free to do
23  so.
24  **INMATE JAY:**   Okay.
25  **PRESIDING COMMISSIONER ST.JULIEN:**   And
26  then the District Attorney and your attorney
27  will be able to ask you questions.  This is a

6

1   non-adversarial Hearing, so the District

2   Attorney's questions are directed to the Panel

3   and in turn you will answer to us.  And then the

4   District Attorney, your attorney and you will be

5   able to make a final statement regarding your

6   parole suitability.  And then we will recess,

7   deliberation and make a decision and reconvene

8   the Hearing and announce our decision.  The

9   California Code of Regulations states that

10  regardless of time served, a life inmate shall

11  be found unsuitable for and denied parole if, in

12  the judgment of the Panel, he would pose an

13  unreasonable risk of danger to society if

14  released from prison.

15          **INMATE JAY:**  Okay.

16          **PRESIDING COMMISSIONER ST.JULIEN:**  You

17  also have rights, and those rights include the

18  right to a timely notice of the Hearing, the

19  right to review your Central File, and the right

20  to present relevant documents.  Mr. DeFilippis,

21  has your client's rights been met in those

22  areas?

23          **ATTORNEY DEFILIPPIS:**  Yes, they have.

24          **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

25  You also have the right to be heard by a fair

26  and impartial Panel.  Now that you have seen the

27  Panel here today, do you have any objections?

7

1        **INMATE JAY:**  No, I do not.

2        **PRESIDING COMMISSIONER ST.JULIEN:**

3   Mr. DeFilippis?

4        **ATTORNEY DEFILIPPIS:**  None.

5        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

6   You will receive a copy of our written tentative

7   decision today.  That decision is subject to

8   review by the Decision Review Unit and the

9   entire Board meeting as a whole and will become

10  effective within 120 days.  It is also subject

11  to review by the Governor.  You will receive a

12  copy of that decision and the Hearing transcript

13  once they are transcribed.  And the Board no

14  longer has an Appeals process, so if you have

15  any objections or complaints about anything that

16  happens here today, you need to take those

17  directly to the Court.  And you can find

18  information on how to file that claim in the

19  Prison Law Library, and the policy is entitled

20  Administrative Appeals, Correspondence and

21  Review Concerning Board of Prison Terms

22  Decision.  You are not required to admit your

23  offense or discuss your offense, if you do not

24  wish to do so.  However, we do accept as true

25  the Findings of the Court.  We invite you to

26  discuss the facts and circumstances of the crime

27  if your wish.  And please note that we will

8

1   review and consider prior statements that you

2   have made regarding the crime in determining

3   your suitability for parole. Commissioner

4   Smith, is there any confidential information?

5       **DEPUTY COMMISSIONER SMITH:** There is

6   confidential information in the file, but it

7   will not be used this morning.

8       **PRESIDING COMMISSIONER ST.JULIEN:** Okay,

9   thank you. And, Mr. DeFilippis, I know that we

10  have gotten quite a few documents this morning.

11  Do you have any additional documents?

12      **ATTORNEY DEFILIPPIS:** None at additional

13  other than what I have provided this morning.

14      **PRESIDING COMMISSIONER ST.JULIEN:** Okay.

15  And I see that you have the Hearing Checklist

16  there, are those documents in order?

17      **ATTORNEY DEFILIPPIS:** It appears to be.

18  The only thing that I would note, is that it

19  notes crime partner's last Hearing transcript.

20  I'm assuming that that is in the confidential

21  section of the file that will not be utilized?

22      **DEPUTY COMMISSIONER SMITH:** That's

23  correct.

24      **ATTORNEY DEFILIPPIS:** It also notes other

25  non-specific but pertinent information developed

26  since date of last Hearing, and I'm not exactly

27  sure what that is referencing. But I didn't see

9

1   anything unusual in the Lifer Hearing packet
2   beyond just simple the documentation of what he
3   has done since then.
4        **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah,
5   and I think it might refer to some other things
6   that we have gotten after the packets were
7   prepared.  There's chronos and things like that.
8        **DEPUTY COMMISSIONER SMITH:**  Such as some
9   of the updated materials and some of the things
10  that you have provided.  But at this point we
11  have no intention of referring to any
12  documentation other than what's in the Board
13  packet and what's been submitted to all of us.
14       **ATTORNEY DEFILIPPIS:**  Then I have all the
15  documents that are referred to.
16       **PRESIDING COMMISSIONER ST.JULIEN:**
17  Mr. Turley?
18       **DEPUTY DISTRICT ATTORNEY TURLEY:**  I have
19  those documents.
20       **PRESIDING COMMISSIONER ST.JULIEN:**  Thank
21  you.  Okay, do you have any preliminary
22  objections?
23       **ATTORNEY DEFILIPPIS:**  No, I don't.
24       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
25  And will Mr. Jay be speaking with us today?
26       **ATTORNEY DEFILIPPIS:**  Yes, he will.  He
27  will not be discussing the commitment offense,

10

1    however; he will discuss all other issues.  We

2    will submit the issue of the commitment offense

3    on his prior testimony at, I think, five of the

4    last six Hearings that he spoke about the crime.

5         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

6    I need to give you an Oath, Sir.  Do you

7    solemnly swear or affirm that the testimony you

8    provide at this Hearing will be the truth, the

9    whole truth and nothing but the truth?

10        **INMATE JAY:**  I do.

11        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

12   I will read into the record the Summary of the

13   Crime, as it appears in the May 2005 Board

14   Report.  And it states that -- first, this

15   information was taken from the probation

16   officer's report:

17           The offense occurred on the night

18           of October 15, 1985, when Jay and

19           co-defendants Richard Parker, and

20           is it Torran?

21        **INMATE JAY:**  Torran.?

22         **PRESIDING COMMISSIONER ST.JULIEN:**

23           T-O-R-R-A-N, Meier, M-E-I-E-R, strangled

24           and killed Meier's mother, Shirley Rizk,

25           R-I-Z-K, and attempted by various methods

26           to kill Meier's eight-year old brother,

27           Rory Rizk, and that's R-O-R-Y, R-I-Z-K.

11

1    On the evening of October 13, 1985, 16

2    year-old Meier had decided to kill his

3    mother.  He obtained a promise of

4    assistance from Richard Parker and

5    Matthew Jay.  Meier, Jay and Parker

6    discussed how they would kill Meier's

7    mother.  Meier found a rope and fashioned

8    into a noose.  They decided they would

9    strangle her in Meier's bedroom,

10    transport her body in car to Malibu

11    Canyon, light the car on fire and push it

12    over the cliff in order for it to appear

13    like an accident.  Meier let Jay and

14    Parker enter his bedroom through the

15    window.  Meier lured his mother into the

16    bedroom and Parker placed a noose around

17    her neck and began to strangle her.

18    While Parker pulled the rope around her

19    neck, Jay and Meier held her down.

20    During the strangulation, Meier's half-

21    brother Rory awoke to the screams and

22    went to his brother's room to

23    investigate.  Rory observed the

24    strangulation, while Parker and Jay

25    continued.  Meier took Rory away from the

26    room to keep him from knowing what was

27    happening.  Meier told Rory to watch

12

1       television and then returned to the
2       bedroom.  It took 15 minutes to complete
3       the strangulation of Shirley Rizk.
4       During this time, Meier repeatedly left
5       the room to deal with his half-brother,
6       who wanted to know what was going on.
7       The three crime-partners then realized
8       that Rory was a potential witness and he
9       must also be killed.  Meier gave Jay
10      money to buy snail and rat poison.  While
11      Jay was gone, Parker and Meier placed
12      Shirley Rizk's body into the trunk of her
13      car.  Meier cleaned the blood off his
14      bedroom rug.  After Jay returned with the
15      poison, Meier attempted to poison Rory,
16      first by placing poison in a sandwich and
17      placing it into a malt drink.  Rory
18      refused the food and drink because of the
19      bad taste.  After he attempted to poison
20      him, Rory went to the garage and saw his
21      mother's body in the open trunk of the
22      vehicle and her legs extending from under
23      her robe.  Meier asked Rory if he wanted
24      to go for a ride to Malibu Canyon and he
25      agreed.  With his mother's body in the
26      trunk and the Rory in the backseat, Jay
27      and his crime-partners drove away from

13

1        the crime scene.  In route they stopped

2        at gas station and purchased a gallon of

3        gas.  After driving through Malibu Canyon

4        and finding a location to push the car

5        over the edge, they drove back to Jay's

6        house, and Jay followed them to the spot

7        in Malibu Canyon.  Meier tied-up and

8        blindfolded Rory in the backseat and put

9        a rag with gas into the gas tank fill up

10       spout.  Parker put the body of Shirley

11       Rizk behavior the steering wheel.  The

12       car was then pushed over the embankment

13       as Parker lit the rag on fire.  The car

14       rolled down the embankment, possibly

15       rolling over and coming to a rest

16       approximately 30-feet below.  The

17       defendants then left in Jay's car.  Rory

18       was able to untie himself and remove his

19       blindfold.  He saw his deceased mother in

20       the front seat with blood on her face.

21       After opening the window he climbed out

22       of the burning car and began calling for

23       help.  A passing motorist observed the

24       fire and stopped to investigate and Rory

25       was subsequently rescued.

26   And I do note that you don't dispute any of

27   those facts.  Is that correct?

14

1      **ATTORNEY DEFILIPPIS:**  Well, actually,

2  since he is not going to be discussing the

3  crime, there are a number of facts that are

4  disputed in there.

5      **PRESIDING COMMISSIONER ST.JULIEN:**  Oh.

6      **ATTORNEY DEFILIPPIS:**  And there has been

7  a -- there's a prisoner's version in the

8  probation report that accurately gives --

9      **PRESIDING COMMISSIONER ST.JULIEN:**  Oh,

10  the aggravating and mitigating circumstances.

11      **ATTORNEY DEFILIPPIS:**  No, I met in the

12  probation report.  It actually talks --

13      **PRESIDING COMMISSIONER ST.JULIEN:**  Oh,

14  okay.

15      **ATTORNEY DEFILIPPIS:**  Yeah.

16      **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

17      **ATTORNEY DEFILIPPIS:**  -- about the facts

18  of the offense.

19      **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

20      **ATTORNEY DEFILIPPIS:**  He was not -- he

21  was not present at the time that the body was

22  placed in the car.  He had left and gone back to

23  his home.

24      **PRESIDING COMMISSIONER ST.JULIEN:**  And

25  left his car?

26      **ATTORNEY DEFILIPPIS:**  No.  He took his

27  car and went home.  And the co-defendants, with

15

1    the car, came over to his house, got him and

2    then went to Malibu Canyon.  So, the decisions

3    about going to Malibu Canyon, taking the

4    youngest were all the co-defendants, not

5    Mr. Jay.

6         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

7    so, at what -- okay, I can't ask that, we're not

8    going to talk about the crime.  Okay.

9         **ATTORNEY DEFILIPPIS:**  There's a

10   defendant's statement at pages 12 to 15 of the

11   probation report that could be referred to that.

12        **PRESIDING COMMISSIONER ST.JULIEN:**  In

13   some of the materials, and I'm not sure where I

14   read this, but it did state that you were

15   relieved and happy that the victim's parents had

16   forgiven you.  And I just got the letters that

17   they actually wrote this morning, so I hadn't

18   known that that was documented.  And I'm curious

19   to ask how that came about.

20        **INMATE JAY:**  Around 1992, '93, I was at

21   the point in my life where I, through

22   counseling, through talking with my family, and

23   my own inter belief that I needed to tell the

24   family how sorry I was for my actions.

25        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

26   huh.

27        **INMATE JAY:**  And in talking to my

16

1  Counselor at the time, he suggested that I write

2  a letter through him and he would send it to the

3  District Attorney's Office.

4          **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

5  huh.

6          **INMATE JAY:**  Not only did I send a letter

7  to the parents of the victim, but to Rory,

8  himself, separate letters.

9          **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

10  huh.

11          **INMATE JAY:**  And I didn't ask for

12  forgiveness, I just wanted them to know that I

13  was sorry and I realized how much pain I had

14  caused them.  And that initiated a relationship,

15  my relationship with the victim's parents.

16          **PRESIDING COMMISSIONER ST.JULIEN:**  And

17  were you surprised that they were able to

18  forgive you?

19          **INMATE JAY:**  I was.  I was, I think,

20  surprised and perhaps the word that came to my

21  mind is grateful more than anything.  It's not

22  something that I earned.  It was simply a

23  blessing from God.

24          **PRESIDING COMMISSIONER ST.JULIEN:**  How do

25  you think that they were able to overcome?

26          **INMATE JAY:**  I believe their Christian

27  beliefs, which I know they are Christians,

17

1  played a vital role in that --

2      **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

3  huh.

4      **INMATE JAY:**  -- more than anything else.

5      **PRESIDING COMMISSIONER ST.JULIEN:**  And

6  what about Rory, have you ever heard from him?

7      **INMATE JAY:**  Not directly, no.

8      **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

9  So, let's go back to your prior.  You don't have

10  a -- well, I guess you were a juvenile when this

11  happened.  So, there are no prior arrests or

12  convictions.  Can you describe what your life

13  was like at the time that this crime was

14  committed?

15      **INMATE JAY:**  My life was -- I was lost.

16  Very simply, I was lost.  As a result of taking

17  drugs and alcohol over an extended period of

18  time lead to a spiraling effect that lead me to

19  make poor decisions, everything from dropping

20  out of school to committing this crime.

21      **PRESIDING COMMISSIONER ST.JULIEN:**  What

22  was the attraction to drugs and alcohol?

23      **INMATE JAY:**  I was, I was, I was -- my

24  self-awareness, I had a low self-esteem.

25  Wanting to be accepted.  Wanting something

26  better in life.  Wanting to be happy.  And the

27  people or the friends that I hung around with at

18

1    that time, seemed to be able to laugh and enjoy

2    themselves while using and abusing.  And I got

3    into that scene.  And it was a false sense of

4    happiness, you know, that I was looking for, you

5    know.

6         **PRESIDING COMMISSIONER ST.JULIEN:**  So,

7    why do you think you were from most people and

8    that you needed, apparently you needed other

9    substances so that you could laugh and --

10        **INMATE JAY:**  Are you referring to other

11   people that don't use drugs?

12        **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.

13        **INMATE JAY:**  People, individuals,

14   everybody's different.  I wish I could say that

15   I was that individual who did everything right,

16   who made all the right choices, who didn't need

17   anything, who had that confidence; and I didn't.

18   I think just -- I had a hard time expressing

19   myself when I was younger.  And I kept taking

20   all of my problems and just putting them down,

21   putting them down, not realizing the damage it

22   did to me and how it affected my decisions later

23   on in life, including using drugs.

24        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

25   So, how would you describe your drug use?

26        **INMATE JAY:**  It was daily.

27        **PRESIDING COMMISSIONER ST.JULIEN:**  So,

19

1  you were dependent.  And apparently there were a

2  lot of drugs.

3      **INMATE JAY:**  Yes.

4      **PRESIDING COMMISSIONER ST.JULIEN:**  At

5  times, okay.

6      **INMATE JAY:**  Absolutely.

7      **PRESIDING COMMISSIONER ST.JULIEN:**  And

8  what about alcohol?

9      **INMATE JAY:**  Alcohol.  Definitely.  I

10  enjoyed alcohol just as much as I enjoyed drugs.

11  I used alcohol and marijuana more than the

12  others.  It's easy to get.

13      **PRESIDING COMMISSIONER ST.JULIEN:**  Your

14  psych evaluation talks about you being

15  chronically depressed, severely depressed as a

16  child.  Do you think you were self-medicating,

17  you know, looking back?

18      **INMATE JAY:**  Looking back, I'm positive I

19  was.  I mean, definitely.  I wanted the pain,

20  the depression to go away and I found a way

21  through drugs and alcohol to do that.

22      **PRESIDING COMMISSIONER ST.JULIEN:**  Do you

23  have depression now?

24      **INMATE JAY:**  Nothing out of the normal.

25  I mean, every once in awhile I get depressed.

26  But I have a greater awareness of myself today

27  and that depression is normal and how to deal

20

1  with things through communication and the

2  support of family and loved ones.

3      **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

4  And what was your family life like?  I'm not

5  getting a good picture of your family life in

6  any of these --

7      **INMATE JAY:**  My family was together.  My

8  parents never separated, they were always

9  married --

10     **PRESIDING COMMISSIONER ST.JULIEN:**  So,

11  they are still --

12     **INMATE JAY:**  -- they're still together.

13  I think the biggest difference between then and

14  now are a few things that I have come to

15  realize.  One is as a family, we didn't know how

16  to communicate with one another.

17     **PRESIDING COMMISSIONER ST.JULIEN:**  It was

18  you and --

19     **INMATE JAY:**  My brother, my older brother

20  and my younger sister.

21     **PRESIDING COMMISSIONER ST.JULIEN:**  They

22  had three?

23     **INMATE JAY:**  Right, three kids.

24     **PRESIDING COMMISSIONER ST.JULIEN:**  You

25  were in the middle?

26     **INMATE JAY:**  I was in the middle.  I also

27  felt like, at that time, I was the mediator of

21

1    all arguments. You know, I was closer to my
2    sister and I was closer to my brother and they
3    weren't, and I always seemed to be caught in the
4    middle, the middle child. And always wanting to
5    please my -- my dad was a perfectionist. He
6    wanted the best in us and I think that added
7    pressure into my life, wanting to be the perfect
8    son, doing the chores. And I did that for a
9    while and got good grades and did those things.
10   But what I didn't do was tell the truth. I
11   wasn't truthful with myself nor with my family.
12   And today I can be. Today we all can be. We
13   communicate so well today. That's not to say
14   that we don't have problems.
15         **PRESIDING COMMISSIONER ST.JULIEN:** I
16   know.
17         **INMATE JAY:** But today we are a true, a
18   true family, I mean.
19         **PRESIDING COMMISSIONER ST.JULIEN:** Okay.
20   So at the point in time when you were a teenager
21   and you started using the drugs and you were
22   depressed, and the school started going down
23   hill, what did you parents -- did you parents
24   know you were on drugs? Did you ever get
25   counseling?
26         **INMATE JAY:** At that time, my parents --
27   through talking with them over the years, I have

22

1  learned a lot of this.  And they have learned a
2  lot about me.
3       **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
4  huh.
5       **INMATE JAY:**  They knew something was
6  wrong.  They didn't know what.  They told each
7  other it was a phase at one point.  You know,
8  they thought it was a phase I was going through
9  and that I would get over it.  They thought I
10 might have been using drugs, but they didn't
11 think it was as sever as they came to know, you
12 know.
13      **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
14 huh.
15      **INMATE JAY:**  And I certainly did
16 everything that I could to lie to them, to hide
17 it.
18      **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
19 huh.
20      **INMATE JAY:**  And it became almost a game,
21 you know, trying to hide it from them.  And so,
22 I think they did realize back then that there
23 was something wrong, but they didn't realize the
24 severity of it, and they didn't know what to do.
25 I really think they were lost, too, as to what
26 to do.
27      **PRESIDING COMMISSIONER ST.JULIEN:**  So, do

23

1   you think that anything would have prevented you

2   from taking the road that you took and

3   eventually leading to this crime?  Do you think

4   that at any point in time you could have been

5   stopped by something?  By counseling?  By your

6   parents?

7        **INMATE JAY:**  Oh, absolutely.  I think

8   there are a lot of factors involved.  One

9   example is in my senior year of high school, I

10  missed, I don't know, a hundred plus days.  And

11  they had a computer that would call home and --

12       **PRESIDING COMMISSIONER ST.JULIEN:**

13  (indiscernible)

14       **INMATE JAY:**  And say, you know,

15       **PRESIDING COMMISSIONER ST.JULIEN:**

16  (indiscernible).

17       **PRESIDING COMMISSIONER ST.JULIEN:**  -- by

18  the way your son has missed 16 days of school,

19  18 days of school.

20       **PRESIDING COMMISSIONER ST.JULIEN:**

21  There's letters and -- yeah.

22       **INMATE JAY:**  Yeah, but I would always be

23  there to answer.  It was just a tape-recorder,

24  you know.  And I lived right across the street

25  from the high school, right across.  And not one

26  Counselor, not one teacher came to my house or

27  made a personal call or whatever.  And I'm

24

1   reluctant to say that, because I don't want to
2   place blame on them.  But part -- a little bit
3   of the blame does go on them, because, I think
4   that if people such as that, in their position,
5   and my parents, if they had done something.  If
6   they had stepped in and really maybe followed me
7   one night, I don't -- you know.  And if had
8   chose not to do drugs.  I mean, there are so
9   many factors that could have played a role in me
10  not doing this.
11       PRESIDING COMMISSIONER ST.JULIEN:  Where
12  did you get the money for the drugs?
13       INMATE JAY:  Me?  Well, I worked at
14  various places.  One was Carl's Junior.  So, I
15  had a paycheck coming in.  But also with the
16  friends that I hung around with at that time, we
17  would take turns --
18       PRESIDING COMMISSIONER ST.JULIEN:
19  Buying.
20       INMATE JAY:  -- buying it and supplying
21  it to each other.
22       PRESIDING COMMISSIONER ST.JULIEN:  Okay.
23  So, if this crime hadn't happened, where do you
24  think you would have been in five years?  You're
25  like 23.  Where do you think you would have been
26  in life?
27       INMATE JAY:  Well, that's so hard to say.

25

1  If I had used drugs, if I was continuing to --
2       **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah,
3  the path you were on.
4       **INMATE JAY:**  The path I was on, but I
5  didn't commit drugs, I probably would have died.
6  I probably would have died.
7       **PRESIDING COMMISSIONER ST.JULIEN:**  Could
8  I ask Mr. Jay how he feels about the crime
9  today?
10      **ATTORNEY DEFILIPPIS:**  Absolutely.
11      **INMATE JAY:**  I'm devastated by it.  I'm -
12  - it has moved me in ways that I never would
13  have been moved if it hadn't happened.  And let
14  me say this:  Because I committed this crime,
15  because I caused the pain that I did, and
16  because I was sent to prison with this sentence,
17  it enabled me to become a good human being
18  again.  It enabled me to answer for my wrongs.
19  It gave me an opportunity to pay the debt as
20  much as I can to both the family and society.
21  It is so outside of who I am, what I did, it
22  really was an aberration.  The crime, the pain
23  that I caused, I live with it daily.  I know
24  that people say that all the time, I mean, I'm
25  sure that you guys hear that all the time.  But,
26  you know, I do, I -- because of that I try to do
27  everything -- everyday I wake up I try to make

26

1    the right decisions.  I try to do the best that

2    I can.  I try to bring goodness to life.  I

3    mean, I know that I caused pain to so many

4    people, that I don't even realize.  I mean, the

5    neighbors, their trust.  The neighbors are the

6    victims, I'm saying.  Their trust in that

7    community was probably shattered.  To my family,

8    and obviously, to the victim's -- to Rory, to

9    the grandparents, and my family and myself, and

10   my potential in life.  I -- maybe I could have

11   become somebody great.  Maybe I could have been

12   a surgeon or something, or a great chief, which

13   is what I wanted to do when I was younger.  So,

14   when you asked me how I feel about this crime,

15   I'm devastated.  I'm devastated on all accounts.

16   I'm devastated that you guys have to sit here

17   and read about it and know that this happened

18   and that they do.  I know that I affected untold

19   lives, and the D.A.

20       **PRESIDING COMMISSIONER ST.JULIEN:**  So,

21   this  -- the patterns shows that you were easily

22   influenced.  Is that right?

23       **INMATE JAY:**  Absolutely.

24       **PRESIDING COMMISSIONER ST.JULIEN:**  How do

25   we know -- how are you different?  How do we

26   know that you are different today?

27       **INMATE JAY:**  That's a great question.

27

1    I've thought about that and I've worked hard
2    over the last 20 years.  Please understand this:
3    that in prison, I think that -- I mean, there
4    are pressures on the outside just as there are
5    pressures in prison, and they are different
6    pressures.  In here there is a lot of peer
7    pressure of being accepted, of bullies.  I mean,
8    I live with criminals and I have been able to
9    not only --
10         **PRESIDING COMMISSIONER ST.JULIEN:**  Do you
11   think you're a criminal?
12         **INMATE JAY:**  Absolutely.
13         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
14         **INMATE JAY:**  Absolutely.
15         **PRESIDING COMMISSIONER ST.JULIEN:**  You
16   are.
17         **INMATE JAY:**  Yes.
18         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
19         **INMATE JAY:**  Yeah.  And I am definitely
20   one of them.
21         **PRESIDING COMMISSIONER ST.JULIEN:**  So,
22   you live with criminals.
23         **INMATE JAY:**  I live with criminals, but
24   because I've been able to not just only stay out
25   of trouble for the last 20 plus years, but to
26   grow in so many areas.  And I'm not just saying
27   this, I mean, I have Counselors that have told

28

1   me this.  I have psychs, State psychologist --
2          **PRESIDING COMMISSIONER ST.JULIEN:**  Your
3   record will speak for itself, so you don't need
4   to get into that.
5          **INMATE JAY:**  But --
6          **PRESIDING COMMISSIONER ST.JULIEN:**  At
7   what point did you -- because, I'm perceiving
8   this as a transformation, obviously.  At what
9   point do you think that you changed?
10         **INMATE JAY:**  Well, I changed at different
11  times in different ways.  I changed immediately
12  as soon as the crime happened in untold ways.  I
13  mean, it just -- I think as far as what you're
14  speaking about right now, it started in the
15  County jail I made a decision that I either
16  could kill myself or I could, what I figured at
17  the time, take the hard road and try to make
18  something of my life and realize what I did and
19  correct what I could.  And at that point I
20  started trying to come out of that blackness.
21  And everyday I try -- and I realize, I could
22  live for another hundred years and would never,
23  you know, come close to correcting what I did,
24  but that's when it began.
25         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
26  So, this, you know, when I read this crime I
27  couldn't believe it.  And I think in one of the

29

1    previous transcripts the Commissioner said this

2    is like a T.V. movie.  I mean, there's a

3    phenomenal series of events here.  And amazing

4    cruelty.  Obviously, the documentation shows

5    that you have done everything that you've been

6    asked to do.  You haven't been in any trouble.

7    How we over here get over this crime?

8         **INMATE JAY:**  I can -- the crime is never

9    going to change.

10        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

11   huh.

12        **INMATE JAY:**  The violence that was in

13   that crime is never going to change.  The only

14   thing that I have control over is who I am

15   today.  I mean, really, I mean, I can't change

16   the past.  I wish I could.  All I can do is

17   instill in you that today I am genuinely a good

18   person.  I am a safe person.  I am a person

19   aware of who I am, and what my responsibilities

20   are to myself and to my family and to my

21   community.

22        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

23   Why do you think that you haven't gotten a date

24   yet?

25        **INMATE JAY:**  Because of the crime.  They

26   have told me, past Board members, if I may say,

27   have told that my parole plans are perfect --

30

1       **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.

2       **INMATE JAY:**  My institutional programming

3  is very good.  I have psych clearance and so,

4  it's very clear why.

5       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

6  so on the note of parole plans. I notice that in

7  some of your -- now, I don't know what stack to

8  look at, I've got so many stacks here.  But in

9  some of your letters it is clear that you have

10  residence offers.  You have job offers.  And you

11  have many of them.  So, why don't we talk about

12  what your plans are, because, like I said, you

13  have numerous offers and numerous places of

14  residence.  Do you have like a one, two, three,

15  four?

16       **INMATE JAY:**  If I may ask my attorney

17  something real quick.  I just wanted to -- I

18  don't know if you can see it --

19       **PRESIDING COMMISSIONER ST.JULIEN:**  No, I

20  don't have that here.

21       **INMATE JAY:**  Well, I just --

22       **PRESIDING COMMISSIONER ST.JULIEN:**

23  (indiscernible).

24       **INMATE JAY:**  No, it's basically parole

25  plans.

26       **PRESIDING COMMISSIONER ST.JULIEN:**  Oh,

27  okay.

31

1       **INMATE JAY:**  Just to kind of --

2       **PRESIDING COMMISSIONER ST.JULIEN:**  Why

3   don't you go through those and then you can

4   leave them with us.

5       **INMATE JAY:**  Okay.  I have five or six

6   different areas on parole plans.  The first is

7   place of residence.

8       **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

9   huh.

10      **INMATE JAY:**  As you know, I have many

11  places that have been offered to me and my

12  immediate plans are to live with my parents in

13  Valencia.

14      **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

15  huh.

16      **INMATE JAY:**  They have a beautiful home

17  and the size is appropriate for me.  I wouldn't,

18  you know, be crowding them or anything.  And

19  they do want this.

20      **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

21  huh.

22      **INMATE JAY:**  But I eventually plan on

23  getting my own place, my own apartment.  I do

24  want that for myself, you know, for various

25  reasons.  But that is definitely where I plan on

26  staying.  Also, because it's close to the church

27  where my mom is the Minister.

32

 1          **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
 2    huh.
 3          **INMATE JAY:**  St. Stevens [phonetic].  And
 4    there are a lot of people at church who over the
 5    years that I have come in contact with.
 6          **PRESIDING COMMISSIONER ST.JULIEN:**
 7    There's a lot of letters from people --
 8          **INMATE JAY:**  Through letters --
 9          **PRESIDING COMMISSIONER ST.JULIEN:**  Right.
10          **INMATE JAY:**  -- and phone calls and
11    stuff.  And they have invited me to be a part of
12    that church and I look forward to that.
13          **PRESIDING COMMISSIONER ST.JULIEN:**  Now,
14    did you go there when you were younger?
15          **INMATE JAY:**  I have been there a few
16    times.  Because --
17          **PRESIDING COMMISSIONER ST.JULIEN:**  At
18    what point in time did your mother become a
19    Minister?
20          **INMATE JAY:**  She became a Minister
21    probably five years before my arrest.
22          **PRESIDING COMMISSIONER ST.JULIEN:**  Wow.
23          **INMATE JAY:**  Maybe six.
24          **PRESIDING COMMISSIONER ST.JULIEN:**  So,
25    she was studying and going to school and things
26    like that when you were --
27          **INMATE JAY:**  Right, she was in Seminary.

33

1        **PRESIDING COMMISSIONER ST.JULIEN:**  -- on

2    the brink?

3        **INMATE JAY:**  Yeah.  She was away a lot of

4    the time.  Part of the requirement in becoming a

5    Minister or Priest is spending a year or two at

6    Patton State Hospital or a correctional facility

7    or something like that.  And she chose Patton

8    State Hospital.  So, a lot of the parenting was

9    left to my dad at that time.

10       **PRESIDING COMMISSIONER ST.JULIEN:**  Did

11   you feel that perhaps your mother should have

12   been --

13       **INMATE JAY:**  Yes.

14       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

15       **INMATE JAY:**  Should have been home?  Is

16   that what you were referring to.

17       **PRESIDING COMMISSIONER ST.JULIEN:**

18   Attending to your issues?

19       **INMATE JAY:**  Yes, absolutely, absolutely.

20   And --

21       **PRESIDING COMMISSIONER ST.JULIEN:**  You

22   knew what she was doing?  I mean, you knew --

23       **INMATE JAY:**  She asked us.  She asked us

24   and --

25       **PRESIDING COMMISSIONER ST.JULIEN:**  So,

26   you --

27       **INMATE JAY:**  -- wanting my mom to be

34

1    happy, I said, "Go ahead. Yeah, that's great."
2    Not realizing what I just said. You know, not
3    realizing that she was going to be away all this
4    time, you know. So, it had a great impact on my
5    life, absolutely. I'm very proud of her today.
6        **PRESIDING COMMISSIONER ST.JULIEN:** Have
7    you resolved that?
8        **INMATE JAY:** Absolutely.
9        **PRESIDING COMMISSIONER ST.JULIEN:** Does
10   she know now that you felt -- I will just say
11   somewhat out in the (indiscernible) or rejected
12   or something like that?
13       **INMATE JAY:** Oh, absolutely.
14       **PRESIDING COMMISSIONER ST.JULIEN:** She
15   has.
16       **INMATE JAY:** Yes, definitely, we've
17   talked about it. And today I'm very proud of
18   her. She's an incredible Minister; she really
19   is. And also at the church there are AA groups.
20   There are four AA groups. One is on Friday.
21   One is on Saturday, and there are two on
22   Wednesday. There's an H and I meeting once a
23   month.
24       **PRESIDING COMMISSIONER ST.JULIEN:** do you
25   have a sponsor?
26       **INMATE JAY:** I don't have a person, you
27   know, a name sponsor. But I have many people

35

1    that are willing to sponsor me if I -- you know,

2    because sponsorship you have to meet the person.

3    But I have many people willing --

4            **PRESIDING COMMISSIONER ST.JULIEN:**  So,

5    you know people who attend those groups?

6            **INMATE JAY:**  Absolutely.

7            **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

8            **INMATE JAY:**  Absolutely.  Transportation.

9    Transportation I have bus schedules as well as -

10   - but the main thing that I have is a support

11   letter from Melissa and Jerry Ryke [phonetic].

12   You'll see it in there.

13           **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah,

14   it's right here.

15           **INMATE JAY:**  Okay.  In there they talk

16   about --

17           **PRESIDING COMMISSIONER ST.JULIEN:**

18   Offering you a job with, is it Kreiger?

19           **INMATE JAY:**  Kreiger.

20           **PRESIDING COMMISSIONER ST.JULIEN:**

21   Kreiger Sales and Services, K-R-E-I-G-E-R, as an

22   apprentice inventory control clerk, starting at

23   $10 an hour.  After 60-days you would get

24   medical coverage.

25           **INMATE JAY:**  Right.  And if you read just

26   a little bit further they talk about

27   transportation.

36

1          **PRESIDING COMMISSIONER ST.JULIEN:**  Oh,
2    you would have a car pool --
3          **INMATE JAY:**  Or rental.
4          **PRESIDING COMMISSIONER ST.JULIEN:**  --
5    loan or rental of a car.
6          **INMATE JAY:**  I spoke to them on the phone
7    and they said --
8          **PRESIDING COMMISSIONER ST.JULIEN:**  You
9    have to drive around a lot?  Or just to and
10   from?
11         **INMATE JAY:**  To and from.  To and from.
12   Also, school.  School is an important thing for
13   me.
14         **PRESIDING COMMISSIONER ST.JULIEN:**  You
15   want to continue your education?
16         **INMATE JAY:**  Absolutely.  I'm currently
17   enrolled in the University of Iowa.  I'm trying
18   to earn my BLS Degree, which is Bachelor of
19   Liberal Studies.
20         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
21   huh.
22         **INMATE JAY:**  With an emphasis in drug
23   abuse counseling.  If I am paroled before I
24   finish that I'm going to transfer to CSUN, Cal
25   State University of Northridge, which is fairly
26   close to my parents' home.
27         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

37

1    huh.

2          **INMATE JAY:**  To obtain credentials for

3    drug counseling for young adults.  And also, I

4    didn't know if you were interested in this, some

5    people who I've talked to, my fellow peers, have

6    suggested that I put down hobbies and

7    recreation.  And I just figured if you would be

8    interested in that I --

9          **PRESIDING COMMISSIONER ST.JULIEN:**  What

10   you would do in your spare time?

11         **INMATE JAY:**  Well, I do want to -- in

12   here I write poetry, I listen to music, I

13   workout, I run.  I also write letters to various

14   Church Youth Groups and different relatives,

15   people that have problems.  I enjoy writing and

16   I enjoy helping them when they do have problems.

17         **PRESIDING COMMISSIONER ST.JULIEN:**  Have

18   you read "A Million Little Pieces?"

19         **INMATE JAY:**  I waiting to read that right

20   now; my dad sent it to me.  I asked for it.  By

21   James Fray [phonetic], Fry [phonetic].  Yes.

22         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh --

23         **INMATE JAY:**  But I'm also -- one last

24   thing.  I also want to be a part of the church

25   and they have a lot of activities, sports and

26   just all kinds of things that I can get involved

27   in.

38

1    **PRESIDING COMMISSIONER ST.JULIEN:**  What
2    are your brother and sister doing?

3    **INMATE JAY:**  My brother, my older
4    brother, Andrew, he's 40.  He lives back east
5    with his family.  He's in the restaurant
6    business, and lives in Pennsylvania.  My sister
7    just got her Masters Degree for becoming a
8    school administrator.

9    **PRESIDING COMMISSIONER ST.JULIEN:**  Oh.

10   **INMATE JAY:**  And she is happily married.
11   She lives right down the street from my parents
12   in Valencia.

13   **PRESIDING COMMISSIONER ST.JULIEN:**  And
14   how do they feel about -- because it seems that
15   your parents now are really active on your
16   behalf.  On getting you released and your life
17   after that.  How are your brother and sister?
18   Because sometimes it seems like the prodigal
19   child gets a lot of the attention.

20   **INMATE JAY:**  Yeah.  We've had our issues,
21   we have.  It's interesting that you say that.
22   First of all, my brother and his family, they
23   have letters in there and they support my
24   release.  They are 100 percent behind me.  My
25   sister and I are as close as ever.  And, in
26   fact, her husband and I get along great, we're
27   like brothers.  But I think that's never

39

1    changed, from when we were kids to now.  It's

2    like we all want our parents' attention.  And my

3    dad writes me everyday, a letter.  He has

4    written me a letter everyday that I've been in.

5    And it is just incredible.  And my sister has

6    even told him of her jealousy, because of that.

7         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

8    huh.

9         **INMATE JAY:**  And has mentioned it to me.

10        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

11   huh.

12        **INMATE JAY:**  And I said, I said, "Sarah,

13   it is a wonderful thing.  But I said the one

14   thing you get that I don't get, and that's my

15   fault, is that you get to actually spend time

16   with him whenever you want."

17        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

18   huh.

19        **INMATE JAY:**  And I don't and he doesn't

20   get to spend that time.  So, that's his way of

21   spending time with me.  You know, it's been a

22   gift, it really has.

23        **PRESIDING COMMISSIONER ST.JULIEN:**  Do you

24   think that he's also trying to make amends to

25   you?

26        **INMATE JAY:**  Oh, absolutely.  He has said

27   as such.

40

1          **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,
2    so, I will note for the record that you had in
3    this packet there are 39 support letters.  I
4    think that I have -- there was an additional
5    packet today.  And we noted that some were
6    duplicates, so, that's why I didn't want to
7    recount everything.  You have an enormous amount
8    of support from people from church, from people
9    through different States, your brother.  And I
10   think your brother has also stated that if you
11   were going to go -- I guess you could go to --
12   he's offered you --
13          **INMATE JAY:**  Right, right.
14          **PRESIDING COMMISSIONER ST.JULIEN:**  -- to
15   go to Pennsylvania.  "I don't think that's
16   necessarily something that you want to do, but
17   if you did you would make a lot of money as a
18   cook, or waiter with tips," and that type of
19   thing.
20          **INMATE JAY:**  Uh huh.
21          **PRESIDING COMMISSIONER ST.JULIEN:**  So,
22   you do have a tremendous amount of positive
23   support and also, as you've mentioned, the
24   support and involvement from the Episcopal --
25   It's Episcopal, right?
26          **INMATE JAY:**  Episcopal, yes.
27          **PRESIDING COMMISSIONER ST.JULIEN:**

41

1    Episcopal Church that your mother is the Priest

2    at.  And then we also have a letter, I think we

3    have three letters from three different times

4    from the VanHoves?

5        **INMATE JAY:**  VanHove.

6        **PRESIDING COMMISSIONER ST.JULIEN:**

7    VanHove, okay.  And that is a Joyce and Gus,

8    G-U-S, VanHove, V-A-N, capital H-O-V-E, who are

9    the parents of the murder victim.

10       **DEPUTY COMMISSIONER SMITH:**  And the most

11   recent letter from them was October 2002.

12       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

13   thank you.  And then --

14       **DEPUTY COMMISSIONER SMITH:**  Correct?

15       **INMATE JAY:**  Correct.

16       **PRESIDING COMMISSIONER ST.JULIEN:**  -- in

17   response to 3042 Notices, which are notices that

18   go the Courts and law enforcement and your

19   previous lawyer, we do have a letter of

20   opposition from the Los Angeles County Sheriff.

21   We were --

22       **ATTORNEY DEFILIPPIS:**  I don't have that.

23       **PRESIDING COMMISSIONER ST.JULIEN:**  It was

24   in my -- it was in, I think it was in this -- I

25   pulled it out of one of these packets.  Maybe

26   the big one there.  -- in opposition as we have

27   the presents here today of the Los Angeles

42

1  County District Attorney.  Do you want to see
2  this?
3          **ATTORNEY DEFILIPPIS:**  I'm just wondering
4  where my packets went.
5          **PRESIDING COMMISSIONER ST.JULIEN:**  It's
6  something that looks like this.  Because, when
7  you came in wasn't there something on the table
8  there.
9          **ATTORNEY DEFILIPPIS:**  Yes.
10         **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.
11         **ATTORNEY DEFIIPPIS:**  And I did pick them
12  up.  I think I left them in the other room.  Can
13  we break for just 30 seconds?
14         **PRESIDING COMMISSIONER ST.JULIEN:**  Do you
15  want this?
16         **ATTORNEY DEFILIPPIS:**  That would be fine.
17         **PRESIDING COMMISSIONER ST.JULIEN:**  Do you
18  want me to just --
19         **ATTORNEY DEFILIPPIS:**  Or do you want to
20  take a break for a moment?
21         **PRESIDING COMMISSIONER ST.JULIEN:**
22  Because the rest of them were --
23         **DEPUTY COMMISSIONER SMITH:**  I'm about
24  ready to turn the tapes over anyway so this
25  would be a good --
26         **ATTORNEY DEFILIPPIS:**  I'll go ahead and
27  grab those --

43

1          **DEPUTY COMMISSIONER SMITH:**  Okay.

2          **INMATE JAY:**  Do I stay here.

3          **DEPUTY COMMISSIONER SMITH:**  You can stay

4     here, sure.

5               (TAPE 1, SIDE A, ENDS)

6               (TAPE 1, SIDE B, BEGINS)

7          **DEPUTY COMMISSIONER SMITH:**  We're back on

8     the record.  Everyone previously identified is

9     back in the Hearing room.

10         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

11    Now, did you go to a treatment program to try to

12    stop your drugs?

13         **INMATE JAY:**  No.  I --

14         **PRESIDING COMMISSIONER ST.JULIEN:**  For

15    nutrition.

16         **PRESIDING COMMISSIONER ST.JULIEN:**  Are

17    you talking about --

18         **PRESIDING COMMISSIONER ST.JULIEN:**  It

19    says Sugar Blues Syndrome.

20         **PRESIDING COMMISSIONER ST.JULIEN:**  Oh, I

21    went to a few sessions with a doctor.

22         **PRESIDING COMMISSIONER ST.JULIEN:**  For

23    depression?

24         **INMATE JAY:**  Yeah, it was for depression.

25         **PRESIDING COMMISSIONER ST.JULIEN:**  Was

26    that before Prozac and thing like that?  I mean,

27    did they ever suggest that take medication?

44

1          **INMATE JAY:**  No.  I mean, Prozac wasn't
2   around at that point.  But a lot of it had to do
3   with my diet and not understanding the effects
4   sugar had on me.

5          **PRESIDING COMMISSIONER ST.JULIEN:**  We're
6   all learning that.

7          **INMATE JAY:**  Yeah.

8          **PRESIDING COMMISSIONER ST.JULIEN:**  As
9   time goes on.  Okay.  Is there anything that you
10  want to add to anything that we've discussed so
11  far, before we move on to your post-conviction?

12         **INMATE JAY:**  I think at this point
13  everything is good.

14         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.
15  Commissioner Smith.

16         **DEPUTY COMMISSIONER SMITH:**  Mr. Jay, you
17  were received by the Department of Corrections
18  on June 10, 1987.  You were received here at CTF
19  on April 19, 1999.  You have a classification
20  score of 19, which the lowest score that a life
21  inmate can obtain.  Your last Hearing, which was
22  your fifth Subsequent Hearing, was held on
23  May 5, 2004, and you received a one-year denial
24  at that time.  To say that you have been
25  programming in an exemplary way doesn't do you
26  justice.  Your programming far exceeds what this
27  Panel or I'm sure most other Panels would see.

45

1    Since you've been incarcerated you have had no

2    disciplinary actions, 115s or 128s.  And we

3    realize that, in and of itself, is quite an

4    accomplishment, it is not an easy thing to do.

5    You have received six recently laudatory chronos

6    for your attendance with AA, and that's from

7    July '04 to January  '06, and you have been

8    involved in AA for certainly a longer period

9    than that, but I'm focusing primarily what your

10   adjustment has been since your last Hearing.

11        **INMATE JAY:**  Okay.

12        **DEPUTY COMMISSIONER SMITH:**  And certainly

13   when I complete that overview if there is

14   anything that you want to add that may go beyond

15   or that has taken place prior to the last

16   Hearing, we will certainly allow you to do that.

17        **INMATE JAY:**  Okay, thank you.

18        **DEPUTY COMMISSIONER SMITH:**  You have a

19   general chrono that is dated February 2005 for

20   your donation of five books to the Prison

21   Library.  A laudatory chrono dated July 2005 for

22   participating in a three-hour Anger Management

23   course.  You have a laudatory chrono dated

24   November 25, wherein you completed nine two-hour

25   sessions of the Impact Workshop.  You have

26   completed the Hepatitis Prevention Course in

27   November 2005.  And you have a laudatory chrono

46

1  dated December 2005 for completing the third-
2  phase of the Inmate Employability Program.  You
3  received a Certificate as a Customer Service
4  Specialist from the Electronics' Technician
5  Association, and you received that in October
6  2004.  You were assigned to the PIA Furniture
7  Assembler area until December 2004, and you
8  received above average to exceptional work
9  reports in that assignment.  And then in
10  December 2004 you were reassigned as a labor
11  expeditor, in PIA.  Are you still in that
12  assignment?
13      **INMATE JAY:**  Yeah, there was a little
14  confusion as to the dates.  Before the labor
15  expeditor, I was a production coordinator.  And
16  what that was is the two go hand-in-hand, they
17  both deal with inventory control and the work is
18  similar, you know, to inventory.
19      **DEPUTY COMMISSIONER SMITH:**  So, you went
20  from an assembler to --
21      **INMATE JAY:**  To the inventory clerk, or
22  to the production coordinator
23      **DEPUTY COMMISSIONER SMITH:**  production
24  coordinator --
25      **INMATE JAY:**  Right.
26      **DEPUTY COMMISSIONER SMITH:**  And then to
27  labor expeditor.

47

1          **INMATE JAY:**  right, correct.

2          **DEPUTY COMMISSIONER SMITH:**  And what are

3    you functions as labor expeditor?

4          **INMATE JAY:**  Well, there are many.  One

5    thing that I do is that I am in charge of

6    ensuring that all of the shop orders that we do,

7    for example, building desks, and that all the

8    material that is required in that is issued to

9    that in the appropriate amounts.  Also, I'm in

10   charge of keeping track of all the finished

11   product that the factory makes, and what gets

12   shipped out of the prison.  And other materials,

13   I have to make sure that the materials are

14   actually sent to the floor, each different

15   factory, there are seven factories, seven shops,

16   all requiring different material, and they

17   request it through me and I have type up

18   different forms and make sure that they get

19   those materials.

20         **DEPUTY COMMISSIONER SMITH:**  There is also

21   a letter in the packet from PIA, from a number

22   of your supervisors, complementing you the work

23   that you are doing and have done for PIA.  And

24   they talk about what an asset you are to the

25   program.  You received a Certificate from

26   Criminon, that's C-R-I-M-I-N-O-N, dated April

27   2005 regarding your completion of a program

48

 1  entitled A Way to Happiness.

 2          **INMATE JAY:**  Correct.

 3          **DEPUTY COMMISSIONER SMITH:**  How long --

 4  it doesn't indicate how long that program was,

 5  whether it is on-going or --

 6          **INMATE JAY:**  Yeah, it's a self-study

 7  program that pretty much you can go at your own

 8  pace.  But there are 20 lesson plans, each

 9  dealing with different issues, ranging from

10  self-esteem to parenting, and how to raise

11  children who know right from wrong.  And it also

12  depends on the mail, because it's a

13  correspondence course and you have a proctor

14  through this Criminon.  And it took me about a

15  year to complete the course, corresponding back

16  and forth with my instructor.  So, it varies, it

17  really does.

18          **DEPUTY COMMISSIONER SMITH:**  It was a

19  long-term program.

20          **INMATE JAY:**  Right, it wasn't --

21          **DEPUTY COMMISSIONER SMITH:**  Because, some

22  programs might be like the three-hour Anger

23  Management Program --

24          **INMATE JAY:**  Exactly.

25          **DEPUTY COMMISSIONER SMITH:**  -- that you

26  completed.

27          **INMATE JAY:**  I would call this a course

49

1    more than a class.

2        **DEPUTY COMMISSIONER SMITH:**  Okay.  I

3    appreciate that, because again just looking at

4    the Certificate, other than the Certificate

5    being in existence, --

6        **INMATE JAY:**  Right.

7        **DEPUTY COMMISSIONER SMITH:**  -- it doesn't

8    tell us what it was.  It certainly doesn't, you

9    know, reference the amount of activity --

10       **INMATE JAY:**  Right.

11       **DEPUTY COMMISSIONER SMITH:**  -- you know,

12   that you put into it.  You enrolled in Western

13   Civilization and Word Power.  Is that through

14   the University that you commented on?

15       **INMATE JAY:**  Excuse me.  Real quick if I

16   may?  I have this Welcome Way of Happiness.  And

17   it's a little introductory thing that I thought

18   you might need to read.  So, if my attorney

19   could pass it to you.

20       **DEPUTY COMMISSIONER SMITH:**  Sure, when we

21   take --

22       **INMATE JAY:**  And the Certificate --

23       **DEPUTY COMMISSIONER SMITH:**  -- our

24   recess.

25       **INMATE JAY:**  Okay.

26       **DEPUTY COMMISSIONER SMITH:**  If that's all

27   right with you?

50

1          **INMATE JAY:**  Okay, that would be fine.
2          **DEPUTY COMMISSIONER SMITH:**  Then we can
3     read it at that time.
4          **INMATE JAY:**  And my Certificate is on the
5     backside of that.
6          **DEPUTY COMMISSIONER SMITH:**  Right, and
7     I've got a copy --
8          **INMATE JAY:**  Okay.
9          **DEPUTY COMMISSIONER SMITH:**  -- of your
10    Certificate here.
11         **INMATE JAY:**  Okay, great.
12         **DEPUTY COMMISSIONER SMITH:**  That's why I
13    came up with the question.
14         **INMATE JAY:**  Yes.
15         **DEPUTY COMMISSIONER SMITH:**  The Western
16    Civilization Word Power Course, is that through
17    the University?
18         **INMATE JAY:**  Yes.  Those are two separate
19    courses.  One is Western Civilization II, and
20    the other one other one is an English course,
21    Word Power, that is based on Latin and Greek
22    elements.
23         **DEPUTY COMMISSIONER SMITH:**  Okay.  And
24    that's the University of Iowa?
25         **INMATE JAY:**  University of Iowa.
26         **DEPUTY COMMISSIONER SMITH:**  Okay.
27         **INMATE JAY:**  Yeah, they're required

51

1    courses.  Two of many required courses that I

2    took, you know, trying to get closer and closer

3    to my -- I have 81 units completed, and I am 39

4    units shy of a degree.

5        **DEPUTY COMMISSIONER SMITH:**  Are you

6    currently enrolled in those courses --

7        **INMATE JAY:**  Actually --

8        **DEPUTY COMMISSIONER SMITH:**  -- or have

9    you completed them?

10       **INMATE JAY:**  I have completed those

11   courses, I'm just waiting for the grades, the

12   final grades.  I took the finals in October

13   2005, and my dad just called the school because

14   I still haven't received the final grades,

15   though I did receive "A"s on the final.

16       **ATTORNEY DEFILIPPIS:**  Does the 81 units

17   count those two courses?

18       **INMATE JAY:**  Yes, those two courses, yes.

19       **DEPUTY COMMISSIONER SMITH:**  Should you

20   not receive a grant of a date today, and we are

21   certainly a long way from making that decision,

22   do you plan on continuing in this curriculum?

23       **INMATE JAY:**  Oh, absolutely.

24   Absolutely.  I'm going to work until I get my

25   degree.  Absolutely.

26       **DEPUTY COMMISSIONER SMITH:**  And if you

27   are granted a date, then you would continue to -

52

1    - you would enroll some program out in the

2    community to continue working towards the

3    degree.  Is that correct?

4        **INMATE JAY:**  Absolutely, yes, that's my

5    plan.

6        **DEPUTY COMMISSIONER SMITH:**  Okay.

7        **INMATE JAY:**  Definitely.

8        **ATTORNEY DEFILIPPIS:**  Those were taken in

9    the Northridge school.

10       **DEPUTY COMMISSIONER SMITH:**  Northridge.

11       **ATTORNEY DEFILIPPIS:**  CSU, Northridge.

12       **INMATE JAY:**  CSUN, which is located near

13   my parents' home, not too far.

14       **DEPUTY COMMISSIONER SMITH:**  There's been

15   an extensive and very positive list of things

16   that you have been involved in since your last

17   Hearing.  Before I go to the psychological

18   evaluation, are there any other activities that

19   you have been involved in that I have not

20   addressed?

21       **INMATE JAY:**  I'm looking at my list here,

22   because I had an institutional programming and

23   you have really done a thorough job, so, I think

24   we have covered everything up to this point,

25   that I can think of.

26       **DEPUTY COMMISSIONER SMITH:**  Certainly

27   during the course of this Hearing if you or

53

1  Counsel something comes to mind that I did not
2  cover, we will give you every opportunity to
3  bring it up so that it's on the record.
4        **INMATE JAY:**  Thank you.
5        **DEPUTY COMMISSIONER SMITH:**  The
6  psychological evaluation is dated December 2005,
7  prepared by Dr. Macomber, M-A-C-O-M-B-E-R.  It
8  is a positive evaluation.  And I'm going to
9  identify what I consider just to be some of the
10 highlights in the evaluation.  And if you or
11 Mr. DeFilippis want to make any comments or
12 reference any other parts of the evaluation for
13 the record that I have not or will not do, I
14 will certainly give you an opportunity to do
15 that as well.
16       **INMATE JAY:**  Thank you.
17       **DEPUTY COMMISSIONER SMITH:**  On the first
18 page or actually the second page, the doctor
19 writes that the result of the mental status
20 examination shows you to be within the normal
21 limits, that intellectually bright, you are
22 functioning in the high average ranges
23 intellectually, your judgment is sound and you
24 have good self-awareness and insight, you have a
25 GAF score of 90, which is extremely high.  And
26 under the review of the life-crime the doctor
27 writes:  "That in addressing the question of

54

1    causative factors, the Youth Authority
2    evaluation of '87 lends some insight into your
3    functioning at the time of the commitment
4    offense.  And quoting a prior psychological
5    evaluation, you were described as a passive
6    dependent personality and there was evidence of
7    a chronic childhood depression, which increased
8    the demands of adolescence and developed a
9    strong dependence on drugs, which combined in a
10   spiraling psychiatric deterioration, resulting
11   in an apathetic, severely depressed, severely
12   drug dependent and non-functioning adolescent.
13   And clearly drugs was a significant precipitant
14   with regard to your behavior."  And the doctor
15   goes on to write:  "At the time of the
16   commitment offense, you were severely
17   intoxicated on LSD, which you had taken for the
18   first time in conjunction with Hashees and
19   alcohol.  And the prior psychiatrist noted that
20   you were very remorseful for the offense and
21   that you are now very anti-drug and would like
22   to spend your life trying to help other people
23   get off drugs."  Towards the bottom of that
24   page, the doctor writes:  "When questioned by
25   Dr. Macomber, you stated that at that time in
26   your life, as an 18 year-old, due to the chronic
27   drug use that you couldn't think right and that

55

1    you had no appreciation for life's values.
2    Since that time you have accepted responsibility
3    for your participation in the offense, and that
4    you understand that if it were not for your role
5    in the crime that the crime probably would not
6    have happened."  Going on to the next page, the
7    doctor writes that:  "You have accepted
8    responsibility for the offense.  And stated that
9    if you had not participated in it that it might
10   not have happened and that your feelings," and
11   I'm thinking that's supposed to be of remorse
12   not or remorse --

13        **ATTORNEY DEFILIPPIS:**  I think you are
14   right.

15        **DEPUTY COMMISSIONER SMITH:**  "appear to be
16   sincere and genuine, and that you were very
17   happy with the victim's parents forgiving you
18   and you do correspond with them regularly."
19   Under assessment of dangerousness, the doctor
20   writes:  "That in considering your potential for
21   dangerous behavior in the institution, that you
22   have remained entirely disciplinary free.  You
23   have demonstrated strong pro-social values.
24   There are no anti-social values or thinking in
25   this case.  And your violence potential is
26   definitely below average in comparison to other
27   inmates."  With regard to your potential for

56

1    dangerousness in the community, he discusses an

2    exam a measurement that was administered to you.

3    And the doctor indicates that as a result of

4    that exam, that "of a 100 men that were to be

5    released on parole, that you success on parole

6    would be estimated to be better than 90 percent

7    --"

8         **INMATE JAY:**  Thank you.

9         **DEPUTY COMMISSIONER SMITH:**  -- 'of that

10   total 100 population."

11        **ATTORNEY DEFILIPPIS:**  Ninety-eight

12   percent.

13        **DEPUTY COMMISSIONER SMITH:**  What did I

14   say?  I'm sorry.

15        **ATTORNEY DEFILIPPIS:**  Ninety.

16        **DEPUTY COMMISSIONER SMITH:**  Oh, I

17   apologize.  Ninety-eight percent.  Thank you for

18   clarification, Counsel.  "This indicates an

19   extremely low risk level, and as a result your

20   potential for violence is no more than the

21   average citizen in the community, and it is

22   probably less than the average citizen in the

23   community due to your life experiences."  A

24   comment simply for the record is:  I was

25   tracking pretty well with Dr. Macomber until he

26   got to the last sentence.  I certainly don't

27   have quarrel with his conclusion that your

57

1    potential for violence is no more than the

2    average citizen in the community, with an

3    asterisk, obviously, most people in the

4    community have not been committed to a life-

5    crime.  But to indicate that your potential for

6    violence is less than the average citizen, I

7    personally have some difficulty with and in no

8    way when we get to discussing your potential

9    being granted will I use that as a negative.

10   But I just wanted to comment on that for the

11   record.

12        **ATTORNEY DEFILIPPIS:**  It's actually just,

13   I think, a philosophical approach that if you

14   had done something like and rehabilitated

15   yourself after that, that you recognize the

16   potential within yourself and probably will

17   exercise more controls than the average citizen

18   would.  And therefore, the theory is that you

19   would be less likely to commit an offense than

20   the average citizen.

21        **DEPUTY COMMISSIONER SMITH:**  If

22   Dr. Macomber were here, he and I could have

23   quite a detailed conversation about that

24   conclusion.  Which is neither here nor there.

25   It's certainly a very positive evaluation.  But

26   since I'm sitting on this site of the table,

27   when I see that kind of a conclusion I will

58

1    comment.  With regard to your current maturity

2    and coming of age, and with the experience that

3    you have shown and the adjustment that you have

4    made, the doctor concludes that there are no

5    significant risk factors at this time, and that

6    the prognosis for successful adjustment in the

7    community is excellent in your case.  And with

8    that, do you do not have comments or additions

9    regarding the evaluation report or the

10   adjustment, I'll return to Commissioner

11   St.Julien.

12           **INMATE JAY:**  If I may at this time, since

13   I recovered this, you told me to give this

14   paperwork to you guys.  I'm going to have my

15   attorney do so.

16           **DEPUTY COMMISSIONER SMITH:**  Actually,

17   Counsel, if you could hand it to one of the --

18   okay, I can get it.

19           **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

20           **DEPUTY COMMISSIONER SMITH:**  And we will

21   review this as well.

22           **PRESIDING COMMISSIONER ST.JULIEN:**  I was

23   looking for -- and maybe I just didn't find it,

24   but I was looking for -- tell me about what

25   happened to Lora?

26           **INMATE JAY:**  To who?

27           **PRESIDING COMMISSIONER ST.JULIEN:**  Lora.

59

1    Is there a letter from her this years.

2          INMATE JAY:  No.  And she really is --

3    it's nothing to do with any unwavering support

4    or anything like that, she lost track of time,

5    she has three kids and she is a single mother --

6          PRESIDING COMMISSIONER ST.JULIEN:  So,

7    are you still engaged?

8          INMATE JAY:  We're still very much a part

9    of each other's life and love each other

10   greatly.

11         PRESIDING COMMISSIONER ST.JULIEN:  Okay,

12   so you --

13         INMATE JAY:  Absolutely.  In fact, her

14   and the kids just came to see me two weeks ago.

15         PRESIDING COMMISSIONER ST.JULIEN:  So, do

16   you plan to embark on a relationship with her?

17         INMATE JAY:  Well, --

18         PRESIDING COMMISSIONER ST.JULIEN:  Or

19   have?

20         INMATE JAY:  -- we are always going to be

21   significant to one another.

22         PRESIDING COMMISSIONER ST.JULIEN:  Uh

23   huh.

24         INMATE JAY:  And when I get out --

25         PRESIDING COMMISSIONER ST.JULIEN:  Uh

26   huh.

27         INMATE JAY:  We'll see.  We'll see what

60

1  happens.  And we are both on the same page as

2  far as that's concerned.  We don't want to

3  promise something -- she doesn't want me to be

4  responsible for her kids as soon as I get out.

5  And I don't want her to marry me in here --

6        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

7  huh.

8        **INMATE JAY:**  -- given my sentence --

9        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

10  huh.

11        **INMATE JAY:**  -- and limitations.  So, we

12  definitely have talked about that, our future

13  together.  And we are hoping that that could be

14  a possibility.

15        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

16  And you have known each other since you were

17  kids?

18        **INMATE JAY:**  Yes.  We were in Youth

19  Groups together at St. Ander [phonetic] and

20  St. Charles.  We met when we were about 12 years

21  of age.  We are the same age today.

22        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

23  And what about Bishop Bruno [phonetic]?

24        **INMATE JAY:**  Bishop Bruno.  Yeah, he is

25  very much in my corner.  A very, very wonderful

26  man.

27        **PRESIDING COMMISSIONER ST.JULIEN:**  So, do

61

1  you still plan to work there?

2        **INMATE JAY:**  Actually, that's --

3        **PRESIDING COMMISSIONER ST.JULIEN:**  Or did

4  you --

5        **INMATE JAY:**  -- my secondary job.  One

6  thing that I didn't cover and I don't know why I

7  passed right over it on my plans.

8        **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

9  huh.

10       **INMATE JAY:**  Was work.  And the primary

11  work is working with Kreiger.

12       **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

13  huh.

14       **INMATE JAY:**  With my friends.

15       **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

16  huh.

17       **INMATE JAY:**  Melissa and Jerry.  And my

18  secondary -- because it is more feasible, given

19  where I'm going to live, the transportation and

20  what they're offering, you know, given my skills

21  that I have learned.  And then my secondary job,

22  if that doesn't work out for whatever reason,

23  Bishop Bruno's offer is still good.

24       **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

25  And I know that you have done a tremendous

26  amount and you have a set and firm career path

27  and all that, but just for the record, have you

62

1    resisted obtaining a CDC vocation?

2          INMATE JAY:  No.  In fact, I have one.

3          PRESIDING COMMISSIONER ST.JULIEN:  You

4    do?

5          INMATE JAY:  Well, I --

6          PRESIDING COMMISSIONER ST.JULIEN:  You

7    know, because it seems like in the past

8    transcripts they talked to about that.

9          INMATE JAY:  They did and then at the

10   last Hearing --

11         PRESIDING COMMISSIONER ST.JULIEN:  Uh

12   huh.

13         INMATE JAY:  -- they recognized that I

14   had two vocations.  One was as a production

15   coordinator, which I received certification --

16         PRESIDING COMMISSIONER ST.JULIEN:  Oh, so

17   was that -- okay.  So, was that something that

18   didn't stand out initially?

19         INMATE JAY:  Yeah, well, no.  I had

20   achieved that not two Hearing ago, but for the

21   last Hearing.

22         PRESIDING COMMISSIONER ST.JULIEN:  Uh

23   huh.

24         INMATE JAY:  I had just --

25         PRESIDING COMMISSIONER ST.JULIEN:  Oh,

26   okay.

27         INMATE JAY:  -- achieved that.  So, two

63

1   Hearings ago and prior to that I didn't have

2   that.

3          **PRESIDING COMMISSIONER ST.JULIEN:**   Okay,

4   because I noticed that they were saying …

5          **INMATE JAY:**   Right.  And they did and

6   that's why at the last Hearing they did

7   recognize that and my forklift driver's license,

8   which I achieved as being a vocation or a job

9   skill, I guess.  That's what the Board Panel

10  said.  And they said to continue in that

11  vocation or upgrading that in their decision.

12         **PRESIDING COMMISSIONER ST.JULIEN:**   Okay.

13  Do you have any question, Commissioner?

14         **DEPUTY COMMISSIONER SMITH:**   No, I don't.

15         **PRESIDING COMMISSIONER ST.JULIEN:**   Okay.

16  Mr. Turley, do you have any questions?

17         **DEPUTY DISTRICT ATTORNEY TURLEY:**   Given

18  the inmates stated position of not discussing

19  the life-crime, I have no questions.

20         **PRESIDING COMMISSIONER ST.JULIEN:**

21  Mr. DeFilippis.

22         **ATTORNEY DEFILIPPIS:**   I think that we

23  have pretty much covered everything.

24         **PRESIDING COMMISSIONER ST.JULIEN:**   Okay.

25  I have a question before we go to closing

26  statements.

27         **INMATE JAY:**   Also, will I have a chance

64

1    to say --

2         PRESIDING COMMISSIONER ST.JULIEN:  Yes,

3    you get a chance.

4         INMATE JAY:  All right.

5         PRESIDING COMMISSIONER ST.JULIEN:  You

6    know, you came from a good family, suburban,

7    middleclass, you know, no alcoholic parents or

8    visible signs of trauma and problems, and you

9    get caught in this life.  And, you know, you

10   mentioned, you know, you're in here with

11   criminals.  I mean, I'm sure you know that there

12   are people in here who some of them they just

13   really didn't have a chance, okay.  And they

14   just kind of did what they saw going on around

15   them and what they usually do.  You had a lot of

16   opportunities, chances, you fell into, you know,

17   you went the wrong way.  How do we get over

18   that?  There was no reason for you to be a part

19   of this crime.

20        INMATE JAY:  Well, you said a keyword,

21   and there was no visible reason.  A lot of times

22   other inmates, since you mentioned it, that come

23   from obvious backgrounds that are poor -

24        PRESIDING COMMISSIONER ST.JULIEN:  Yeah,

25   there is no excuse for them either.  It's --

26        INMATE JAY:  No, no, no.  Gang infested,

27   but it is obvious.  It is more obvious.

65

1          **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.
2          **INMATE JAY:**  It is more apparent.
3          **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.
4          **INMATE JAY:**  Whereas, somebody who comes
5   from the middleclass family, you know, I have a
6   roof over my head, I had clothes, I had food on
7   the table, all the necessities.  And from the
8   outside looking in, I've heard a lot of my
9   family and my friends tell me, "Man, I really
10  thought that you guys had like the American
11  family."
12         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh
13  huh.
14         **INMATE JAY:**  But on the inside we were
15  dysfunctional in the sense that we didn't act
16  like a family.  I had a mom, I had a dad, I had
17  a brother and a sister, and that's what
18  constituted our family.  But as far as
19  communicating -- knowing how if we had a problem
20  not to internalize it but to, you know, let it
21  out, because what happens is, is when people --
22  when I internalized my problems it became worse,
23  you know, they didn't go away, so I began
24  fooling myself from an early age.  And part of
25  that stems from the lack of communication that
26  and my mom being away played a vital role in
27  that, and my dad being a perfectionist, you

66

1  know, demanding things.  And that pressure, I

2  think, all those things added up to allowing me

3  to make the decision that I did, and they were

4  awful decisions, they were terrible decisions.

5        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

6  let's say you go out and you have this

7  overwhelming support and two months, three

8  months down the road, you know, people are like,

9  "Okay, well, you know I'm busy with this and

10 busy with that," and, you know, your parents are

11 overjoyed but their doing their own thing and

12 they're used to being on their own.  And, you

13 know, you're starting to feel alone again.

14       **INMATE JAY:**  Sure.

15       **PRESIDING COMMISSIONER ST.JULIEN:**  What

16 do you do?

17       **INMATE JAY:**  Well, I've felt alone for

18 many years in here.  And I've learned that I

19 have to be happy with myself and alone with

20 myself before I can be happy with others.  And I

21 am today.  I am at peace with who I am.  I love

22 myself today and who I am today.  I am a caring

23 --

24       **PRESIDING COMMISSIONER ST.JULIEN:**  How

25 have you forgiven yourself?

26       **INMATE JAY:**  How?

27       **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

67

1    huh.

2          **INMATE JAY:**  Early on, that was one of my

3    biggest difficulties.  And I had a spiritual

4    leader by the name of Father Jess [phonetic]

5    Taylor [phonetic], who used to come in and see

6    me, I knew him from the streets, he was my

7    Minister.  And he would come in and see me.  And

8    one day he asked me a question, he said:

9    "Matthew, what is wrong?  What is your problem,

10   you just look so, besides the obvious, but you

11   look terrible."  And I said, I said, "I don't

12   know if God's ever going to forgive me or my

13   family."  He said, "God has already forgiven

14   you, but you must forgive yourself."  He goes,

15   "As far as your family goes, that's something

16   you need to discuss with them."  But he said,

17   "But you have to forgive yourself."  And from

18   that day on he helped me to instill that in me.

19   And surely, certainly the forgiveness that I

20   received from the family was a tremendous gift

21   and a weight that they gave me, a weight that

22   they lifted off that allowed me to continue to

23   grow in the matter that I have shown you through

24   the programming, that's I've tried to show you.

25   One last thing that I would like to say, because

26   I know that it is a major concern:  You know,

27   these support letters, I don't want you just to

68

1   see what they are offering.  I want you to --
2   because it's hard for you, I could see -- I've
3   tried to put myself in your position, and I
4   know, you know, we're coming in front of you
5   with these crimes and stuff, and you have the
6   responsibility of letting me back out there.
7   And one thing that I want to ask you:  Is that
8   when you read these support letters is that you
9   look at how -- not just what they are offering
10  me, but who they see me to be.  Not what I'm
11  telling you, but what they are telling you.
12  Along with what the evidence says, and how I am
13  changed.  You know, and how I do want to help.
14  I don't want to destroy.  I don't want to take;
15  I want to give.
16      **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,
17  thank you very much.  Mr. Turley, closing
18  statement, please.
19      **DEPUTY DISTRICT ATTORNEY TURLEY:**  Yes,
20  thank you.  As was pointed out at the very
21  beginning in the reading of the Statement of
22  Facts and all of the facts of the crime that are
23  revealed in the file here, this is a virtually
24  unimaginable horrific crime.  A person holding
25  down an adult while that person is strangled
26  over a 15-minute period, helping haul the body
27  around, making a trip to the store to obtain

69

1    poison, knowing that that poison is going to be
2    attempted to be given to an eight-year old
3    child.  Helping haul the body of the adult and
4    helping take the child to the location, where
5    the person knows that they are going to try to
6    destroy the evidence of their crimes by burning
7    the body of the victim and binding an eight-year
8    old child, who for whatever excuse, might have
9    been given for the murder of the adult, did
10   nothing other than simply walk into the room
11   when the crime was taking place.  Taking that
12   child, binding him, watching him be put in the
13   car, throw gasoline and push the car over the
14   cliff, assuming that both people were going to
15   be burned beyond recognition.  Not just a made
16   for T.V. movie, it is just bone chilling to
17   think that someone could participate in all
18   that.  Beyond that, though the gravity of the
19   offense itself gives every reason to consider
20   whether at this time, even after this amount of
21   time, just simply based on the gravity of the
22   offense alone, whether or not this inmate should
23   be released on parole.  The inmate had some
24   difficulties with his parents.  His dad was a
25   perfectionist, his mother was studying in
26   Seminary on the way to being Ordained and became
27   a Minister.  They didn't communicate with him

70

1   real well.   That's a lot more than most of the
2   folks we see in here got.   Probably more than
3   some of us sitting here in this room got.
4   Educated people, concerned people, ,people who
5   had a mission in their life, people who had a
6   concern for their children, and from everything
7   that we see here went beyond providing food,
8   clothing and shelter, but attempted to provide a
9   stable, healthy, loving environment, which their
10  children could grow up.   And yet that support
11  was insufficient to prevent the inmate from
12  embarking on a life of crime.   His 39 letters of
13  support, according to his attorney, I didn't
14  count them, are here today.   At the time he was
15  sentenced, the Judge indicated in the Sentencing
16  Hearing that he had 44 letters of support.   So,
17  in addition to the support of his parents, he
18  had the support of a whole community, lots of
19  people who were around this individual, who were
20  apparently believed that they were in a position
21  to provide with support prior to his committing
22  this offense, and he chose to ignore the
23  assistance of his parents.   He chose to ignore
24  the assistance of these 44 people who wrote
25  letters of support at that time.   He chose
26  instead to go his own way.   It is hard to
27  imagine why someone would do that.   The psych

71

1    report certainly is positive.  However, all of
2    the psych report appears to be based upon the
3    psychologist believe, and I assume he gained his
4    assumption or belief from the statements of the
5    inmate, that at the time of this crime the
6    inmate was under sever intoxication.  I think
7    that conclusion is questionable at best.  The
8    inmate was capable of walking, capable of
9    talking, capable of assisting and holding an
10   adult, capable of driving, capable of going to
11   the store, capable of finding an item, capable
12   of bringing it back.  Doing all the things that
13   he did over a rather extended period of time.
14   And I'm not sure what the good doctor's
15   definition of sever intoxication is, but under
16   most circumstances and conventional use, being
17   able to conduct oneself in that manner would
18   suggest that the person is not severely
19   intoxicated.  I'm certainly not going to
20   question that the inmate was a regular drug
21   abuser and a regular alcohol abuser.  But there
22   isn't anything in his conduct, which is the only
23   thing that we have to go on, and his conduct on
24   the day of this offense and at the time that
25   these crimes were committed, to suggest anything
26   other than the fact that the inmate was fully
27   aware of what was happening.  Fully aware of

72

1   what he was doing, and fully aware of the

2   consequences to the victim, particularly the

3   direct victims of the crime, the adult female

4   and the eight-year old boy.  He was fully aware

5   of the intended consequences to those people.

6   There is nothing at all to suggest that there

7   was any lack of awareness on his part.  Finally,

8   the inmate recognizes that there is a broad

9   range of victims that resulted from his

10  behavior.  And he does have the insight to

11  recognize that among the victims are

12  neighborhoods.  And as he suggested the

13  neighbors of the victim felt unsafe in their own

14  homes, "How could this happen on our street?

15  How could this happen on our block?  How could

16  this happen to someone to right here?  How could

17  this happen to a person from our high school?"

18  Neighbors of his own family, can you imagine the

19  boy who lived next-door engaging in this kind of

20  behavior?  Can you imagine the person who lived

21  down the street doing this?  Well, if he is

22  given parole, he is going to have new neighbors

23  and they are going to be confronted with the

24  reality that next-door to them or down the

25  street from them or someplace close to them,

26  there's a person who engaged in horrific crimes

27  that this person has.  And at this point in

73

1    time, I'm not prepared to reach a conclusion
2    that those new neighbors don't need protection.
3    That those new potential neighbors would be
4    safe.  That those new neighbors could rest
5    assured that this man is not once again going to
6    feel lonely and depressed.  That this man is not
7    once again going to be lead by other who may be
8    stronger than him emotionally or
9    psychologically, or for whatever reason that
10   this man once more isn't going to be enticed,
11   directed, or fallen to this kind of violent
12   behavior.  And on behalf of those neighbors and
13   the People of Los Angeles County we would
14   recommend denial of parole at this time.  Thank
15   you.

16        **PRESIDING COMMISSIONER ST.JULIEN:**  Thank
17   you.  Mr. DeFilippis.

18        **ATTORNEY DEFILIPPIS:**  Thank you.  It is
19   always interesting listening to the District
20   Attorney give an assessment of the case.  When I
21   look back the case and think about how this went
22   through the Court system and one of the reasons
23   that I provided you with some declarations that
24   had been submitted, and I did that for a fairly
25   specific reason.  If you will look at the last
26   one, Exhibit E, it's the declaration of Elliot
27   Stanford, and he talks about the expectations

74

1    that the District Attorney had at the time of
2    the conviction in this case.  That Mr. Jay would
3    spend approximately seven to ten years in
4    custody.  And so, at the time that this offense
5    occurred, the District Attorney's Office, the
6    same District Attorney's Office that Counsel is
7    here from, agreed to a plea agreement where they
8    believed Mr. Jay would only spend seven to ten
9    years in custody.  And that was a satisfactory
10   resolution of the case from their standpoint.
11   And we talked a lot about the circumstances of
12   this offense, and I will not in any way attempt
13   to diminish the circumstances of this crime, but
14   I think that it does have to be put into some
15   perspective.  And I don't know exactly how in
16   depth you looked at the legal background of this
17   case, but the co-defendant, Torran Meier --
18   there was a lot of different evaluations that
19   occurred in this case.  As you may be aware,
20   Mr. Meier actually went to trial on the case.
21   And again, the same District Attorney's Office
22   prosecuted Mr. Meier.  Now, remember that
23   Mr. Meier was the mastermind of this offense.
24   It was his mother.  It was an alleged pattern of
25   abuse by her of him that lead him to commit the
26   offense, that lead him to solicited Mr. Jay and
27   Parker to participate.  And he ended up

75

 1   convicted of manslaughter, and attempted

 2   voluntary manslaughter as to Rory.  He was given

 3   a 12 sentence and has served that and has been

 4   out since, I think it was around 1990.  And has

 5   been out of custody -- or the early '90s, and

 6   has been out of custody ever since then.  In

 7   those evaluations that were done back then --

 8        **DEPUTY COMMISSIONER SMITH:**  Excuse me,

 9   Counsel.  So that I don't break or interrupt you

10   right at a major point, let me go ahead --

11              (Tape 1, Side B, Ends)

12              (Tape 2, Side A, Begins)

13        **DEPUTY COMMISSIONER SMITH:**  Go ahead.

14        **ATTORNEY DEFILIPPIS:**  Let me just step

15   back a moment.  One of the things that I think

16   is a very crucial fact in this case is that

17   first of all you are dealing with a youngster,

18   Matthew Jay was barely 18 years old in probably

19   just about every way conceivable.  He didn't

20   have the maturity level of even an 18 year old

21   even at the time.  But what we do know, and

22   Counsel suggests that there may be something a

23   rye about the intoxication issue, I think all

24   you have to do is look back at what happened a

25   year before this crime.  Torran Meier came to

26   Mr. Jay one year prior to this offense and

27   attempted to talk him into helping him kill his

76

1   mother.  Mr. Jay went to the police and he

2   notified them that this had occurred.  The

3   police at the time didn't do anything.  Mr. Jay

4   then went about his business.  But what happened

5   over the course of that year was very

6   significant, because that's the year that

7   Mr. Jay severely deteriorated.  He dropped out

8   of school.  He started doing very poorly

9   basically in life.  He was described in the

10  probation report as his mind was fried, he was

11  like a zombie, he was out of his mind, he was

12  drug-dazed.  These are all descriptors that are

13  used in the probation report talking about the

14  way that Mr. Jay was that relevant period of

15  time when he made the decision to involve

16  himself in this offense.  At the same time, the

17  co-defendant Torran Meier was described as,

18  although younger, was the influential one; he

19  was the one that had the power.  He was

20  described as being influential, not only Mr. Jay

21  but over the even older Mr. Parker.  He was

22  described by the probation officer, and again

23  this based on assessments that were done, I

24  believe it was at the Youth Authority of

25  Mr. Meier, that he was, quote, "a rather

26  imposing figure, quite sophisticated, poised and

27  apparently persuasive, always calm and seemed in

77

1    command of everything, seemed and looked much
2    older than his years."  These are the
3    descriptors that the probation officer is using
4    in the report to describe Mr. Meier.  The reason
5    that I bring those things up is not to diminish
6    this offense and I don't want to diminish this
7    offense, it is what it is, but it will never
8    change.  What I want you to look at when you are
9    looking at this offense, is the conduct of
10   Mr. Jay.  And a lot of times the facts in this
11   case somewhat get blurred together; it's all
12   three made these decisions and all three did
13   this and all three did that.  And that wasn't
14   how it actually happened.  The decisions that
15   were made were decisions made by Mr. Meier and
16   them him influencing the others to participate
17   in those decisions.  Then there were things like
18   -- after the homicide, Mr. Jay went and made the
19   purchase of the rat poison and came back to the
20   premises, but at that point he left.  He was no
21   longer there at the time that Torran Meier made
22   the attempts to kill Rory.  He had gone back to
23   his home.  By all descriptors, what he had done
24   was that he went home and essentially collapsed
25   on the floor and was crying most of the time
26   that he was there.  The other two put the body
27   into the trunk during that period of time, and

78

1   drove over to Mr. Jay's house and had Mr. Jay
2   follow them in a separate vehicle. At that time
3   he was not aware that Rory was in car. So, when
4   Counsel describes this, you know, throwing
5   gasoline and how could somebody participate in
6   that. That's conduct that is attributable to
7   Mr. Parker and Mr. Meier, who were present in
8   that car. It is not conduct that is
9   attributable to Mr. Jay. And again, this does
10  not diminish the overall offense, but at the
11  same time you need to look at his participation
12  and what he was doing. What he was doing was
13  following these guys to a location where what
14  was going to happen was the decision of
15  Mr. Meier and then he drove them away from the
16  scene of that. That being said, then we have to
17  somewhat fast forward to today. When you are
18  looking at this offense, and you are looking at
19  suitability, the determining factor is going to
20  be: Does Mr. Jay at this time present an
21  unreasonable risk or harm to society if he is
22  released on parole. The problem with continuing
23  to rely upon the commitment offense is that what
24  it does is that it ignores how out of character
25  this particular offense was for Mr. Jay. This
26  was not something that was typical of his life.
27  And if you go back to the psychological report

79

1    that was prepared back in 1986 by Dr. Shaftner

2    [phonetic], he talks about the four factors that

3    lead to the offense:  dependency, depression,

4    drugs, and circumstances.  There also have been

5    submitted two reports of Dr. Kennedy, in 1994

6    and in 1999.  And if you recall, Dr. Kennedy was

7    the Counselor that came from, I think, the San

8    Diego area and actually was doing regular on-

9    going therapy with Mr. Jay over the course of

10   1990 to 1999.  She was doing two hours a month

11   for the time that he was at Donovan and

12   Tehachapi and up here at Soledad, it was about

13   once for two hours every other month.  She talks

14   about each of those four issues and she talks

15   about he has gone about correcting himself under

16   those conditions so that those are no longer

17   issues in his life.  So, when you look at where

18   he has come, you will see that you have a young

19   man that -- well, I think that probably the best

20   descriptor that I've ever heard of is from the

21   United States Supreme Court and I will just read

22   this to you.  "Three general differences between

23   juveniles under 18 and adults demonstrate that

24   the juvenile offenders can, with reliability, be

25   classified as the worst offenders.  First, as

26   any parent knows and as the Scientific and

27   Sociological Studies responded in his Meecee

80

1    [phonetic] cite tend to confirm, a lack of
2    maturity and an under developed sense of
3    responsibility are found in youth more often
4    than in adults and are more understandable among
5    the young.  These qualities often result in
6    impetuous and ill-considered actions and
7    decisions.  The secondary difference is that the
8    juveniles are more vulnerable or susceptible to
9    negative influences and outside pressures,
10   including peer pressure.  The third broad
11   difference is the character of the juvenile is
12   not as well formed as that of an adult.  The
13   personality traits of juveniles are more
14   transitory and less fixed.  These difference
15   render suspect any conclusion that a juvenile
16   falls among the worst offenders."  The Supreme
17   Court then went on to say:  "The qualities that
18   distinguish juveniles from adults do not
19   disappear when an individual turns 18."  Those
20   issues, I think, ring very clear in this case.
21   They talk about these three things, the lack of
22   maturity and under developed sense of
23   responsibility, and all of the psychologist
24   talked about that at the time of the offense.
25   The vulnerability or susceptibility to negative
26   influences and peer pressures.  Look at what was
27   happening to him at the time and the peer

81

1  pressure that was put on him by Torran Meier

2  getting him to get into this offense.  How his

3  drug induced state helped lead to that.  And

4  then look at today and what he has done in the

5  20 years that he has been in prison, subjected

6  to the same types of negative types of peer

7  influences that are going to be ramped in the

8  prison.  He has handled those appropriately.

9  So, you know that there is a difference in how

10  he responds to the negative peer influences.

11  And then the third broad difference that they

12  talked about is that his character is not as

13  well formed as that of an adult.  You know,

14  Counsel talked about the fact that he had the

15  same support back out on the streets.  That's

16  not true.  The potential for that support was

17  there and those people came and rallied around

18  him at the time of sentencing and showed up for

19  Court.  They provided letters to the Judge.  And

20  if you look at the Sentencing Transcript the

21  Judge actually chastised those people says,

22  "Where were you.  Where were you when the drug

23  abuse was going on.  What were you doing for

24  Mr. Jay."  Because the support was there in a

25  potentiality, it was not there in actuality.

26  Today that support is there in actuality.  But I

27  think more importantly is that the

82

1    transformation of Mr. Jay makes him a person
2    with or without support, he is going to be able
3    to walk the straight line.  He's going to be
4    able to make the decisions, which he does on a
5    day-to-day basis in here, to make the decisions
6    to stay away from drugs and alcohol.  It is not
7    a mystery. that drugs and alcohol are ramped in
8    prison.  Any body that wants drugs in prison can
9    get them.  I mean I see 115s all the time for
10   people having marijuana, heroin, needles, you
11   name it, I don't think there's a substance that
12   I haven't seen a inmate get his hands on in
13   prison.  And Mr. Jay stays away from all of that
14   and completely stays out of trouble.  The things
15   that he has done in prison -- I have
16   represented, you know, some guys with some
17   pretty clean records, some guys that have really
18   turned themselves around in prison, and --
19   published decision on Edward Ramero [phonetic],
20   Earnest Smith, you know, these are John
21   Danenburg, these are guys that have really
22   walked the line in prison or like Eddie Ramero
23   started out poorly and really turned himself
24   around.  I haven't seen a program, maybe one or
25   two that come close, but pretty tough to match
26   the program that this young man has done in the
27   time that he has been in prison.  He has been

83

```
 1  before the Board -- this is the seventh time.
 2  The crime has been the impediment to parole on
 3  every occasion.  That crime is never going to
 4  change.  His involvement differs than the
 5  involvement of the two co-defendants.  If you
 6  look that the Sentencing Transcript the Judge
 7  makes some evaluations of the evidence.  He
 8  actually makes some ruling.  And as this Board
 9  says at the beginning of every Hearing, you are
10  bound by the decisions the Court makes, and the
11  Court made a determination that the factors and
12  aggravation do not outweigh the factors in
13  mitigation, and the factors in mitigation do not
14  outweigh the factor in aggravation.  And what
15  that Judge concluded was that this young man,
16  with his involvement, with all the
17  circumstances, that this was not an aggravated
18  case.  And I think that is how this should be
19  treated.  The District Attorney at the time that
20  this case was settled agreed to this being a
21  second-degree murder, agreed to this being an
22  offense that would cause this young man to be
23  locked up for seven to ten years and was
24  acceptable with that; that was acceptable to the
25  District Attorney's Office at the time that the
26  plea was entered.  And that should continue to
27  be acceptable to the District Attorney's Office.
```

84

1    Unfortunately, they don't come in here and say

2    that today.  But that was there position at the

3    time of the resolution of this case and it

4    shouldn't change.  The only thing that has

5    changed since that time is Mr. Jay.  And

6    everything that he has done has shown the

7    positive changes and I think that everything

8    that he has done has shown you that when he goes

9    out there he is going to be a success in the

10   community.  Two things that I think you should

11   look at, let me get the names, was Paul

12   Mercoglianos, M-E-R-C-O-G-L-I-A-N-O-S, and Alex

13   Mouton, M-O-U-T-O-N.  These were two youngsters

14   that -- one is a cousin and, you know, these are

15   two youngsters that basically what happened is

16   that Mr. Jay talked to them at a point in time

17   when they were going down the wrong path and

18   successfully turned both of these youngsters

19   around.  So, he is somebody who wants to give

20   back to the community.  And the desires that he

21   has are genuine.  These are not, you know, pie-

22   in-the-sky, "let me just tell you what you want

23   to hear."  This is a young man that wants to

24   give back to the community and I think he has

25   already been doing.  And the time that he has

26   been in here he has been doing that in how he

27   handles his relationships with people out in the

85

1    community.  He has turned a situation, you know,

2    where he didn't really have relationship, I

3    think, before he -- I don't think you can truly

4    say -- it like he says, "They didn't really have

5    a family.  They had something that looked like a

6    family."  But what he has done is that he has

7    participated with the rest of his siblings and

8    his parents in putting that back into a family

9    and creating a strong bond of community support

10   that rests behind him.  He will keep doing that

11   when he gets out in the streets.  This is going

12   to be one of your success stories.  And I would

13   urge you to give him a parole date at this time.

14        **DEPUTY COMMISSIONER SMITH:**  Thank you.

15        **PRESIDING COMMISSIONER ST.JULIEN:**  Thank

16   you.  Mr. Jay --

17        **DEPUTY DISTRICT ATTORNEY TURLEY:**  If I

18   may Commissioner.

19        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

20        **DEPUTY DISTRICT ATTORNEY TURLEY:**  Counsel

21   suggested a disparity in crime charging and

22   sentencing between the inmate and Mr. Meier --

23        **ATTORNEY DEFILIPPIS:**  Excuse me.  The

24   District Attorney is here solely for the purpose

25   of stating the position of the District

26   Attorney's Office on parole.  It is not his job

27   to be making objections.  And there is no

86

1  business of him responding to anything that has
2  been said.

3      **PRESIDING COMMISSIONER ST.JULIEN:**  Were
4  you going to make an objection?

5      **DEPUTY DISTRICT ATTORNEY TURLEY:**  No.  I
6  wanted to elaborate on the legal reasons for the
7  disparity between the crime charging and the
8  sentencing for Mr. Meier --

9      **ATTORNEY DEFILIPPIS:**  He also --

10      **DEPUTY DISTRICT ATTORNEY TURLEY:**  -- and
11  the inmate.

12      **ATTORNEY DEFILIPPIS:**  He also may not
13  give legal advice to the Board.  This is highly
14  inappropriate.

15      **PRESIDING COMMISSIONER ST.JULIEN:**  Can we
16  -- I will just let Mr. Jay finish.

17      **DEPUTY DISTRICT ATTORNEY TURLEY:**  Okay,
18  that's fine.

19      **PRESIDING COMMISSIONER ST.JULIEN:**  Thank
20  you.

21      **INMATE JAY:**  I will keep this brief.  I
22  in no way want to impress upon you that I think
23  that I wasn't responsible for this crime.  My
24  participation allowed this crime to take place.
25  I am fully aware of that today.  I wasn't 20
26  years ago, but I am today.  There are key
27  factors that lead me to be involved in that

87

1  crime, in doing that crime, in participating.
2  And I believe that over the last 20 plus years
3  that I have addressed those issues with the help
4  of my family, loved ones, and the groups that
5  are offered.  That being depression.  I still
6  get depressed, but I know how to deal with it in
7  a constructive manner.  Drug use, I have been
8  clean and sober for over 20 years, my entire
9  incarceration.  In fact the night of the crime
10 is the last time that I was intoxicated.  I am -
11 - I want to say, I am avid in my sobriety.  I am
12 proud of my sobriety.  I love my sobriety.  It
13 allows me to be human, to be what I really know
14 that God intended me to be.  Mostly I want this
15 Panel, District Attorney, Attorney General to
16 know that the biggest difference between Matthew
17 as a teenager and Matthew as a full grown adult
18 is my belief and my relationship with Christ
19 today.  I knew about God, but I never had a
20 relationship with him.  It wasn't real it was
21 just something that I heard about.  And with
22 that as my foundation it has allowed me to grow
23 in ways that are apparent to the Board, you
24 know, with the groups and the chronos and the
25 schooling and the relationships that I have been
26 able to maintain, the new people that I've been
27 able to meet, the trouble that I've been able to

88

1  stay out of.  It is so different than who I was

2  back then.  I can never change what I did.  And

3  if the Panel continues to look at the crime as a

4  suitability factor I will never be released.  I

5  am only hoping and asking that you look at who I

6  am today and not who I was back then.  I do

7  recognize the severity of the crime.  And I will

8  close with that.

9          **DEPUTY COMMISSIONER SMITH:**  Thank you.

10         **PRESIDING COMMISSIONER ST.JULIEN:**  Thank

11  you, sir.  We will recess now for deliberations.

12                      **R E C E S S**

13                       --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

89

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER SMITH:**  We're back on

4    record.  And everyone that was previously

5    identified is back in the Hearing room.

6    **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

7    Well, Mr. Jay, I want you to know that we really

8    struggled with this.  We really struggled with

9    trying to balance the commitment offense and

10   your significant and undeniable strides that you

11   have made since coming to prison.  However, the

12   severity of the crime and our duty to the public

13   interest, we are going to deny you parole today.

14   And we are going to deny you parole for one

15   year.  Okay.  I usually say at this point that

16   I'm going to read the decision and give you some

17   recommendations, but I don't have any

18   recommendations for you.  You are doing an

19   excellent program.  You are doing everything

20   that we could ever ask somebody to do, but, you

21   know, the crime and I think the opportunities,

22   at least for me what sticks in my mind, is the

23   opportunities that there were for you to stop,

24   and I counted seven.  So, you know, it really,

25   like I said, it is a very, very tough decision.

26   But nevertheless that's the decision we have for

27   **MATTHEW JAY  D-55653    DECISION PAGE 1    1/26/06**

90

1    you today.  And the Panel has reviewed all
2    information received from the public and relied
3    on the following circumstances in concluding
4    that the inmate is not yet suitable for parole
5    and would pose an unreasonable risk of danger to
6    society or a threat to public safety if released
7    from prison.  As I mentioned, the commitment
8    offense and there are multiple victims and one
9    was killed and one was attacked and, I imagine,
10   injured as well.  And these are the mother of
11   one of the crime partners, Shirley Rizk,
12   R-I-Z-K.  She was murdered and she was
13   strangled.  And her son, eight years old at the
14   time, Rory, R-O-R-Y, who, for all intents and
15   purposes, would be dead if he had not been able
16   to escape from the burning car.  And this
17   happened on October 15, 1985, and it was a plan
18   that was hatched by the son of Shirley Rizk,
19   Torran Meier.  And apparently he had had this
20   plan for some time.  And unfortunately for
21   Mr. Jay was able to entice Mr. Jay along with
22   another crime partner, Mr. Parker, into carrying
23   out the unfortunate and atrocious events that
24   lead to the death of his mother, Shirley.  And
25   the offense was carried out in a dispassionate
26   and calculate manner, in that they discussed how
27   **MATTHEW JAY  D-55653    DECISION PAGE 2  1/26/06**

91

1    they would kill the victim and proceeded to
2    strangle her and then the inmate actually went
3    to a store and bought rat poison to poison eight
4    year old Rory, who happened to come upon the
5    scene and witness his mother being strangled.
6    And the offense was carried out in a manner that
7    demonstrates a callous disregard for human
8    suffering, in that Mrs. Rizk was vulnerable, she
9    was in her own home, and I am assuming she was
10   unarmed and defenseless, and it took
11   approximately 15 minutes to strangle her.  So,
12   indeed, there must have been a significant
13   amount of terror and trauma going through her
14   mind at that time.  And these conclusions are
15   drawn from the Statement of Facts as they
16   appeared in the May 2005 Board Report.  And in
17   terms of a previous record, the inmate does not
18   have one.  He has admitted, which is all behind
19   him now, thank goodness, significant history of
20   narcotics and alcohol abuse.  Institutionally --
21   I have seen people refer to themselves before as
22   model inmates, I have rarely seen a model
23   inmate, but you are a model inmate.  Actually, I
24   have seen a couple of others, but I think they
25   are very few and far between, and I would put
26   you amongst those.  And the psychological
27   **MATTHEW JAY  D-55653   DECISION PAGE 3  1/26/06**

92

1   report, dated December 15th, authored by

1   report, dated December 15th, authored by
2   Dr. Macomber, it says that you would be a low
3   risk.  So, it is a favorable report.  Your
4   parole plans are excellent.  You have viable
5   residential plans and numerous offers of
6   residence.  You even laid out your different
7   options for us.  You do have acceptable
8   employment plans and you do have marketable
9   skills.  We note that in response to opposition
10  from 3042 Notices, the District Attorney of Los
11  Angeles County has spoken today in opposition
12  and we did have a letter from the L.A. Sheriff's
13  Department.  And we make the following findings:
14  that the inmate continues to need self-help in
15  order to face, discuss, understand and cope with
16  stress in a non-destructive manner.  And
17  Commissioner Smith is going to give you
18  commendations, but I just would like to say --
19  well, I've already said it enough.  I know that
20  you are discouraged.  You can't help but being
21  discouraged.  And I know other Panels have said
22  this to you before, but your time is going to
23  come and it's going to be sooner rather than
24  later.  I would like to see you again.  Maybe
25  I'll see you again.  It's just, you know,
26  somebody has to get over this crime, okay, and
27  **MATTHEW JAY  D-55653   DECISION PAGE 4   1/26/06**

93

1    obviously nobody has been able to do that yet.
2    Okay, but I'm confident that it will be in the
3    near future, okay.  Commissioner Smith.
4         **DEPUTY COMMISSIONER SMITH:**  Certainly in
5    terms of programming, Mr. Jay, you have done
6    just exceptionally well.  You have got 81
7    college units completed.  No disciplinaries.
8    Since your last Hearing you have had nine
9    laudatory chronos for your involvement in AA,
10   Anger Management, Impact Workshop, the Inmate
11   Employability Program, and an excellent current
12   work history.  And typically our recommendations
13   would be for an individual to do something that
14   they haven't done.  Our recommendation, as the
15   Commissioner indicated, was that you continue to
16   do what you are doing.  I know very well that
17   there's the impression at both this institution
18   as well as other institution that the Board
19   never gives a date anyway.  Your Counselor knows
20   that although there aren't many dates that are
21   given, there are dates that are given.  And
22   Mr. DeFilippis knows that I was on a Panel that
23   granted a date.  So, it does happen, and it does
24   happen with me sitting on the Panel as well as
25   with Commissioner St. Julien.  This was just
26   such a horrific crime, and not that your
27   **MATTHEW JAY  D-55653    DECISION PAGE 5   1/26/06**

94

1    positive changes are recent, because they are

2    certainly not, but we need to see them going on.

3    We need to be more comfortable with the overall

4    of who you are than we are right now.   And

5    you're right, the circumstances of the crime

6    will never change.   But speaking for the two of

7    us, we can get over that.   You know, that's a

8    hill that you can help us get over.   You know, I

9    can't speak for other Panels, but I would expect

10   that that being said it would apply to them as

11   well.   We certain went through extensive

12   conversations, you know, that we had during the

13   recess, this was not an easy decision by any

14   stretch of the imagination.   And very much we

15   felt that your extremely positive programming is

16   kind of pushing us in the back to get us up and

17   over that hill.   And that is not something that

18   I say frequently by any stretch of the

19   imagination.

20        **INMATE JAY:**   Okay.

21        **DEPUTY COMMISSIONER SMITH:**   So, I can

22   understand you being disappointed.   But do the

23   best you can.   Take heart in what you're doing.

24   Take heart and be encouraged that the path that

25   you are on, that you need to continue being on,

26   is going to show you that door.   Commissioner

27   **MATTHEW JAY   D-55653    DECISION PAGE 6   1/26/06**

95

1   St. Julien said:  "I have no doubt that that's

2   going to be the case.  And it's going to be the

3   case sooner than later."  And in every possible

4   way I concur with that.  I wish you well.

5   Counsel, thank you very much.

6        **ATTORNEY DEFILIPPIS:**  Thank you both.

7        **INMATE JAY:**  Thank you.

8        **DEPUTY DISTRICT ATTORNEY TURLEY:**

9   Counsel, thank you.

10        **ATTORNEY DEFILIPPIS:**  Thank you.

11        **PRESIDING COMMISSIONER ST.JULIEN:**  I will

12   adjourn the Hearing and it is 11:40 A.M.

13        **INMATE JAY:**  Thank you.

14                    oOo--

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**          MAY 2 6 2006

24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **MATTHEW JAY  D-55653   DECISION PAGE 7   1/26/06**

96

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, JUDY K. FARNCOMB, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total Two in number and cover a total of pages numbered 1 - 95, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MATTHEW JAY, CDC NO. D-55653, on JANUARY 26, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated February 9, 2006, at Sacramento, California.

_____
JUDY K. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# Exhibit
# 2

**PRESENT OFFENSE:**
**(CONTINUED)**

SOURCES OF INFORMATION (this page)

D.A. FILE, PROBATION RECORDS

| REST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 10-16-85 | 1740 HRS | SAME | 187 PC | EL CAMINO HIGH SCHOOL | LASO |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| RICHARD PARKER | A-811060 | 11-10-86 PLED GUILTY TO 187 PC AND 664/187 PC – P&S HEARING 2-10-87. |

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

TORRAN MEIER                  A-811060         6-24-86 FOUND GUILTY OF 192 PC
                                              (VOLUNTARY MANSLAUGHTER) AND
                                              664/192 PC (ATTEMPTED VOLUNTARY
                                              MANSLAUGHTER) AND 182/192 PC
                                              (CONSPIRACY TO COMMIT MANSLAUGHTER)
                                              ON 12-19-86 SENTENCED TO CALIFORNIA
                                              YOUTH AUTHORITY FOR 12 YEARS.

DEFENDANT JAY, IN CONSPIRACY WITH CO-DEFENDANTS MEIER

AND PARKER, STRANGLED AND KILLED MEIER'S MOTHER, SHIRLEY RIZK, AND

ATTEMPTED TO KILL, BY VARIOUS METHODS, THE EIGHT YEAR OLD HALF BROTHER

OF MEIER, RORY RIZK.

ON THE EVENING OF OCTOBER 13, 1985, DEFENDANT MEIER,

AT THAT TIME, AGE 16, WAS AT HIS PLACE OF EMPLOYMENT, AND APPARENTLY

DECIDED TO KILL HIS MOTHER THAT NIGHT. HE WAS ABLE TO OBTAIN A

PROMISE OF ASSISTANCE FROM DEFENDANT JAY. LATER, WHILE STILL AT

WORK, DEFENDANT MEIER TOLD DEFENDANT PARKER, AGE 23 OF HIS PLANS

AND PARKER ALSO AGREED TO ASSIST HIM. AT SOME POINT, THE THREE

DEFENDANTS WENT TO A NEARBY RESTAURANT WHERE THEY DISCUSSED HOW THEY

WOULD KILL DEFENDANT MEIER'S MOTHER. DEFENDANT MEIER PRODUCED A ROPE

-2-   (JAY)

1  THAT HE HAD FASHIONED INTO A NOOSE, AND IT WAS DECIDED THAT THEY

2  WOULD STRANGLE HER IN MEIER'S BEDROOM AND THEN TRANSPORT HER BODY,

3  IN HER CAR, TO THE MALIBU CANYON AREA, LIGHT THE CAR ON FIRE, AND

4  PUSH IT OVER A CLIFF IN ORDER TO MAKE IT APPEAR AN ACCIDENT.

5           THE THREE DEFENDANTS' THEN PROCEEDED TO THE HOME OF

6  DEFENDANT MEIER IN CANOGA PARK.  MEIER LET HIS TWO CO-DEFENDANTS

7  INTO HIS ROOM THROUGH A WINDOW.  WHILE PARKER AND JAY LAID IN WAIT,

8  DEFENDANT MEIER LURED HIS MOTHER INTO THE ROOM.  PARKER PLACED A NOOSE

9  AROUND THE NECK OF SHIRLEY RIZK, DEFENDANT MEIER'S MOTHER AND BEGAN

10  TO STRANGLE HER.  PARKER PULLED ON THE ROPE AROUND HER NECK, WHILE

11  THE OTHER TWO CO-DEFENDANTS PULLED ON HER LEGS.  AT SOME POINT DURING

12  THE STRANGULATION, HER EIGHT YEAR OLD SON, RORY, AWAKENED TO HER

13  SCREAMS AND WENT TO INVESTIGATE.  HE WAS ABLE TO LOOK INTO MEIER'S

14  BEDROOM AND OBSERVED JAY AND DEFENDANT PARKER IN THAT ROOM AND HIS

15  MOTHER ON THE FLOOR.  WHILE PARKER AND JAY CONTINUED TO ATTEMPT

16  THE STRANGULATION, DEFENDANT MEIER TOOK VICTIM RORY AWAY FROM THE

17  ROOM IN AN EFFORT TO KEEP HIM FROM KNOWING WHAT WAS HAPPENING.

18  MEIER TOLD HIS HALF BROTHER TO WATCH TELEVISION AND THEN RETURNED TO

19  HIS BEDROOM.  THE THREE DEFENDANTS THEN APPARENTLY STRANGLED

20  SHIRLEY RIZK FOR APPROXIMATELY 15 MINUTES BEFORE SHE DIED.  DURING

21  THIS PERIOD OF TIME, DEFENDANT MEIER REPEATEDLY LEFT THE ROOM TO

22  DEAL WITH HIS BROTHER WHO WANTED TO KNOW WHAT WAS GOING ON.  THE

23  DEFENDANTS CAME TO THE REALIZATION THAT RORY WAS A POTENTIAL WITNESS

-3-  (JAY)

76C692G — PROB. 5A — PS 11-85

1  AND THEN IT WAS DETERMINED THAT HE MUST ALSO BE KILLED.  IT WAS
2  DECIDED THAT THEY WOULD POISON HIM AND DEFENDANT MEIER GAVE DEFENDANT
3  JAY SOME MONEY TO GO TO A STORE AND PURCHASE SNAROL SNAIL POISON AND
4  D-CON RAT POISON.  WHILE JAY WENT TO GET THE POISON, PARKER AND MEIER
5  PLACED SHIRLEY RIZK'S BODY IN THE TRUNK OF THE CAR AND DEFENDANT
6  MEIER CLEANED BLOOD OFF THE FLOOR OF HIS BEDROOM RUG.

7        DEFENDANT JAY PURCHASED THE POISON AND RETURNED TO THE
8  MEIER RESIDENCE WITH IT.

9        DEFENDANT MEIER THEN ATTEMPTED TO POISON HIS BROTHER,
10  VICTIM RORY RIZK. AFTER TESTING HIS BLOOD SUGAR, AS RORY IS A DIABETIC,
11  DEFENDANT MEIER TRIED TO INDUCE HIM TO EAT A PEANUT AND BUTTER
12  SANDWICH LACED WITH SNAIL BAIT.  RORY DID NOT LIKE THE TASTE OF THE
13  SANDWICH AND WOULD NOT EAT IT.  MEIER THEN TRIED TO INDUCE RORY TO
14  DRINK SOME TYPE OF MALT WHICH HE MADE, ALSO LACED WITH POISON.  RORY
15  AGAIN REFUSED BECAUSE OF ITS TASTE.  AT SOME POINT RORY WENT INTO
16  THE GARAGE AND SAW HIS MOTHER'S BODY IN THE OPEN TRUCK OF HER VEHICLE
17  WITH HER LEGS EXTENDING FROM UNDER HER ROBE.

18        DEFENDANT MEIER THEN ASKED RORY IF HE WANTED TO GO FOR
19  A RIDE IN MALIBU CANYON.  RORY AGREED.  WITH HIS MOTHER'S BODY IN THE
20  TRUNK AND RORY IN THE BACK SEAT, DEFENDANT MEIER AND THE CO-DEFENDANTS
21  THEN DROVE AWAY FROM THE FAMILY HOME.  EN ROUTE THEY STOPPED AT A GAS
22  STATION AND PURCHASED A GALLON OF GAS.  AFTER DRIVING THROUGH THE
23  MALIBU CANYON AREA AND FINDING A GOOD LOCATION TO PUSH THE CAR OVER

-4- (JAY)

76C692G — PROB. 5A — PS 11-85

1   A CLIFF, THEY DROVE BACK TO DEFENDANT JAY'S HOUSE.  JAY THEN FOLLOWED

2   THEM TO THE AGREED-UPON LOCATION IN MALIBU CANYON.  DEFENDANT MEIER

3   THEN POURED GASOLINE ON A RAG AND STUFFED THE RAG INTO THE GAS TANK

4   FILLER OF SHIRLEY RIZK'S CAR.  MEIER THEN BLINDFOLDED RORY, TIED HIS

5   HANDS BEHIND HIS BACK, AND PUT HIM IN THE BACK SEAT OF THE CAR.

6   DEFENDANT PARKER THEN PLACED THE BODY OF SHIRLEY RIZK BEHIND THE

7   STEERING WHEEL.  THE CAR WAS THEN PUSHED OVER THE EMBANKMENT AS

8   DEFENDANT PARKER LIT THE RAG ON FIRE.  THE CAR ROLLED DOWN THE

9   EMBANKMENT, POSSIBLY ROLLING OVER, AND COMING TO REST APPROXIMATELY

10  THIRTY FEET BELOW.  WITH THE CAR BURNING, THE DEFENDANTS THEN LEFT

    IN DEFENDANT JAY'S CAR.  AS THE CAR BECAME CONSUMED BY FLAMES, RORY

    WAS ABLE TO UNTIE HIMSELF AND REMOVE HIS BLINDFOLD.  HE SAW HIS

13  DECEASED MOTHER IN THE FRONT SEAT WITH BLOOD ON HER FACE.  AFTER

14  OPENING A WINDOW, HE CLIMBED OUT OF THE BURNING CAR AND BEGAN TO

15  CALL FOR HELP.

16          A PASSING MOTORIST OBSERVED THE FIRE AND STOPPED TO

17  INVESTIGATE.  HE HEARD RORY'S CALL FOR HELP AND ASSISTED HIM UP THE

18  HILL.  LATER, SHERIFFS DEPUTIES AND FIRE DEPARTMENT PERSONNEL

19  ARRIVED ON THE SCENE AND RORY TOLD THEM WHAT HAPPENED.  WHILE RORY

20  WAS BEING TRANSPORTED TO A HOSPITAL BY AMBULANCE, A DEPUTY SHERIFF

21  FOLLOWING THE AMBULANCE OBSERVED THE CAR DESCRIBED BY RORY AS THE

22  ONE OWNED BY RORY'S BROTHER, DEFENDANT MEIER.  THE VEHICLE WAS

23  STOPPED.  DEFENDANT MEIER AND DEFENDANT PARKER WERE ARRESTED AT THAT

        -5-   (JAY)

76C692G — PROB 5A —  PS 11-85

POINT.

DEFENDANT PARKER MADE A FULL STATEMENT TO HOMICIDE INVESTIGATORS IMPLICATING HIMSELF, DEFENDANT MEIER AND DEFENDANT JAY. ON OCTOBER 16, 1985, DEFENDANT JAY WAS ARRESTED.

SUBSEQUENT INVESTIGATION BY SHERIFFS DEPUTIES REVEALED THAT SOME TIME PRIOR TO COMMITTING THESE OFFENSES, DEFENDANT MEIER APPROACHED OTHER INDIVIDUALS INFORMING THEM OF HIS DESIRE TO PLAN TO KILL HIS MOTHER. ACCORDING TO A SHERIFF'S REPORT, DEFENDANT MEIER REPORTEDLY TOLD ONE MICHAEL MENDELSOHN OF HIS PLAN IN THE SUMMER OF 1985. THEN IN SEPTEMBER OF 1985, DEFENDANT MEIER TOLD MENDELSOHN, "I'M GOING TO KILL HER AT HOME, I COULD CHOKE HER OR POISON HER, I'LL PUT HER IN A CAR, DRIVE HER TO MALIBU CANYON, PUSH THE CAR OVER THE CLIFF AND MAKE IT LOOK LIKE AN ACCIDENT. MATT (DEFENDANT JAY) WILL PICK ME UP." MENDELSOHN FURTHER TOLD OFFICERS THAT AT APPROXIMATELY 8:00 P.M., ON OCTOBER 13, 1985, HE WENT TO DEFENDANT MEIER'S PLACE OF WORK AND MEIER TOLD HIM "I'M GOING TO DO IT TONIGHT, RICK (CO-DEFENDANT RICHARD PARKER) KNOWS ALL ABOUT IT."

ANOTHER INDIVIDUAL, MARK DAVID SAFRAN, TOLD INVESTIGATING OFFICERS THAT THE DAY AFTER THE KILLING, DEFENDANT MATTHEW JAY TOLD HIM THAT THE DEFENDANT OFFERED HIM $2,000 TO HELP KILL HIS MOTHER.

-6-  (JAY)

TSLo92G — PROB. 5A — PS 11-85

VICTIM:                         PROBATION RECORDS

| NAME | COUNT(S) |
|---|---|
| RORY RIZK  (AGE EIGHT AT TIME OF OFFENSE) | II AND IV |

**INJURY: PROPERTY LOSS (TYPE / COST / ETC.)**
UNINJURED, BUT LATER PARTICIPATED IN THERAPY.

**INSURANCE COVERAGE**

| LOSS: ☐ YES ☐ NO | ESTIMATED LOSS | RESTITUTION ALREADY MADE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK ☐ YES ☐ NO |
|---|---|---|---|

**VICTIM STATEMENT:**

THE UNDERSIGNED OFFICER DID NOT INTERVIEW THE VICTIM AS HE HAD ALREADY BEEN INTERVIEWED EXTENSIVELY BY ANOTHER PROBATION OFFICER IN RELATION TO THE INVESTIGATION OF TORRAN MEIER.  DURING THAT INVESTIGATION, THE VICTIM'S STATEMENT WAS IN GENERAL AGREEMENT WITH THE FACTS PRESENTED UNDER THE OFFENSE.  ESSENTIALLY, RORY TOLD THE PROBATION OFFICER THAT HIS BROTHER, MEIER, TRIED TO KILL HIM IN A WAY THAT WAS CONSISTENT WITH THE OFFICIAL VERSION.  HE DID NOT BELIEVE THAT HIS BROTHER HAD THE RIGHT TO KILL HIS MOTHER AND DID NOT BELIEVE SHE HAD TREATED HIM AS BADLY AS HE SAID, THAT SHE WOULD YELL AT HIM SOMETIME IF HE DID NOT DO WHAT HE WAS SUPPOSED TO DO AND SHE WOULD SLAP HIM ONCE IN A WHILE.  HE MADE NO COMMENTS AS TO THE OTHER TWO DEFENDANTS.

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

_____ VICTIM LIST CONTINUES NEXT PAGE

76P725B—Prob. 19SC (Rev. 6/85)

**PRIOR RECORD:**

SOURCES OF INFORMATION (this page)

AUTOMATED RECORD CHECK, PROBATION DEPT.
RECORD CHECK, INFORMATION FROM THE DISTRICT
ATTORNEY'S FILE, DEFENDANT'S STATEMENT

AKA'S:

NONE.

JUVENILE HISTORY:

NONE.

ADULT HISTORY:

NONE.

-8-  (JAY)

76P725B—Prob. 19SC (Rev. 6/85)

PERSONAL HISTORY:

DEFENDANT, BARELY EIGHTEEN YEARS-OF-AGE AT THE TIME OF THE OFFENSE, HAS ALWAYS LIVED WITH HIS PARENTS, HAS NEVER MARRIED, HAS NO CHILDREN, PERFORMED VERY WELL IN HIGH SCHOOL UNTIL THE TWELFTH GRADE WHEN HIS GRADES DETERIORATED BECAUSE OF DRUG USE, FINALLY DROPPING OUT. HE HAS COMPLETED HIS HIGH SCHOOL EDUCATION WHILE IN THE COUNTY JAIL. AS TO EMPLOYMENT, HE HAS BEEN A COOK AT MARIE CALENDAR'S AND CARL'S JR., AND HAS ALSO WORKED AS A BUS BOY. HE HAS $1,500 IN SAVINGS AT THE PRESENT TIME AS A RESULT OF GIFTS THAT HAVE BEEN GIVEN TO HIM BY FRIENDS AND RELATIVES.

OTHERWISE, SIGNIFICANT ASPECTS OF HIS PERSONAL HISTORY ARE BELOW.

ALCOHOL AND CONTROLLED SUBSTANCE ABUSE:

(SOURCES OF INFORMATION: DEFENDANT AND INTERESTED PARTIES.)

DEFENDANT FIRST USED MARIJUANA AND ALCOHOL IN THE SEVENTH GRADE, TAKING BOTH ON THE SAME EVENING. HE IMMEDIATELY SAID YES AND AFTERWARDS HE LIKED THE EFFECT AND THE EUPHORIA. AT AGE 15, HE WAS A REGULAR MARIJUANA USER. DAILY CONSUMPTION GREW TO 15 TO 20 "BOWLS" (PIPE LOADS) FOR AN AVERAGE OF $20 A DAY HABIT. MARIJUANA STATES DEFENDANT, WAS GIVEN TO HIM BY A FRIEND AND HE BOUGHT SOME OF IT HIMSELF. AT AGE 17, HE WAS USING COCAINE AND USED FIVE TO SEVEN TIMES A MONTH FOR A COST OF APPROXIMATELY $150 A MONTH. DEFENDANT

-9-  (JAY)

SAYS HE WAS ABLE TO FINANCE THIS FROM WORKING AND FROM MONEY HE HAD IN THE BANK.  DEFENDANT STATES HE HAS ALSO USED METHAMPHETAMINE ORALLY.

FROM AGE 14 TO AGE 16, HE WAS DRINKING EACH WEEKEND. HE SAW IT AS A GAME, TRYING TO OUTDRINK OTHERS AND SEEING JUST HOW MUCH HE COULD CONSUME, AND SOME RECORDS SHOW THAT HE SOMETIMES DRANK UNTIL HE BECAME ILL.  HE BELIEVES HE WAS AN ALCOHOLIC FROM AGE 14 TO AGE 16.

DEFENDANT STATES HE WAS IN TREATMENT WITH A PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS, BUT CANNOT REMEMBER WHAT SHE SAID ABOUT DRUG USE OR ALCOHOL USE.  DEFENDANT'S MOTHER SAYS THE PSYCHOLOGIST DISMISSED IT AS "CHILDHOOD REBELLION".

FURTHER, DEFENDANT STATES THAT HE WAS USING MARIJUANA EVERY DAY FOR SIX MONTHS PRIOR TO THE PRESENT OFFENSE.

PHYSICAL/MENTAL/EMOTIONAL HEALTH:

(SOURCES OF INFORMATION:  DEFENDANT AND PARENTS)

DEFENDANT'S PARENTS SENT HIM TO COUNSELING WHEN DEFENDANT WAS IN THE SECOND GRADE AS HE ALWAYS "GAVE UP" WITH RESPECT TO HIS OLDER BROTHER, ANDREW, WHO IS EXCEEDINGLY BRIGHT AND VERY COMPETITIVE.

AT ABOUT AGE 15, DEFENDANT WAS IN TREATMENT WITH A PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS AND THAT PERSON DISMISSED DEFENDANT'S DRUG AND ALCOHOL USE "REBELLION" AS INDICATED

-10-  (JAY)

1  ABOVE.

2          IN RELATION TO THE PRESENT OFFENSE, DEFENDANT WAS

3  EXTENSIVELY EXAMINED BY PSYCHIATRIST, DR. DAVID SHEFFNER, WHO

4  RECEIVED TESTING RESULTS INPUT FROM PSYCHOLOGIST MARTHA ROGERS.

5  DR. SHEFFNER SAYS IN A LETTER DATED OCTOBER 7, 1986, THAT DEFENDANT

6  IS NOT BASICALLY ANTI-SOCIAL, THAT FOUR PROMINENT ELEMENTS,

7  DEPENDENCY, DEPRESSION, DRUGS AND CIRCUMSTANCES PRODUCED DEFENDANT'S

8  INVOLVEMENT IN THE PRESENT OFFENSE.  A MORE DETAILED ACCOUNT IS

9  CONTAINED UNDER PARAGRAPH HEADING  PSYCHIATRIC REPORT.

10          DEFENDANT HAS BEEN AN ASTHMA SUFFERER.

OTHER RELEVANT DEFENDANT INFORMATION:

12          CHILDHOOD/UPBRINGING:

13          DEFENDANT IS THE SECOND OF THREE CHILDREN BORN TO

14  DAVID JAY AND LYNN DIBA.  THE FATHER IS A TEACHER OF FILM LITERATURE

15  AND ENGLISH IN THE LOS ANGELES CITY SCHOOL SYSTEM.  THE MOTHER IS AN

16  EPISCOPALIAN PRIEST.  IN REVIEWING THE PYCHIATRIC REPORT BY

17  DR. SHEFFNER AND TALKING WITH INTERESTED PARTIES, AS WELL AS

18  INTERVIEWING DEFENDANT AND DEFENDANT'S PARENTS, IT IS CONCLUDED THAT

19  THE FAMILY HAS ALWAYS BEEN STABLE AND HARMONIOUS.

20  EDUCATION:

21          FROM ALL REPORTS, DEFENDANT WAS A VERY GOOD STUDENT

22  IN SCHOOL, RECEIVING A'S AND B'S UNTIL THE TWELFTH GRADE WHEN

23  EVERYTHING BEGAN TO DETERIORATE BECAUSE OF DRUG USE.

        -11-  (JAY)

1   DEFENDANT'S STATEMENT:

2           DEFENDANT ADMITS TO HELPING IN THE STRANGULATION OF

3   VICTIM SHIRLEY RIZK, TO BUYING THE POISON THAT WAS TO BE USED TO

4   MURDER RORY RIZK AND TO GENERALLY PARTICIPATING IN THE CONSPIRACY.

5           HE SAYS HE HELD THE VICTIM'S RIGHT SHOULDER AND HER

6   RIGHT ARM WHILE DEFENDANTS PARKER AND MEIER STRANGLED HER WITH A

7   NOOSE.  HE COMMENTED, "I WAS TOO SCARED TO JUST GET OUT (BEFORE

8   COMPLETION OF THE STRANGLING ... I FROZE."  FURTHER, HE RECALLS

9   CRYING WHILE IT WAS HAPPENING.  HE ASKED TO LEAVE AND GO HOME WHILE

10  THE VICTIM WAS STILL STRUGGLING, AND ACCORDING TO DEFENDANT, MEIER

    TOLD HIM THAT NO, HE COULD NOT, AS "WE STILL NEED YOU."

12          THEN, SAYS DEFENDANT, "TORRY" SENT HIM TO THE STORE

13  FOR RAT POISON THAT WAS TO BE USED TO KILL RORY, WHO UNEXPECTEDLY

14  HAD BECOME A WITNESS WHEN HE SAW HIS MOTHER BEING STRANGLED.  AT

15  THAT TIME DEFENDANT DESCRIBES HIS STATE OF MIND AS THAT OF "MASS

16  CONFUSION, HYSTERIA, FEAR ... I FELT LIKE I HAD NO ANSWERS."

17          HE BOUGHT THE POISON AND WENT BACK TO THE SCENE OF

18  THE MURDER.  BY THAT TIME, MEIER AND PARKER HAD THE VICTIM'S BODY

19  IN THE TRUNK OF THE VICTIM'S VEHICLE.  HE TOLD TORY THAT HE NEEDED

20  TO LEAVE.  HE TOLD TORRY THAT HE NEEDED TO LEAVE. TORRY REPLIED

21  THAT IT WAS ALL RIGHT FOR HIM TO LEAVE, BUT THEY (CO-DEFENDANTS)

22  WOULD PICK HIM UP IN ABOUT TWO HOURS.  THEY DID, AND DEFENDANT

23  FOLLOWED THEM IN HIS FATHER'S CAR.  HE STOPPED ABOUT TWENTY YARDS

       -12-  (JAY)

BEHIND. THE CO-DEFENDANTS TOLD HIM THAT VICTIM RORY WAS IN THE CAR ASLEEP. WHILE STILL SITTING IN HIS FATHER'S VEHICLE HE SAW THE CO-DEFENDANTS PUSH THE CAR OVER A CLIFF. THEY GOT IN DEFENDANT'S VEHICLE AND DEFENDANT DROVE THEM BACK TO MEIER'S RESIDENCE. DEFENDANT THEN WENT HOME AND WENT TO SLEEP. THE NEXT DAY HE HAD NO IDEA WHAT HAD HAPPENED. IT DID NOT REGISTER UNTIL HE SAW IT ON THE NEWS. HE THEN TOLD HIS BROTHER AND "SOMEONE ELSE" WHAT HE HAD DONE. LATER, THE POLICE ARRIVED AND ARRESTED HIM.

DEFENDANT RELATES, "I FEEL MUCH REMORSE FOR WHAT HAPPENED, BUT I'M GLAD THAT THE KID LIVED ... I'M ECSTATIC THAT I'M SOBER. ... I NEED TO GO ON WITH MY LIFE. I GET DEPRESSED WHEN I THINK WHAT I HAVE TAKEN PART IN." HE FURTHER EXPLAINED, "I FELT SUCKED INTO IT ... POWERLESS." HE FEELS IT WOULD NOT HAVE HAPPENED HAD HE REJECTED ALCOHOL AND MARIJUANA WHEN IT WAS OFFERED HIM AT AN EARLY AGE, OR WHEN HIS PARENTS FIRST COUNSELED HIM CONCERNING SUBSTANCE ABUSE. ABOUT THAT, DEFENDANT SAID THAT HIS PARENTS FOUND HIM UNDER THE INFLUENCE AT ABOUT THE AGE OF FIFTEEN OR SIXTEEN. THEY SAT HIM DOWN FOR ABOUT AN HOUR AND TOLD HIM HOW FRIGHTENED THEY WERE FOR HIS FUTURE. THEY TOLD HIM ABOUT THE DELETERIOUS EFFECTS OF SUBSTANCE ABUSE. HE TOLD THEM THAT IT WOULD BE THE LAST TIME. HOWEVER, HE DID NOT STOP BECAUSE HE LIKED IT. HE LIKED THE FEELING IT GAVE HIM. HE KNEW IT WAS ILLEGAL, BUT USED IT ANYWAY.

SO, THE USE WENT ON AND HIS CONSUMPTION INCREASED,

-13- (JAY)

76C692G — PROB. 5A — PS 11-85

1  FINALLY RESULTING IN A SHARPLY DETERIORATING STATE AND LEADING TO

2  HIS SCHOOL GRADES FALLING FROM A'S AND B'S TO F'S, ACCOMPANIED BY

3  CHRONIC TRUANCY.  FOR A SIX MONTH PERIOD PRIOR TO THE MURDER HE WAS

4  IN A DAILY STATE OF MARIJUANA INTOXICATION, AND WENT TO GREAT LENGTHS

5  TO CONCEAL THIS FROM HIS PARENTS.

6          AS TO TORRAN MEIER, DEFENDANT STATES HE FIRST BECAME

7  ACQUAINTED WHILE THEY WERE WORKING TOGETHER IN A FAST FOOD RESTAURANT.

8  HE SAW HIM AS A "VERY BIG GUY" AND "INTIMIDATING".  ON A NUMBER OF

9  OCCASIONS DEFENDANT HAD OBSERVED HIM IN AFTER SCHOOL FIGHTS.  HE

10 SEEMED "CRAZY".  HE, MEIER, COMMENTED ON NUMEROUS OCCASIONS THAT HE

11 WAS GOING TO KILL HIS MOTHER.  DEFENDANT SAYS HE TURNED DOWN AN

12 EARLIER OFFER TO HELP MURDER MEIER'S MOTHER AND AT THAT TIME HE,

13 MARK SAFRON AND ERIC LORDAHAL WENT TO THE WEST VALLEY POLICE STATION

14 AND REPORTED IT.

15         HE TRIED TO SEVER HIS RELATIONSHIP WITH MEIER AND TO

16 AVOID HIM AS MUCH AS POSSIBLE, AND DID SO FOR THE MOST PART.

17 HOWEVER, ONE DAY MEIER CALLED AND THEN CAME TO DEFENDANT'S HOME.

18 THEY HELD A CONVERSATION OUTSIDE.  MEIER SAID HE NEEDED A FAVOR.

19 THEN HE PULLED OUT A ROPE FROM BEHIND HIS BACK AND ALLEGEDLY SAID,

20 "TONIGHT'S THE NIGHT, WILL YOU HELP ME?"  DEFENDANT NODDED HIS HEAD,

21 YES.  HE BELIEVES HE DID SO BECAUSE HE WAS UNDER THE COMBINED

22 INFLUENCE OF MARIJUANA, ALCOHOL, COCAINE AND HASHISH.

23         DEFENDANT ADMITS THAT MEIER OFFERED HIM $1,000 FOR

-14-  (JAY)

76C692G – PROB. 5A – PS 11-85

1  HIS ROLE, BUT DEFENDANT AGREED TO THE CONSPIRACY BEFORE THE OFFER

2  WAS MADE.  IN ANY EVENT, HE DID NOT EXPECT TO RECEIVE THE MONEY AS

3  HE DID NOT BELIEVE THAT MEIER HAD THAT KIND OF CASH.  WHEN THE OFFER

4  WAS MADE HE, DEFENDANT, RESPONDED, "OKAY" ... "SURE", OR SOMETHING TO

5  THAT EFFECT.

6          AS TO RICHARD PARKER, DEFENDANT STATES HE KNEW HIM FOR

7  ONLY ONE WEEK.  HE WAS AWARE THAT HE HAD JUST RECENTLY GOT OUT OF

8  JAIL AND THAT PARKER WANTED TO GET INTO THE RIGHT CROWD SO THAT HE

9  COULD GO STRAIGHT.  HE DID NOT KNOW FOR WHAT TYPE OF OFFENSE PARKER

10  HAD BEEN INCARCERATED FOR.

11          AGAIN, DEFENDANT SAID THAT IT WAS DIFFICULT TO EXPLAIN,

12  BUT FOR MONTHS PRECEDING THE OFFENSE HE FELT HE HAD LOST CONTROL OF

13  HIS LIFE AND WAS TOTALLY POWERLESS.

14          DEFENDANT IS REQUESTING THAT HE BE HOUSED IN A YOUTH

15  AUTHORITY FACILITY.

16  PSYCHIATRIC REPORT:

17          AS REPORTED EARLIER IN THE REPORT, DEFENDANT HAS BEEN

18  EXAMINED BY DR. DAVID J. SHEFFNER, NEWPORT BEACH, TELEPHONE NUMBER

19  714/645-4323.  DEFENDANT REPORTED TO THE DOCTOR THAT HE SAW A

20  PSYCHOLOGIST FOR AT LEAST TWO YEARS, THE LAST TIME BEING IN JANUARY

21  OF 1985.  THEY WORKED ON FAMILY, SCHOOL PROBLEMS AND DRUG PROBLEMS.

22  DEFENDANT TOLD THE PSYCHIATRIST THAT HE WAS AN ALCOHOLIC IN ABOUT

23  1981 OR 1982.  HE ALSO REPORTED THAT HIS MOTHER HAD BEEN VERY BUSY

    -15-  (JAY)

1  FOR THE LAST YEARS, BUT ALSO REPORTED A VERY GOOD FAMILY LIFE, AND

2  THAT THE FAMILY SPENT A LOT OF TIME TOGETHER.

3          IT WAS THE DOCTOR'S PSYCHIATRIC IMPRESSION THAT

4  DEFENDANT WAS NOT BASICALLY ANTI-SOCIAL IN PERSONALITY

5  STRUCTURE-BEHAVIOR.  AS REPORTED EARLIER, HE BELIEVED THAT DEFENDANT'S

6  PARTICIPATION IN THE OFFENSE WAS MULTI-DETERMINED WITH FOUR PROMINENT

7  ELEMENTS, EACH NECESSARY, BUT NOT SUFFICIENT IN ITSELF TO PRODUCE

8  DEFENDANT'S INVOLVEMENT AND THEY WERE DEPENDENCY, DEPRESSION, DRUGS

9  AND CIRCUMSTANCES.

10          HE WENT ON TO DESCRIBE DEFENDANT AS PASSING-DEPENDENT

   PERSONALITY AND BEING A FOLLOWER VERSUS AN INSTIGATOR,

12  SELF-SACRAFICING IN INTERPERSONAL RELATIONSHIPS.  HE WAS NOT

13  CONSIDERED TO BE SOCIALLY OR PHYSICALLY AN AGGRESSIVE PERSON.

14          THERE WAS EVIDENCE OF CHRONIC CHILDHOOD DEPRESSION

15  WHICH INCREASED WITH DEMANDS OF ADOLESCENCE, WITH ALCOHOLISM AND

16  DEPRESSION INCREASED EVEN MORE WHEN DEFENDANT BROKE UP WITH A

17  GIRLFRIEND IN 1984.  THE DOCTOR WROTE: "DEPENDENCY, DRUGS AND

18  DEPRESSION ALL COMBINED IN A SPIRALING PSYCHIATRIC DETERIORATION

19  RESULTING IN APATHETIC, SEVERELY DEPRESSED, SEVERELY DRUG-DEPENDENT,

20  NON-FUNCTIONING ADOLESCENT.  DOING DRUGS BECAME THE FOCAL POINT OF

21  HIS LIFE AND DRUG DEPRESSION-DEPENDENCY WERE INTERTWINED, EACH

22  REINFORCING THE OTHER."

23          THE DOCTOR CITED AN EXAMPLE OF BEHAVIOR CHANGE IN THAT

   -16-  (JAY)

76C692G — PROB. 5A —  PS 11-85

DEFENDANT ALLEGEDLY TRIED TO TURN IN CO-DEFENDANT MEIER A YEAR
EARLIER AND THEN AFTER SEVERE DRUG USE, AGREED TO PARTICIPATE IN THE
CRIME.

THE DOCTOR FURTHER WROTE THAT "DEPENDENCY,
DEPRESSION AND CHRONIC APATHY, SECONDARY TO DEPRESSION AND MARIJUANA
SET THE STAGE FOR THE OFFENSE, BUT ... THERE WAS A VERY PROMINENT
CIRCUMSTANTIAL ELEMENT OPERATING AS WELL, I.E., GIVEN THE
"LEADERSHIP" (AND MOTIVATION) OF TORRY..." FURTHER, ... IT IS HARD
TO IMAGINE MATT'S INVOLVEMENT IN THE MURDER WITHOUT THE VERY
SPECIFIC CIRCUMSTANCES OF HIS EXPOSURE TO TORRY."

THE DOCTOR CONCLUDED THAT IF DEFENDANT IS TO BE
INCARCERATED, HE SHOULD BE PLACED WHERE THERE ARE MAXIMUM
POSSIBILITIES FOR GROWTH MIGHT OCCUR, SUCH AS SCHOOLING,
PSYCHOTHERAPEUTIC FACILITIES.

THE DOCTOR'S REPORT WHICH WAS PROVIDED TO THE PROBATION
OFFICER BY DEFENDANT'S ATTORNEY, IS ATTACHED FOR THE COURT'S
CONSIDERATION.

INTERESTED PARTIES:

PROBATION OFFICER ATTEMPTED TO REACH INVESTIGATING
DEPUTIES IN THIS CASE. A MESSAGE WAS LEFT, BUT AS THE TIME OF
DICTATION, THERE HAVE BEEN NO RESPONSE. HOWEVER, SERGEANT RENE LAPORTE
SHERIFF'S DEPARTMENT INVESTIGATOR SPOKE WITH THE PREVIOUS PROBATION
OFFICER WHO DID THE PRE-SENTENCE INVESTIGATION IN THE MEIER CASE.

-17-   (JAY)

1  HE TALKED MOSTLY ABOUT MEIER'S INVOLVEMENT AND HIS DISENCHANTMENT

2  WITH THE JURY VERDICT.  HE DID SAY, HOWEVER, THAT DEFENDANT MEIER

3  INFLUENCE JAY AND PARKER IN THIS CASE AND HE POINTED OUT THAT THERE

4  WAS SOME EVIDENCE THAT DEFENDANT WAS OFFERED MONEY TO HELP OUT.

5       ANOTHER JUVENILE OFFICER IN THE PROBATION DEPARTMENT

6  SPOKE WITH ANOTHER SHERIFF'S INVESTIGATOR, RUSSELL ULOTH, WHO SAID

7  THAT HE FELT DEFENDANT MEIER HAD THE ABILITY TO LEAD OTHERS AND

8  INFLUENCED THE CO-DEFENDANTS TO HELP HIM KILL HIS MOTHER.  HE ALSO

9  POINTED OUT THAT JAY WAS OFFERED $2,000 TO HELP DEFENDANT MEIER.

10      PROBATION OFFICER INTERVIEWED DEFENDANT'S PARENTS IN

    PERSON.  THEY INDICATED THAT THEY HAD DONE WHAT THEY FELT WAS

12  EVERYTHING, INCLUDING GOING TO SUCH LENGTHS AS SEARCHING DEFENDANT'S

13  ROOM.  THEY ONCE CONSIDERED INSTITUTIONALIZATION.  PRIOR TO THAT

14  THEY HAD SEEN A PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS WHO

15  DISMISSED THE MATTER AS TEENAGE REBELLION, AND ACCORDING TO THE

16  MOTHER AND FATHER, SAID THAT THE MOTHER WAS OVERREACTING TO HER

17  BACKGROUND.  IN THIS REGARD, THE MOTHER STATES THAT HER MOTHER AND

18  FATHER WERE ALCOHOLICS, AND IT IS HER UNDERSTANDING THAT IT IS

19  COMMON KNOWLEDGE THAT ALCOHOLISM TENDS TO RUN IN FAMILIES.  THEY SAID

20  THAT THE WHOLE THING IS EXTREMELY FRIGHTENING, AS THEY WERE JUST

21  TAKEN OVER AND THEY FELT HELPLESS.  AS TO DEFENDANT, THEY SAY THAT HE

22  WAS LIKEABLE TO EVERYONE AND WAS GOOD AT ALL AGE LEVELS UNTIL JUST

    PRIOR TO THE OFFENSE.  THEY ACKNOWLEDGE THAT HE HAD BEEN REFERRED

-18-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1   FOR COUNSELING IN THE SECOND GRADE BECAUSE OF A POOR SELF-IMAGE,

2   EXPLAINING THAT HE WAS FAR OVERSHADOWED BY HIS BROTHER ANDREW WHO

3   WAS VERY COMPETITIVE.  HIS YOUNGER SISTER WAS EXCEPTIONALLY CUTE

4   AND APPARENTLY SHE GOT A LOT OF ATTENTION, BUT THEY ARE NOT SURE IF

5   THAT IS PART OF THE PROBLEM.

6           IN GENERAL, THE PARENTS ARE VERY DISTRESSED, AND

7   EXPRESSED HOPE THAT THEIR SON CAN STILL MAKE SOMETHING OF HIS LIFE.

8   THEY WERE VERY CONCERNED THAT HE IS NOT STRONG ENOUGH TO WITHSTAND

9   A STATE PRISON INSTITUTION AND HOPE THAT HE WILL BE INCARCERATED IN

10  A YOUTH AUTHORITY FACILITY, AND THAT HE WILL BE GIVEN PROTECTION

    THAT HE NEEDS, AS HE IS NOT A STRONG PERSON EITHER EMOTIONALLY OR

12  PHYSICALLY.  THE PARENTS GAVE REFERENCES OF THE REVEREND JESS TAYLOR

13  AND A "MRS. MENDOZE, A BIOLOGY TEACHER AT EL CAMINO HIGH SCHOOL."

14          PROBATION OFFICER SPOKE WITH A LONG-TIME FRIEND OF

15  DEFENDANT, 19 YEAR OLD MICHAEL LITTLE, TELEPHONE NO. 805/544-5519

16  AND 818/889-1945.  HE DESCRIBES DEFENDANT AS VERY EASY-GOING AND

17  FRIENDLY, AS NOT A STRONG PERSON, BUT INSTEAD A FOLLOWER.  HE JUST

18  LIKES TO SAY YES AND WANTS NO "HASSLES".  HE WANTS TO GET ALONG WITH

19  EVERYONE.  HE WAS A CHURCH ALTAR BOY AND A B-PLUS STUDENT UNTIL HIS

20  SENIOR YEAR.  HE BROKE UP WITH A GIRLFRIEND AT ABOUT THAT TIME AND

21  WAS USING A LOT OF DRUGS.  HIS DRUGS WERE PROVIDED BY TWO OR THREE

22  DIFFERENT PEOPLE, BUT HE WAS ALSO DOING SOME SELLING TO SUPPORT HIS

23  HABIT.  HE SMOKED MARIJUANA EVERY DAY AND WAS ALSO USING COCAINE AND

            -19-   (JAY)

DRINKING. HE WOULD ESTIMATE THAT HIS MARIJUANA USAGE WAS FOUR TO

FIVE "JOINTS" A DAY FOR A PERIOD OF SEVERAL MONTHS PRIOR TO THE

PRESENT OFFENSE. HE WAS WITH THE DEFENDANT ON THE EVENING OF THE

OFFENSE ABOUT 6:30 P.M., AND HE WAS ALREADY UNDER THE INFLUENCE OF

MARIJUANA. THE DEFENDANT WAS DRINKING AND BEER AND LATER DRANK RUM

AND WINE COOLERS. HE PERSONALLY SAW HIM TAKE "SIX LINES OF COKE",

AND FINISHED UP WITH HASHISH. HE HAD LSD THE NIGHT BEFORE.

MR. LITTLE STATES, "HIS MIND WAS FRIED, HE DIDN'T KNOW WHAT HE WAS

DOING." HE EMPHASIZES THAT THE PERSON HE KNEW THAT NIGHT WAS NOT

THE PERSON HE USED TO KNOW BECAUSE, "I KNOW HOW MATT ACTS." HE HAS

SEEN HIM RECENTLY AND DESCRIBES HIM AS THE "NEW MAN".

FURTHER, AS TO DEFENDANT'S STATE JUST PRIOR TO THE

OFFENSE, MR. LITTLE STATES THAT HE LOOKED TO BE IN A "ZOMBIE".

SOMETIMES IT WOULD TAKE HIM FIVE TO TEN MINUTES TO RESPOND TO A

QUESTION. FURTHER, HE SAYS THE DEFENDANT WAS ABLE TO FOOL HIS

PARENTS BY GETTING UP EARLY AND PRETENDING TO GO TO SCHOOL, BUT

INSTEAD HE WOULD GET "STONED" AND COME HOME AND GO TO HIS ROOM.

PROBATION OFFICER TALKED WITH MR. PATRICK DICKINSON,

THE PROBATION OFFICER WHO PREPARED THE PRE-SENTENCE INVESTIGATION IN

THE CASE OF TORRAN MEIER. HE DESCRIBED MEIER AS A RATHER IMPOSING

FIGURE, QUITE SOPHISTICATED, POISED AND APPARENTLY PERSUASIVE. HE

WAS ALWAYS CALM AND SEEMED IN COMMAND OF EVERYTHING, EVEN WHILE

INCARCERATED AT JUVENILE HALL WHERE HE SEEMED TO HAVE ALREADY

-20-  (JAY)

76C692G - PROB. 5A - PS 11-85

1  ESTABLISHED RAPPORT WITH THE STAFF.  HE SEEMED AND LOOKED MUCH OLDER

2  THAN HIS YEARS.

3  PROBATION OFFICER HAS REVIEWED THE PROBATION REPORT

4  OF RICHARD PARKER.  IT SHOWS THAT PARKER WAS A TRANSIENT, AND

5  APPARENTLY HAD NO PLACE TO LIVE.  INFORMATION RECEIVED BY THE

6  PROBATION OFFICER INDICATES THAT HE WAS LIVING IN A BOX AT THE TIME

7  OF THE OFFENSE.  HIS RECORD SHOWS CONVICTIONS FOR AUTO BURGLARY,

8  PROPERTY THEFT, PETTY THEFT, ET CETERA.  HE REPORTED AT THE TIME

9  OF THE PROBATION INTERVIEW THAT HE WAS "LIVING ON THE STREETS AND

10 TORRY ASKED ME IF I WANTED TO HELP HIM DO SOMETHING ..."

11 THE REVEREND JESS TAYLOR OF WOODLAND HILLS, SAYS HE

12 HAS KNOWN THE FAMILY A LONG TIME.  AND THAT DEFENDANT GREW UP AS A

13 PART OF HIS CONGREGATION.  HE WAS ACTIVE IN THE CHURCH UNTIL ABOUT

14 TWO YEARS AGO.  HE DESCRIBES THE FAMILY AS "TOP FLIGHT PEOPLE", AND

15 SAYS, "SO WAS MATT."  HE SAYS THAT DEFENDANT WAS ALWAYS A

16 COOPERATIVE PERSON AND TRIED TO GET ALONG.  FURTHER, THAT HE WAS

17 "JUST A GOOD KID."  HE SUBSTANTIATES THAT THE DEFENDANT WAS AN ALTAR

18 BOY.  HE HAS VISITED DEFENDANT IN CUSTODY AND FEELS THAT HE IS WELL

19 ON HIS WAY TO A REORDERED LIFE.  HE HOPES THAT THE

20 DEPARTMENT OF CORRECTIONS WILL TAKE MEASURES TO PROTECT HIM.

21 MRS. MENDOZA, A BIOLOGY TEACHER AT EL CAMINO HIGH

22 SCHOOL STATES THAT DEFENDANT WAS "OUTSTANDING."  HE RECEIVED ONLY

23 A'S AND B'S, AND SHE BELIEVES THIS WAS IN THE TENTH AND ELEVENTH

-21-  (JAY)

GRADES. HE WAS ALSO HER TEACHING ASSISTANT. OF ALL THE STUDENTS
SHE HAS TAUGHT SHE WOULD PLACE HIM IN THE UPPER FIVE. SHE
DESCRIBES HIM AS BRIGHT AND AS HAVING STUDIED HARD AND HAVING A GOOD
PERSONALITY.

ADDITIONAL INFORMATION:

PROBATION OFFICER HAS REVIEWED THE AMENABILITY
DETERMINATION REPORT FROM THE YOUTH AUTHORITY IN THE *CASE OF* TORRAN LEE MEIER.
DEFENDANT MEIER WAS REFERRED TO DIAGNOSTIC STUDY PRIOR TO HIS
SENTENCE AND DURING THAT STUDY DEFENDANT MEIER, ON PAGE 17 OF THE
REPORT TOLD AN EXAMINER THAT HE FELT DEFENDANT JAY, AT THE TIME OF
THE OFFENSE, WAS OUT OF HIS MIND FROM THE RESULTS OF HIS HISTORY OF
CHRONIC DRUG ABUSE.

EVALUATION:

THIS YOUNG DEFENDANT'S PARTICIPATION IN MURDER AND
ATTEMPTED MURDER HAS ITS ROOTS IN A SUBMISSIVE NATURE, DEPRESSION
AND PRONENESS TO SUBSTANCE ABUSE AND HIS PRESENCE IN A SOCIETY AT A
TIME WHEN INTOXICANTS WERE GENERALLY DISMISSED AS A HARMLESS PHASE
OF GROWING UP. THE LATTER ELEMENT WAS A VIEWPOINT THAT APPARENTLY
PREVAILED AT A TIME WHEN HIS PARENTS WERE SEEKING SOLUTIONS.

BY ALL ACCOUNTS, DEFENDANT WAS A FAIRLY WELL-ADJUSTED,
CONTENTED MEMBER OF A HIGHLY STABLE FAMILY. WHILE HE WAS PROBABLY
THE WEAKEST OF THE THREE CHILDREN, HE DID WELL IN SCHOOL, HAD FRIENDS
AND WAS WELL LIKED BY EVERYONE. ALL THIS WAS ABOUT TO END UPON THE

-22-    (JAY)

INTRODUCTION OF MARIJUANA AND ALCOHOL WHICH HE LIKED VERY MUCH, AS
IT MADE HIM FEEL GOOD.  HE SUCCUMBED AND THE SPIRAL BEGAN.  THERE
WAS LITTLE IMPEDIMENT TO WHAT WAS TO BE A SEARCH FOR OBLIVION.

        BY THE TIME HE BEGAN HIS ASSOCIATION WITH TORRAN MEIER,
DEFENDANT WAS RAPIDLY DETERIORATING.  MEIER HAD A PLAN, BUT NEEDED
HELP.  IT WAS NOT EASY TO RECRUIT OTHERS TO HELP STRANGLE HIS MOTHER,
BUT EVENTUALLY THE STRONG, PERSUASIVE MEIER FOUND ACQUIESENCE FROM
PARKER, A HOMELESS DRIFTER AND THIEF, AND THE DRUG-DAZED JAY, WHOM
MEIER DESCRIBED TO PAROLE AUTHORITIES AS BEING OUT OF HIS MIND FROM
THE RESULTS OF CHRONIC DRUG ABUSE AT THE TIME OF THE OFFENSE.

        THUS, THE DEPENDENCY, DEPRESSION, DRUGS, CIRCUMSTANCES
CYCLE REFERRED TO IN DR. DAVID SHEFFNER'S THOROUGH AND INCISIVE
ANALYSIS WAS COMPLETED WITH THE TRAGIC RESULTS THAT ARE NOW A MATTER
OF RECORD.

        THE UNDERSIGNED OFFICER AGREES WITH THE ABOVE DOCTOR'S
ASSESSMENT OF THIS DEFENDANT.  HE DOES NOT APPEAR TO BE BASICALLY
ANTI-SOCIAL, AND ANY INCARCERATION SHOULD TAKE THIS INTO ACCOUNT,
AS WELL AS DEFENDANT'S POTENTIAL TO BE A PRODUCTIVE CITIZEN.  HE
NEED ONLY TO LIVE A LIFE OF SOBRIETY.  HE IS APPARENTLY REMORSEFUL
AND UNDERSTANDING OF WHAT LED TO THE CATASTROPHIC EVENTS ON THE
EVENING OF THE OFFENSE.

                SENTENCING CONSIDERATIONS:

    -23-  (JAY)

CIRCUMSTANCES IN MITIGATION:

1.  OF THE THREE DEFENDANTS, DEFENDANT WAS THE MOST
    PASSIVE PARTICIPANT, AND WHILE HIS ROLE CANNOT
    BE SAID TO BE A MINOR ONE, IT WAS THE MOST
    MINOR OF THE THREE.

2.  THE DEFENDANT PARTICIPATED IN THE CRIME UNDER
    THE CIRCUMSTANCES OF EXTREME DRUG USE, WHICH WAS
    EVEN ACKNOWLEDGED BY CO-DEFENDANT MEIER, WHO
    INSTIGATED THE CRIME.  THIS WOULD INDICATE THE
    DEFENDANT'S CONDUCT WAS PARTIALLY EXCUSABLE FOR
    SOME OTHER REASON NOT AMOUNTING TO A DEFENSE.

3.  THE DEFENDANT WITH NO APPARENT PRE-DISPOSITION
    TO DO SO, WAS INDUCED BY DEFENDANT MEIER TO
    PARTICIPATE IN THE CRIME.

4.  DEFENDANT HAS NO PRIOR RECORD.

5.  DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING
    THE CRIME BEFORE HE WAS APPREHENDED, THUS
    INSURING HIS EVENTUAL ARREST AND CONVICTION.

CIRCUMSTANCES IN AGGRAVATION:

1.  THE CRIME INVOLVED GREAT VIOLENCE, DISCLOSING A
    HIGH DEGREE OF CRUELTY AND CALLOUSNESS. WHETHER
    OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT
    UNDER SECTION 12022.7 PENAL CODE.

DEFENDANT APPEARS TO BE INELIGIBLE FOR PROBATION

UNLESS THE COURT FINDS THIS IS AN UNUSUAL CASE.

DUE TO THE NATURE OF THE OFFENSE, THE PROBATION

OFFICER CANNOT RECOMMEND ANYTHING OTHER THAN DENIAL PROBATION AND

A COMMITMENT TO THE DEPARTMENT OF CORRECTIONS.  AS POINTED OUT IN

VARIOUS PARTS OF THE REPORT, DEFENDANT IS NOT A STRONG PERSON, BUT

HE IS BRIGHT, USEFUL AND SALVAGEABLE.  IT IS SUGGESTED THAT THE

-24-  (JAY)

7EC592G — PROB. 5A — PS 11-85

1 | DEPARTMENT OF CORRECTIONS PLACE DEFENDANT IN A MINIMUM SECURITY
2 | INSTITUTION IN A PLACE THAT IS REASONABLY SAFE AND DUTIES THAT WILL
3 | ENHANCE THE FUNCTION OF THE INSTITUTION.
4 | RECOMMENDATION:
5 |             IT IS RECOMMENDED THAT PROBATION BE DENIED, AND THAT
6 | THE DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT
7 | CREDIT OF 482 DAYS, THAT THE COURT ORDER THE DEFENDANT TO PAY A
8 | RESTITUTION FINE OF $100 IN SUBDIVISION (A) OF SECTION 13967 OF THE
9 | GOVERNMENT CODE.
10 | RESPECTFULLY SUBMITTED,

BARRY J. NIDORF,
PROBATION OFFICER

12 |
13 | BY
14 | ROBERT E. KELSEY, DEPUTY
     EAST SAN FERNANDO VALLEY AREA OFFICE
15 | 901-4053
16 |

17 | READ AND APPROVED:            I HAVE READ AND CONSIDERED
                                   THE FOREGOING REPORT OF
18 |                              THE PROBATION OFFICER
19 | BY
     ART KEENER, SDPO
20 |
                                  _____
21 | (SUBMITTED 2-2-87)          JUDGE OF THE SUPERIOR COURT
22 | (TYPED 2-3-87)
     REK:RH    (6)

-25-  (JAY)

76C692G – PROB. 5A – PS 11-85

# Exhibit
# 3

1
2
3
4
5
6
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10   DEPARTMENT NE "B"                    HON. GEORGE XANTHOS, JUDGE

11

12   THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                              )
13                        PLAINTIFF,          )
                                              )
14        VS.                                 )        NO. A811060
                                              )
15   MATTHEW ADAM JAY,                        )        STATE PRISON
                                              )
16                        DEFENDANT.          )
                                              )
17   _____

18   PASADENA, CALIFORNIA; THURSDAY, MARCH 12, 1987 A.M. SESSION

19            UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT

20   IN COURT AND REPRESENTED BY COUNSEL, E. STANFORD; THE PEOPLE

21   BEING REPRESENTED BY E. FELDMAN, DEPUTY DISTRICT ATTORNEY

22   OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

23            (BARBARA BURLESON, OFFICIAL REPORTER, CSR #2247.)

24

25        THE COURT:  ON THE MATTER OF PEOPLE VERSUS MATTHEW

26   ADAM JAY, 811060, MR. JAY IS PRESENT WITH HIS ATTORNEY

27   MR. STANFORD.  PEOPLE ARE REPRESENTED BY MR. FELDMAN.

28            MR. JAY, TODAY IS THE DAY SET FOR YOUR PROBATION

1  AND SENTENCING.

2          DID YOU EVER INQUIRE INSOFAR AS THE ARBUCKLE

3  WAIVERS?

4          DID MR. JAY GIVE AN ARBUCKLE WAIVER WHEN HE PLED

5  EARLIER TO JUDGE PEREZ?

6      MR. STANFORD:  YES.

7      THE COURT:  WAS THERE AN ARBUCKLE WAIVER?

8      MR. STANFORD:  YES.

9      MR. FELDMAN:  YES.  IT WAS AN EXPLICIT UNDERSTANDING

10  HE WOULD BE SENTENCED BY YOUR HONOR.

11     THE COURT:  IS THAT YOUR UNDERSTANDING, MR. JAY?

12  YOU ENTERED YOUR PLEA BEFORE JUDGE PEREZ IN VAN NUYS, AND

13  YOUR ATTORNEY HAS INDICATED THAT YOU REQUESTED THAT I SENTENCE

14  YOU.  DO YOU GIVE UP YOUR RIGHT TO BE SENTENCED BY JUDGE PEREZ

15  SO I CAN DO THAT?

16     DEFENDANT JAY:  YES, YOUR HONOR.

17     THE COURT:  THANK YOU.

18         COUNSEL JOIN?

19     MR. STANFORD:  YES, YOUR HONOR.

20     THE COURT:  THANK YOU.

21         AS I SAID, TODAY IS PROBATION AND SENTENCING TIME.

22  DO YOU WANT TO BE HEARD?

23     MR. STANFORD:  YES, YOUR HONOR.

24     THE COURT:  ALL RIGHT.

25     MR. STANFORD:  THANK YOU.

26         IF YOUR HONOR PLEASES AND MR. FELDMAN, I THINK

27  IT MIGHT BE APPROPRIATE TO SAY HERE THAT EVERY BEAUTIFUL WORK

28  OF ART HAS SOME DEFECT IN IT.  SOMETIMES IT IS NOT APPARENT

1   TO THE EYE OF THE BEHOLDER; SOMETIMES IT IS.

2            SOMETIMES THERE IS A GAP IN THE WAY THE PAINTING

3   IS PREPARED, SOME DEFECT IN THE ARTIST.  THE BLACK SPOT IN

4   THE OTHERWISE ENERGETIC AND LOVELY LIFE OF MATTHEW JAY, THE

5   GAP, THE ABERRATION WAS HIS INVOLVEMENT IN THE CRIME WHICH

6   LED TO THE DEATH OF SHIRLEY RIZK AND WHICH INVOLVED THE ATTEMPTED

7   MURDER OF LITTLE RORY RIZK.

8            THIS CASE HAS RAISED MANY THOUGHTS IN THE MINDS

9   OF THE FAMILY OF MATT JAY.  IT HAS RAISED MANY THOUGHTS IN

10  MY MIND AS COUNSEL.

11           I WOULD SAY THAT I IS AN AMERICAN TRAGEDY NO LESS

12  THAN THE TRAGEDY THAT THEODORE DREISER WAS TALKING ABOUT,

13  ALTHOUGH HIS NOVEL AND HIS ANALYSIS WAS A LITTLE DIFFERENT

14  THAN WHEN HE TALKED ABOUT THE MATERIALISM AND THE FACT THAT

15  AN INDIVIDUAL GOT CAUGHT UP IN THE MATERIALISM OF LIFE AND

16  WHAT HAPPENED TO MATT JAY IS NOT LESS THAN AN AMERICAN TRAGEDY.

17           HE IS JOINED HERE TODAY, AS THE COURT CAN SEE,

18  BY FAMILY AND FRIENDS.  THERE HAVE BEEN NO LESS THAN 40 OR

19  50 LETTERS OF RECOMMENDATION WHICH HAVE BEEN SENT TO THE COURT

20  ON BEHALF OF THIS YOUNG MAN.

21      THE COURT:  FORTY-FOUR TO BE EXACT.

22      MR. STANFORD:  FORTY-FOUR.  THANK YOU.

23           HIS MOTHER IS PRESENT.  HIS FATHER IS PRESENT.

24  HIS BROTHER AND SISTER ARE PRESENT.  THE PEOPLE WHO YOU SEE

25  BEFORE YOU, YOUR HONOR, ARE NOT MERELY HIS RELATIVES, BUT

26  THEY ARE MEMBERS OF THE COMMUNITY, NOT ONLY THE CHURCH

27  COMMUNITY BUT THE GENERAL COMMUNITY IN WHICH MATT JAY LIVED,

28  AND HOPEFULLY A COMMUNITY TO WHICH HE WILL RETURN IN DUE COURSE.

1    THESE LETTERS POINT OUT SEVERAL FACTORS ABOUT

2  MATT JAY WHICH CAN BE CONSIDERED, OF COURSE, AS DESCRIPTIVE

3  OF HIS CHARACTER.  HE IS A LOVING INDIVIDUAL, A RELIGIOUS

4  YOUNG MAN, CAME FROM A GOOD FAMILY.

5    WHEN HE WAS SOBER HE HELPED OTHERS.  HE EVEN

6  EXTENDED HIMSELF TO THE EXTENT -- AND I THINK THERE IS A

7  RELATIONSHIP OR MENTION OF IT IN THE PROBATION REPORT -- HE

8  EVEN TRIED TO DISSUADE OTHER YOUNG PEOPLE TO STAY AWAY FROM

9  DRUGS WHEN HE WAS SOBER, WHEN HE WAS NOT ON DRUGS.

10    HE WAS A LEADER IN HIS CHURCH COMMUNITY WHEN HE

11  WAS IN CONTROL OF HIMSELF.  THESE ARE THE THINGS THAT ARE

12  SAID IN THE LETTERS.  HE HAS A FUTURE AS IT SAYS.  I AM SURE

13  HE DOES.

14    HE COMPLETED HIGH SCHOOL IN THE COUNTY JAIL HALL

15  OF JUSTICE TO SHOW HIMSELF THAT HE COULD DO IT AND TO HELP

16  HIS REHABILITATION AND TO SHOW HIS PARENTS THAT YOU COULD

17  DO IT.  HE HAS THE LOVE AND SUPPORT OF HIS COMMUNITY AND OF

18  HIS FAMILY, BUT NOT ONE LETTER HAS OVERLOOKED THE SERIOUSNESS

19  OF THIS CRIME.  NOT ONE LETTER HAS SAID THAT HE OUGHT TO NOT

20  BE PUNISHED FOR HIS CRIME, BUT IT IS -- IT IS SIMPLY A HARD,

21  DIFFICULT THING TO TALK ABOUT WHEN ONE FINDS A YOUNG MAN WHO

22  COULD NOT SAY NO TO TORRY MEIER, WHO I THINK WAS REFERRED

23  TO IN MATT JAY'S REPORT AS BEING A LEADER AND A RATHER

24  AGGRESSIVE INDIVIDUAL.

25    BE THAT AS IT MAY, THAT IS IN THE PAST.  THE

26  PROBATION DEPARTMENT HAS THOROUGHLY REVIEWED MATT JAY'S CASE.

27  THEY HAVE SEEN FIT -- PRECISELY ROBERT KELSEY, THE PROBATION

28  OFFICER IN THIS CASE, HAS SEEN FIT TO NOTICE NO LESS THAN

1  FIVE CIRCUMSTANCES IN MITIGATION FOR THIS YOUNG MAN WHO, I

2  MIGHT ADD, WAS 18 YEARS AND 76 DAYS AT THE TIME THIS EVENT

3  OCCURRED.

4          WITH REGARD TO THE FACT OF THE CRIME, I AM GOING

5  TO SAY PROBABLY THREE SENTENCES, AND THE FIRST SENTENCE I

6  WOULD SAY THAT MATT JAY PARTICIPATED BUT WAS NOT THE PRIME

7  ACTOR IN THE CRIME IN THE HOUSE WHERE SHIRLEY RIZK DIED.

8  HE DID NOT EVEN TOUCH ANY ROPE OR ANYTHING OF THIS SORT.

9          SECONDLY, IT WAS ALLEGED -- AND HE HAS ADMITTED

10  THAT HE PURCHASED POISON. HOWEVER, IT WAS SOMEBODY ELSE WHO

11  DID SOMETHING WITH THAT POISON IN AN ATTEMPT TO DO AWAY WITH

12  RORY RIZK, AND NOT ONLY DID TORRY MEIER -- MY REMARKS ARE

13  NOT INTENDED TO IN ANY WAY EXPLAIN OR DIMINISH THIS YOUNG

14  MAN'S RESPONSIBILITY, BUT TWICE TORRY MEIER TRIED TO USE THE

15  POISON, ONCE IN A SANDWICH AND ONCE IN SOME MALTED MILK

16  SUBSTANCE.

17          I AM SAYING THAT THERE IS SOME REMOVAL AS FAR

18  AS A COMPLETE PARTICIPATION IN THE RORY RIZK SITUATION.

19          MY CLIENT DID NOT  SET FIRE TO ANY CAR IN MALIBU,

20  ALTHOUGH THERE IS INFORMATION THAT HE WAS ON THE ROAD IN A

21  SEPARATE CAR. I AM NOT GOING TO TALK ABOUT THE FACTS ANYMORE

22  BECAUSE THOSE ARE THE ACCURATE FACTS AS THE REPORT SEEMS TO

23  INDICATE.

24          ONE OF THE INTERESTING FACETS OF MY CLIENT'S

25  BACKGROUND IS REALLY MENTIONED IN THE CIRCUMSTANCES MITIGATION

26  NUMBER FIVE IN WHICH THE PROBATION DEPARTMENT MENTIONS THAT

27  THE DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING THE CRIME

28  BEFORE HE WAS APPREHENDED THUS ENSURING HIS EVENTUAL ARREST

1   AND CONVICTION.

2         WHY DID HE -- MATT JAY -- AN OTHERWISE FINE YOUNG

3   MAN TALK THE DAY AFTER OR TWO DAYS AFTER THE EVENT? I DON'T

4   KNOW, AND GOD ONLY KNOWS THAT, BUT I CAN SUGGEST THAT HAVING

5   SOBERED UP THE DAY AFTER AND HAVING HEARD ON THE TELEVISION

6   OR SEEING ON THE TELEVISION OR HAD SOME INFORMATION AS TO

7   WHAT HAPPENED, THE REAL REALIZATION OF WHAT HE WAS INVOLVED

8   IN CAME UPON HIS SHOULDERS AND HE SIMPLY WAS INVOLVED IN SOME

9   EFFORT TO RELEASE HIS GUILT TO WHOMEVER WOULD LISTEN TO HIM.

10        THIS MAN HAS BEEN -- AND I SAY "MAN" ADVISEDLY --

11  HAS BEEN REMORSEFUL FROM THE TIME BEFORE HE WAS EVEN ARRESTED.

12  HE HAS BEEN COMPASSIONATE WITH PEOPLE THAT HE HAS KNOWN AND

13  HE IS DEEPLY, DEEPLY SORRY FOR WHAT HE HAS DONE. HE HAS NO

14  PRIOR RECORD.

15        FURTHERMORE, AS THE PROBATION DEPARTMENT HAS

16  MENTIONED AS A FURTHER CIRCUMSTANCE IN MITIGATION, HE WAS

17  A PASSIVE PARTICIPANT. THAT IS NUMBER ONE IN THIS EVENT,

18  AND WHILE HIS ROLE CANNOT BE SAID TO BE A MINOR ONE, HE WAS

19  THE MOST MINOR OF THE THREE. HE WAS A PASSIVE PARTICIPANT

20  BECAUSE, AS THE COURT KNOWS PARTICULARLY FROM THE REPORT OF

21  THE PSYCHIATRIST WHO EXAMINED HIM AND HOSPITAL REPORTS

22  MENTIONED IN THE PROBATION REPORT -- THIS YOUNG MAN WAS

23  UNFORTUNATELY FOR HIMSELF AND HIS FAMILY USING DRUGS, BUT

24  HE WAS USING DRUGS ON THE DAY AND ON THE NIGHT OF THE CRIME.

25  HE WAS USING MARIJUANA. THERE WAS A SUGGESTION OF A LITTLE

26  COCAINE. THERE WAS HASHISH AND THERE WAS DRINKING OF SOME

27  BEER, AND THE PSYCHIATRISTS' REPORTS INDICATE THAT WERE IT

28  NOT FOR THE STUPOROUS CONDITION OF THIS YOUNG MAN OR THE

1   CONDITION THAT HE WAS IN OF BEING PASSIVE AND NONRESISTANT

2   TO FORCE BECAUSE OF HIS DRUG INVOLVEMENT AND, NUMBER TWO,

3   BECAUSE OF THE FORCEFUL CHARACTER OF TORRY MEIER HE WOULD

4   HAVE NAMELY -- MATT JAY WOULD HAVE NEVER BEEN INVOLVED IN

5   THIS CRIME, ALL OF WHICH IS FINE, BUT HE DID GET INVOLVED.

6           BUT I AM SUGGESTING TO THE COURT THAT HE DID NOT

7   GET INVOLVED AS A PERSON WITH COMPLETE CONTROL OVER HIMSELF,

8   ALTHOUGH IT IS TRUE AND IT WILL BE ARGUED THAT HE DROVE A

9   CAR AND WENT TO A STORE. I DON'T KNOW. I AM NOT ENOUGH OF

10  A DOCTOR TO KNOW HOW MUCH A PERSON HAS TO BE IN CONTROL OF

11  THEMSELVES TO GO TO A STORE OR DRIVE A CAR, BUT THERE IS A

12  BACKGROUND TO THIS YOUNG MAN SHOWING THAT HE USED DRUGS BECAUSE

13  OF A DISAPPOINTMENT THAT WENT ON.

14          HIS FAMILY TRIED TO HELP HIM AND IT CAME TO A

15  CLIMATIC END WITH THIS CASE. FOR EXAMPLE, PAGE 4 *OF THE

16  PROBATION REPORT, LINES 12 TO 14 -- "IN A DAZED, STUPOROUS

17  CONDITION THIS YOUNG MAN BOUGHT POISONS AT MEIER'S DIRECTION."

18  PAGE 4, LINES 12 TO 14.

19          THE COMMENT ABOUT THE EVENTS FROM THE LITTLE

20  VICTIM HIMSELF, PAGE 7, LINES 15 TO 16, RORY SAYS THE BROTHER

21  TRIED TO KILL HIM AND THERE WAS NO COMMENT BY RORY AS TO THE

22  OTHER TWO. I DON'T KNOW WHY, BUT I'M JUST MENTIONING THESE

23  THINGS SO THAT THE ACCURATE FACTS AS AT LEAST I VIEW THEM

24  ON BEHALF OF MY CLIENT WOULD BE UNDERSTOOD BY THE COURT.

25          OF COURSE, THE SINGLE MOST AGGRAVATING CIRCUMSTANCE

26  AND THE ONLY CIRCUMSTANCE THAT IS USED IN AGGRAVATION IS THE

27  CRIME ITSELF. IT WAS A CRIME OF GREAT VIOLENCE AND WAS A

28  HIGH DEGREE OF CRUELTY, BUT AS THE COURT MAY HAVE NOTICED --

1    AGAIN RETURNING TO THE FACTS OF THE CRIME, THIS NOW FROM THE

2    MOUTH OF THE DEFENDANT HIMSELF TO THE PROBATION OFFICER --

3    PAGE 12, LINES 7 TO 10:

4            "MATT JAY WAS CRYING, TOO SCARED TO WITHDRAW

5    BEFORE THE CRIME WAS COMPLETED. 'I FROZE,' SAYS HE.  MEIER

6    SAYS, 'WE NEED YOU.'"

7            AT LEAST MATT JAY IS TELLING THE PROBATION OFFICER

8    THAT HE -- MATT JAY -- WAS AFRAID OF WHAT WOULD HAPPEN TO

9    HIM HAD HE ATTEMPTED TO WITHDRAW -- WAS IN A STATE OF MASS

10   CONFUSION AND SO ON AND SO FORTH, AND HE DIDN'T HAVE THE

11   COURAGE TO WITHDRAW OR ANYTHING OF THAT SORT.

12           BUT A YEAR BEFORE THE CRIME HE HAD GREAT COURAGE,

13   WHICH IS AN INDICATION OF HIS FUTURE ABILITY TO RETURN TO

14   SOCIETY, BECAUSE HE WENT TO THE WEST VALLEY POLICE DEPARTMENT

15   AND REPORTED TO THE WEST VALLEY LOS ANGELES POLICE DEPARTMENT

16   WITH TWO OTHER FRIENDS OF HIS THAT MR. MEIER HAD MADE OVERTURES

17   ABOUT KILLING HIS MOTHER A YEAR BEFORE THIS CRIME OCCURRED,

18   AND THAT INFORMATION IS CONTAINED IN THE REPORTS THAT ARE

19   IN OUR POSSESSION.  GOD ONLY KNOWS WHY HE DIDN'T DO IT IN

20   OCTOBER OF 1985, BUT I AM MERELY MENTIONING IT TO THE COURT

21   BECAUSE IT SHOWS THAT THE MAN -- ALMOST A MAN  -- HAS MANY,

22   MANY BEAUTIFUL QUALITIES.

23           THERE ARE OTHER MITIGATING CIRCUMSTANCES THAT

24   HAVE BEEN MENTIONED BY THE PROBATION OFFICER.  OF COURSE,

25   POINT TWO CIRCUMSTANCE WAS THAT THE DEFENDANT HERE PARTICIPATED

26   IN THE CRIME UNDER CIRCUMSTANCES OF EXTREME DRUG USE WHICH

27   WAS EVEN ACKNOWLEDGED BY THE CO-DEFENDANT MEIER.

28           THE LAST SENTENCE OF THE PROBATION OFFICER'S

REPORT AS TO POINT TWO SAYS:

"THIS WOULD INDICATE THE DEFENDANT'S CONDUCT WAS PARTIALLY EXCUSABLE FOR SOME OTHER REASON NOT AMOUNTING TO A DEFENSE."

THAT IS THE ESSENCE OF THIS CASE, YOUR HONOR. MATT JAY IS NOW THE WAY HE WAS WHEN HE WAS RIGHT, AND GOD WILLING, HE WILL BE RIGHT AGAIN.

ONE OF THE OTHER MITIGATING CIRCUMSTANCES THAT HAS BEEN MENTIONED IS THAT HE HIMSELF WAS INDUCED BY DEFENDANT MEIER TO PARTICIPATE IN THE CRIME AND, OF COURSE, MR. JAY HAS NO PRIOR RECORD.

ANOTHER MITIGATING CIRCUMSTANCE THAT I WOULD LIKE TO MENTION SIMPLY TO ASSIST MY CLIENT HERE IS THAT UNDER RULE 414 OF THE CALIFORNIA RULES OF COURT SUBSECTION D AND SUBPARAGRAPH 7, THE EFFECTIVE IMPRISONMENT UPON HIM AND IN MY OPINION THE REMORSEFUL EFFECT OR THE REMORSEFULNESS OF THE DEFENDANT HIMSELF MIGHT CERTAINLY BE TAKEN INTO CONSIDERATION, BUT I THINK IT IS SIGNIFICANT THAT THIS YOUNG MAN HAS IMPRESSED SO MANY PEOPLE. HE HAS IMPRESSED NOT ONLY THE PEOPLE IN THIS COURTROOM WHO HAVE COME TO SUPPORT HIM, BUT HE HAS IMPRESSED THE PROBATION OFFICER WHO HAS DONE EVERYTHING THAT HE COULD DO EVEN TO THE POINT OF SUGGESTING THAT THIS MAY VERY WELL BE AN UNUSUAL CASE FOR THE COURT TO CONSIDER.

THERE ARE CERTAIN CRITERIA WHICH MAY FALL INTO THAT CATEGORY UNDER RULE 416 OF THE CALIFORNIA RULES OF COURT. I WILL JUST MENTION THOSE POINTS IN PASSING.

SUBSECTION D, "THERE MIGHT HAVE BEEN SOME COERCION

1    OR DURESS NOT AMOUNTING TO A DEFENSE." I AM NOT SURE WHETHER

2    THE FACTS THAT I HAVE RELATED AMOUNT TO ACTUAL COERCION, BUT

3    IT BORDERS ON THAT.

4            SUBSECTION E, RULE 416 DISCUSSES "BECAUSE OF SOME

5    PSYCHOLOGICAL PROBLEMS NOT AMOUNTING TO A DEFENSE THIS COULD

6    BE CONSIDERED AN UNUSUAL CASE," BUT LAST AND NOT LEAST, I

7    WOULD SAY THAT THE DEFENDANT'S AGE, HIS BEING NOW 19 YEARS

8    OF AGE BUT ONLY 76 DAYS BEYOND 18 AT THE TIME OF THE CRIME,

9    SHOULD HAVE SOME BEARING ON THE COURT'S CONSIDERATION IN THIS

10   CASE.

11           HE WAS A PASSIVE PARTICIPANT IN A TRAGEDY THAT

12   WILL KEEP HIM OUT OF SOCIETY, YOUR HONOR, FOR A LONG WHILE.

13   IF IT WERE NOT FOR THIS CASE, IF IT WERE NOT FOR THIS ONE

14   BLACK MARK, THIS IS ON HIS RECORD ON AN OTHERWISE BEAUTIFUL

15   PAINTING, THIS YOUNG MAN IS THE TYPE OF PERSON THAT ANYBODY

16   IN THIS ROOM WOULD LOVE TO HAVE OVER TO THEIR HOMES, TO A

17   YOUTH GROUP OUTING, TO KNOW AND TO LOVE FOR MANY, MANY YEARS.

18           I WOULD, OF COURSE, EXPECT THE COURT TO TAKE ALL

19   THESE ITEMS INTO CONSIDERATION AS I'M SURE THE COURT WILL,

20   AND I MUST SAY THAT THE DISTRICT ATTORNEY'S OFFICE IN A

21   CURIOUS WAY HAS BEEN HELPFUL IN THIS CASE, BECAUSE I THINK

22   THE DISTRICT ATTORNEY'S OFFICE HAS REALIZED THE TRAGEDY OF

23   THIS SITUATION. THEY HAVE REALIZED THE PROBLEM THAT MR. JAY

24   FACES WHEN THE MAIN CULPRIT HAS BEEN SENTENCED IN A DIFFERENT

25   WAY. I DON'T KNOW WHAT CAN BE DONE ABOUT THAT, BUT THE

26   SYMPATHIES THAT MR. JAY HAS FOR HIM SHOULD BE CONSIDERED.

27           HE IS AN EXCELLENT YOUNG MAN SAVE FOR THIS CASE.

28   I WOULD THINK, YOUR HONOR, THAT ONE POINT IN ADDITION TO WHAT

1    I HAVE MENTIONED BEFORE IS THAT -- AND THIS HAS BEEN MENTIONED

2    BY THE COURT -- WHATEVER THE COURT DOES, IT IS IMPORTANT THAT

3    THIS YOUNG MAN WHO DEEPLY UNDERSTANDS WHAT HE HAS DONE, BE

4    GIVEN A CHANCE TO GROW AND DEVELOP AND TO LIVE IN AN

5    ENVIRONMENT WHERE THERE IS AS MUCH EDUCATION AS POSSIBLE AND

6    AS MUCH CHANCE FOR DEVELOPMENT AS POSSIBLE, AND IN THAT RESPECT,

7    OF COURSE, WE WOULD REQUEST THAT IN THE COURT'S SENTENCING,

8    THERE BE A DEFINITE AND CONCRETE RECOMMENDATION THAT HE BE

9    HOUSED IN THE CALIFORNIA YOUTH AUTHORITY.

10         HAVING SAID WHAT I HAVE JUST SAID, YOUR HONOR,

11   I SIMPLY WOULD ASK THE COURT TO FORGIVE THE LENGTH OF MY

12   REMARKS.  I HAVE BEEN AFFECTED BY THIS YOUNG MAN AS HAS

13   EVERYBODY ELSE.  BUT FOR THIS ONE BLACK MARK HE WOULD BE A

14   FINE CITIZEN, AND I AM CERTAIN THAT HE WILL AGAIN BE A USEFUL

15   AND PRODUCTIVE MEMBER OF SOCIETY.

16         THANK YOU.

17     THE COURT:  THANK YOU, MR. STANFORD.

18       MR. FELDMAN.

19   MR. FELDMAN:  THANK YOU.

20         YOUR HONOR, COUNSEL, AS THIS COURT WELL KNOWS

21   THE FUNCTION OF THE DISTRICT ATTORNEY'S OFFICE IS GENERALLY

22   NOT SIMPLY TO CONVICT OR SIMPLY TO SEEK MAXIMUM SENTENCING,

23   BUT BASICALLY TO SEEK SUBSTANTIAL JUSTICE WHEREVER AND HOWEVER

24   IT PERCEIVES IT AND, INDEED, IN MY COMMENTS TO THE COURT I

25   WILL TRY TO REFLECT OUR HONEST APPRAISAL OF MATTHEW JAY AND

26   WHAT WE FEEL THE ACCURATE PROSPECTIVE SHOULD BE BOTH BEFORE

27   THIS COURT AND SUBSEQUENT AUTHORITIES THAT WILL BE VIEWING

28   HIM AND HIS INCARCERATION.

1    COUNSEL REFERS TO MATTHEW JAY AS AN ALMOST PRIME

2    EXAMPLE OF A 1980'S AMERICAN TRAGEDY.  IN MANY OF COUNSEL'S

3    REMARKS I FIND MYSELF IN AGREEMENT.  IN A FEW PARTICULARS,

4    I VARY.

5    IN HIS REFLECTION OF THE TRAGEDY OF MATTHEW JAY,

6    I HAVE TO AGREE.  IN MANY PARTS OF SOCIETY, PERHAPS UNTIL

7    RECENTLY MAYBE STILL IN SOME COURTS TODAY WE HEAR REFERENCES

8    TO DRUG OFFENSES AS VICTIMLESS CRIMES, AND I THINK PERHAPS

9    AS MUCH AS ANY CASE THAT I CAN RECALL THE PROSECUTION -- THE

10   OFFENSE OF MATTHEW JAY REALLY DISAPPROVES OF THE CONCEPT THEY

11   ARE VICTIMLESS CRIMES.

12   MATTHEW JAY AND THE OTHERS WERE VICTIMS IN THE

13   MORE TRADITIONAL WAYS OF THE CRIME INVOLVING THE DEATH OF

14   SHIRLEY RIZK AND NEAR DEATH OF RORY RIZK IS VERY MUCH THE

15   VICTIM OF THE DRUG LIFE AND THE DRUG CRIMES THAT WERE A PART

16   OF MATTHEW JAY UNTIL OCTOBER OF 1985.

17   AS COUNSEL HAS STATED, IT IS CLEARLY A FACT THAT

18   THE YEAR BEFORE THIS DEFENDANT JOINED WITH TORRY MEIER AND

19   MR. PARKER IN THE KILLING OF SHIRLEY RIZK AND THE ATTEMPTED

20   MURDER OF RORY RIZK, THERE HAD BEEN ANOTHER OVERTURE MADE

21   AND, INDEED, THIS DEFENDANT AT THAT TIME SAID, "NO," AND

22   PERHAPS WITH THE PEER PRESSURE THAT HE AND HIS FRIENDS WERE

23   ABLE TO DISSUADE TORRY MEIER FROM GOING FORWARD AT THAT TIME

24   AND CERTAINLY DID NOT JOIN IN WITH TORRY MEIER.

25   I THINK THE EVIDENCE IS FAIRLY CLEAR THAT INDEED

26   IN OCTOBER OF 1985 MATTHEW JAY HAD GONE VERY FAR DOWN THE

27   ROAD FROM A YEAR EARLIER IN HIS INVOLVEMENT IN DRUGS AND THE

28   EFFECTS THAT IT HAD ON HIS LIFE, AND, INDEED, ON THAT OCCASION

1   WHEN THE OVERTURE WAS MADE HE DIDN'T DISSUADE, HE PARTICIPATED

2   AND HE JOINED IN THE KILLING OF SHIRLEY RIZK AND ATTEMPTED

3   MURDER OF RORY RIZK.

4        I'M NOT SO SURE THAT I TOTALLY AGREE WITH

5   COUNSEL'S REFERENCE TO MATTHEW JAY OR THE PROBATION OFFICER'S

6   REFERENCES TO MATTHEW JAY AS A PASSIVE PARTICIPANT AND THAT

7   HE WAS TRUELY AND COMPLETELY DAZED AND STUPOROUS IN HIS

8   INVOLVEMENT IN THE CRIME AND THE FACTS TO REFLECT THAT AT

9   THE TIME WHEN TORRY MEIER WOULD LEAVE THAT 15 TO 20 MINUTE

10  STRANGULATION OF SHIRLEY RIZK TO ABATE THE FEARS OF RORY TO

11  MAKE SURE THAT RORY WAS TAKEN CARE OF AND NOT INERTERFERING

12  IN IT, THE TWO REMAINING DEFENDANTS -- THIS DEFENDANT AND

13  RICHARD PARKER -- CONTINUED IN THAT STRANGULATION, AND TO

14  THAT EXTENT THE EVIDENCE WE SUBMIT IS FAIRLY CLEAR THERE WAS,

15  INDEED, ACTIVE PARTICIPATION IN THAT STRANGULATION AND,

16  INDEED, AS COUNSEL HAS INDICATED WHEN THE DECISION WAS MADE

17  AMONGST THEM THAT RORY RIZK COULD NOT BE ALLOWED TO LIVE,

18  THIS DEFENDANT DID -- WHETHER HE TOOK THE INITIATIVE OR UPON

19  THE INSTRUCTION OF TORRY MEIER -- HE DID GO OUT AND GET THE

20  POISONS WHICH SUBSEQUENTLY WERE USED IN AN ATTEMPT TO TAKE

21  THE LIFE OF EIGHT-YEAR-OLD RORY RIZK, AND, LASTLY, AT THE

22  TIME THAT THE BODY OF SHIRLEY RIZK WAS BEING PREPARED TO BE

23  DISPOSED OF AND THE ATTEMPT IS BEING MADE TO BURN RORY RIZK

24  ALIVE, THIS DEFENDANT DRIVES A FAIRLY SIGNIFICANT DISTANCE,

25  FAIRLY SECURITOUS (PHONETICALLY), OUT TO MALIBU CANYON AND

26  PERFORMS THE ROLE OF GETAWAY DRIVER TO ALLOW THE OTHER

27  PARTICIPANTS TO LEAVE THE SCENE.

28        COUNSEL MAY VERY WELL BE RIGHT THAT BUT FOR HIS

1    DRUG INVOLVEMENT THIS IS THE ONLY SIGNIFICANT BLACK MARK ON

2    AN OTHERWISE FINE LIFE LOOKING IN TERMS OF ITS POTENTIAL OF

3    MATTHEW JAY, BUT IT IS A TERRIBLE BLACK MARK AND IT IS A VERY

4    SIGNIFICANT ONE AND THE COURT NEED NOT WEIGH EQUALLY ALL THE

5    VARIOUS CONSIDERATIONS IN DETERMINING WHAT DISPOSITION TO

6    IMPOSE, WHAT PARTICULAR SENTENCE TO IMPOSE AND WHAT

7    ALTERNATIVES.

8         WE DO DISAGREE WITH COUNSEL THAT THIS IS AN

9    UNUSUAL CASE UNDER RULE 416.  JUST THE ENORMITY OF THE OFFENSE,

10   THE METHOD IN WHICH IT WAS CONDUCTED, THE PERIOD OF TIME OVER

11   WHICH IT WAS CONDUCTED, THE CRUELTY, THE VIOLENCE, THE

12   EXTREME VULNERABILITY OF RORY RIZK WOULD MAKE THIS AN

13   INAPPROPRIATE CASE IN OUR VIEW TO DETERMINE THIS TO BE AN

14   UNUSUAL CASE WHERE STATE PRISON WOULD NOT BE THE APPROPRIATE

15   SENTENCE ALTERNATIVE.

16        IN CONCLUSION, YES, WE DO BELIEVE THAT MATTHEW

17   JAY IS A TRAGEDY AS WAS THE TRAGEDY OF THE LOSS OF THE LIFE

18   OF SHIRLEY RIZK AND NEAR GREAT TRAGEDY OF THE LOSS OF RORY

19   RIZK'S LIFE, BUT NONETHELESS STATE PRISON SENTENCING IS THE

20   ONLY MEANINGFUL ALTERNATIVE.  WE DON'T OPPOSE THE CONCURRENT

21   AND DON'T OPPOSE 1731(C) ORDER REQUESTED BY COUNSEL THAT HE

22   BE HOUSE IN YOUTH AUTHORITY AND GIVEN WHATEVER APPROPRIATE

23   TREATMENT, TRAINING AND PROGRAMS AVAILABLE TO THE YOUTH

24   AUTHORITY UNTIL HE REACHES AGE 25.

25        THE COURT:  ANYTHING FURTHER?

26        MR. STANFORD:  NO.

27        THE COURT:  WAIVE ARRAIGNMENT FOR JUDGMENT?

28        MR. STANFORD:  YES.  SO WAIVED.

1    THE COURT:  IS THERE ANY LEGAL CAUSE?

2    MR. STANFORD:  NO, YOUR HONOR.

3    THE COURT:  I HAVE HAD THIS PROBATION REPORT AND

4    PRACTICALLY ALL OF THE FORTY-SOME-ODD LETTERS ON MY DESK IN

5    CHAMBERS SINCE I RETURNED TO WORK ON MARCH THE 2ND AND SOME

6    CAME IN AFTER THAT.

7    THE COURT, IN LOOKING AT THIS PROBATION REPORT,

8    LOOKING AT ALL THESE LETTERS, OBVIOUSLY PROPOUND AN ENIGMATIC

9    SITUATION.  MATTHEW JAY IS AN ENIGMA.  HE, IN COMPARISON TO

10   MR. PARKER, SHOULD BE PUNISHED EVEN MORE SO BECAUSE HE CAME

11   FROM AN ENVIRONMENT THAT HE HAD EVERYTHING GOING FOR HIM.

12   HIS FATHER IS AN EDUCATOR; HIS MOTHER IN THE

13   MINISTRY; ACTIVE IN HIS CHURCH, AND THE THING THE COURT WAS

14   ALSO IMPRESSED WITH ALL THESE LETTERS THAT WERE WRITTEN ON

15   BEHALF OF MR. JAY ALL TELLING ME HOW MANY YEARS THEY HAVE

16   KNOWN HIM, ALL OF THESE CLOSE FRIENDS.

17   WELL, NOT ONLY HAS MR. JAY LET THEM DOWN, BUT

18   HIS FRIENDS LET HIM DOWN.  I THINK HIS FRIENDS AND HIS

19   ASSOCIATES AND HIS RELATIVES ARE EQUALLY AS CULPABLE IN HAVING

20   MR. JAY SITTING HERE TODAY AS HE IS.  THIS DOESN'T COME

21   TO JUST ONE YEAR.

22   I HAVE LETTERS FROM HIS FRIENDS TELLING ME THAT

23   THEY HAVE KNOWN HE HAS HAD A PROBLEM SINCE HE WAS 14, 15

24   YEARS OLD. NOBODY BOTHERED TO BLOW THE WHISTLE ON HIM AND

25   TODAY HE IS FACED WITH LOOKING AT A STATE PRISON COMMITMENT

26   PERHAPS FOR THE REST OF HIS LIFE.

27   THE COURT IS VERY MINDFUL OF THE FACT OF HIS AGE

28   AND HIS PARTICIPATION IN THIS CRIME.  THE COURT IS PERSUADED

1    BY ALL OF THE LETTERS WHO SEEM TO THINK THAT MR. JAY -- AND

2    I AM ALSO SATISFIED WITH THE STATEMENTS HE HAS MADE TO THE

3    PROBATION DEPARTMENT -- MR. JAY CAN LEAD A SUCCESSFUL LIFE,

4    BUT I AM NOT GOING TO FORGET THAT WE HAVE A LIFE THAT HAS

5    BEEN TAKEN ALREADY AND THAT HE PARTICIPATED IN THAT AND,

6    SECONDLY, THAT BUT FOR A FORTUITOUS EVENT THAT AN EIGHT-AND-

7    A-HALF-YEAR-OLD BOY'S LIFE WOULD HAVE BEEN SNUFFED OUT.

8         NOW I DON'T FIND ANYTHING IN THIS FILE THAT WOULD

9    WARRANT ME TO COME TO THE CONCLUSION THAT THERE ARE

10   EXTENUATING CIRCUMSTANCES OR THAT THIS IS AN UNUSUAL CASE

11   THAT WOULD WARRANT MY GRANTING PROBATION TO MR. JAY.

12   ACCORDINGLY, PROBATION WILL BE DENIED.

13        WE NOW COME TO THE SENTENCING.  MR. JAY HAS PLED

14   TO COUNT I OF THE INFORMATION, SECOND DEGREE MURDER, AND IN

15   LOOKING AT THIS ENTIRE MATTER AND READING ALL OF THE REPORTS

16   AND READING EVERYTHING THAT I HAVE BEFORE ME, I AM GOING TO

17   SENTENCE MR. JAY TO STATE PRISON FOR THE TERM PRESCRIBED BY

18   LAW, THAT IS 15 YEARS TO LIFE.  HOWEVER, BECAUSE OF HIS AGE

19   AND BECAUSE OF HIS APPARENT -- AND BECAUSE OF ALL OF THESE

20   FACTORS THAT THIS COURT HAS CONSIDERED, I THINK IT APPROPRIATE

21   THAT PURSUANT TO THE PROVISIONS OF 1731.5 OF THE WELFARE AND

22   INSTITUTIONS CODE SUBSECTION C, THAT MR. JAY WILL BE HOUSED

23   IN THE CALIFORNIA YOUTH AUTHORITY TO UNDERGO WHATEVER PROGRAMS

24   ARE AVAILABLE TO HIM DURING SUCH TIME THAT HE IS IN CUSTODY.

25        UNDER THAT SECTION, MR. JAY, SO YOU UNDERSTAND,

26   YOU WILL BE SENT TO THE CALIFORNIA YOUTH AUTHORITY IF THEY

27   TAKE YOU.  IF THEY DO NOT, THEN YOU HAVE TO COME BACK HERE

28   AND WE WILL SEND YOU TO STATE PRISON, BUT ASSUMING THAT YOU

1  ARE STILL INCARCERATED BY THE TIME YOU ARE AGE 25 AND THERE

2  IS A BALANCE TO BE SERVED ON YOUR TERM, YOU WILL BE SENT TO

3  STATE PRISON UNDER THAT CODE SECTION.  DO YOU UNDERSTAND THAT,

4  SIR?

5       DEFENDANT JAY:  YES, SIR.

6       THE COURT:  NOW, ACCORDING TO THE PROBATION REPORT

7  THAT I HAVE BEFORE ME YOU HAVE BEEN IN CUSTODY AS OF TODAY

8  512 DAYS.

9       IS THAT YOUR CALCULATION?

10      MR. STANFORD:  YES, YOUR HONOR, THAT IS, THAT'S CORRECT.

11      THE COURT:  AND I WILL GIVE YOU CREDIT FOR THE 512 DAYS

12  THAT YOU HAVE ALREADY SERVED TOGETHER WITH AN ADDITIONAL 256

13  DAYS GOOD TIME WORK TIME, MAKING TOTAL CREDITS OF 760 DAYS

14  AGAINST YOUR LIFE SENTENCE.

15           AS TO COUNT II OF THE INFORMATION WHICH IS THE

16  ATTEMPTED MURDER OF RORY RIZK, THE COURT FINDS THAT THERE

17  ARE FACTORS IN MITIGATION WHICH DO NOT PREPONDERATE OVER THE

18  FACTORS IN AGGRAVATION NOR DO I FIND FACTORS IN AGGRAVATION

19  THAT PREPONDERATE OVER THE FACTORS IN MITIGATION, WHICH MEANS

20  THAT BOTH BALANCE OUT.  I AM GOING TO SENTENCE YOU TO THE

21  MID TERM FOR THE ATTEMPTED MURDER OF RORY RIZK AS TO COUNT II,

22  SEVEN YEARS BE SERVED CONCURRENT, BE SERVED AT THE SAME TIME

23  YOU ARE SERVING THE LIFE SENTENCE, WHICH MEANS IN THAT EFFECT

24  OF YOUR SENTENCE WILL BE SERVED 15 TO LIFE, UP TO THE TIME

25  YOU ARE 25 YOU WILL BE IN THE CALIFORNIA YOUTH AUTHORITY.

26  AFTER YOU ARE THROUGH SERVING YOUR TIME IN EITHER THE YOUTH

27  AUTHORITY AND/OR STATE PRISON, YOU WILL BE PUT ON A PERIOD

28  OF PAROLE UNDER 3000.1 OF THE PENAL CODE FOR A PERIOD OF YEARS

1   UP TO THE REST OF YOUR LIFE, AND IF AT SOME POINT IN TIME

2   THE BOARD OF PRISON TERMS OR STATE AUTHORITIES WHO HAVE AUTHORITY

3   OVER PAROLE MAY SET A PAROLE FOR YOU, AND IF YOU ARE

4   RELEASED ON PAROLE YOU WILL BE RELEASED ON PAROLE UNDER CERTAIN

5   TERMS AND CONDITIONS FOR A PERIOD OF TIME THEY SHALL DETERMINE,

6   AND IF YOU VIOLATE ANY TERMS OF PAROLE, THEN YOU ARE LOOKING

7   TO BE RETURNED TO STATE PRISON FOR A LOT LONGER; DO YOU

8   UNDERSTAND THAT?

9        DEFENDANT JAY:  YES, SIR.

10        THE COURT:  PEOPLE'S MOTION?

11        MR. FELDMAN:  DISMISSED, 1385.

12        THE COURT:  MOTION GRANTED.

13             ANYTHING FURTHER?

14        MR. STANFORD:  NOTHING FURTHER.

15        THE COURT:  GOOD LUCK TO YOU, MR. JAY.

16        DEFENDANT JAY:  THANK YOU.

17        THE COURT:   WILL ORDER A COPY OF THIS TRANSCRIPT,

18   ORIGINAL AND TWO COPIES OF THE SENTENCING TRANSCRIPT FOR THOSE

19   WHO WANT IT.

20        MR. STANFORD:  THANK YOU, YOUR HONOR.

21             MIGHT I JUST REQUEST THAT THE COURT MAKE AS PART

22   OF ITS JUDGMENT THAT THE ABSTRACT SHOULD REFLECT IF THE COURT

23   IS SO WILLING THAT SPECIAL CONSIDERATION BE GIVEN TO THE

24   DEFENDANT MATTHEW JAY FOR IMMEDIATE HOUSING WITH THE CALIFORNIA

25   YOUTH AUTHORITY.  THAT LANGUAGE MAY HELP IN SEEING THAT THE

26   COURT'S JUDGMENT IS FOLLOWED OUT, NAMELY, BY HIS GOING TO

27   THE YOUTH AUTHORITY.

28        THE COURT:  SO ORDERED.

1          MR. STANFORD:  THANK YOU.

2     THE COURT:  GOOD LUCK.

3               (PROCEEDING CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF LOS ANGELES

3    DEPARTMENT NE "B"                    HON. GEORGE XANTHOS, JUDGE

4

5    THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                            )
6                           PLAINTIFF,      )
                                            )
7         VS.                               )        NO. A811060
                                            )
8    MATTHEW ADAM JAY,                      )REPORTER'S CERTIFICATE
                                            )
9                           DEFENDANT.      )
                                            )
10   ─────────────────────────────────────

11   STATE OF CALIFORNIA,     )
                              )  SS
12   COUNTY OF LOS ANGELES.   )

13              I, BARBARA BURLESON, OFFICIAL REPORTER OF

14   THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

15   COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING

16   IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD

17   AT THE TIME OF PRONOUNCING SENTENCE; THAT THE VIEWS AND

18   RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN,

19   PURSUANT TO SECTION 1203.01 OF THE PENAL CODE.

20              DATED THIS 20 DAY OF APRIL, 1987.

21

22

23

24

25                                        _____ CSR #2247
                                              OFFICIAL REPORTER
26

27

28

# Exhibit
# 4

NAME AND NUMBER:     JAY        D-55653       F-235L        CTF-CENTRAL      CDC-128-C

During his recent Board of Prison Terms hearing, inmate Jay stated that the Board told him that he had not participated sufficiently in therapy and self-help. Regarding the need for therapy, he demonstrated an adequate understanding of his commitment offense and the various factors which led up to it during his recent interview. In addition, due to staffing shortages at CTF, we do not provide therapeutic services to non-mental health inmates. Regarding the availability of self help at CTF, other than Alcoholics Anonymous and Narcotics Anonymous, the Life Skills group (which has a waiting list at least one and a half years long and is only available to CCCMS inmates) is the only treatment that I am aware of at CTF.

Orig.: C-file
Copy: Unit Sergeant
      CC-I
      Assignment Lt.
      Control
      Inmate
      Medical file
      Chrono file

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

DATE:     06/27/00     JAY     D-55653     gmj     MEDICAL-PSYCHIATRIC-DENTAL

**NAME**   JAY, M          ●UMBER  D55653          **CELL** ●D-012U          **CDC-128B**

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of Sexually Transmitted Disease.

**Original:**      Central File
**cc:**              IPEP File
                     Inmate

*L. Tyley Kinney*
Peer Education Coordinator

**DATE:** 7/27/01

**C-1813**
**GENERAL CHRONO**

# Inmate Peer Education Program

This is to certify that

**M. JAY**

has successfully completed a
course of instruction in



## Sexually Transmitted Diseases

an "Infectious Disease". Date: _____ **7/27/01**



Inmate Peer Education Program Coordinator
Correctional Training Facility

**C-1813**
Certificate Number

# CERTIFICATE OF PARTICIPATION

May all who come hereafter know that

## Matthew Jay

has participated in the
*"Alcoholic Anonymous Program"*

from   **10/6/1999**   to   **12/31/2001**

*Carol A. Allen*
Sponsor
Correctional Training Facility
Soledad, CA



**December 20, 2001**
Date

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

NAME and NUMBER    JAY, M    D55653    ED-012U

Since the Self Help Program resumed in August, you have attended meetings of the Alcoholics Anonymous "A" Group for the 3rd Quarter of 2003 (August, and September). You provide your service to the group by your attendance and participation. Through this program, you are shown what tools are available to you by following "The 12 Steps of Recovery." By following these steps in your life, it will show your willingness to improve yourself.

You have been participating at CTF since: 10-06-1999

DATE: 11/3/03

(LAUDATORY CTF- Central Facility)

GENERAL CHRONO

Original : Central File
cc: Staff Sponsor
: Inmate

K.L. Villa
A.A. Staff Sponsor
CTF-Central Facility

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

NAME and NUMBER    JAY, M    D55653    ED-012U

You have attended meetings of the Alcoholics Anonymous "A" Group for the 4th Quarter of 2003 (October, November, and December.) You provide service to the Group by your attendance. Through this program, you are shown what tools are available to you. By following "The 12 Steps of Recovery" in your life, you will show your willingness to improve yourself. You have been a participant at CTF since: 10-06-1999

DATE 12/18/03

(LAUDATIRY CTF-Central Facility)

GENERAL CHRC

Original : Central File
cc: Staff Sponsor
: Inmate

K.L. Villa
AA Staff Sponsor
CTF-Central Facility

**NAME**   JAY, M            **NUMBER**  D55653            **CELL**  W-208U      **CDC-128B**

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of Tuberculosis.

**Original:**     Central File
**cc:**           IPEP File
                  Inmate

                                              *S. Tyler Kinney*
                                              Peer Education Coordinator

**DATE: 3/8/02**                                              **C-2192**
                                                      **GENERAL CHRONO**



# Inmate Peer Education Program

This is to certify that

**M. JAY**

has successfully completed a course of instruction in

**Tuberculosis**

an "Infectious Disease". Date: **3/8/02**

Inmate Peer Education Program Coordinator
Correctional Training Facility

Certificate Number **C-2192**

**NAME**   JAY, M       **NUMBER**  D55653        **CELL**  W-208U    **CDC-128B**

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of HIV/Aids.

**Original:**   Central File
cc:         IPEP File
            Inmate

*X. Tyler Kinney*
Peer Education Coordinator

**DATE:** 3/14/02

**C-2199**
**GENERAL CHRONO**



# Inmate Peer Education Program

This is to certify that

**M. JAY**

has successfully completed a
course of instruction in

**HIV/Aids**

an "Infectious Disease". Date: **3/14/02**

Inmate Peer Education Program Coordinator
Correctional Training Facility

Certificate Number **C-2199**

# SHARE A BEAR

## Marcheu Jay

This certificate is to thank you for your monetary contribution to the Third Annual Correctional Training Facility "Share a Bear" Teddy Bear Drive.

Your generous contribution has warmed the hearts of many needy children in our community.

P. SKINNER, SERGEANT
"Share A Bear" Coordinator
Correctional Training Facility

J. SOLIS
Warden
Correctional Training Facility



# EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

*This Certificate of Achievement is to acknowledge that*

**MATTHEW A. JAY**

Has reaffirmed a dedication to serve in times of crisis through continued professional development
and completion of the independent study course:

IS-001

**Emergency Program Manager
An Orientation to the Position**

.3 CEU

*Issued this 16th Day of August, 2003*

Stephen G. Sharro
*Director, Training Division*

UNITED STATES FIRE ADMINISTRATION



EMERGENCY MANAGEMENT INSTITUTE

Certificate of Achievement

This Certificate of Achievement is to acknowledge that

MATTHEW A. JAY

Has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

Decision Making & Problem Solving
IS-241

Issued this 08th Day of September, 2003

Stephen G. Sharro
Director, Training Division

UNITED STATES FIRE ADMINISTRATION

# EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

This Certificate of Achievement is to acknowledge that

**MATTHEW A. JAY**

Has reaffirmed a dedication to serve in times of crisis through continued professional development
and completion of the independent study course.

**IS-242**
**Effective Communication**

Issued this 14th Day of October, 2003

Stephen G. Sharro
Director, Training Division

UNITED STATES FIRE ADMINISTRATION



EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

*This Certificate of Achievement is to acknowledge that*

**MATTHEW A. JAY**

Has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

IS-244
**Developing and Managing Volunteers**

*Issued this 19th Day of November, 2003*

Stephen G. Sharro
*Director, Training Division*

UNITED STATES FIRE ADMINISTRATION

# *Certificate*
## OF COMPLETION

This is to re-certify that

**Matthew Adam Jay**

has fulfilled all the theoretical and practical evaluation
requirements of OSHA 1910.178 (I), and, as such,
has maintained the designation of

# Certified Operator

on the following type(s) of equipment:

Class 5, LC 4, 4,000 Lbs.

and is hereby authorized to operate at the following worksite:

Furniture Factory/Corp. Yard

4108-072-R
OPERATOR CERTIFICATION NUMBER

October 03, 2003
ORIGINAL DATE OF CERTIFICATION

January 27, 2007

January 27, 2010

**IVES**
TRAINING & COMPLIANCE
GROUP INC

P.I.A. Furniture Factory

C.D. Walker, 4108

**PIA**
California
Prison Industry
Authority

# Certificate of Proficiency

*This is to certify that*

*Matt Jay*

*Has achieved proficiency
in the following occupational category*

Industry:  Wood Products

Institution:  CSP-Soledad
CDC #:  D-55653

| Job Title/Specialty | D.O.T. No.* | No. of Hours |
|---|---|---|
| Production Coordinator | 221.167-018 | 2,250 + |

* US Department of Labor, Dictionary of Occupational Titles

Supervisor                    Date
5-22-03

General Manager, Prison Industry Authority

liability. Selects reinsurers who may accept part of ceded liability. Types applications. Computes amount of each premium due, using calculating machine. Accepts reinsurers and their liability for cash values and dividends. Prepares abstract for typing of contracts (2) Receives reinsurance application from prime insurer. Determines amount of insurance already held on risk from company records and calculates reinsurance that company can accept, based on limit of liability. Determines if reinsurance is automatic from treaty provisions and sends application to underwriting department when it is not automatic. Types notice of acceptance or rejection, based on limit of liability, and action of UNDERWRITER (insurance). Operates calculator to verify computations made by prime insurer.
GOE: 07.02.04 STRENGTH: S GED: R4 M3 L3 SVP: 5 DLU: 77

**219.487-010  TAX CLERK (clerical) alternate titles: revenue-stamp clerk**
Computes state or federal taxes on sales transactions, production processes, or articles produced, and keeps record of amount due and paid. May affix revenue stamps to tax reports to cover amount of tax due.
GOE: 07.02.04 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77

**219.587-010  PARIMUTUEL-TICKET CHECKER (amuse. & rec.) alternate titles: ticket counter**
Counts and records number of parimutuel tickets cashed at race track to verify records of cashiers. Compares totals with entries on daily balance sheet. Compares each ticket with sample or examines tickets under fluorescent light to verify validity of tickets. Reports discrepancies.
GOE: 07.05.02 STRENGTH: S GED: R3 M3 L3 SVP: 2 DLU: 77

# 22  PRODUCTION AND STOCK CLERKS AND RELATED OCCUPATIONS

This division includes occupations concerned with compiling and maintaining production records, expediting flow of work and materials, and receiving, storing, shipping, issuing, requisitioning, and accounting for materials and goods.

## 221  PRODUCTION CLERKS

This group includes occupations concerned with compiling records and reports on various aspects of production, such as materials and parts used, products produced, and frequency of defects; estimating or measuring amount of material needed and computing material and production costs; counting, measuring, or weighing goods produced or material on hand to tally data for production control or payroll purposes; charting production progress; preparing or distributing work tickets, formula cards, or other production guides; scheduling and expediting flow of work and materials for production or repair; coordinating, scheduling or monitoring production, using electronic equipment; and observing production operations to log products produced, materials used, processes completed, and machine and instrument readings. Occupations concerned with preparing payroll and timekeeping records from production data are found in Group 215.

**221.132-010  CHIEF CLERK, MEASUREMENT DEPARTMENT (petrol. & gas; pipe lines)**
Supervises and coordinates activities of workers engaged in compiling reports concerning quality and quantity of oil or natural gas produced, purchased, transported, and sold: Directs clerks in compiling of production and sales reports, purchase orders, and transportation records. Oversees consolidation of data used to determine heating quality of natural gas. Directs clerks in compiling production records and other reports. Calculates factors used to compute petroleum or gas volumes transported by pipelines, using adding machine or calculator. Performs duties as described under SUPERVISOR (clerical) Master Title. May direct CHART CLERKS (clerical) in compiling data relating to volume of petroleum or gas products passing specified points on pipeline system and be designated Chart Clerk, Chief (clerical).
GOE: 07.02.03 STRENGTH: S GED: R4 M4 L4 SVP: 7 DLU: 77

**221.137-010  CONTROL CLERK, HEAD (clock & watch)**
Supervises and coordinates activities of CONTROL CLERKS (clock & watch) engaged in distributing material to workers and keeping records of parts worked on and completed: Keeps perpetual inventory of watches in department. Totals hours worked by subordinates for payroll purposes. Issues work tickets. Performs duties as described under SUPERVISOR (clerical) Master Title.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 6 DLU: 77

**221.137-014  SUPERVISOR, PRODUCTION CLERKS (clerical)**
Supervises and coordinates activities of PRODUCTION CLERKS (clerical) engaged in keeping records and preparing statistical statements and reports on production of manufactured goods, consumption of raw materials, and other production data, performing duties as described under SUPERVISOR (clerical) Master Title.
GOE: 07.02.03 STRENGTH: S GED: R4 M4 L4 SVP: 7 DLU: 77

**221.137-018  SUPERVISOR, PRODUCTION CONTROL (clerical)**
Supervises and coordinates activities of MATERIAL COORDINATORS (clerical) engaged in expediting flow of material, parts, and assemblies within or between departments of industrial plant, and of PRODUCTION COORDINATORS (clerical) engaged in scheduling production operations: Evaluates written data, such as job orders, product specifications and operations sheets,

parts and materials inventory lists, and machine and worker production rates to establish efficient allocation and scheduling of parts, materials, machines, and sequences of operations and workflow. Confers with production personnel to resolve problems affecting production schedules. Performs duties as described under SUPERVISOR (clerical) Master Title.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 7 DLU: 77

**221.162-010  PRODUCTION SCHEDULER, PAPERBOARD PRODUCTS (paper goods) alternate titles: production clerk; production planner; scheduler**
Prepares production schedules and miscellaneous reports for manufacturers: Examines blueprint or drawings to determine type and quantity of material and equipment required to manufacture number of containers specified. Confers with production personnel to clarify processing methods or establish sequence of operations. Prepares production schedules, issues work orders, and keeps progress records [PRODUCTION CLERK (clerical)]. Calculates unit and job lot manufacturing costs of containers, based on size and type, and involving such factors as labor, material, handling, and shipping costs.
GOE: 05.03.03 STRENGTH: S GED: R4 M4 L4 SVP: 6 DLU: 77

**221.167-010  COPY CUTTER (print. & pub.)**
Coordinates activities of workers engaged in setting of copy into type: Examines, apportions, and distributes editorial and classified advertising copy to COMPOSITORS (print. & pub.); LINOTYPE OPERATORS (print. & pub.) to MONOTYPE-KEYBOARD OPERATORS (print. & pub.) machinery mfg.; print. & pub.). Examines copy to determine time and date for publication, type style, and size specified for headings and body. Determines size of sections to be cut and distributed, according to time available for setting type. Cuts copy into sections, marks sections with type size if cuts are to be used, and distributes to composing room. May mark sections to aid in assembling type and cuts in galley.
GOE: 05.05.05 STRENGTH: S GED: R4 M3 L3 SVP: 8 DLU: 77

**221.167-014  MATERIAL COORDINATOR (clerical) alternate titles: material control expediter; production control scheduler**
Coordinates and expedites flow of materials, parts, and assemblies between sections or departments, according to production and shipping schedules or department priorities, and compiles and maintains manual or computerized records: Reviews production schedules and related information and confers with department supervisors to determine material requirements to identify overdue materials and to track material. Requisitions material and establishes sequential delivery dates to departments, according to job order priorities and material availability. Examines material delivered to production departments to verify conformance to specifications. Arranges in-plant transfer of materials to meet production schedules. Computes amount of material required to complete job and maintains manual or computerized records, such as material inventory, inprocess production reports, and status and location of materials. May move or transport material from one department to another, manually or using material handling equipment. May arrange for repair and assembly of material or part. May monitor and control movement of material and parts on automated conveyor system.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 6 DLU: 90

**221.167-018  PRODUCTION COORDINATOR (clerical) alternate titles: production controller; production expediter; production scheduler; progress clerk; schedule clerk; scheduler**
Schedules and coordinates flow of work within or between departments of manufacturing plant to expedite production: Reviews master production schedule and work orders, establishes priorities for specific customer orders, and revises schedule according to work order specifications, established priorities and availability or capability of workers, parts, material, machines, and equipment. Reschedules identical processes to eliminate duplicate machine setups. Distributes work orders to departments, denoting number, type, and proposed completion date of units to be produced. Confers with department supervisors to determine progress of work and to provide information on changes in processing methods received from methods or engineering departments. Compiles reports concerning progress of work and downtime due to failures of machines and equipment to apprise production planning personnel of production delays. Maintains inventory of materials and parts needed to complete production. May expedite material [MATERIAL COORDINATOR (clerical) 221.167-014]. May expedite production of spare parts and establish delivery dates for spare parts orders and be designated Spares Scheduler (clerical). May coordinate and expedite work in automobile repair and service establishment from control tower, using public address system, and be designated Work Coordinator, Tower Control (automotive ser.). May use computer system to track and locate production units.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 6 DLU: 87

**221.167-022  RETORT-LOAD EXPEDITER (wood prod., nec) alternate titles: load tallier**
Coordinates tram-car loading activities in wood-preserving plant to expedite movement of wood products into treatment retorts, tallies products loaded to verify against customer orders, and records product-load data for use by processing personnel: Confers with supervisors to determine processing schedule. Determines combinations of orders which can be processed together and number and sizes of tram cars required for each retort charge, according to retort





**Date of Issue**

**October 22,**

**2004**

CSS

# Certified Customer
# Service Specialist

**Matthew A. Jay - CSSCA551**
**Soledad, California**

has successfully completed the technical examinations and requirements to be universally recognized for competency, ability, and knowledge as a Certified Customer Service Specialist. To be recognized for this honor, practicing technical personnel must pass examinations in product technology understanding and customer-relations decision-making skills with at least a 75% score. They also must accept the CSS Code of Conduct. Only well trained technicians with 'people skills' are able to accomplish this feat. The Electronics Technicians Association takes great pride in presenting this official recognition to the above named expert Customer Service Specialist. His/her name has been published in the High Tech News journal, imbedded in the CSS permanent database, and is available for recognition by officials of the industry.  This individual may display the CSS identification items or advertise his level of accomplishment as a technical specialist. Congratulations from ETA officers and members and the electronics industry.

The Electronics Technicians Association, International, Inc
Greencastle, Indiana

*Richard L. Glass CET*
President, Electronics Technicians Assn., Int'l.



ICAC
International Certification
Accreditation Council



Certified
Customer Service Specialist

CSS - CSSCA551

Matthew A. Jay
PO Box 689
Soledad CA  93960-0689



The Electronics Technicians Association, International

800-288-3824/765-653-8262/4301/5592 765 653-4287fax
http://www.etainternational.org  eta@tds.net
President,  Richard L. Glass, CETsr
Vice President, Teresa Maher, CSS

Friday, October 22, 2004

Chairman
Bill Woodward, CFOI
2500 Almeda Ave. Suite 214
Norfolk, VA 23513-2403
757-858-9000
Wwoodward@wrsystems.com
Vice Chairman
Randy Reusser, CETsr, MBA
6317 50th St
Kenosha, WI 53144
262-654-1756
randyr@safeaccess.com
Secretary
John MacLean III, CET
4014 Ashburner Street
Philadelphia, PA 19136
215-332-5129
ATLASIII@ureach.com
Treasurer
Eric M. Funderburk, CETma
6550 First Park Ten Blvd., Ste. 201
San Antonio, TX 78213
210-733-6000
efunderb1@juno.com
Comm Div Chair
Tom Janca, CETsr
6279 S. Kramena
Greenwood Village, CO 80111
720-200-0784
trjanca@lucent.com
Comm Div S/T
Jim Arcaro, CETsr
29461 Valley View Dr
Wickliffe, OH 44092-2030
216-362-8104
jgarcaro@juno.com
Educ Div Chair
Clark Adams, CETsr
409 2nd St. NE
Watertown, SD 57201
605-886-9611
stuff@dakypost.com
Educ Div S/T
Dave Koenig, CNST
3700 S Westport Ave. #1165
Sioux Falls, SD 57106-6344
505-290-1353
dkoenig@etainternational.org
Cert. Tech Div Chair
Fred Weiss
80 Brittan Rd, Rm 240
Akron, OH 44305
330-794-4116
fweiss@akron.k12.oh.us
Cert Tech Div S/T
Glen Wolfe, CETsr
3609 S Gunderson Ave
Berwyn, IL 60402
847-452-3413
gw1966@hotmail.com
Shop Div Chair
Roy Tarter, CET
RR 2 Box 324
Spencer, IN 47460
765-795-6374
Kath@tccrtc.com
Shop Div S/T
Ron Habegger, CSI
1065 N Main
Crete, IL 60417
708-672-6677
midweststar@starband.net
WebMaster
Chris Courson, CET
7109 N 18th St
Tampa, FL 33610
813-238-5279
chris@chrisbot.com
Dir. Chap Relations
Randy Glass, CST
1111 Bishop St #406
Honolulu, HI 96813
808-258-8655
ecommerce@hawaii.rr.com
Cabling Chair
Barry McLaughlin, FOI
32 Boulevard Rd
Wellesley Hills, MA 02481
781-235-1455
barry@barrymdaughlin.com
Cabling Div S/T
Jim Parker, FOT
5269 Cleveland St
Virginia Beach, Va 23462
757-518-8100
jparker@kitcofo.com
SDA Chairman
Bill Yates
PO Box 3724
Victoria, TX 77903
361-575-3276
wyates@netstartechnologies.net
SDA Vice Chair
John Zielinski, CETma
167 Orchard Pl Apt#1
Lackawanna, NY 14218-1739
716-668-6600
zielinski@att.net
SDA Sec.
Michael King, CSI
3002 Country Rd
Grand Junction CO 81504
Fresco, CO 80443
970-470-3523
king@onemage.com
SDA Treas.
John Barlow
CVS1139 S Baldwin Ave
Marion, IN 46952
800-825-1100
jbarlow@cvssystems.com

Matthew A. Jay, CSS
POBox 689
Soledad, California   93960-0689

Dear Matthew A.,

Congratulations on passing the Electronics Technicians Association exam(s)!  You have now been registered as a CSS.

Your name will be published in the next issue of ETA's "High-Tech News" journal.  We urge you to include the initials of your new title, CSS, behind your name-it means something.  By becoming ETA certified, you have raised the level of professionalism one more notch.  Thank you for your contribution to the electronics industry.  We would also like to encourage you to become a member of our professional trade association.  To accept a one-year renewable membership, simply fill out the enclosed brochure and return with your payment to ETA.

Regarding the certification examination itself, ETA has an exam advisory committee of top electronics professionals who continually monitor exam content, and the certification program itself.  We encourage your support in helping to mold the program.  Any suggestions you would like to submit in the areas of mix, wording, context or subject matter would add to the comprehensiveness of this exam.  We welcome your feedback.

To make comments on one or more item, just jot them down and send the to the ETA office in Greencastle at the address at the top of this page.

Again-Congratulations!

Tests: CSS102 92%                                 Assigned CSS number: CSSCA551

Sincerely,

Richard L. Glass, CETsr
President

**5 Depot Street, Greencastle, Indiana 46135**

# Exhibit
# 5


INMATE COPY

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### REVISED SEPTEMBER 1998
### PAROLE CONSIDERATION HEARING
### JANUARY 2006 LIFE-TERM INMATE CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### DECEMBER 10, 2005


**NAME:**        JAY, MATHEW
**CDC #:**        D-55653
**DOB:**        07/29/67
**MEPD:**        10/18/95
**DATE OF OFFENSE:**  10/13/85
**OFFENSE:**   Penal Code 187, Murder, Second Degree
              Penal Code 187, Attempted Murder, Second Degree
**SENTENCE:** 15 years to Life
**COUNTY OF COMMITMENT:** Los Angeles County
**EVALUATION DATE:** 12/15/05


**I.**    **IDENTIFYING INFORMATION:**

Inmate Mathew Jay is a first-term, Caucasian, 38-year-old, single male who has served 20 years of his sentence. He is an active Christian.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single, 90-minute, psychodiagnostic evaluation, plus review of the Central file and medical file.

The last Board of Prison Terms' panel asked for a current psychological evaluation because they noted that the 1990 psychological evaluation by Dr. Charlens at R.J. Donovan, and the 1994 psychological evaluation by Ronald Kitt, Ph.D., raised questions about the motivational issues that caused this offense. The Board felt that these issues have not been addressed.

The previous psychological evaluation, dated 10/09/02, by J. Howlin, Ph.D., is still quite current and valid.

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

The mental status examination is entirely within normal limits. Inmate Jay is
quite bright intellectually. He is functioning in the high average ranges
intellectually. His judgment is sound. He had good self-awareness and insight.

Inmate Jay has remained entirely disciplinary-free during the last 20 years of his
incarceration. This is commendable. Drugs and alcohol are readily available in
the institutional environment. However, he has significantly changed his life, and
he has avoided any ~~environment~~ with drugs or alcohol during the last 20 years. In *INVOLVE-MENT*
addition, he has participated extensively in therapy groups, self-help
programming, and ongoing Alcoholics Anonymous. He also has helped the
bishop in his church develop alcohol and drug abuse programs, which he hopes to
become involved in in a more direct manner upon his parole. Due to the fact that
drugs and alcohol are available, and he could have used them if he had chosen to,
it is clear that drugs and alcohol are no longer a problem in his life. Therefore,
this cannot be listed as a current diagnostic problem.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

*AXIS I:*      No contributory clinical disorder.
*AXIS II:*     No contributory personality disorder.
*AXIS III:*    Asthma.
*AXIS IV:*     Life-term incarceration.
*AXIS V:*      Current GAF = 90.

### XIII.    REVIEW OF LIFE CRIME:

In addressing the question of causative factors, the California Youth Authority
psychiatric evaluation, dated 06/24/87, does lend some insight into his functioning
at the time of the commitment offense. Quoting a prior psychiatric evaluation, the
defendant was described as a passive-dependent personality, and there was
evidence of a chronic childhood depression, which increased the demands of
adolescence, and developed a strong dependence on drugs, which combined in a

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE THREE*

spiraling psychiatric deterioration, resulting in an "apathetic, severely depressed, severely drug-dependent, and nonfunctioning adolescent." Drug use was seen as a significant precipitant of his behavior.

At the time of the commitment offense, inmate Jay was severely intoxicated on LSD, which he had taken for the first time in conjunction with hashish and alcohol. The psychiatrist noted that inmate Jay was very remorseful for the offense, and he is now very anti-drug, and would like to spend his life trying to help other people get off of drugs.

In the 10/11/95 psychological evaluation by Dr. McDill, it was noted that inmate Jay broke into tears in discussing the offense. His remorse appeared to be very genuine. When asked why he participated in such a crime, the inmate listed several factors. He stated that, at that time in his life, he did not have the ability to say no. He stated the drugs numbed him and disinhibited him. He was operating with a strong wish to help a friend and to please someone in a life where he seemed unable to please anyone. He also mentioned his basic immaturity and youthful stupidity. The psychologist stated that such a description pretty much tells the whole story.

The last psychological evaluation by Dr. Howlin on 10/15/02, reported that inmate Jay felt his heavy, ongoing drug use significantly interfered with his ability to know right from wrong. He stated he never thought the crime would happen, but when it did happen, it was too late. Prior to this offense, inmate Jay had been struggling with low self-esteem and occasional depression, coupled with heavy drug use.

When questioned by this evaluator, inmate Jay stated that, at that time in his life, as an 18-year-old, due to his chronic drug use, he could not think right. He had no appreciation of life's values. He stated that the heavy use of drugs had caused him to become an uncaring person who did not consider the consequences of his actions, or even what he was doing. In addition, he was immature, dependent on his friends, including the 16-year-old son of the victim. Inmate Jay accepted responsibility for his participation in this offense. He understands that, if it were not for his role in the crime, it probably would not have happened. He stated that

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FOUR*

he saw his 16-year-old friend being abused by the victim, and he wanted to befriend and protect his friend. He stated that his extreme intoxication at the time caused severely impaired judgment.

He did accept responsibility for this offense, and stated that if he had not participated in it, it could not have happened. His feelings or remorse appear to be sincere and genuine. He was very happy with the victim's parents forgiving him, and he does correspond with them regularly.

## XIV.    ASSESSMENT OF DANGEROUSNESS:

*A.*    In considering his potential for dangerous behavior in the institution, inmate Jay has remained entirely disciplinary-free. He has grown significantly over his 20 years of incarceration. He is no longer the immature, drug-dependant individual that he was at the time of the commitment offense. He demonstrates strong prosocial values. There are no antisocial values or thinking in this case. His violence potential is definitely below average in comparison to other inmates.

*B.*    In considering his potential for dangerous behavior if released on parole to the community, the Level of Service Inventory-Revised, was administered. This is an actuarial measure that assesses criminal history, substance abuse, educational attainment, vocational attainment, emotional problems, and several other factors. His score indicated a 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better than 98% of them. This indicates an extremely low risk level. As a result, his potential for violence is no more than the average citizen in the community, and is probably less than the average citizen in the community due to his life experiences.

*C.*    At the time of the commitment offense, risk factors were his immaturity and his severe substance dependence. After 20 years of drug and alcohol abuse programming, and maturity that comes with age and experience, this is no longer a factor. There are no significant risk factors at this time.

*JAY, M.*        *D-55653*        *CTF-CENTRAL*        *12/15/05*        *gmj*

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FIVE*

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

There are no mental or emotional problems in this case that would interfere with parole planning.  He has strong family support in the community.  He also has strong community support.  He has achieved vocational skills, and he does have job offers in the community.  The prognosis for successful adjustment to the community is excellent in this case.


*M. Macomber, Ph.D.*
*Staff Psychologist*
*Correctional Training Facility, Soledad*


*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D:   12/15/05*
*T:   12/17/05*


C:\Documents and Settings\gjorgensen\My Documents\JAY, MATHEW   D-55653   01-06   MACOMBER.doc

# Exhibit
# 6

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
NOVEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 9, 2002

This is a psychological evaluation for the Board of Prison
Terms on inmate Mathew Jay, CDC# D-55653. This report is
the product of a personal interview, conducted on 10/09/02,
as well as a review of his Central file and unit health
record. This interview was a single contact with this
individual for the sole purpose of preparing this report.

### PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Jay is a 35-year-old, single, Caucasian male.
His date of birth is 07/29/67. He stated his religious
affiliation as being Christian, specifically
Episcopalian. He presented with no unusual physical
characteristics, and denied the use of nicknames or
aliases.

II.   DEVELOPMENTAL HISTORY:

Inmate Jay denied any history of birth defects or
abnormalities of developmental milestones. He denied a
history of cruelty to animals, a history of arson, or a
history of physical or sexual abuse as either a
perpetrator or a victim.

He stated that he had appendicitis as a child, and also
had seasonal asthma, beginning in childhood, which he
continues to take medication for on an intermittent
basis.

Inmate Jay stated that at about the age of 12, and
shortly after beginning to experiment with alcohol and
drugs, he was hospitalized for one to two days as a
result of an overdose of his brother's asthma
medication. He stated that, at the time, he was having
difficulties with the building up of his emotions, and

JAY, M.        D-55653        CTF-CENTRAL        10/15/02        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

some conflict with his family.  He stated that after
discharge from the hospital, he received no additional
mental health treatment, and did not take any
psychotropic medication.  He denied any additional
childhood medical concerns.

## III.  EDUCATIONAL HISTORY:

Inmate Jay stated that he completed his high school
diploma while in the county jail.  He has been involved
in working on a bachelor of liberal studies degree
through the University of Iowa, taking correspondence
courses.  He explained that he started taking the
courses when offered at CDC, but when that program was
discontinued, started through correspondence.  He hopes
to earn his bachelor's degree with a focus on social
work and drug counseling.  He denied any history of
special education.

## IV.  FAMILY HISTORY:

Inmate Jay explained that his family is, overall, a
warm, supportive and caring family.  His parents are
still married.  His father is 69, and his mother is 61.
His father works as a teacher, and his mother is an
Episcopalian minister.  He explained that both of his
parents suffer from diabetes.

Inmate Jay has one older brother, age 37, who is
married, and one sister, age 33, who is also married.

Inmate Jay denied any family history of drug or alcohol
abuse.  He communicates with his family on a regular
basis, receiving visits often, and letters from family
members.  He explained that his father writes on a
daily basis.  Inmate Jay described his relationship
with his family currently as very positive.

## V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Jay stated that he is a heterosexual male.
He denied any history of high-risk sexual behavior,
including sexual aggression.

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

VI.   MARITAL HISTORY:

Inmate Jay has never been married.  He was incarcerated
in the county jail at the age of 18 for the commitment
offense.  He has no children.

He described a long-term relationship with a woman,
whom he continues to communicate with frequently.  He
explained that he met this woman in church while he was
still in the community.  He has continued to
communicate with her, and described the relationship as
being positive.

VII.  MILITARY HISTORY:

Inmate Jay denied any history of military service.

VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Jay explained that he worked in the food
industry prior to being incarcerated.  He worked for
about one year at Carl's Junior as a cook.  He said he
also worked for about six months at a restaurant called
Marie Calendar's, again as a cook.  He explained that
both of these jobs were while he was in school, so he
worked mostly after school.

Since his incarceration in CDC, he has worked in sewing
machine repair and in textiles, and has had various
porter jobs.  He worked in the bakery for about five
years, and is currently working as a shipping clerk for
PIA, where he is in charge of production.

Aside from working towards a bachelor's degree and
working as a shipping clerk, inmate Jay said that he
likes to write poetry.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Jay explained that he started experimenting
with alcohol at about age 12.  This progressed to the
use of marijuana.  He said that by about the age of 16,
he was using alcohol and marijuana on an almost daily
basis.  He said that he experimented with both LSD and
cocaine one time each.  He denied the use of any other
illicit substance.

JAY, M.      D-55653      CTF-CENTRAL      10/15/02      gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

Inmate Jay had no substance abuse treatment prior to being incarcerated. However, since entering CDC in 1987, he explained that he has had continuous attendance at both Alcoholics Anonymous and Narcotics Anonymous. For about the past year and a half, he has been mostly involved in AA since, he explained, it addresses recovery for both alcohol and drugs.

Inmate Jay demonstrated insight specifically related to factors about his own recovery. He has a sponsor arranged, who is a chaplain in the same community where his parents live, and hopes to follow through with this plan if paroled. He seems to realize that recovery from substance abuse oftentimes is an ongoing process.

Self-help-wise, he has been involved in several programs since being incarcerated. He has been involved in the Alternatives to Violence program, in Breaking Barriers, and was involved in a Life Skills group with Dr. Bakeman. He has also had occasional, individual counseling with a psychologist at a different institution. However, this is not documented in the file.

It should be noted that inmate Jay has zero disciplinary CDC-115s or CDC-128s related to allegations regarding substance use in prison.

## X.   PSYCHIATRIC AND MEDICAL HISTORY:

As mentioned earlier in this report, inmate Jay was hospitalized as a teen for about two days related to an overdose of his brother's asthma medication. He denied any subsequent psychological treatment, including a history of suicidal gestures or attempts.

He denied any additional hospitalizations, including any psychiatric hospitalizations. He denied any history of serious accidents or head injuries, or a history of seizures or other neurological conditions. As noted, he uses an inhaler for asthma on an occasional basis.

JAY, M.    D-55653    CTF-CENTRAL    10/15/02    gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


XI.  PLANS IF GRANTED RELEASE:

Inmate Jay stated that he hopes to live with his parents in Valencia if paroled.  He explained that they agreed to this plan for his transition back into the community.  He hopes to attend his mother's church, where she serves as an Episcopalian minister.  He stated that they also have regular AA meetings there that he will join.  He would like to eventually complete his bachelor's degree, and if he does not complete in within CDC, he hopes to continue it in the community.  He stated that he has had two job offers, one working for a bishop of the Episcopalian Church in Los Angeles, and the second working for a consulting firm, doing clerical work.  Additionally, he hopes to be able to utilize his degree in social work and drug counseling in either of these job offers, or in possible additional areas.

Based on what was discussed with this clinician, it appears that his parole plans are viable, and his prognosis for community living is positive.


## CLINICAL ASSESSMENT


XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Jay is a 35-year-old, single, Caucasian male. He appeared his stated age.  He was appropriately dressed and groomed.  He was coherent, cooperative, calm and alert throughout the interview.  His speech, flow of thought and affect were all within the normal range.  His intellectual functioning was estimated to be slightly above average when compared to this Level II inmate population.  There was no evidence of a mood or thought disorder.  His judgment appeared to be sound.  He demonstrated good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     Polysubstance Dependence, in sustained full
            remission in a controlled environment.
AXIS II:    No Contributory Personality Disorder.


JAY, M.      D-55653       CTF-CENTRAL       10/15/02        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


AXIS III:  Asthma.
AXIS IV:  Incarceration.
AXIS V:  GAF = 85.

His prognosis is positive for being able to maintain his current mental status in the community upon parole.

## XIII. REVIEW OF LIFE CRIME:

Inmate Jay is serving a 15 year to life sentence for Second Degree Murder.  He was 18 years old when incarcerated for this crime, and spent about two years in county jail before entering CDC in 1987.  Therefore, he has been incarcerated for almost 17 years.

Inmate Jay described the circumstances surrounding the commitment offense.  He admitted to being heavily intoxicated preceding the crime, and had been using marijuana, alcohol, and cocaine.  The crime consisted of his participation in the strangling death of one of the crime partners' mother, and then the subsequent attempted murder of the crime partner's eight-year-old half brother, who allegedly witnessed part of the murder of the mother.

This reviewer agrees with the past psychological evaluation, done by Dr. Reed:  the idea that the crime was quite violent, and quite removed from both inmate Jay's history and functioning since being incarcerated.

Inmate Jay explained his attempts at making sense of what happened.  He stated that he feels it was his heavy, ongoing drug use that significantly interfered with his ability to know right from wrong.  He added that he never really thought that the crime would happen, and when it in fact did, it was too late.  He also added that, prior to the crime, he had been struggling with low self-esteem and on-and-off-again depression, coupled with the heavy drug use.  Inmate Jay also discussed an increasingly conflictual relationship with family members preceding the crime.

The above-diagnosed psychopathology would likely be directly related to the crime.  Inmate Jay demonstrated

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SEVEN

what appeared to be insight into his actions and the
crime, and remorse for the victim and the victim's
family members.

Since being incarcerated for a period of almost 17
years, the Central file notes zero CDC-115s or CDC-128
counseling chronos.  Inmate Jay did add that he
received one CDC-128 counseling chrono for smoking,
which was not found in the Central file by this
reviewer.

Inmate Jay denied any gang involvement either prior to
or since his incarceration.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.   In consideration of several factors, including his
lack of a criminal history prior to his commitment
offense, his lack of a CDC-115 disciplinary
history, and his insight and increased maturity
since his incarceration, his violence potential
within a controlled setting is estimated to be well
below average relative to this Level II inmate
population.

B.   If released to the community, his violence
potential is estimated to be no more than the
average citizen in the community.

C.   A possible risk factor for this inmate which could
be a precursor to violence would be to choose to go
back to the use of alcohol and/or drugs again.
Should this inmate make the choice to use
substances again, his violence potential would be
considered higher than the average citizen in the
community.  As noted earlier, however, inmate Jay
does appear to have insight into his substance
abuse history, and awareness of the idea that
recovery from such a history is most likely going
to be an ongoing process, and has made plans for
the future addressing these issues.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his
behavior.  He has the capacity to abide by

JAY, M.      D-55653        CTF-CENTRAL      10/15/02       gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE EIGHT


institutional standards and has done so during his
incarceration period.

B.   This inmate does not have a mental health disorder
which would necessitate treatment, either during
his incarceration period or following parole.

C.   As inmate Jay has acknowledged a significant
history related to the abuse of alcohol and drugs,
I would recommend upon parole:

1)  Continued abstinence from all illegal drugs and
alcohol.

2)  Mandatory attendance at self-help groups, such
as Alcoholics Anonymous or Narcotics Anonymous.


JEFF HOWLIN, Ed.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:  10/09/02
T:  10/15/02


JAY, M.       D-55653       CTF-CENTRAL       10/15/02       gmj

# Exhibit
# 7

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
FEBRUARY 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
FEBRUARY 7, 2001

This is a psychological evaluation for the Board of Prison
Terms for inmate Mathew Jay, CDC# D-55653.  This report is
based upon a personal clinical interview of the inmate,
conducted on 02/07/01, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.   IDENTIFYING INFORMATION:

Inmate Jay is a 33-year-old, single, Caucasian male
whose date of birth is 07/29/67.  English is his
primary language and he is an American citizen.  His
stated religious preference is Christian.  No obvious
unusual physical characteristics were observed and he
denies ever using any nicknames or aliases.

II.  DEVELOPMENTAL HISTORY:

Inmate Jay denies any childhood history of physical or
sexual abuse as either a perpetrator or a victim.
Between the ages of seven to nine, he saw a
psychiatrist for apparent relational problems with his
siblings.

At about the age of 12 to 13, he began using drugs,
including marijuana, alcohol, etc.  Over the next
several years, he became increasingly rebellious
towards his parents and had developed a history of
depression.

In 1983, he attempted suicide by overdosing on his
brother's asthma medication.  He ultimately dropped out
of school in the 12th grade, primarily due to his heavy
drug use.  During his childhood, he suffered from
chronic asthma, a condition which currently remains.

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

In summary, heavy drug use significantly impacted his development as an adolescent.

## III. EDUCATIONAL HISTORY:

Inmate Jay acknowledges that he attended public school and also a private Catholic school. He completed the 11th grade and ultimately attained his GED and high school diploma in the Los Angeles County Jail in 1986. He is currently working towards a BA degree in social work from the University of Iowa. The record indicated that in 1987, his measured grade point level ranged from 11.1 to 12.3. He has no history of special education in school. As noted previously, he dropped out of high school due to drug related problems.

## IV. FAMILY HISTORY:

Records indicate this inmate has no significant family history of drug abuse or significant family history of crime. He generally describes his immediate relationships with his family members as very warm and supportive. He states he receives daily letters, phone calls and frequently receives visits. He reports that there is no history of abuse in these relationships.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Jay is a heterosexual male. He denies any history of sexual aggression or high-risk sexual behavior.

## VI. MARITAL HISTORY:

Inmate Jay states that he has never been married and has no children.

## VII. MILITARY HISTORY:

Inmate Jay has no history of military service.

## VIII. EMPLOYMENT/INCOME HISTORY:

While this inmate was only 18 at the time of the instant offense, his preincarceration work history includes working two years as a restaurant cook and as a baker.

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

His incarceration work history includes working five years in a bakery and he has received numerous laudatory chronos for his work.

IX. **SUBSTANCE ABUSE HISTORY:**

Inmate Jay acknowledges having severely abused alcohol, marijuana, LSD and cocaine in the past. He admitted heavy drug usage during his teenage years. He states that he has remained abstinent since 1985, the time of his incarceration, and has remained drug-free since that time.

He states that he began attending Alcoholics Anonymous and Narcotics Anonymous in 1987 and has regularly attended until the current date. He plans to continue attending AA and NA. This inmate does have a significant substance abuse history.

X. **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Jay's recent psychiatric diagnosis includes Polysubstance Abuse (by history), in institutional remission. He was hospitalized as a teenager in 1983 for the previously mentioned drug overdose. There were no serious residual effects. He denies a history of serious accidents, including head injuries. He has no history of seizure or other neurological conditions. He does have chronic asthma and currently takes medication for this condition.

XI. **PLANS IF GRANTED RELEASE:**

If granted parole, inmate Jay plans to live in Los Angeles County with his parents, who have agreed to this arrangement. His financial and vocational plans include working as a cook and baker, or in various labor jobs. He also plans to continue attending school.

**CLINICAL ASSESSMENT**

XII. **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

During the clinical interview, inmate Jay was alert and oriented to person, place and time. He was well dressed and groomed. His speech was articulate and

JAY    D-55653    CTF-CENTRAL    02/20/01    gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was in the average to above
average range.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      Polysubstance Dependence, in sustained full
             remission in a controlled environment (by
             history).
AXIS II:     No Contributory Personality Disorder.
AXIS III:    Asthma.

In addition to attending Alcoholics Anonymous and
Narcotics Anonymous, inmate Jay has completed a number
of other self-help groups.  In 1994, he completed the
Lifeskills group with Dr. Bakeman.  From 1990 until
1992, he attended Alternatives to Violence.  In 1990,
he completed Breaking Barriers, beginning and advanced
classes.  A chrono dated 1990 indicates that inmate Jay
completed personal, individual counseling from Dr.
Kennedy, a clinical psychologist, over a period of
several years.

XIII. REVIEW OF LIFE CRIME:

Inmate Jay described the circumstances surrounding
his commitment offense involving Second Degree Murder
and Attempted Murder.

In this crime, the inmate was a participant in the
strangling death of one of the crime partners' mother
and the attempted murder of this crime partner's eight-
year-old, half brother.  The crime did appear markedly
violent and is significantly inconsistent with the
inmate's current demeanor and nonviolent history within
CDC.

As reported in previous psychological evaluations, the
inmate stated that he was very immature and that his
judgment was drastically altered by chronic, heavy drug
usage.  He did demonstrate empathy towards the damage
done to the victims and appeared to be genuinely
penitent for his crime.  Heavy drug abuse does appear
to be directly related to the instant offense, and the

JAY       D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

inmate appears to have an adequate understanding of
this relationship and the need to maintain abstinence
from drug and alcohol use.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.   His violence potential within a controlled setting
is considered to be significantly below average
relative to this Level II inmate population.
Additionally, his level of dangerousness is
considered to be average to that of the average
citizen in the community.  These conclusions are
based upon several factors.

On the one hand, he heavily abused drugs from the
age of 12 or 13 until the age of 18.  Such heavy
drug usage during this development period likely
heavily impacted his cognitive, emotional and
social development.

On the other hand, however, he has no history of
juvenile crime or a history of adult criminal
behavior, other than the instant offense.  He also
has no history of gang involvement.  Significantly,
he has never received any CDC-115 violations during
his entire incarceration of 13 years within CDC.
Moreover, he has no disciplinaries for violent
behavior during this entire period.  No significant
psychopathic traits were observed during the
interview.  This inmate appears to have matured
greatly during his 13 years of incarceration within
CDC and to have profited from his participation in
the Lifeskills group and his individual counseling
with Dr. Kennedy.  However, it should be noted that
no report regarding his progress was found in
regards to his individual counseling with Dr.
Kennedy.  Nonetheless, he appears to have matured
greatly both from the self-help groups and therapy,
and from the structured programming within CDC.

Therefore, in light of these factors, his violence
potential is considered to be significantly below
average relative to this Level II inmate
population.

JAY          D-55653          CTF-CENTRAL          02/20/01          gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

    B.  If released to the community, his violence
        potential is considered to be no more than that of
        the average citizen in the community, if he remains
        free from substance abuse.

    C.  Substance abuse is a risk factor which may be a
        precursor to violence for this individual.

XV.  **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

    A.  This inmate is competent and responsible for his
        behavior.  He has the capacity to abide by
        institutional standards and has largely done so
        during his incarceration.

    B.  This inmate does not have a mental health disorder
        which would necessitate treatment either during his
        incarceration period or following upon parole.

    C.  This inmate does appear to have a significant
        substance abuse history, and continued
        participation in  Alcoholics Anonymous and
        Narcotics Anonymous is suggested both during his
        incarceration within CDC and as a contingency for
        parole.

JOE REED, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


R. (S.) COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:  02/14/01
T:  02/20/01


JAY      D-55653      CTF-CENTRAL      02/20/01      gmj

# Exhibit
# 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | MAY 16, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004357

In re,

MATTHEW ADAM JAY,                                 Counsel for Petitioner:

Petitioner,

On Habeas Corpus                                  Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on November 6, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on June 10, 1987 after a conviction for second-degree murder and attempted murder. He was sentenced to fifteen years to life. His minimum parole eligibility date was October 18, 1995. The record reflects that petitioner and two crime partners strangled to death the mother of one of the crime partners. The victim was lured into her son's room, where he and petitioner held her down while another man slipped a noose around her neck. During the fifteen-minute attack, the victim's eight-year-old son walked into the room. Petitioner's crime partners decided that they would have to kill the child since he was a witness. Petitioner bought rat poison, which was put in a snack for the child. He refused to eat it. Petitioner left the premises. He later rejoined the others and followed them to a location on Malibu Canyon. The victim's body was taken out of the trunk of her car and placed at the steering wheel. Her young son was tied up and blindfolded in the backseat. The men then threw gasoline in the car and rolled it off the edge. The child managed to survive the attack and get help.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on January 26, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on his commitment offense.

The Court finds that there is some evidence that "multiple victims were attacked, injured or killed in the same or separate incidents." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) One victim was killed while another was attacked and would have been killed had he not been able to untie himself and escape from a burning car.

The record reflects that there is some evidence that, "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*In re Scott* (2004) 119 Cal.App.4th 871,

1

| Minutes Entered |
|---|
| 05-16-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 16, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004357
In re,
MATTHEW ADAM JAY,
        Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

891.) An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g. beating, clubbing stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Id.* at 892.) In this case, the victim was strangled by three men. The attack lasted fifteen minutes during which time she was screaming loudly enough to wake her son, who had been sleeping in another room. Additionally, they attempted to kill petitioner's crime partner's brother, an eight-year-old child, by tying him up and leaving him in a car, which they set on fire and push off a cliff. Based on these actions, there is some evidence that the crime was committed in a more aggravated and violent manner than that ordinarily shown in the commission of second-degree murder.

      Accordingly, the petition is denied.

      The court order is signed and filed this date. The clerk is directed to send notice.

      A true copy of this minute order is sent via U.S. Mail to the following parties:

Steve M. DeFilippis, Esq.
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
Attorney for Petitioner Matthew Adam Jay

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101



THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE, AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE.

ATTEST _____ JUN 1 5 2007 _____

JOHN A. CLARKE, Executive Officer/Clerk of the
Superior Court of the State of California for the County
of Los Angeles.

By _____ , Deputy

JOSEPH M. PULIDO, S.C.C.
233219

| Minutes Entered |
|---|
| 05-16-07 |
| County Clerk |

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA  90012 | ~~CONFORMED COPY~~<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>JUN 1 5 2007<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER<br><br>MATTHEW ADAM JAY | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER<br><br>BH004357 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time        ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause         ☐ Order
☐ Order for Informal Response    ☐ Order re:
☐ Order for Supplemental Pleading   ☐ Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

June 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_____, Clerk
         Joseph M. Pulido

Steve M. DeFilippis, Esq.
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
Attorney for Petitioner Matthew Adam Jay

Department of Justice
Office of the Attorney General of the State of
California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# Exhibit
# 9

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

COURT OF APPEAL - SECOND DIST.

F I L E D

OCT 2 6 2007

JOSEPH A. LANE                    Clerk

F. MELUBHHOER           Deputy Clerk

In re

MATTHEW ADAM JAY

on Habeas Corpus.

B203009

(Super. Ct. No. A811060)

(George Xanthos, Judge)

ORDER

THE COURT*:

The petition for writ of habeas corpus filed herein October 23, 2007 has been read and considered. The petition is denied. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *In re Dannenberg* (2005) 34 Cal.4th 1061.)

_____          _____          _____
*PERLUSS, P.J.,           WOODS, J.,               WILEY, J. (Assigned)

# Exhibit
# 10

Court of Appeal, Second Appellate District, Div. 7 - No. B203009
**S157963**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re MATTHEW ADAM JAY on Habeas Corpus

The petition for review is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JAN - 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
**GEORGE**
Chief Justice

MATTHEW A. JAY, D-55653
CTF-EAST DORM (ED-154)
P.O. BOX 689
SOLEDAD, CA 93960

LEGAL MAIL

PRIORITY MAIL

RECEIVED
FEB -5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TO: UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102

$10.50
02/04
000-423813
MAILED FROM ZIP CODE 93960