1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JESSICA N. BLONIEN
   Supervising Deputy Attorney General
5  DENISE A. YATES, State Bar No. 191073
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5531
    Fax: (415) 703-5843
8   Email: Denise.Yates@doj.ca.gov
   Attorneys for Respondent Ben Curry, Warden at the
9  Correctional Training Facility
   SF2008401548

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      OAKLAND DIVISION

14

15  **MATTHEW ADAM JAY,**                     No. C 08-00845  CW (PR)

16                          Petitioner,        **RESPONDENT'S NOTICE OF
                                               MOTION AND MOTION TO**
17          v.                                 **DISMISS; SUPPORTING
                                               MEMORANDUM OF POINTS**
18  **BEN CURRY, Warden,**                     **AND AUTHORITIES**

19                          Respondent.

20

21          TO PETITIONER MATTHEW ADAM JAY, IN PRO PER,

22          PLEASE TAKE NOTICE that Respondent Ben Curry, Warden at the Correctional

23  Training Facility, moves this Court to dismiss the Petition for Writ of Habeas Corpus, pursuant

24  to 28 U.S.C. § 2254 and Rules 2 and 4 of the Rules Governing § 2254 Cases in the United States

25  District Courts, on the grounds that Jay did not exhaust his state court remedies for his equal

26  protection claims, and that those claims are without merit and do not warrant federal habeas

27  relief. This motion is based on the notice and motion, the supporting memorandum of points and

28  authorities and exhibits, the Petition for Writ of Habeas Corpus, this Court's records in this

1  action, and other such matters properly before this Court.

2  ## MEMORANDUM OF POINTS AND AUTHORITIES

3  ### INTRODUCTION

4  Petitioner Jay (D-55653) is a state prisoner serving an indeterminate life sentence and

5  proceeding pro se in this matter. (Pet. 1-2.) In this Petition, Jay alleges three claims. First, Jay

6  alleges that his federal due process rights were violated because no evidence supports the Board

7  of Parole Hearings' decision that he was a current threat to public safety twenty-one years after

8  the commitment offense. Second, although he does not artfully articulate this claim, it appears

9  Jay alleges that the Board and the state courts violated his federal equal protection rights by not

10  finding him suitable for parole based on his age and the stress he was under at the time of his

11  commitment offense, which is contrary to other state court decisions finding these factors

12  significant and granting relief on that basis. (*See* Pet. 26-28.) Because Jay challenges both the

13  Board and the state courts' actions, which are separate and distinct from one another, this claim

14  should be treated as two separate claims. Respondent moves to dismiss the Petition because Jay

15  failed to exhaust his equal protection claims, and because his equal protection claims are without

16  merit and do not warrant federal habeas relief. Accordingly, this Court must dismiss this mixed

17  Petition or at a minimum, this Court should dismiss the equal protection claims as lacking merit

18  and not deserving of federal habeas relief.

19  ### ARGUMENT

20  **I.    THIS PETITION MUST BE DISMISSED BECAUSE IT CONTAINS
         BOTH EXHAUSTED AND UNEXHAUSTED CLAIMS.**

21

22  Because Jay did not exhaust all of his current federal claims in the state courts, this Court

23  must dismiss this mixed Petition. A federal habeas petitioner must exhaust his available state

24  court remedies before a federal court may grant his petition. 28 U.S.C. § 2254(b)(1)(A). If one

25  or more claims in the federal petition have not been exhausted, the district court must dismiss the

26  petition. *Pliler v. Ford*, 542 U.S. 225, 227 (2004) (citing *Rose v. Lundy*, 455 U.S. 509, 510

27  (1982)). This rule provides the state courts a full and fair opportunity to resolve federal

28  constitutional claims before they are presented to the federal court, thus "protect[ing] the state

---

Resp't's Not. of Mot. & Mot. to Dismiss; Supporting Mem. of P. & A.

*Jay v. Curry*
No. C 08-00845 CW (PR)

1  courts' role in the enforcement of federal law." *Rose*, 455 U.S. at 518.

2       It is the petitioner's burden to prove he has exhausted his state court remedies before

3  filing his federal habeas petition. *Williams v. Craven*, 460 F.2d 1253, 1254 (9th Cir. 1972) (per

4  curiam). "A petitioner has satisfied the exhaustion requirement if: (1) he has 'fairly presented'

5  his federal claim to the highest state court with jurisdiction to consider it [citations] . . . or (2) he

6  demonstrates that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th

7  Cir. 1996). In California, a petitioner exhausts his federal claim by fairly presenting it to the

8  California Supreme Court. *Kim v. Villalobos*, 799 F.2d 1317, 1318 (9th Cir. 1986). If the

9  petition in the state's highest court is one for discretionary review, the petitioner must have

10  exhausted all of his federal claims at the lower levels of the state courts. *Casey v. Moore*, 386

11  F.3d 896, 916-18 (9th Cir. 2004). Finally, a petitioner has not exhausted the available state court

12  remedies "if he has the right under the law of the State to raise, by any available procedure, the

13  question presented." 28 U.S.C. § 2254(c).

14       Here, Jay did not exhaust the available state court remedies before seeking federal habeas

15  relief for his claims that his equal protection rights were violated when the Board and the state

16  courts did not properly consider his age and the stress he was under at the time he committed the

17  offense, when other state courts had found this to be a significant factor and granted relief on that

18  basis. (*See* Pet. 26-28.) Although Jay raised his equal protection claim regarding the Board's

19  actions in his petition for review to the California Supreme Court (Ex. 1 at 5-6 ), he did not raise

20  it in his habeas petition filed in the state appellate court (Ex. 2). By not presenting this claim to

21  the state appellate court, this claim is unexhausted. *Casey*, 386 F.3d at 916-18. Jay's contention

22  that he could not have raised this claim until now because he is challenging the state courts'

23  decisions is disingenuous because Jay also alleges that the Board violated his equal protection

24  rights. (Pet. 26, 28.) Thus, just as Jay raised his challenge to the Board's actions in his petition

25  for review, he also could have raised this claim in his state appellate court petition. Further,

26  assuming Jay's challenge to the state courts' decisions is valid (*but cf.* Arg. II), just as he

27  appeared to challenge the superior court's decision in his appellate court petition, he could have

28  challenged the appellate court decision in his petition for review to the state supreme court.

---

Resp't's Not. of Mot. & Mot. to Dismiss; Supporting Mem. of P. & A.                    *Jay v. Curry*
                                                                                       No. C 08-00845 CW (PR)

1   (*Compare* Ex. 2 at 21, *with* Ex. 1.)  Thus, this Court should reject Jay's contention that he could

2   not have raised his equal protection claim regarding the state courts' actions before now.

3          Further, Jay is not precluded from exhausting his state court remedies because the

4   California Supreme Court has original jurisdiction to review petitions for writs of habeas corpus.

5   Cal. Const. art. VI, § 10.  Thus, Jay can still file a habeas petition in the California Supreme

6   Court alleging the unexhausted equal protection claims.  Accordingly, Jay has not "reach[ed] the

7   point where he has no state remedies available to him," *Peterson v. Lampert*, 319 F.3d 1153,

8   1156 (9th Cir. 2003), and the Petition must be dismissed.

9   **II.    JAY'S EQUAL PROTECTION CLAIMS ARE WITHOUT**
    **MERIT AND DOES NOR WARRANT FEDERAL HABEAS RELIEF.**

10

11         Jay's contentions that his equal protection rights were violated because the Board and the

12  state courts failed to properly consider his age and the stress he was under are without merit.

13  (Pet. 13-14.)  In order to establish an equal protection claim, Jay must have established that he

14  was treated differently from other similarly situated persons, and he did not.  *City of Cleburne v.*

15  *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Merely asserting that state courts have granted

16  relief based on other prisoners' age or the stress they were under at the time they committed their

17  life crimes does not establish that Jay was similarly situated to those prisoners.  Specifically, Jay

18  has not articulated how the parole suitability factors, other than age and stress, in each of the

19  other prisoners' cases reflects that they and Jay are similarly situated.  Moreover, the fact that

20  other prisoners convicted of second-degree murder have been paroled does not establish an equal

21  protection violation.  *See Sturm v. Cal. Adult Authority*, 395 F.2d 446, 448-49 (9th Cir. 1967)

22  (finding that "the fact that other prisoners have had their sentence reduced, or been granted

23  parole, affords no ground for complaint by petitioner," when addressing an equal protection

24  claim petitioner alleged because he had been denied parole but his co-defendant had been granted

25  parole).  Jay is entitled to a parole consideration hearing every one to five years, just as all

26  second-degree murderers sentenced to an indeterminate life terms are entitled.  Cal. Penal Code

27  §§ 3041.5(b)(2)(A)-(B).

28         In addition, this Court should reject Jay's equal protection claims because they appear to

1    address a state law issue, which does not warrant federal habeas relief. Federal habeas relief is

2    not available to "reexamine state-court determinations on state-law questions." *Estelle v.*

3    *McGuire*, 502 U.S. 62, 67-68 (1991). "A federal court may not issue the writ on the basis of a

4    perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Moreover, just as a

5    habeas petitioner may not transform a state law issue into a federal one merely by asserting a due

6    process violation, *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996), Jay should not be able

7    to transform a state law issue into a federal one by merely asserting a violation of the Equal

8    Protection Clause. Jay's equal protection claims essentially allege that the Board and the state

9    courts should have granted him parole because other state courts have done so based on the

10    prisoner's age and stress he was under at the time he committed his life crime. But what the

11    Board and the state courts should have done according to other state court decisions does not

12    establish that Jay's custody is contrary to United States Supreme Court law and thus, does not

13    justify federal habeas relief. 28 U.S.C. § 2254(a).

14          In summary, because Jay's equal protection claims are without merit and do not warrant

15    federal habeas relief, this Court should dismiss these claims.

**CONCLUSION**

17          Jay did not present each of his claims to all of the state courts; thus, this Petition must be

18    dismissed because it contains exhausted and unexhausted claims. Alternatively, this Court

19    should dismiss Jay's equal protection claims because they are without merit and do not warrant

20    federal habeas relief.

21          Dated:  September 2, 2008

22                                Respectfully submitted,

23                                EDMUND G. BROWN JR.
                                  Attorney General of the State of California
24

25

26                                DENISE A. YATES
                                  Deputy Attorney General
27

28                                Attorneys for Respondent Ben Curry, Warden at the
                                  Correctional Training Facility

---

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Matthew Adam Jay v. Ben Curry, Warden**

No.:   **CV 08-0845 CW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On September 2, 2008, I served the attached

### RESPONDENT'S NOTICE OF MOTION AND MOTION TO DISMISS; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Matthew Adam Jay, D-55653**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **September 2, 2008**, at San Francisco, California.

_____
J. Palomino
Declarant

_____
Signature

20138534.wpd

# EXHIBIT 1

SUPREME COURT OF THE STATE OF CALIFORNIA

# S157963

In the matter of:

MATTHEW ADAM JAY,

on habeas corpus.

_____/

CASE NO. _____
(App.Ct. Case No.B203009,
Second Appellate District;
Supp.Ct. Case No. BH004357,
Los Angeles County)

SUPREME COURT
FILED

NOV – 5 2007

Frederick K. Ohlrich Clerk

Deputy

P E T I T I O N   F O R   R E V I E W

After Decision of the Court of Appeal, Second Appellate District

Denying the Petition for Writ of Habeas Corpus on October 26, 2007

Matthew Adam Jay, D-55653
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960

Petitioner in pro per

RECEIVED

NOV 5 – 2007

CLERK SUPREME

SUPREME COURT OF THE STATE OF CALIFORNIA

In the matter of:

MATTHEW ADAM JAY,

on habeas corpus.

CASE NO. _____

(App. Ct. Case No. B203009,
Second Appellate District;
Supp. Ct. Case No. BH004357,
Los Angeles County)

_____/

PETITION FOR REVIEW

TO: THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND THE
ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

COMES NOW Matthew Adam Jay (hereafter Petitioner) respectfully

requesting review following the decision of the Court of Appeal,

Second Appellate District, filed on October 26, 2007, appended hereto

as ATTACHMENT A, denying Petitioner's writ of habeas corpus.

On January 12, 1987 Petitioner pled guilty to one count of second

degree murder and one count of attempted murder.  On March 13, 1987

Petitioner was sentenced to an indeterminate term of 15 years to

life.  Petitioner was barely 18 years old at the time of the offenses

and at the time of the  the parole suitability hearing in question

was imprisoned for 20 years with an unblemished record.

I.

JURISDICTION OF THE COURT

The Court has sole jurisdiction to review decisions of state

appellate courts.

II.

## NECESSITY FOR REVIEW

It is necessary for the Court to review the summary denial of the appellate court because of the confusion that has arisen in a split of appellate courts after opposing decisions interpreting the review for "some evidence" after In re Rosenkrantz (2002) 29 Cal.4th 616, 667. See In re Lee (2007) 144 Cal.App.4th 1400, 1408 ["The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence a parolee's release unreasonably endangers public safety"] as opposed to In re Jacobson (2007) ___ Cal.App.4th ___, 65 Cal.Rptr.3d 222, 230 [any evidence will do.]

III

## FACTS OF THE CASE

In short, Petitioner, a drugged out adolescent who just turned 18, whose "dependency, drugs and depression all combined in a spiraling psychiatric deterioration resulting in apathetic, severely depressed, severally drug-dependent, non-functioning adolescent" (EXHIBIT 2, p. 16 of habeas), who was pressured by Torry Meier's to help Meire's kill his mother. Although when Meier's approached Petitioner with his plan a year prior and Petitioner went to the police at that time and reported it, by now Petitioner was too much under the influence of drugs and other life stressors and went along with Meier's to strangle his mother.

On October 13, 1985, Petitioner participated in the strangulation death of Shirley Rizk. The next day Petitioner told friends who reported it to the police and Petitioner was arrested.

## IV

## QUESTIONS FOR REVIEW

WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE BOARD OF PAROLE HEARINGS DENIED HIM PAROLE ABSENT "SOME EVIDENCE" THAT PETITIONER IS A <u>CURRENT</u> THREAT T PUBLIC SAFETY TWENTY YEARS AFTER THE COMMITMENT OFFENSE?

A.  WHILE THE STANDARD OF REVIEW IS "SOME EVIDENCE" — DID THE BOARD MEET ITS STANDARD OF PROOF OF "A PREPONDERANCE OF THE EVIDENCE?

Petitioner, being an indeterminately sentenced prisoner, has a "liberty interest" in parole (<u>Greenholtz v. Inmates of Nebraska Penal and Correctional Complex</u> (1979) (hereater <u>Greenholtz</u>), 442 U.S. 1; <u>Sass v. California Board of Prison Terms</u> (9th Cir. 2006) (hereafter <u>Sass</u>), 461 F.3d 1123; <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616; <u>In re Dannenberg</u> (2005) 34 Cal.4th 1061).

Judicial review is, assuming the Board's decision was based on a standard of proof not lower than "a preponderance of the evidence" (<u>In re Tripp</u> (2006) 150 Cal.App.4th 306, 312; <u>In re Morrall</u> (2002) 102 Cal.App.4th 280, 302; Cal. Evid. Code § 115), the "some evidence" standard (<u>Hamdi v. Rumsfeld</u>, (2004) 542 U.S. 507, 537 [when a "liberty interest" attaches, some evidence is "a standard of review, not a standard of proof"]; <u>Superintendent v. Hill</u> (1985) (hereafter <u>Hill</u>), 472 U.S. 445, 456; <u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 656). However, "the 'some evidence' standard applies only to questions of evidentiary sufficiency" (<u>Edwards v. Balisok</u> (1997) 520 U.S. 641, 648; <u>In re Ramirez</u> (2001) 94 Cal.App.4th 549, 563-564, disapproved on other ground (<u>In re Dannenberg</u>, <u>supra</u>, 34 Cal.4th, at 1100).

B.  IS THE COMMITMENT OFFENSE TWENTY YEARS AFTER THE FACT EVIDENCE
    OF CURRENT THREAT WHEN ALL BEHAVIORAL, MEDICAL, AND PSYCHIATRIC
    EVIDENCE FIRMLY ESTABLISHES PETITIONER HAS BEEN REHABILITATED?

The ultimate test is not whether there is "some evidence" to

support the reasons given to deny parole suitability because there

will always be "some evidence" (In re Weider (2006) 145 Cal.App.4th

570, 587; In re Caswell (2001) 92 Cal.App.4th 1017, 1029 [evidence

of unsuitability exists in every case], but rather, the ultimate

test is "whether the inmate will be able to live in society without

committing additional antisocial acts" (In re Rosenkrantz, supra,

29 Cal.4th, at 655; In re DeLuna (2005) 126 Cal.App.4th 585, 591),

or, as the Second Appellate District stated: "whether some evidence

indicates a parolee's release unreasonably endangers public safety"

(In re Lee (2006) 143 Cal.App.4th 1400, 1408, emphasis in original,

Petition for Review denied, depublication denied).  Thus, in reviewing

parole suitability, the Board, as well as the courts, "must remain

focused not on the circumstances that may be aggravating in the

abstract but, rather, on facts indicating that release currently

poses 'an unreasonable risk of danger to society" (In re Elkins (2006)

144 Cal.App.4th 475, 499, emphasis added, Petition for Review denied,

depublication denied).  Moreover, as articulated by the United States

Supreme Court in the Nation's controlling parole suitability case:

"The decision turns on...primarily what a man is and what he may

become rather than simply what he has done" (Greenholtz, 442 U.S.,

at 10, supra).  Thus, REHABILITATION could be said to be the

Greenholtz doctrine.

The true issue before the Court, therefore, is whether there

is some evidence that granting parole "unreasonably endangers public

safety"; not, as the trial court asserts, whether the evidence supports the reasons asserted for denying parole (In re Cooper (2007) 153 Cal.App.4th 1043, 1059-1060, citing In re Lee, supra, 143 Cal.App.4th, at 1408).

Petitioner's twenty years of an unblemished record cogently demonstrates his REHABILITATION. Federal District Courts and California courts are correct in following Greenholtz and Irons in the principle that the fact there is 'some evidence' the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents 'some evidence' the prisoner's release would pose a CURRENT threat to public safety (see, inter alia, Rosenkrantz v. Marshall, supra, 444 F.Supp.2d 1063, 1086; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1046; Willis v. Kane (N.D. Cal. 2006) 485 F.Supp.2d 1126, 1136; In re Lee, supra, 143 Cal.App.4th, at 1412; In re Elkins, supra, 144 Cal.App.4th, at 498).

C.  WAS IT A VIOLATION OF DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW FOR THE BOARD (1) TO NOT CONSIDER AND WEIGH PETITIONER'S AGE AT THE TIME OF THE COMMITMENT OFFENSE? AND (2) FAILED TO CONSIDER THE SIGNIFICANT STRESS HE WAS UNDER WHEN HE COMMITTED THE OFFENSE?

A decision to deny parole can only be sustained if "the factual basis on which the [Board] relies--which must be tailored to the individual inmate and give due consideration to the factors the [Board] is required by law to consider--is supported by 'some evidence' in the record before the Board" (In re Jacobson, supra, 65 Cal.Rptr.3d, at 230).

At the time of the offense, Petitioner had just turned 18 years old. Although the Board mentioned this mitigating factor during

- 5 -

the evidence gathering part of the hearing, it did not consider or weigh this important mitigating factor in the decision. This failure denied the "tailored" application of the individual factors to Petitioner, and denied him equal protection under the law having been applied to similar cases (see In re Barker (2007) 151 Cal.App.4th 346, 376-377; Rosenkrantz v. Marshall, supra, 444 F.Supp.2d, at 1063; relying on, inter alia, Roper v. Simmons (2005) 543 U.S. 551, 561-562; Stanford v. Kentucky (1989) 492 U.S. 361, 395).

There was also uncontrverted evidence that Petitioner was under significant stress at the time of the commitment offense and the Board acknowledging as much when it made the finding "that the inmate continues to need self-help in order to face, discuss, understand and cope with stress in a nondestructive manner" (HT 92:13-16). The record is devoid evidence that Petitioner cannot cope with stress in a nondestructive manner, as he has been doing so for over 20 years now. "[T]he Board failed to acknowledge that the crime was the result of significant stress in Weider's life-stress that had built up over a long period of time. [¶] But it does not appear that the Board considered this evidence at all. This it is bound to do" (In re Weider, supra, 145 Cal.App.4th, at 589-590; In re Scott (2005) 133 Cal.App.4th 573, 596; In re Rosenkrantz, supra, 29 Cal.4th, at 679).

D.   CAN THE BOARD USE FIRST DEGREE ELEMENTS WHEN PETITIONER WAS CONVICTED OF SECOND DEGREE MURDER?

The Board found the offense to be "dispassionate and calculated, such as an execution-style murder." Petitioner was convicted of second degree murder, not first degree murder. The Board cannot retry the case just because it does not agree with Petitioner's plea bargain. Regardless, the commitment offense is an immutable factor

that must be weighed against time and rehabilitation.

The principles of law articulated in <u>Greenholtz</u> makes it clear that static offense factors cannot be used forever to deny parole. "'The decision turns on a 'discretionary assessment of imponderables, entailing <u>primarily</u> what a man <u>is</u> and what he may become rather than simply what he has done'". (<u>Greenholtz</u>, 442 U.S., at 10, <u>supra</u>, citation omitted). The High Court continued, "It is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of <u>rehabilitation</u>" (<u>Id.</u>, at 13, emphasis added). Rehabilitation is the <u>Greenholtz</u> doctrine. Postconviction behavior is indicative of rehabilitation, thus, the High Court recognized "[t]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (<u>Id.</u>, at 15).

As the Ninth Circuit instructed in <u>Irons v. Carey</u>, 479 F.3d, 568, at 665 (9th Cir. 2007):

> "We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest that flows from the relevant California statutes."

No one is saying that the Board cannot rely on the commitment offense to deny parole, "initially" (<u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3rd, 910, 916). What the Board cannot do, however, is rely on the commitment offense and prior criminal history "over time" transmuting an indeterminate sentence with the possibility of parole into life without the possibility of parole, especially on grounds of political safety when all evidence points to rehabilitation of the offender, being "contrary to the rehabilitative goals espoused

by the prison system" (Biggs v. Terhune, supra, 334 F.2d, at 917)
and making a sham of the parole process and rehabilitation.

### C O N C L U S I O N

For the foregoing reasons review should be granted and an Order
to Show Cause issued returnable to the Appellate Court.

DATED: 11/01/07

Respectfully submitted,

Matthew Adam Jay
Petitioner in pro per

- 8 -

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

COURT OF APPEAL - SECOND DIST.

F I L E D

OCT 2 6 2007

DIVISION SEVEN

JOSEPH A. LANE          Clerk

~~E. MCLAUGHLIN~~          ~~Deputy Clerk~~

In re

MATTHEW ADAM JAY

on Habeas Corpus.

B203009

(Super. Ct. No. A811060)

(George Xanthos, Judge)

ORDER

THE COURT*:

The petition for writ of habeas corpus filed herein October 23, 2007 has been read and considered. The petition is denied. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *In re Dannenberg* (2005) 34 Cal.4th 1061.)

_____          _____          _____
*PERLUSS, P.J.,              WOODS, J.,              WILEY, J. (Assigned)

<u>PROOF OF SERVICE BY MAIL</u>

CASE NAME: <u>JAY v. CURRY</u>

CASE NO. : <u>Second App.Dist. No. B203009</u>

I, <u>Matthew Adam Jay</u>, hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

PETITION FOR REVIEW

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

Office of Attorney General          Clerk of the Court
State of California                 California Appellate Court
455 Golden Gate Ave. #11000         300 South Spring St., Fl.2 N. Twr.
San Francisco, CA 94102             Los Angeles, CA 90013

I declare under penalty of perjury that the foregoing is true and correct, doing so this <u>1st</u> day of <u>November</u>, 2007, at Soledad, California.

Pursuant to the "mailbox rule, this document is "constructively filed" when turned over to prison staff (see <u>In re Jordan</u> (1992) 4 Cal.4th 116, 119-120, citing <u>Houston v. Lack</u> (1988) 487 U.S. 266).

# EXHIBIT 2
# PART 1 OF 3

AURORA

REC'D CLS DOCKETING

MC-275

Name    Matthew Adam Jay

Address Correctional Training Facility

P.O. Box 689 (ED-15U)

Soledad, CA 93960

CDC or ID Number    D-55653

## CALIFORNIA COURT OF APPEALS

## SECOND APPELLATE DISTRICT

(Court)

| | |
|---|---|
| MATTHEW ADAM JAY, | PETITION FOR WRIT OF HABEAS CORPUS |

MATTHEW ADAM JAY,
Petitioner
                vs.

BEN CURRY (Warden),
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____
                    (To be supplied by the Clerk of the Court)
(Supp. Ct. Case No. BH 004357,
Los Angeles County)

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction                        ☐ Parole

☐ A sentence                          ☐ Credits

☐ Jail or prison conditions           ☐ Prison discipline

☒ Other *(specify)*: <u>Denial of parole suitability</u>

1. Your name:  <u>Matthew Adam Jay</u>

2. Where are you incarcerated?  <u>Correctional Training Facility, P.O. Box 689, Soledad, CA 93960</u>

3. Why are you in custody?  ☒☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   <u>Second degree murder / attempted murder</u>

   b. Penal or other code sections:  <u>187 & 664/187</u>

   c. Name and location of sentencing or committing court:  <u>Los Angeles County Superior Court,</u>

   <u>Northeast Division</u>

   d. Case number:  <u>AB11060</u>

   e. Date convicted or committed:  <u>January 12, 1987</u>

   f. Date sentenced:  <u>March 13, 1987</u>

   g. Length of sentence:  <u>15 years to life</u>

   h. When do you expect to be released?  <u>Unknown</u>

   i. Were you represented by counsel in the trial court?  ☐ Yes.    ☐ No.  If yes, state the attorney's name and address:
   N/A

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty  ☒☒ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial
   N/A

6.  GROUNDS FOR RELIEF
    **Ground 1:**  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement."  *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE APPENDIX "A" AT PAGE 5 FOR ANSWER TO 6

    a.  Supporting facts:
        Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE APPENDIX "A AT PAGE 6 FOR ANSWER TO 6(a)

    b.  Supporting cases, rules, or other authority (optional):
        *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE APPENDIX "B" AT PAGE 23 FOR ANSWERS TO 6(b)

8. Did you appeal from the conviction, sentence, or commitment? [ ] Yes. [XX] No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

       (2) _____

       (3) _____

   f. Were you represented by counsel on appeal? [ ] Yes. [ ] No.  If yes, state the attorney's name and address, if known:
       **N / A**

       _____

9. Did you seek review in the California Supreme Court? [ ] Yes. [ ] No.   If yes, give the following information:
   **N / A**

   a. Result: _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    **N / A**

    _____

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       **NO ADMINISTRATIVE APPEAL IS AVAILABLE**

       _____

       _____

       _____

       _____

       _____

       _____

       _____

       _____

    b. Did you seek the highest level of administrative review available? [ ] Yes. [ ] No.
       *Attach documents that show you have exhausted your administrative remedies.* **N / A**

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? [XX] Yes. If yes, continue with number 13. [ ] No. If no, skip to number 15.

13. a. (1) Name of court: **Los Angeles County Superior Court**

   (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus**

   (3) Issues raised: (a) **SAME AS RAISED HEREIN (additional claims are dropped)**

   (b) _____

   (4) Result (Attach order or explain why unavailable): **Denied (see EXHIBIT 8)**

   (5) Date of decision: **May 16, 2007**

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

   (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
   **Superior court denied writ on 5/16/07, mailed to counsel for Petitioner on 6/15/07, counsel forwarded to Petitioner receiving decision on 7/11/07 (EXHIBIT 9).**

16. Are you presently represented by counsel? [ ] Yes. [XX] No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? [XX] Yes. [ ] No. If yes, explain:

   **Fed. Dist. Ct., N. Dist. of Calif. contesting 2004 parole decision**

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   **N/A**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: **October 14, 2007**

▶ _____
(SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Page six of six

A P P E N D I X  "A"

Answers to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION WHEN THE BOARD OF PAROLE
HEARINGS DENIED HIM PAROLE ABSENT "SOME EVIDENCE" THAT
PETITIONER IS A <u>CURRENT</u> THREAT TO PUBLIC SAFETY TWENTY
YEARS AFTER THE COMMITMENT OFFENSE.

---

I N T R O D U C T I O N

COMES NOW Matthew Adam Jay (hereafter Petitioner) with his writ

of habeas corpus challenging the Board of Parole Hearings (hereafter

Board) finding him unsuitable for parole for the SEVENTH time after

nearly twenty-one years of exemplary post-offense, crime-free behavior

on an indeterminate sentence of 15 years to life.  The evidence shows,

by the Board's own admission, that Petitioner is fully rehabilitated,

and he has served the legislatively prescribed punishment for, what

is admittedly, an aborent offense, but not outside the common manners

of death described by the law for which parole is expected.  Thus,

the only issue at bench is the commitment offense.

Petitioner was barely 18 years old at the time of the offense,

and is now 40 years old.  In that Petitioner has satisfied the

legislatively prescribed punishment for the commitment offense, and

is rehabilitated, does it serve any legitimate penological interest

to continue imprisonment?

Was the Los Angeles County Superior Court's decision in this

case unreasonable in light of the facts and evolution of the law

at the time of its decision?

///////

- 5 -

Answer to 6 (b) - Supporting facts

Because the only issue before the Court is the commitment offense verses time and rehabilitation, Petitioner will present evidence only related to the issue. Moreover, in that the "facts" the Board relied on for the offense are third hand and disputed by counsel (EXHIBIT 1, HT 14:1-15:11),[1]/ facts of the commitment offense will be taken from the Probation Officer's Report (POR) (EXHIBIT 2), which is in Petitioner's prison file before the Board, presenting all relevant information to provide a complete order of events. In no way does Petitioner try to mitigate the horrific offense.

The commitment offense

The facts of the commitment offense, in chronological order, are (EXHIBIT 2):

"On the evening of October 13, 1985, Defendant Meier, at that time, age 16, was at his place of employment, and apparently decided to kill his mother that night. He was able to obtain a promise of assistance from [Petitioner]. Later, while still at work, Defendant Meier told Defendant Parker, age 23 of his plans and Parker agreed to assist him. At some point, the three defendants went to a nearby restaurant where they discussed how they would kill Defendant Meier's mother. Defendant Meier produced a rope that he had fashioned into a noose, and it was decided (Meier had already "decided" and told Petitioner and Parker what they would do) that they would strangle her in Meier's bedroom and then transport her body, in her car, to the Malibu Canyon area, light the car on fire, and push it over a cliff in order to make it appear an accident (EX. 2, pp. 2-3).

"The three defendants then proceeded to the home of Defendant Meier in Canoga Park. Meier let his two co-defendant's into his room through a window. While Parker and [Petitioner] laid in wait, Defendant Meier lured his mother into the room. Parker placed a noose around the neck of Shirley Rizk, Defendant Meier's mother and began to strangle her. Parker pulled on the rope around her neck, while the other two co-defendants pulled on her legs. At some point during the strangulation, her eight year old son, Rory, awakened to her screams and went to investigate. He was able to look in Meier's bedroom and observed [Petitioner] and Defendant Parker in that room and his mother on the floor. While Parker and [Petitioner] continued to attempt the strangulation, Defendant Meier took victim Rory away from the room in an effort to keep him from knowing what was

---

1. References to parole hearing transcript, EXHIBIT 1, will be noted by HT followed by page number and line number, e.g., (HT 1:1).

happening. Meier told his half brother to watch television and then returned to his bedroom. The three defendants then apparently strangled Shirley Rizk for approximately 15 minutes before she died. During this period of time, Defendant Meier repeatedly left the room to deal with his brother who wanted to know what was going on. The defendants (Meier) came to the realization that Rory was a potential witness and then it was determined (by Meier) that he must also be killed. It was decided by (Meier) that they would poison him and Defendant Meier gave [Petitioner] some money to go to a store and purchase Snarol snail poison and D-Con rat poison. While [Petitioner] went to get he poison, Parker and Meier placed Shirley Rizk's body in the trunk of her car and Defendant Meier cleaned blood off the floor of his bedroom rug." (EX. 2, pp. 3-4).

Petitioner reported that during the commission of the offense, that "he held the victim's right shoulder and her right arm while Defendants Parker and Meier strangled her with a noose. [Petitioner] commented, 'I was too scared to just get out (before) completion of the strangling ... I froze.' Further, he recalls crying while it was happening. He asked to leave and go home while the victim was struggling, and according to [Petitioner], Meier told him that no, he could not, as 'we still need you.'" (EX. 2, p. 12).

After purchasing the poison requested by Meier, upon returning to the Meier residence, Petitioner "told Torry that he needed to leave. Torry replied that it was all right to leave, but they (co-defendants) would pick him up in about two hours" (EX. 2, p. 12). After Petitioner departed from the Meier residence (EXHIBIT 1, HT 14:20-15:5), Torry Meier then attempted to poison his brother, but failed (EX. 2, p. 4).

"Defendant Meier then asked Rory if he wanted to go for a ride in Malibu Canyon. Rory agreed. With his mother's body in the trunk and Rory in the back seat, Defendant Meier and the co-defendant (Parker) then drove away from the family home. En route they stopped at a gas station and purchased a gallon of gas. After driving through the Malibu Canyon and finding a good location to push the car over a cliff, they drove back to [Petitioner's] house. [Petitioner] then followed them to the agreed-upon location in Malibu Canyon" (EX. 2, pp. 4-5). Petitioner "stopped about twenty yards behind. The co-defendants told him that victim Rory was in the car asleep. While Petitioner sat in his father's vehicle (Ex. 2, p. 13), "Defendant Meier then poured gasoline on a rag and stuffed the rag into the gas tank filler of Shirley Rizk's car. Meier then blindfolded Rory, tied his hands behind his back, and put him in the back seat

of the car. Defendant Parker then placed the body of Shirley Rizk behind the steering wheel. The car was then pushed over the embankment as Defendant Parker lit the rag on fire" (EX. 2, p. 5). Petitioner only observed the car being pushed over a cliff (EX. 2, p. 13). "With the car burning, the defendants then left in [Petitioner's] car. As the car became consumed by flames, Rory was able to untie himself and remove his blindfold. He saw his deceased mother in the front seat and blood on her face. After opening a window, he climbed out of the burning car and began yelling for help" (EX. 2, p. 5).

Petitioner drove Meier and Parker to Meier's residence, dropped them off, and went home and went to bed (EX. 2, p. 13). "The next day (Petitioner) had no idea what had happened. It did not register until he saw it in the news. He then told his brother and 'someone else' what he had done. Later, the police arrived and arrested him" (EX. 2, p. 13).

Factors related to the commitment offense

The above sums up the commitment offense. There are additional facts, however, set out in the POR that were instrumental to offering Petitioner a plea agreement to second degree murder, sentencing, and parole suitability.

Petitioner "was barely eighteen years-of-age at the time of the offense (EX. 4, p. 9; EX. 1, HT 75:18), the Board acknowledging Petitioner was "a juvenile when this happened" (HT 17:10-12). Petitioner was described as "very easy-going and friendly, as not a strong person, but instead a follower. He just likes to say yes and wants no 'hassles'. He wants to get along with everyone. He was a church Alter Boy and B-plus student until his senior year. He broke up with his girlfriend about that time and was using a lot of drugs" (EX. 2, p. 19). At the time of the offense, Petitioner was described as looking like a "Zombie" (EX 2, p. 20).

Investigating officers and Parole Officers who interviewed Meier's report that "Defendant Meier had the ability to lead others

- 8 -

and influenced the co-defendants to help him kill his mother (EX. 4, p. 18); being "a rather imposing figure, quite sophisticated, poised, and apparently persuasive. He was always calm and seemed in command of everything, even while incarcerated at juvenile hall where he seemed to have already established rapport with the staff. He seemed and looked much older than his years" (EX. 2, pp.20-21).

A court ordered psychiatrist evaluation was prepared for sentencing consideration. Dr. David Sheffner, the court appointed forensic expert, as recorded in the POR, reported that Petitioner had been abusing drugs and alcohol since 1981 or 1982. Petitioner was described "as passing-dependant personality and being a follower verses an instigator, self-sacrificing in interpersonal relationships. He was not considered to be socially or physically an aggressive person. [¶] "There was evidence of chronic childhood depression which increased even more when [Petitioner] broke up with his girlfriend in 1984 (EX. 2, pp. 15-16). It was Dr. Sheffner's expert opinion that "dependency, drugs and depression all combined in a spiraling psychiatric deterioration resulting in apathetic, severely depressed, severely drug-dependent, non-functioning adolescent. Doing drugs became the focal point of his life and drug depression-dependency were intertwined, each reinforcing the other" (EX. 2, p. 16).

The sentencing expert who signed off on the POR agreed, writing: "By the time [Petitioner] began his association with Torran Meier, [Petitioner] was rapidly deteriorating. Meier had a plan, but needed help. It was not easy to recruit others to help strangle his mother, but eventually the strong, persuasive Meier found acquiescence from

Parker, a homeless drifter and thief, and the drug-dazed [Petitioner], whom Meier described to parole authorities as being out of his mind from the results of chronic drug abuse at the time of the offense" (EX. 2, p. 23).

It was the sentencing expert's opinion that the following mitigating circumstances applied to Petitioner: (1) "while his role cannot be said to be a minor one, it was the most minor of the three"; (2) "The [Petitioner] participated in the crime under circumstances of extreme drug use.... This would indicate the [Petitioner's] conduct was partially excusable for some other reason not amounting to a defense"; (3) Petitioner, "with no apparent pre-disposition to do so, was induced by Defendant Meier to participate in the crime"; (4) Petitioner "has no prior record"; and (5) Petitioner "voluntarily acknowledged committing the crime before he was apprehended, thus insuring his eventual arrest and conviction" (EX. 2, p. 24). In aggravation, the sentencing expert found: "The crime involved great violence, disclosing a high degree of cruelty and callousnes" (Id.).

In light of the above evidence, the Los Angeles County District Attorney's Office offered a plea agreement to Petitioner to plead guilty to one count of second degree murder in violation of Penal Code § 187,[2/] and attempted murder in violation of Penal Code §§ 664/187, to run concurrent. After accepting the offer, and on January 12, 1987, pleading guilty, on March 13, 1987 Petitioner was sentenced to an indeterminate term of 15 years to life plus 7 years to run concurrent (EXHIBIT 3, sentencing transcript).

2. All statutes and regulations are California, unless otherwise noted.

Post-conviction history and rehabilitation

Petitioner was received by the Department of Corrections on June 10, 1987 and has "a classification score of 19, which is the lowest score that a life inmate can obtain" (HT 44:16-21). In reference to Petitioner's post-conviction behavior: "To say that you have been programming in an exemplary way doesn't do you justice. Your programming far exceeds what this Panel or I'm sure most other Panels would see. Since you've been incarcerated you have had no disciplinary actions, 115's or 128s. And we realize that, in and of itself, is quite an accomplishment, it is not an easy thing to do" (HT 44:24-45:4).

The Board reviewed Petitioner's plethora of self-help rehabilitative programs he has completed as well as his job assignments in which he has received all satisfactory to excellent work evaluations (HT 45:5-49:9; EXHIBIT 4). Petitioner, at the time of the hearing, had also completed 81 units toward a four year degree through the University of Iowa (HT 50:15-51:17). (Petitioner has continued with his education and is currently 31 units from his degree.)

In an unusual step toward rehabiltation, Petitioner felt compelled to write Ms. Rizk's parents, the VanHove's, and Rory Rizk and tell them how sorry he was for the pain and suffering he caused them, not asking forgiveness, but "grateful" when they responded that they did forgive him (HT 15:12-16:23), and have been supportive of Petitioner being paroled (HT 41:2-11).

When asked the important question how Petitioner feels about the commitment offense today (HT 25:7-9), he answered (HT 25:11-26:19:

- 11 -

"I'm devastated by it. I'm - it moved me in ways that I never would have been moved it it hadn't happened. And let me say this: Because I committed this crime. because I caused the pain I did, and because I was sent to prison with this sentence, it enabled me to become a good human being again. It enabled me to answer for my wrongs. It gave me an opportunity to pay the debt as much as I can to both the family and society. It is so outside who I am, what I did, it really was an aberration. The crime, the pain that I caused, I live with it daily. I know that people say that all the time, I mean, I'm sure that you guys hear that all the time. But, You know, I do, I -- because of that I try to do everything -- everyday I wake up I try to make the right decisions. I try to do the best that I can. I try to bring goodness to life. I mean, I know that I caused pain to so many people, that I don't even realize. I mean, the neighbors, their trust. The neighbors are the victims, I'm saying. Their trust in that community was probably shattered. To my family, and obviously, to the victim's -- to Rory, to the grandparents, and my family and myself, and my potential in life. .... So, when you asked me how I feel about this crime, I'm devastated. I'm devastated on all accounts. I'm devastated that you guys have to sit here and read about it and know that this happened and that they do. I know I affected untold lives, and the D.A."

When asked the equally important question how Petitioner is different today (HT 26:21-26), the Board "perceiving this is a transformation, obviously"; asking, "What point do you think that you changed?" (HT 28:6-9), Petitioner answered (HT 28:10-24):

"Well, I changed at different times in different ways. I changed immediately as soon as the crime happened in untold ways. I mean, it just -- I think as far as what you're speaking about right now, it started in the County jail I made a decision that I either could kill myself or I could, what I figured at the time, take the hard road and try to make something of my life and realize what I did and correct what I could. And at that point I started trying to come out of the blackness. And everyday I try -- and I realize, I could live for another hundred years and would never, you know, come close to correcting what I did, but that's when it began."

When Petitioner was asked why he thought he has not "gotten a date yet" he answered: "Because of the crime. They have told me, past Board members, if I may say, have told that my parole plans are perfect -- [] My institutional programming is very good. I have psych clearances and so, it's very clear why" (HT 29:22-30:4).

Forensic evaluations

The Board relied on Petitioner's forensic evaluation dated December 2005, prepared by Dr. Macomber (EXHIBIT 5). The Board

- 12 -

stated: "It is a positive evaluation" (HT 53:7-8). Germane to issue at bench, "intellectually, your judgment is sound and you have good self-awareness and insight, you have a GAF (Global Assessment of Functioning) score of 90, which is extremely high" (HT 53:23-25). The Board read directly from Dr. Macomber's forensic evaluation (HT 53:26-58:7). Petitioner will quote directly from the evaluation. Petitioner has remained entirely disciplinary-free during the last 20 years of his incarceration. Although drugs and alcohol are readily available in the prison environment, Petitioner "has significantly changed his lie, and he has avoided any involvement with drugs or alcohol during the last 20 years. In addition, he has participated extensively in therapy groups, and ongoing Alcoholics Anonymous" (EX. 5, p. 2). On this point, it is the expert opinion of Dr. Macomber that "[d]ue to the fact that drugs and alcohol are available, and he could have used them if he had chosen to, it is clear that drugs and alcohol are no longer a problem in his life. Therefore, this cannot be listed as a current diagnostic problem" (Id.).

In reviewing the commitment offense (EX. 5, pp.2-3), Dr. Macomber writes:

"In addressing the question of causative factors, the Caliornia Youth Authority psychiatric evaluation, dated 06/24/87, does lend some insight into his functioning at the time of the commitment offense. Quoting a prior psychiatric evaluation, the defendant was described as a passive-dependent personality, and there was evidence of a chronic childhood depression, which increased the demands of adolescence, and developed a strong dependence on drugs, which combined in a spiraling psychiatric deterioration, resulting in an 'apathetic, severely depressed, severely drug-dependent, nonfunctioning adolescent.' Drug use was seen as a significant precipitant of his behavior. [¶] "At the time of the commitment offense, [Petitioner] was severely intoxicated on LSD, which he had taken for the first time in conjunction with hashish and alcohol." .... [¶] "The last psychological evaluation by Dr. Howlin on 10/15/02 (EXHIBIT 6), reported that [Petitioner] felt his heavy, ongoing drug use significantly interfered with his ability to know right from wrong. .... Prior to the offense, [Petitioner] had been struggling with low self-esteem and occasional depression, coupled with heavy drug use."

- 13 -

Petitioner accepts "responsibility for this offense, and stated that if he had not participated in it, it could not have happened." Petitioner's "feelings of remorse appear to be sincere and genuine. He was very happy with the victim's parents forgiving him, and he does correspond with them regularly" (EX. 5, p. 4).

Most importantly, addressing CURRENT threat to public safety, "assessment of dangerousness," it is Dr. Macomber's expert opinion that Petitioner "has grown significantly over his 20 years of incarceration. He is no longer the immature, drug-dependant individual that he was at the time of the commitment offense. He demonstrates strong prosocial values. There are no antisocial values or thinking in this case. His violence potential is definitely below average in comparison to other inmates" (EX. 5, p. 4).

"In considering his potential for dangerous behavior if released on parole to the community," using objective actuarial measuring instruments that assess several factors, Petitioner's "score indicated a 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better than 98% of them. This indicates an extremely low risk level" (EX. 5, p. 4).

Taking many factors into consideration, it is the expert opinion of Dr. Macomber that Petitioner's CURRENT "potential for violence is no more than the average citizen in the community, and is probably less than the average citizen in the community due to his life experience" (EX. 5, p. 4, emphasis added).

Relative to time and rehabilitation, it is Dr. Macomber's expert opinion: "At the time of the commitment offense, risk factors were his immaturity and his severe substance dependence. After 20 years

- 14 -

of drug and alcohol abuse programming, and maturity that comes with age and experience, this is no longer a factor. There is no significant risk factors at this time" (EX. 5, p. 4).

Dr. Macomber concludes: "There are no mental or emotional problems in this case that would interfere with parole plans. .... The prognosis for successful adjustment to the community is excellent in this case" (EX. 5, p. 5).

Dr. Macomber's forensic evaluation and expert opinion echoes that of Dr. Howlin's forensic evaluation (EX. 6), which Dr. Macomber stated is "still quite current and valid" (EX. 5, p. 1). After a review of the evidence and an interview with Petitioner, Dr. Howlin agreed with the previous assessment by Dr. Reed (EXHIBIT 7); that is, "the idea that the crime was quite violent, and quite removed from both [Petitioner's] history and functioning since being incarcerated" (EX. 6, p. 6; see EX. 7, p. 4 ["The crime did appear markedly violent, and is significantly inconsistent with the inmate's current demeanor and nonviolent history within CDC"]).

Addressing Petitioner's "struggling with low self-esteem and on-and-off-gain depression, coupled with the heavy drug use...increasingly conflictual relationship with family members preceding the crime" it was Dr. Howlin's expert opinion that "[t]he above-diagnosed psychopathology would likely be directly related to the crime" (EX. 6, p. 6).

Under assessment of dangerousness, germane to Petitioner's CURRENT threat to public safety, it was Dr. Howlin's expert opinion that Petitioner's violence potential "is estimated to be well below average relative to this Level II inmate population" and "[i]f

- 15 -

released to the community, his violence potential is estimated to be no more than the average citizen in the community" (EX. 6, p. 7), with no "mental health disorder which would necessitate treatment" (EX. 6, p. 8).

As far back as 2001 it was Dr. Reed's expert opinion that "[h]eavy drug abuse does appear to be directly related to the instant offense, and the inmate appears to have an adequate understanding of this relationship and the need to maintain abstinence from drug and alcohol use (EX. 7, pp. 4-5). It was also Dr. Reed's expert opinion that if Petitioner were released to the community, "his violence potential is considered to be no more than that of the average citizen in the community, if he remains free from substance abuse" (EX. 7, p. 6).

It is a fact, Petitioner is rehabilitated. It is a fact that Petitioner has been incarcerated, at the time of this hearing, twenty (20) years.

Closing statements

Representing the Los Angeles County District Attorney's Office, Deputy District Attorney Turley opposed parole, his only argument being the immutable factors "of the gravity of the offense itself gives every reason to consider whether at this time, even after this amount of time, just simply based on the gravity of the offense alone, whether or not this inmate should be released on parole" (EX. 1, HT 69:18-23). Additionally, Mr. Turley questioned whether Petitioner was actually under the influence of drugs at the time he agreed to and participated in the offenses (HT 71:1-72:7).

Counsel for Petitioner responded, pointing out that Petitioner

- 16 -

"was barely 18 years" and "didn't have the maturity level of even
an 18 year old at that time" (HT 75:18-21). In rebuttal to Mr.
Turlery's statement of doubts of Petitioner being too "intoxicated"
at the time to appreciate the consequences of his actions, counsel
pointed out that "Torran Meier came to [Petitioner] one year prior
to this offense and  attempted to talk him into helping him kill
his mother. [Petitioner] went to the police and he notified them
that this had occurred. The police at the time didn't do anything
(EXHIBIT 2, p. 14; EXHIBIT 3, p. 8:12-19). [Petitioner] went about
his business. But what happened over the course of that year was
very significant, because that's the year [Petitioner] severely
deteriorated" (HT 76:21-77:16; EXHIBIT 2, p. 14). Counsel went on
to point out from the POR the sophistication and power Torrian Meier's
wielded over Petitioner, Meier hatching the plan and getting
Petitioner to go along (HT 76:17-77:17). Counsel then reiterated
the evidence of Petitioner's remorse and exemplary rehabilitation
(HT 77:23-79:19). Counsel pointed out to the Board the United States
Supreme Court opinion that juveniles are not to held culpable compared
to adults because of their susceptibility to outside influences and
pressures, immaturity, and inability to appreciate the consequences
of their actions, and these qualities do not dissappear when an
individual turns 18 (HT 79:19-20), relating what the Supreme Court
has held to the many psychological evaluations by forensic experts
stating the same thing (HT 80:21-81:3). Counsel pointed out that
the State agreed that this was an offense of second degree murder,
not first degree murder, and it should continue to be treated as
such (HT 83:19-84:4), then went on to point out the offense is never

- 17 -

going to change but Petitioner has changed and how he has changed,
been rehabilitated (HT 84:4-85:13), urging the Board to find
Petitioner suitable for parole.

Petitioner then made a statement why he believes he is suitable
for parole, in relevant part (HT 86:21-88:8):

"I in no way want to impress upon you that I think that I wasn't responsible
for this crime. My participation allowed this crime to take place. I am fully
aware of that today. I wasn't 20 years ago, but I am today. There are key
factors that lead me to be involved in that crime, in doing that crime, in
participating. And I believe that over the last 20 years that I have addressed
those issues with the help of my family, loved ones, and the groups that are
offered. That being depression. I still get depressed, but I know how to deal
with in a constructive manner. Drug use, I have been clean and sober for over
20 years, my entire incarceration. In fact the night of the crime is the last
time that I was intoxicated. I want to say, I am avid in my sobriety, I am proud
of my sobriety. I love my sobriety. It allows me to be human, to be what
I really know that God intended me to be. Mostly...the biggest difference between
Matthew as a teenager and Matthew as a full grown adult is my belief and my
relationship with Christ today. I knew about God, but I never had a relationship
with him. [Sic] .... It is so different than who I was back then. I can never
change what I did. And if the Panel continues to look at the crime as
a suitability factor I will never be released. I am only hoping and asking that
you look at who I am today and not who I was back then."

### D E C I S I O N

The Board started out: "We really struggled with trying to
balance the commitment offense and your significant and undeniable
strides that you have made since coming to prison. However, the
severity of crime and our duty to the public interest, we are going
to deny you parole today" (HT 89:8-13). The Board then stated the
obvious: "I usually say at this point that I'm going to read the
decision and give you some recommendations, but I don't have any
recommendations for you. You are doing an excellent program. You
are doing everything that we could ever ask somebody to do..."
(HT 89:15-20).

The Board continued, concluding that Petitioner "is not yet
suitable for parole and would pose an unreasonable risk of danger

- 18 -

to society or a threat to public safety if released from prison"
(HT 90:3-7): (1) "there are multiple victims and one was killed and
one was attacked" (HT 90:8-9); (2) "the offense was carried out in
a dispassionate and calculated manner, in that they discussed how
they would kill the victim and proceeded to strangle her and then..."
(HT 90:25-26); and (3) "the offense was carried out in a manner that
demonstrates a callous disregard for human suffering, in that Mrs.
Rizk was vulnerable, she was in her own home, and I am assuming she
was unarmed and defenseless, and it took approximately 15 minutes
to strangle her" (HT 91:6-10). "These conclusion are drawn from
the Statement of Facts as they appeared in the May 2005 Board Report"
(HT 91:14-16). It can be assumed that a fourth factor playing in
the mind of the Board, at least one Commissioner, in denying parole
was, "I think the opportunities, at least for me that sticks in my
mind, is the opportunities that there were for you to stop, and I
counted seven" (HT 89:21-24).

Then, in rote fashion, the Board "make[s] the following findings:
that the inmate continues to need self-help in order to face, discuss,
understand and cope with stress in a non-destructive manner" (HT
92:13-16).

Petitioner was then told: "Maybe I'll see you again. It's just,
you know, somebody has to get over this crime, okay, and obviously
nobody has been able to do that yet. Okay, but I'm confident that
it will be in the near future, okay" (HT 92:24-93:3). (Petitioner
was denied parole for the eighth time on February 16, 2007.)

### J U D I C I A L   P R O C E E D I N G

After being denied parole, through counsel, Petitioner filed

- 19 -

a writ of habeas corpus in the Superior Court of Los Angeles County.
Although the writ was denied on May 16, 2007 (EXHIBIT 8), Petitioner
was not notified or receive the decision until July 11, 2007 (EXHIBIT
9). (Petitioner can no longer afford counsel so he is proceeding
pro per.)

The trial court affirmed the Board's decision, finding "that
there is some evidence that 'multiple victims were attacked, injured
or killed in the same or separate incidents.' (Cal. Code Regs., tit.
15, §2402, subd. (c)(a)(A).)" (EX. 8, p. 1).

The court continued, "The record reflects that there is some
evidence that, 'the offense was carried out in a manner which
demonstrates an exeptionally callous disregard for human suffering.'
(Cal. Code Regs., tit. 15, §2402, subd (c)(1)(D).  This means that
'the offense in question must have been committed in a more aggravated
or violent manner than that ordinarily shown in the commission of
that offense.' (In re Scott (2004) 119 Cal.App.4th 871, 891)."  The
court opined an offense "is more aggravated or violent when it
involves severe trauma, 'as when death resulted from severe trauma
inflicted with deadly intensity; e.g. beating, clubbing, stabbing,
strangulation, suffocation, burning, multiple wounds inflicted with
a weapon not resulting in immediate death or actions calculated to
induce terror in the victim.' (Id. at 892)" (EX. 8, p. 2), referring
to Cal. Code Regs., tit, 15, § 2403(c)(C).  The court then cited
the facts that the victim was strangled, the strangulation lasting
for 15 minutes, and the attempted murder of Meier's little brother
by "tying him up and leaving him in a car, which they set on fire
and push off a cliff" (EX. p. 2).  The court concluded, "Based on

these actions, there is some evidence that the crime was committed in a more aggravated and violent manner than that ordinarily shown in the commission of second degree murder." The petition being denied.

## C O N C L U S I O N

As horrific as the commitment offense was twenty years ago, in light of Petitioner's exemplary rehabilitation, the Board nor the trial court made any rational connection between the offense and Petitioner's CURRENT threat to public safety, which is the intent and spirit of the law.

WHEREFORE, Petitioner respectfully request's that in light of the foregoing facts, exhibits in support of the facts, and the attached memorandum of law in support of Petitioner's claim that the decision is not support by "some evidence" (some evidence of CURRENT threat to public safety, not some evidence to support the reasons given), it is respectfully requested that this Court issue an Order to Show Cause why relief should not be granted and the Board ordered to fix Petitioner's term proportionate to second degree murder and uniform to his culpability in the commitment offense.

DATED: _October 14, 2007_

Respectfully submitted,

Matthew Adam Jay
Petitioner in pro per

## V E R I F I C A T I O N

I, <u>Matthew Adam Jay</u>, declare under penalty of perjury

that I have read the foregoing facts and hereby state them to be

true and correct, and that the exhibits attached hereto in support

of the facts are true copies of the original documents, doing so

this <u>14th</u> day of <u>October</u>, <u>2007</u> at Soledad, California.

<u>Matthew R. Jay</u>
Matthew Adam Jay
Petitioner in pro per

## P R A Y E R   F O R   R E L I E F

I, <u>Matthew Adam Jay</u>, hereby state that I have no other

plain or speedy remedy save habeas corpus, and therefore pray that

this Honorable Court will:

1. Order the respondent to show cause why the writ should
   not be granted;

2. Appoint counsel to protect the rights of Matthew Adam Jay
   against the weight and resources of the state;

3. Declare the rights of the parties;

4. Order discovery and/or an evidentiary hearing as needed to
   further develop the facts of the case;

5. Allow counsel to orally argue the case before the Court;

6. Grant the writ of habeas corpus; and

7. Grant any other relief in the furtherance of justice.

Date: <u>October 14 2007</u>

Respectfully submitted,

<u>Matthew R. Jay</u>
Matthew Adam Jay
Petitioner in pro per

A P P E N D I X  "B"

MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES

I N T R O D U C T I O N

During the decision in case at bench, the Presiding Commissioner stated: "It's just you know, somebody has to get over this crime, okay, and obviously nobody has been able to do that yet" (EXHIBIT 1, HT 92:25-93:1). No one has ever denied the strangulation death of Mrs. Rizk and the attempted murder of young Rory Rizk was not horrible. This crime will be just as horrible 100 years from now as it was the night it was committed. In the words of Omar Khayyam, The Rubaiyat, 11th Century: "The Moving finger writes; and, having writ, Moves on; nor all your Peity nor Wit Shall lure it back to cancel half a line, Nor all your Tears wash out a Word of it." "Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility" (Irons v. Warden of California State Prison-Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947, rev. on other grounds, sub nom Irons v. Carey (9th Cir. 2007) 479 F.3d 658). The Commissioner's remarks, "somebody has to get over this crime," begs the question: Who is going to get over this crime?

Answers to 6(b)

A.  Standard of Review

Petitioner, being an indeterminately sentenced prisoner, has a "liberty interest" in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereater Greenholtz) (1979) 442 U.S.

- 23 -

1; <u>Sass v. California Board of Prison Terms</u> (hereafter <u>Sass</u>) (9th
Cir. 2006) 461 F.3d 1123; <u>In re Rosenkrantz</u>, (2002) 29 Cal.4th 616;
<u>In re Dannenberg</u> (2005) 34 Cal.4th 1061), and judicial review is,
assuming the Board's decision was based on a standard of proof not
lower than "a preponderance of the evidence" (<u>In re Tripp</u> (2007)
150 Cal.App.4th 306, 312; <u>In re Morrall</u> (2002) 102 Cal.App.4th 280,
302, Cal. Evid. Code § 115), the "some evidence" standard (<u>Hamdi
v. Rumsfeld</u> (2004) 542 U.S. 507, 537 [when a "liberty interest"
attaches, some evidence is "a standard of review, not a standard
of proof"]; <u>Superintendent v. Hill</u> (hereafter <u>Hill</u>) (1985) 472 U.S.
445, 456; <u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 656). However,
"the 'some evidence' standard applies only to questions of evidentiary
sufficiency" (<u>In re Ramirez</u> (2001) 94 Cal.App.4th, at 563-564),
explaining <u>Edwards v. Balisok</u> (1997) 520 U.S. 641, 648). <u>Ramirez</u>
was disapproved on other grounds (<u>In re Dannenberg</u>, <u>supra</u>, 34 Cal.4th,
at 1100). Moreover, as articulated by the United States Supreme
Court in the Nation's controlling parole suitability case: "The
decision turns on...primarily what a man is and what he may become
rather than simply what he has done" (<u>Greenholtz</u>, <u>supra</u>, 442 U.S.,
at 10).

The real issue before the Court is whether there is some evidence
that granting parole "unreasonably endangers public safety," not
whether the evidence supports the reasons asserted for denying parole
(<u>In re Cooper</u> (2007) 153 Cal.App.4th 1043, 1059-1060). The principle
of law that "[t]he test is not whether some evidence supports the
<u>reasons</u> the Governor cites for denying parole, but whether some
evidence indicates a parolee's release <u>unreasonably endangers public</u>

- 24 -

safety" (<u>In re Lee</u> (2006) 143 Cal.App.4th 1400, 1408 (Petition for Review denied, depublication denied); <u>In re Elkins</u> (2006) 144 Cal.App.4th 475, 499 (Petition for Review denied, depublication denied)), clearly articulates the spirit of the law. The inquiry here must be, did the Board have some evidence that Petitioner **presently** poses an **unreasonbale risk of danger** to society if released from prison. Additionally, the law requires the evidence have "an indicia of reliability" and a "rational basis in fact" (<u>In re Barker</u> (2007) 151 Cal.App.4th 346, 365-366, emphasis added). If, as here, the Board has no "rational evidence" or can make no rational connection between the crime 20 years ago and current threat to public safety to support its boilerplate conclusion because the Board cannot get over the crime, then its decision is "devoid of a factual basis" and the Court should grant Petitioner the relief requested (<u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 658).

Most admittedly, on October 15, 1985, Petitioner, being a drugged out "Zombie," was a danger to public safety, but the focus is to be on CURRENT threat to public safety. "'Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>. Superintendent v. Hill's standard might be quite low, but it does not require that the decision <u>not</u> be arbitrary'" (<u>Willis v. Kane</u> (N.D. Cal. 2007) 485 F.Supp.2d 1126, 1130); <u>In re Roderick</u> (2007) ____ Cal.App.4th ___, 2007 WL 2343737, *21 (filed 8/17/07)). A two-prong test, therefore, is appropriate. The first prong to determine "sufficiency of the evidence"; then the second prong, can a rational connection be made between the evidence and finding a

- 25 -

CURRENT threat to public safety (In re Lee, supra, 143 Cal.App.4th, at 1408 fn. 3). Thus, as opined by the First Appellate District, although the "some evidence" standard of review is highly differential and extremely low, "it does not convert a court reviewing the denial of parole into a potted plant" (In re Scott I (2004) 119 Cal.App.4th 871, 898).

B. **The Commitment Offense Twenty Years After the Fact Is Not "Some Evidence" Petitioner Is A CURRENT Threat to Public Safety.**

Petitioner was sentenced to 15 years to life; at the time of the 2006 hearing at bench, he had served over twenty (20) years, now 21 years. There is no question of his rehabilitation and remorse (In re Rosenkrantz, supra, 29 Cal.4th, at 674 ["'where a defendant acknowledges guilt, but shows no remorse, he may be expected to repeat the criminal conduct under similar circumstances.'" [Citation.] By the same token, when one admits guilt and shows remorse, he or she is expected not to repeat the criminal act. Unless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety he or she is to be released on parole. The only statutory test is, therefore, is that the Board "identify and weigh the factors relevant to predicting...'whether the inmate will be able to live in society without committing additional antisocial acts'" (In re DeLuna (2005) 126 Cal.App.4th 585, 591, quoting In re Rosenkrantz, supra, 29 Cal.4th, at 655). In case at bench, as so often is the case, the Board, as did the trial court, allowed their personal predilections to dictate the outcome of the decision in this case.

"The only ground for a parole denial is found in Penal Code section 3041, subdivision (b), which provides that a release date

- 26 -

shall be set 'unless [the Board] determines that ... consideration
of the public safety requires a more lengthy period of incarceration'"
(In re Roderick, supra, 2007 WL 2343737, *12).  The commitment
offense, however, loses predictability of threat to public safety
over time when weighed against rehabilitation (In re Lee, supra,
143 Cal.App.4th, at 1412; In re Elkins, supra, 144 Cal.4th, at 500;
In re Scott II (2005) 133 Cal.App.4th 573, 594-595; Rosenkrantz v.
Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1065; Sanchez v. Kane
(C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062).  Additionally, the offense
becomes less reliable when, as Petitioner, the prisoner committed
the crime at a young age (Roper v. Simmons (2005) 543 U.S. 551,
561-562; Stanford v. Kentucky (1989) 492 U.S. 361, 395; Thompson
v. Oklahoma (1988) 487 U.S. 815, 835; In re Barker (2007) 151
Cal.App.4th 346, 376; In re Elkins, supra, 144 Cal.App.4th, at 500).
    a.  Opportunity to cease is not some evidence.

    The strangulation of Mrs. Rizk, the controlling offense, was
horrible, but as horrible as it was, it is still a parolable offense
and the seriousness of the offense and its threat to public safety
has been predetermined (Cal. Code Regs., tit. 15, § 2403(c)(C) [death
resulted by "beating, clubbing, stabbing, strangulation, burning,"
etc.]).  The calculated punishment is 17 to 21 years, depending on
the relationship to the victim.  Petitioner has satisfied the
prescribed punishment for the offense under the DSL model, which
is objective, and, by all the evidence, by the Board's own words:
"... I don't have any recommendations for you.  You are doing an
excellent program.  You are doing everything that we could ask
somebody to do, but you know, the crime and I think the opportunites,

at least for me what sticks in my mind, is the opportunities that
there were for you to stop" (HT 89:17-24).

The Board cannot rely on this factor in any way, "that the
killing could have been avoided to show [the] killing was especially
brutal" (In re Elkins, supra, 144 Cal.App.4th, at 497; In re Barker
(2007) 151 Cal.App.4th 346, 375; In re Cooper (2007) ___ Cal.App.4th
___, 2007 WL 2164237, *13 (filed 7/27/07)).

b.   After twenty years multiple victims is not some evidence.

The fact that there were multiple victims is an immutable factor,
"which will never change, cannot be sufficient to deny [Petitioner]
parole forever" (In re Weider (2006) 145 Cal.App.4th 570, 589); and,
given the lapse of time, 20 years, "'and the exemplary rehabilitative
gains made by [Petitioner] over that time, continued reliance on
the aggravating facts of the crime no longer amount[s] to 'some
evidence' supporting denial of parole'" (In re Barker, supra, 151
Cal.App.4th, at 374). "Moreover, as Barker argues, it could be said
reliance on this factor could be viewed as a dual use of facts, as
one victim was killed in each of the three crimes for which Barker
was convicted, and for each of which he already received a separate
sentence" (Id.)., so can it be said of Petitioner.

c.   The Board's use of the offense being "carried out in
     a dispassionate and calculated manner" is an element of
     first degree murder, of which Petitioner was acquitted.

Dispassionate and calculated is defined as a murder committed
in such a way that it is an "execution-style murder" (Cal. Code Regs.,
tit. 15, § 2402(c)(1)(B) ["The offense was carried out in a
dispassionate and calculated manner, such as an execution-style
murder"]; see EXHIBIT 10, what constitutes an "execution-style

- 28 -

murder"). To support this finding, the Board relied on the fact "that they discussed how they would kill the victim and proceeded to strangle her" (HT 90:26-91:2).

Firstly, this factor may apply for Torran Meier who hatched the plan and was the "mastermind," actually planning the exact scenario months prior and telling others (EXHIBIT 2, p. 6), which when Petitioner found out went to the police (EX. 2, p. 14), who apparently did not take the information seriously, but it cannot apply to Petitioner (see In re Elkins, supra, 144 Cal.App.4th, at 497 fn. 9; People v. Dillion (1983) 34 Cal.3d 441, 480 [punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if disproportionate to the defendant's individual culpability]; see also In re Mark Smith (2003) 109 Cal.App.4th 489; In re Ramirez, supra, 94 Cal.App.4th 549; In re Tripp, supra, 150 Cal.App.4th 306 [although multiple defendants, parole suitability found on individual culpability]).

Secondly, the Board recognized that the plan was "hatched by...Torran Meier. And apparently had had this plan for some time. And unfortunately for [Petitioner] was able to entice [Petitioner]...into carrying out the unfortunate and atrocious events..." (HT 90:17-24). The fact that the evidence clearly shows, as the Board admits, Petitioner was coerced is a mitigating factor (Cal. Code Regs., tit. 15, § 2405(a)(3); POR, EXHIBIT 2, p. 24 [Petitioner was "induced by defendant Meier to participate in the crime" and Petitioner's participation "was the most minor of the three"]). These are immutable factors and must be considered now, not at some arbitrary date in the future when or if Petitioner is

- 29 -

found suitable for parole.

Additionally, the Board relied on Cal. Code Regs., tit. 15, § 2404(c)(1)(D) ["The offense was carried out in a manner which demonstrates a callous disregard for human suffering"] (HT 91:6-8). To support this finding, the Board stated "that Mrs. Rizk was vulnerable, she was in her home, and I am assuming she was unarmed and defenseless, and it took approximately 15 minutes to strangle her" (HT 91: 8-11).

As opined in In re Weider, supra, 145 Cal.App.4th, at 587, internal quotation marks omitted:

> "'Second degree murder is defined as the unlawful killing of a human being with malice aforethought.' (People v. Nieto Benitez (1992) 4 Cal.4th 91, 102 []). Malice itself involves 'an element of viciousness—an extreme indifference to the value of human life.' (People v. Summers (1983) 147 Cal.App.3d 180, 184 [].) Thus, all second degree murders will involve some amount of viciousness or callousness. (Cf. In re (Mark) Smith (2003) 114 Cal.App.4th 343, 366 [].) Thus, the threshold consideration is whether [Petitioner's] crime was more violent or vicious than minimally necessary to convict him of killing with malice aforethought."

Firstly, whether it takes multiple blows to kill a victim (In re Elkins, supra, 144 Cal.App.4th, at 496), or 5 or 15 minutes to strangle a victim, "with the victim continuing to move after the first blow, Elkins had to strike the victim multiple times in order to kill him" (Id., at 496-497), thus, in that there was no intentional infliction of violence prior to the act of strangling Mrs. Rizk, although she no doubt was terrified and suffered during the commission of the offense, it cannot be shown that the commission of the offense was more than the minimum necessary to complete the offense (see In re Dannenberg, supra, 34 Cal.4th, at 1095; In re Lee, supra, 143 Cal.App.4th, at 1409; In re Ernest Smith, supra, 114 Cal.App.4th, at 366; In re Scott I, supra, 119 Cal.App.4th, at 891).

d.  <u>The victim being unarmed, etc. is not some evidence</u>.

In no way does Petitioner down-play the seriousness of his involvement in the commitment offense, but he fails to see how Mrs. Rizk being in her home, unarmed, defenseless and being vulnerable makes the murder of Mrs. Rizk an <u>exceptionally</u> callous disregard for human suffering.  Interestingly, Commissioner St. Julian, the Commissioner in case at bench, made the same finding in <u>In re Barker</u>, <u>supra</u>, 151 Cal.App.4th, at 359 ["The victims were particularly vulnerable as they were in their residence and had absolutely no idea what was about to take place."]  This was also a finding by the Governor in <u>In re Elkins</u>, <u>supra</u>, 144 Cal.App.4th, at 496 ["Chief among the Governor's reasons for finding an 'atrocious murder' were these: '...attack[ed] the victim while he was sleeping.  Unaware of what was happening, Mr. Ecklund was unable to defend himself.  Mr. Elkin's took advantage of the victim's vulnerability...."]  Admittedly this offense was a callus disregard for human suffering, but how does a victim being in his or her own home, unarmed and vulnerable make an offense <u>especially</u> heinous, atrocious, or cruel?  "[E]specially as it is not even mentioned as an unsuitability factor" (<u>In re Barker</u>, <u>supra</u>, 151 Cal.App.4th, at 375).  Rarely is the victim of a murder armed, and many victims are murdered in their own homes, defenseless, but such details tell us nothing about the manner of death, or help "discern how that participation can be considered anything other than the minimum for 'malice aforethought'" (<u>Id</u>., at 373, citing <u>In re Dannenberg</u>, <u>supra</u>, 34 Cal.4th, at 1095 ["violence or viciousness ... must be more than minimally necessary to convict"]).

In reviewing the facts in Case at bench, in fact, reveals a
very similar parallel to that of In re Barker. Barker helped David
Braeseke kill his parents and grandfather because Braeseke told Barker
he was abused by his father (In re Barker, supra, 151 Cal.App.4th,
at 356, and ["Barker felt unable to relate to his family. He had
no guidance, was lost on his own, lacked self-esteem, and was full
of self-doubt. Braeseke, on the other hand, had a strong personality,
and Barker, fearing Braeseke would reject him, sought his acceptance.
He helped Braeseke with the killing because he, Barker, was weak,
and had succumbed to Braeseke's persuasion and allowed Braeseke to
take control over him"]). Petitioner, however, had one other
disadvantage that Meier took advantage of, Petitioner's moral compass
was weakened by heavy drug use. See EXHIBIT 5, p. 3 ["at that time
in his life he did not have the ability to say no...drugs numbed
him and disinhibited him. He was operating on a strong wish to help
a friend and to please someone in his life where he seemed unable
to please anyone".] Also, where Barker assisted in a triple murder,
Petitioner participated in a single murder, and was an accessory
to an attempted murder.

The question the appellate court addressed in Barker, 29 years
after a triple murder, was his CURRENT threat to public safety, which
is the exact same question in case at bench, 20 years after being
convicted of second degree murder, is Petitioner a CURRENT threat
to public safety?

e. <u>Being under significant stress at the time of the commitment
   offense is a suitability factor.</u>

The one finding the Board made in its decision, was "that the
inmate continues to need self-help in order to face, discuss,

- 32 -

understand and cope with stress in a non-destructive manner" (HT 92:13-16).

The record is devoid of any evidence that Petitioner cannot cope with stress and somehow responds to such in a destructive manner. Not only has Petitioner been disciplinary free for over twenty years in one of the most stressful environments known to man, under some of the most harsh conditions that have been deemed cruel and unusual punishment due to lack of medical care, but, the forensic experts give Petitioner a GAF score of 90, "a score in the 80 or 90 range indicates that the person is 'functioning quite well with the general population' and the person gets along well with other" (In re Cooper, supra, 2007 WL 2164237, *3), or, to be exact: "good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns" (EXHIBIT 11).

It was the opinion of Dr. Macomber that Petitioner's "violence potential is definitely below average in comparison to other inmates" (EX. 5, p. 4), and "[t]here are no significant risk factors at this time. There are no mental or emotional problems" (EX, pp. 4-5). If Petitioner was not able to understand or cope with stress, over the twenty years in this most violent environment with stressors that test the limits of anyones coping skills, Petitioner would have at least a counseling chrono for verbally assaulting or disrespecting staff, yet he has none. Therefore, the Board must not have been speaking of the current stress of incarceration, but the stress that Petitioner was under at the time he committed the offense, which is well documented throughout the probation report (EX. 2) and

- 33 -

forensic evaluations (EXHIBITS 5, 6, and 7), Commissioner St. Julian acknowledging Petitioner was "severely depressed" and "self-medicating" (HT 19:14-17), and these pressures resulted in Petitioner being "easily influenced" (HT 26: 20-22), perceived to be rejected by his mom (HT 34: 9-12), and, reading from the psychological evaluation, Petitioner's depression, demands of adolescence, and drug use, "combined in a spiraling psychiatric deterioration, resulting in an apathetic, severely depressed, severely drug dependent and non-functioning adolescent" (HT 54:4-12).

Although acknowledging evidence that all pointed to significant stress Petitioner was under at the time he was manipulated by Meier to participate in the commitment offense, "the Board failed to acknowledge that the crime was the result of significant stress in [Petitioner's] life that had built up over a long period of time" (In re Weider, supra, 145 Cal.App.4th, at 589). This is a factor that tends to show suitability for parole (Cal. Code Regs., tit. 15, § 2402(d)(4)). "The regulation requiring the Board to consider the role that such stress may have played in the commission of the crime reflects the law's awareness of human nature. .... [I]t does not appear the Board considered this evidence at all. This it is bound to do" (Id., at 590; In re Scott II, supra, 133 Cal.App.4th, at 596; In re Rosenkrantz, supra, 29 Cal.4th, at 679; In re Lee, supra, 143 Cal.App.4th, at 1412; In re Gray (2007) 151 Cal.App.4th 379, 407).

On the other hand, if the Board was referring to current stress, in light of the plethora of self-help Petitioner has participated in (EX. 4), and history of psychological evaluations by forensic

- 34 -

experts (EXHIBITS 5, 6, and 7), the finding for additional self-help is totally unsupported by the record and reduced Petitioner's hearing to a "sham" (In re Ramirez, supra, 94 Cal.App.4th, at 571; In re Barker, supra, 151 Cal.App.4th, at 367-368), and is apparently nothing more than "the Panel's recital of the stock phrase...'repeated often in order to add another factor to the non-suitability factor'" (In re Roderick, supra, 2007 WL 2343737, *19, quoting Irons v. Warden, supra, 358 F.Supp.2d, at 948).

f. **Petitioner's adolescence is an immutable factor that must be considered when weighing the immutable factor of the commitment offense.**

Last, but not least, like Rosenkrantz, Petitioner was just two months past his eighteenth birthday at the time of the commitment offense, and, because of his youth and immaturity, was sent to Youth Authority to start his prison term (EX. 3, p. 17). "[T]he decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious" (In re Rosenkrantz, supra, 29 Cal.4th, at 677). The Board failed to consider Petitioner's young age and the influences others could have on him at this time in his life (Roper v. Simmons (2005) 543 U.S. 551, 561-562; Stanford v. Kentucky (1989) 492 U.S. 361, 395; Thompson v. Oklahoma (1988) 487 U.S. 815, 835; In re Rosenkrantz (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1085-1087; In re Barker (2007) 151 Cal.App.4th 346, 376; In re Elkins, supra, 144 Cal.App.4th, at 500). This factor, like significant stress, the Board is bound to consider (Cal. Code Regs., tit. 15, § 2402(b) ["All relevant, reliable information available to the panel shall be considered in determining suitability for parole"]).

Although the Board will use Petitioner's young age when someday,

- 35 -

if ever, finding him suitable for parole, this factor is an immutable factor, and the Board must weigh it in its decision from the start; if not, it violates due process. Moreover, in that there are now several published decisions addressing this very issue, applying it to other like cases, it would be a violation of equal protection under the law to not order Petitioner back for a new hearing and the Board ordered to consider this most important legal factor.

## C O N C L U S I O N

As the Ninth Circuit instructed in <u>Irons v. Carey</u> (9th Cir. 2007) 479 F.3d, 568, at 665:

> "We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest that flows from the relevant California statutes."

Petitioner is **rehabilitated** and has served over 20 years on his 15 years to life sentence which was the result of a plea bargain. The Board has failed to consider several suitability factors that mitigate Petitioner's personal culpability in the offense.

WHEREFORE, it is respectfully requested that the Court order a new parole suitability hearing for Petitioner in which the Board is ordered to follow due process of law, considering, inter alia, the significant stress Petitioner was under, his age, individual offense behavior, and CURRENT threat to public safety, not his threat to public safety over 20 years ago. And, that the hearing be held within thirty (30) days of the Court's order becoming final.

DATED: October 14, 2007

Respectfully submitted,

Matthew Adam Jay
Petitioner in pro per

# EXHIBIT

# 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: ) CDC Number D-55653
)
MATTHEW JAY )
)
_____)

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 26, 2006

9:05 A.M.

PANEL PRESENT:

Ms. Tracey St.Julien, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner

OTHERS PRESENT:
Mr. Matthew Jay, Inmate
Mr. Steve DeFilippis, Attorney for Inmate
Mr. Paul Turley, Deputy District Attorney, Los
Angeles County
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

_____

Judy K. Farncomb      Peters Shorthand Reporting

ii

## INDEX

                                                          PAGE

Proceedings........................................ 1

Case Factors...................................... 10

Pre-Commitment Factors............................ 17

Post-Commitment Factors........................... 44

Parole Plans...................................... 30

Closing Statements................................ 68

Recess............................................ 88

Decision.......................................... 89

Adjournment....................................... 95

Transcriber Certification......................... 96

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER SMITH:**  We're on the

3     record.

4          **PRESIDING COMMISSIONER ST.JULIEN:**  Okay,

5     good morning the time is 9:05.  This is a

6     Subsequent Parole Consideration Hearing for

7     Matthew Jay, CDC Number D-55653.  Today is

8     January 26, 2006.  We are at CTF, Soledad.  The

9     inmate was received on June 10, 1987, the life-

10    term starting the same day.  Count One, murder-

11    second, violation of Penal Code Section 187.

12    And there is also Count Two, attempted murder,

13    Penal Code Section violated 664 and 187, that's

14    how it is on the sheet.  Okay.  And these are

15    from the County of Los Angeles, Case

16    Number A811060.  The inmate received a term of

17    15 years to life with a minimum eligible parole

18    date of October 18, 1995.  Is that correct, sir?

19         **INMATE JAY:**  That is correct.

20         **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

21    We are tape-recorded the Hearing today, so we

22    are going to introduce ourselves, and say our

23    first and last names, spell our names.  And then

24    after you spell your name, if you would also say

25    your CDC number.  And my name is Tracey

26    St.Julien, T-R-A-C-E-Y, S-T, capital

27    J-U-L-I-E-N, Commissioner.

2

1          **DEPUTY COMMISSIONER SMITH**:  My name is

2     Dennis Smith, S-M-I-T-H, Deputy Commissioner.

3          **DEPUTY DISTRICT ATTORNEY TURLEY**:  My name

4     is Paul Turley, T-U-R-L-E-Y, I represent the

5     District Attorney's Office in Los Angeles

6     County.

7          **ATTORNEY DEFILIPPIS**:  My name is Steve

8     DeFilippis, D-E-F, as in Frank, I-L-I-P-P-I-S,

9     I'm the attorney for Mr. Jay.

10         **INMATE JAY**:  I am inmate Matthew Jay,

11    M-A-T-T-H-E-W, capital J-A-Y, Delta- 55653.

12         **PRESIDING COMMISSIONER ST.JULIEN**:  And we

13    also have two correctional officers in the room

14    who are here for security purposes.  Okay, and

15    Mr. Jay, are you familiar with your ADA rights?

16         **INMATE JAY**:  Yes, I am.

17         **PRESIDING COMMISSIONER ST.JULIEN**:  Okay,

18    I'm looking at the BPT Form 1073 that you signed

19    on February 7, 2005, and you have the box marked

20    that you do not have any disabilities and also

21    that you do not need any help for your Parole

22    Hearing.  And is that still accurate?

23         **INMATE JAY**:  That is.

24         **PRESIDING COMMISSIONER ST.JULIEN**:  Okay,

25    now, did you have any trouble walking into the

26    room today?  Can you go up and down stairs?

27         **INMATE JAY**:  Everything is fine.

3

1          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

2   What about hearing?

3          INMATE JAY:  My hearing is good.

4          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

5   Vision?  No glasses, I see.

6          INMATE JAY:  No glasses.

7          PRESIDING COMMISSIONER ST.JULIEN:  Okay,

8   at least not yet.

9          INMATE JAY:  Yeah.

10          PRESIDING COMMISSIONER ST.JULIEN:  Have

11   you ever been the Triple CMS or EOP Programs?

12          INMATE JAY:  No, I haven't.

13          PRESIDING COMMISSIONER ST.JULIEN:  And do

14   you know what those are?

15          INMATE JAY:  I do.

16          PRESIDING COMMISSIONER ST.JULIEN:  And

17   what are they?

18          INMATE JAY:  They are for those

19   individuals who need medication to function.

20          PRESIDING COMMISSIONER ST.JULIEN:  Uh

21   huh.

22          INMATE JAY:  Properly.

23          PRESIDING COMMISSIONER ST.JULIEN:  Right.

24   If they are mental health, okay.

25          INMATE JAY:  That's right.

26          PRESIDING COMMISSIONER ST.JULIEN:  And

27   have you ever been in one of those programs?

4

1          INMATE JAY:  No, I haven't.

2          PRESIDING COMMISSIONER ST.JULIEN:    And

3    are you on any medicines now?

4          INMATE JAY:  None that you have

5    mentioned, other than for Asthma.   I'm on

6    Albuterol.

7          PRESIDING COMMISSIONER ST.JULIEN:    An

8    inhaler.

9          INMATE JAY:  Yes.

10         PRESIDING COMMISSIONER ST.JULIEN:    Okay,

11   do you have that with you?

12         INMATE JAY:  No, I don't.   It's seasonal,

13   so I very rarely use it.

14         PRESIDING COMMISSIONER ST.JULIEN:   Oh,

15   okay.  So, it's -- you're not asthmatic?

16         INMATE JAY:  No, I'm not.

17         PRESIDING COMMISSIONER ST.JULIEN:    Okay,

18   if you get nervous.

19         INMATE JAY:  No, I'm fine.

20         PRESIDING COMMISSIONER ST.JULIEN:    And is

21   there any reason for you cannot participate in

22   the Hearing today?

23         INMATE JAY:  No, everything is good.

24         PRESIDING COMMISSIONER ST.JULIEN:    Okay.

25   Mr. DeFilippis, are you satisfied that your

26   client's ADA rights have been met?

27         ATTORNEY DEFILIPPIS:  Yes, I am.

5

1          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

2    I'm going to give you an outline of the Hearing

3    procedures.  We are conducting the Hearing

4    pursuant to Penal Code Sections 3041 and 3042,

5    and the Rules and Regulations of the Board of

6    Parole Hearings that govern Parole Consideration

7    Hearings for life inmates.  The purpose of the

8    Hearing today is to consider your suitability

9    for parole, and in doing so we are conduct the

10   Hearing in two parts.  First will be discussions

11   with my colleague and I and then the others in

12   the room will have an opportunity to speak as

13   well.  I will be discussing with you the number

14   and the nature of the crimes that you were

15   committed for, your prior criminal and social

16   history, your parole plans and support and

17   opposition letters.  Then Commissioner Smith

18   will discuss with you behavior and programming

19   since your commitment, your counselor's report

20   and psychological evaluation.  If at any point

21   during our discussion that you need to correct

22   or clarify the record, please feel free to do

23   so.

24          INMATE JAY:  Okay.

25          PRESIDING COMMISSIONER ST. JULIEN:   And

26   then the District Attorney and your attorney

27   will be able to ask you questions.  This is a

6

1   non-adversarial Hearing, so the District

2   Attorney's questions are directed to the Panel

3   and in turn you will answer to us.  And then the

4   District Attorney, your attorney and you will be

5   able to make a final statement regarding your

6   parole suitability.  And then we will recess,

7   deliberation and make a decision and reconvene

8   the Hearing and announce our decision.  The

9   California Code of Regulations states that

10  regardless of time served, a life inmate shall

11  be found unsuitable for and denied parole if, in

12  the judgment of the Panel, he would pose an

13  unreasonable risk of danger to society if

14  released from prison.

15          INMATE JAY:  Okay.

16          PRESIDING COMMISSIONER ST.JULIEN:  You

17  also have rights, and those rights include the

18  right to a timely notice of the Hearing, the

19  right to review your Central File, and the right

20  to present relevant documents.  Mr. DeFilippis,

21  has your client's rights been met in those

22  areas?

23          ATTORNEY DEFILIPPIS:  Yes, they have.

24          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

25  You also have the right to be heard by a fair

26  and impartial Panel.  Now that you have seen the

27  Panel here today, do you have any objections?

7

1          INMATE JAY:  No, I do not.

2          PRESIDING COMMISSIONER ST.JULIEN:

3    Mr. DeFilippis?

4          ATTORNEY DEFILIPPIS:  None.

5          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

6    You will receive a copy of our written tentative

7    decision today.  That decision is subject to

8    review by the Decision Review Unit and the

9    entire Board meeting as a whole and will become

10   effective within 120 days.  It is also subject

11   to review by the Governor.  You will receive a

12   copy of that decision and the Hearing transcript

13   once they are transcribed.  And the Board no

14   longer has an Appeals process, so if you have

15   any objections or complaints about anything that

16   happens here today, you need to take those

17   directly to the Court.  And you can find

18   information on how to file that claim in the

19   Prison Law Library, and the policy is entitled

20   Administrative Appeals, Correspondence and

21   Review Concerning Board of Prison Terms

22   Decision.  You are not required to admit your

23   offense or discuss your offense, if you do not

24   wish to do so.  However, we do accept as true

25   the Findings of the Court.  We invite you to

26   discuss the facts and circumstances of the crime

27   if your wish.  And please note that we will

8

1    review and consider prior statements that you

2    have made regarding the crime in determining

3    your suitability for parole.  Commissioner

4    Smith, is there any confidential information?

5         DEPUTY COMMISSIONER SMITH:  There is

6    confidential information in the file, but it

7    will not be used this morning.

8         PRESIDING COMMISSIONER ST.JULIEN:  Okay,

9    thank you.  And, Mr. DeFilippis, I know that we

10   have gotten quite a few documents this morning.

11   Do you have any additional documents?

12        ATTORNEY DEFILIPPIS:  None at additional

13   other than what I have provided this morning.

14        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

15   And I see that you have the Hearing Checklist

16   there, are those documents in order?

17        ATTORNEY DEFILIPPIS:  It appears to be.

18   The only thing that I would note, is that it

19   notes crime partner's last Hearing transcript.

20   I'm assuming that that is in the confidential

21   section of the file that will not be utilized?

22        DEPUTY COMMISSIONER SMITH:  That's

23   correct.

24        ATTORNEY DEFILIPPIS:  It also notes other

25   non-specific but pertinent information developed

26   since date of last Hearing, and I'm not exactly

27   sure what that is referencing.  But I didn't see

9

1  anything unusual in the Lifer Hearing packet

2  beyond just simple the documentation of what he

3  has done since then.

4        PRESIDING COMMISSIONER ST.JULIEN:  Yeah,

5  and I think it might refer to some other things

6  that we have gotten after the packets were

7  prepared.  There's chronos and things like that.

8        DEPUTY COMMISSIONER SMITH:  Such as some

9  of the updated materials and some of the things

10  that you have provided.  But at this point we

11  have no intention of referring to any

12  documentation other than what's in the Board

13  packet and what's been submitted to all of us.

14        ATTORNEY DEFILIPPIS:  Then I have all the

15  documents that are referred to.

16        PRESIDING COMMISSIONER ST.JULIEN:

17  Mr. Turley?

18        DEPUTY DISTRICT ATTORNEY TURLEY:  I have

19  those documents.

20        PRESIDING COMMISSIONER ST.JULIEN:  Thank

21  you.  Okay, do you have any preliminary

22  objections?

23        ATTORNEY DEFILIPPIS:  No, I don't.

24        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

25  And will Mr. Jay be speaking with us today?

26        ATTORNEY DEFILIPPIS:  Yes, he will.  He

27  will not be discussing the commitment offense,

10

1   however; he will discuss all other issues.   We

2   will submit the issue of the commitment offense

3   on his prior testimony at, I think, five of the

4   last six Hearings that he spoke about the crime.

5           PRESIDING COMMISSIONER ST.JULIEN:   Okay.

6   I need to give you an Oath, Sir.  Do you

7   solemnly swear or affirm that the testimony you

8   provide at this Hearing will be the truth, the

9   whole truth and nothing but the truth?

10          INMATE JAY:   I do.

11          PRESIDING COMMISSIONER ST.JULIEN:   Okay.

12  I will read into the record the Summary of the

13  Crime, as it appears in the May 2005 Board

14  Report.  And it states that -- first, this

15  information was taken from the probation

16  officer's report:

17          The offense occurred on the night

18          of October 15, 1985, when Jay and

19          co-defendants Richard Parker, and

20          is it Torran?

21      INMATE JAY:  Torran.?

22          PRESIDING COMMISSIONER ST.JULIEN:

23          T-O-R-R-A-N, Meier, M-E-I-E-R, strangled

24          and killed Meier's mother, Shirley Rizk,

25          R-I-Z-K, and attempted by various methods

26          to kill Meier's eight-year old brother,

27          Rory Rizk, and that's R-O-R-Y, R-I-Z-K.

11

1    On the evening of October 13, 1985, 16

2    year-old Meier had decided to kill his

3    mother.  He obtained a promise of

4    assistance from Richard Parker and

5    Matthew Jay.  Meier, Jay and Parker

6    discussed how they would kill Meier's

7    mother.  Meier found a rope and fashioned

8    into a noose.  They decided they would

9    strangle her in Meier's bedroom,

10   transport her body in car to Malibu

11   Canyon, light the car on fire and push it

12   over the cliff in order for it to appear

13   like an accident.  Meier let Jay and

14   Parker enter his bedroom through the

15   window.  Meier lured his mother into the

16   bedroom and Parker placed a noose around

17   her neck and began to strangle her.

18   While Parker pulled the rope around her

19   neck, Jay and Meier held her down.

20   During the strangulation, Meier's half-

21   brother Rory awoke to the screams and

22   went to his brother's room to

23   investigate.  Rory observed the

24   strangulation, while Parker and Jay

25   continued.  Meier took Rory away from the

26   room to keep him from knowing what was

27   happening.  Meier told Rory to watch

12

1    television and then returned to the

2    bedroom.  It took 15 minutes to complete

3    the strangulation of Shirley Rizk.

4    During this time, Meier repeatedly left

5    the room to deal with his half-brother,

6    who wanted to know what was going on.

7    The three crime-partners then realized

8    that Rory was a potential witness and he

9    must also be killed.  Meier gave Jay

10   money to buy snail and rat poison.  While

11   Jay was gone, Parker and Meier placed

12   Shirley Rizk's body into the trunk of her

13   car.  Meier cleaned the blood off his

14   bedroom rug.  After Jay returned with the

15   poison, Meier attempted to poison Rory,

16   first by placing poison in a sandwich and

17   placing it into a malt drink.  Rory

18   refused the food and drink because of the

19   bad taste.  After he attempted to poison

20   him, Rory went to the garage and saw his

21   mother's body in the open trunk of the

22   vehicle and her legs extending from under

23   her robe.  Meier asked Rory if he wanted

24   to go for a ride to Malibu Canyon and he

25   agreed.  With his mother's body in the

26   trunk and the Rory in the backseat, Jay

27   and his crime-partners drove away from

13

1    the crime scene.  In route they stopped

2    at gas station and purchased a gallon of

3    gas.  After driving through Malibu Canyon

4    and finding a location to push the car

5    over the edge, they drove back to Jay's

6    house, and Jay followed them to the spot

7    in Malibu Canyon.  Meier tied-up and

8    blindfolded Rory in the backseat and put

9    a rag with gas into the gas tank fill up

10   spout.  Parker put the body of Shirley

11   Rizk behavior the steering wheel..  The

12   car was then pushed over the embankment

13   as Parker lit the rag on fire.  The car

14   rolled down the embankment, possibly

15   rolling over and coming to a rest

16   approximately 30-feet below.  The

17   defendants then left in Jay's car.  Rory

18   was able to untie himself and remove his

19   blindfold.  He saw his deceased mother in

20   the front seat with blood on her face.

21   After opening the window he climbed out

22   of the burning car and began calling for

23   help.  A passing motorist observed the

24   fire and stopped to investigate and Rory

25   was subsequently rescued.

26 And I do note that you don't dispute any of

27 those facts.  Is that correct?

14

1          ATTORNEY DEFILIPPIS:  Well, actually,

2    since he is not going to be discussing the

3    crime, there are a number of facts that are

4    disputed in there.

5          PRESIDING COMMISSIONER ST.JULIEN:  Oh.

6          ATTORNEY DEFILIPPIS:  And there has been

7    a -- there's a prisoner's version in the

8    probation report that accurately gives --

9          PRESIDING COMMISSIONER ST.JULIEN:  Oh,

10   the aggravating and mitigating circumstances.

11         ATTORNEY DEFILIPPIS:  No, I met in the

12   probation report.  It actually talks --

13         PRESIDING COMMISSIONER ST.JULIEN:  Oh,

14   okay.

15         ATTORNEY DEFILIPPIS:  Yeah.

16         PRESIDING COMMISSIONER ST.JULIEN:  Okay.

17         ATTORNEY DEFILIPPIS:  -- about the facts

18   of the offense.

19         PRESIDING COMMISSIONER ST.JULIEN:  Okay.

20         ATTORNEY DEFILIPPIS:  He was not -- he

21   was not present at the time that the body was

22   placed in the car.  He had left and gone back to

23   his home.

24         PRESIDING COMMISSIONER ST.JULIEN:  And

25   left his car?

26         ATTORNEY DEFILIPPIS:  No.  He took his

27   car and went home.  And the co-defendants, with

15

1    the car, came over to his house, got him and

2    then went to Malibu Canyon. So, the decisions

3    about going to Malibu Canyon, taking the

4    youngest were all the co-defendants, not

5    Mr. Jay.

6         PRESIDING COMMISSIONER ST.JULIEN:  Okay,

7    so, at what -- okay, I can't ask that, we're not

8    going to talk about the crime.  Okay.

9         ATTORNEY DEFILIPPIS:  There's a

10   defendant's statement at pages 12 to 15 of the

11   probation report that could be referred to that.

12        PRESIDING COMMISSIONER ST.JULIEN:  In

13   some of the materials, and I'm not sure where I

14   read this, but it did state that you were

15   relieved and happy that the victim's parents had

16   forgiven you.  And I just got the letters that

17   they actually wrote this morning, so I hadn't

18   known that that was documented.  And I'm curious

19   to ask how that came about.

20        INMATE JAY:  Around 1992, '93, I was at

21   the point in my life where I, through

22   counseling, through talking with my family, and

23   my own inter belief that I needed to tell the

24   family how sorry I was for my actions.

25        PRESIDING COMMISSIONER ST.JULIEN:  Uh

26   huh.

27        INMATE JAY:  And in talking to my

16

1  Counselor at the time, he suggested that I write

2  a letter through him and he would send it to the

3  District Attorney's Office.

4          PRESIDING COMMISSIONER ST.JULIEN:    Uh

5  huh.

6          INMATE JAY:   Not only did I send a letter

7  to the parents of the victim, but to Rory,

8  himself, separate letters.

9          PRESIDING COMMISSIONER ST.JULIEN:    Uh

10  huh.

11          INMATE JAY:   And I didn't ask for

12  forgiveness, I just wanted them to know that I

13  was sorry and I realized how much pain I had

14  caused them.   And that initiated a relationship,

15  my relationship with the victim's parents.

16          PRESIDING COMMISSIONER ST.JULIEN:    And

17  were you surprised that they were able to

18  forgive you?

19          INMATE JAY:   I was.   I was, I think,

20  surprised and perhaps the word that came to my

21  mind is grateful more than anything.   It's not

22  something that I earned.   It was simply a

23  blessing from God.

24          PRESIDING COMMISSIONER ST.JULIEN:    How do

25  you think that they were able to overcome?

26          INMATE JAY:   I believe their Christian

27  beliefs, which I know they are Christians,

17

1   played a vital role in that --

2          PRESIDING COMMISSIONER ST.JULIEN:   Uh

3   huh.

4          INMATE JAY:   -- more than anything else.

5          PRESIDING COMMISSIONER ST.JULIEN:   And

6   what about Rory, have you ever heard from him?

7          INMATE JAY:   Not directly, no.

8          PRESIDING COMMISSIONER ST.JULIEN:   Okay.

9   So, let's go back to your prior.  You don't have

10  a -- well, I guess you were a juvenile when this

11  happened.  So, there are no prior arrests or

12  convictions.  Can you describe what your life

13  was like at the time that this crime was

14  committed?

15         INMATE JAY:   My life was -- I was lost.

16  Very simply, I was lost.  As a result of taking

17  drugs and alcohol over an extended period of

18  time lead to a spiraling effect that lead me to

19  make poor decisions, everything from dropping

20  out of school to committing this crime.

21         PRESIDING COMMISSIONER ST.JULIEN:   What

22  was the attraction to drugs and alcohol?

23         INMATE JAY:   I was, I was, I was -- my

24  self-awareness, I had a low self-esteem.

25  Wanting to be accepted.  Wanting something

26  better in life.  Wanting to be happy.  And the

27  people or the friends that I hung around with at

18

1    that time, seemed to be able to laugh and enjoy

2    themselves while using and abusing. And I got

3    into that scene. And it was a false sense of

4    happiness, you know, that I was looking for, you

5    know.

6        PRESIDING COMMISSIONER ST.JULIEN:  So,

7    why do you think you were from most people and

8    that you needed, apparently you needed other

9    substances so that you could laugh and --

10        INMATE JAY:  Are you referring to other

11    people that don't use drugs?

12        PRESIDING COMMISSIONER ST.JULIEN:  Yeah.

13        INMATE JAY:  People, individuals,

14    everybody's different. I wish I could say that

15    I was that individual who did everything right,

16    who made all the right choices, who didn't need

17    anything, who had that confidence; and I didn't.

18    I think just -- I had a hard time expressing

19    myself when I was younger. And I kept taking

20    all of my problems and just putting them down,

21    putting them down, not realizing the damage it

22    did to me and how it affected my decisions later

23    on in life, including using drugs.

24        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

25    So, how would you describe your drug use?

26        INMATE JAY:  It was daily.

27        PRESIDING COMMISSIONER ST.JULIEN:  So,

19

1  you were dependent.  And apparently there were a

2  lot of drugs.

3       INMATE JAY:  Yes.

4       PRESIDING COMMISSIONER ST.JULIEN:  At

5  times, okay.

6       INMATE JAY:  Absolutely.

7       PRESIDING COMMISSIONER ST.JULIEN:  And

8  what about alcohol?

9       INMATE JAY:  Alcohol.  Definitely.  I

10  enjoyed alcohol just as much as I enjoyed drugs.

11  I used alcohol and marijuana more than the

12  others.  It's easy to get.

13       PRESIDING COMMISSIONER ST.JULIEN:  Your

14  psych evaluation talks about you being

15  chronically depressed, severely depressed as a

16  child.  Do you think you were self-medicating,

17  you know, looking back?

18       INMATE JAY:  Looking back, I'm positive I

19  was.  I mean, definitely.  I wanted the pain,

20  the depression to go away and I found a way

21  through drugs and alcohol to do that.

22       PRESIDING COMMISSIONER ST.JULIEN:  Do you

23  have depression now?

24       INMATE JAY:  Nothing out of the normal.

25  I mean, every once in awhile I get depressed.

26  But I have a greater awareness of myself today

27  and that depression is normal and how to deal

20

1   with things through communication and the

2   support of family and loved ones.

3         PRESIDING COMMISSIONER ST.JULIEN:   Okay.

4   And what was your family life like?  I'm not

5   getting a good picture of your family life in

6   any of these --

7         INMATE JAY:  My family was together.  My

8   parents never separated, they were always

9   married --

10        PRESIDING COMMISSIONER ST.JULIEN:   So,

11  they are still --

12        INMATE JAY:  -- they're still together.

13  I think the biggest difference between then and

14  now are a few things that I have come to

15  realize.  One is as a family, we didn't know how

16  to communicate with one another.

17        PRESIDING COMMISSIONER ST.JULIEN:   It was

18  you and --

19        INMATE JAY:  My brother, my older brother

20  and my younger sister.

21        PRESIDING COMMISSIONER ST.JULIEN:   They

22  had three?

23        INMATE JAY:  Right, three kids.

24        PRESIDING COMMISSIONER ST.JULIEN:   You

25  were in the middle?

26        INMATE JAY:  I was in the middle.  I also

27  felt like, at that time, I was the mediator of

21

1    all arguments. You know, I was closer to my

2    sister and I was closer to my brother and they

3    weren't, and I always seemed to be caught in the

4    middle, the middle child. And always wanting to

5    please my -- my dad was a perfectionist. He

6    wanted the best in us and I think that added

7    pressure into my life, wanting to be the perfect

8    son, doing the chores. And I did that for a

9    while and got good grades and did those things.

10    But what I didn't do was tell the truth. I

11    wasn't truthful with myself nor with my family.

12    And today I can be. Today we all can be. We

13    communicate so well today. That's not to say

14    that we don't have problems.

15        PRESIDING COMMISSIONER ST.JULIEN:    I

16    know.

17        INMATE JAY:  But today we are a true, a

18    true family, I mean.

19        PRESIDING COMMISSIONER ST.JULIEN:    Okay.

20    So at the point in time when you were a teenager

21    and you started using the drugs and you were

22    depressed, and the school started going down

23    hill, what did you parents -- did you parents

24    know you were on drugs? Did you ever get

25    counseling?

26        INMATE JAY:  At that time, my parents --

27    through talking with them over the years, I have

22

1  learned a lot of this.  And they have learned a

2  lot about me.

3       PRESIDING COMMISSIONER ST.JULIEN:   Uh

4  huh.

5       INMATE JAY:  They knew something was

6  wrong.  They didn't know what.  They told each

7  other it was a phase at one point.  You know,

8  they thought it was a phase I was going through

9  and that I would get over it.  They thought I

10 might have been using drugs, but they didn't

11 think it was as sever as they came to know, you

12 know.

13      PRESIDING COMMISSIONER ST.JULIEN:   Uh

14 huh.

15      INMATE JAY:  And I certainly did

16 everything that I could to lie to them, to hide

17 it.

18      PRESIDING COMMISSIONER ST.JULIEN:   Uh

19 huh.

20      INMATE JAY:  And it became almost a game,

21 you know, trying to hide it from them.  And so,

22 I think they did realize back then that there

23 was something wrong, but they didn't realize the

24 severity of it, and they didn't know what to do.

25 I really think they were lost, too, as to what

26 to do.

27      PRESIDING COMMISSIONER ST.JULIEN:  So, do

23

1  you think that anything would have prevented you

2  from taking the road that you took and

3  eventually leading to this crime?  Do you think

4  that at any point in time you could have been

5  stopped by something?  By counseling?  By your

6  parents?

7      INMATE JAY:  Oh, absolutely.  I think

8  there are a lot of factors involved.  One

9  example is in my senior year of high school, I

10  missed, I don't know, a hundred plus days.  And

11  they had a computer that would call home and --

12      PRESIDING COMMISSIONER ST.JULIEN:

13  (indiscernible)

14      INMATE JAY:  And say, you know,

15      PRESIDING COMMISSIONER ST.JULIEN:

16  (indiscernible).

17      PRESIDING COMMISSIONER ST.JULIEN:  -- by

18  the way your son has missed 16 days of school,

19  18 days of school.

20      PRESIDING COMMISSIONER ST.JULIEN:

21  There's letters and -- yeah.

22      INMATE JAY:  Yeah, but I would always be

23  there to answer.  It was just a tape-recorder,

24  you know.  And I lived right across the street

25  from the high school, right across.  And not one

26  Counselor, not one teacher came to my house or

27  made a personal call or whatever.  And I'm

24

1    reluctant to say that, because I don't want to

2    place blame on them.  But part -- a little bit

3    of the blame does go on them, because, I think

4    that if people such as that, in their position,

5    and my parents, if they had done something.  If

6    they had stepped in and really maybe followed me

7    one night, I don't -- you know.  And if had

8    chose not to do drugs.  I mean, there are so

9    many factors that could have played a role in me

10   not doing this.

11          PRESIDING COMMISSIONER ST.JULIEN:  Where

12   did you get the money for the drugs?

13          INMATE JAY:  Me?  Well, I worked at

14   various places.  One was Carl's Junior.  So, I

15   had a paycheck coming in.  But also with the

16   friends that I hung around with at that time, we

17   would take turns --

18          PRESIDING COMMISSIONER ST.JULIEN:

19   Buying.

20          INMATE JAY:  -- buying it and supplying

21   it to each other.

22          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

23   So, if this crime hadn't happened, where do you

24   think you would have been in five years?  You're

25   like 23.  Where do you think you would have been

26   in life?

27          INMATE JAY:  Well, that's so hard to say.

25

1   If I had used drugs, if I was continuing to --

2          PRESIDING COMMISSIONER ST.JULIEN:  Yeah,

3   the path you were on.

4          INMATE JAY:  The path I was on, but I

5   didn't commit drugs, I probably would have died.

6   I probably would have died.

7          PRESIDING COMMISSIONER ST.JULIEN:  Could

8   I ask Mr. Jay how he feels about the crime

9   today?

10          ATTORNEY DEFILIPPIS:  Absolutely.

11          INMATE JAY:  I'm devastated by it.  I'm -

12   - it has moved me in ways that I never would

13   have been moved if it hadn't happened.  And let

14   me say this:  Because I committed this crime,

15   because I caused the pain that I did, and

16   because I was sent to prison with this sentence,

17   it enabled me to become a good human being

18   again.  It enabled me to answer for my wrongs.

19   It gave me an opportunity to pay the debt as

20   much as I can to both the family and society.

21   It is so outside of who I am, what I did, it

22   really was an aberration.  The crime, the pain

23   that I caused, I live with it daily.  I know

24   that people say that all the time, I mean, I'm

25   sure that you guys hear that all the time.  But,

26   you know, I do, I -- because of that I try to do

27   everything -- everyday I wake up I try to make

26

1    the right decisions.  I try to do the best that

2    I can.  I try to bring goodness to life.  I

3    mean, I know that I caused pain to so many

4    people, that I don't even realize.  I mean, the

5    neighbors, their trust.  The neighbors are the

6    victims, I'm saying.  Their trust in that

7    community was probably shattered.  To my family,

8    and obviously, to the victim's -- to Rory, to

9    the grandparents, and my family and myself, and

10   my potential in life.  I -- maybe I could have

11   become somebody great.  Maybe I could have been

12   a surgeon or something, or a great chief, which

13   is what I wanted to do when I was younger.  So,

14   when you asked me how I feel about this crime,

15   I'm devastated.  I'm devastated on all accounts.

16   I'm devastated that you guys have to sit here

17   and read about it and know that this happened

18   and that they do.  I know that I affected untold

19   lives, and the D.A.

20           PRESIDING COMMISSIONER ST.JULIEN:  So,

21   this  -- the patterns shows that you were easily

22   influenced.  Is that right?

23           INMATE JAY:  Absolutely.

24           PRESIDING COMMISSIONER ST.JULIEN:  How do

25   we know -- how are you different?  How do we

26   know that you are different today?

27           INMATE JAY:  That's a great question.

27

1    I've thought about that and I've worked hard

2    over the last 20 years.  Please understand this:

3    that in prison, I think that -- I mean, there

4    are pressures on the outside just as there are

5    pressures in prison, and they are different

6    pressures.  In here there is a lot of peer

7    pressure of being accepted, of bullies.  I mean,

8    I live with criminals and I have been able to

9    not only --

10         PRESIDING COMMISSIONER ST.JULIEN:  Do you

11   think you're a criminal?

12        INMATE JAY:  Absolutely.

13        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

14        INMATE JAY:  Absolutely.

15        PRESIDING COMMISSIONER ST.JULIEN:  You

16   are.

17        INMATE JAY:  Yes.

18        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

19        INMATE JAY:  Yeah.  And I am definitely

20   one of them.

21        PRESIDING COMMISSIONER ST.JULIEN:  So,

22   you live with criminals.

23        INMATE JAY:  I live with criminals, but

24   because I've been able to not just only stay out

25   of trouble for the last 20 plus years, but to

26   grow in so many areas.  And I'm not just saying

27   this, I mean, I have Counselors that have told

28

1  me this.  I have psychs, State psychologist --

2        PRESIDING COMMISSIONER ST.JULIEN:  Your

3  record will speak for itself, so you don't need

4  to get into that.

5        INMATE JAY:  But --

6        PRESIDING COMMISSIONER ST.JULIEN:  At

7  what point did you -- because, I'm perceiving

8  this as a transformation, obviously.  At what

9  point do you think that you changed?

10        INMATE JAY:  Well, I changed at different

11  times in different ways.  I changed immediately

12  as soon as the crime happened in untold ways.  I

13  mean, it just -- I think as far as what you're

14  speaking about right now, it started in the

15  County jail I made a decision that I either

16  could kill myself or I could, what I figured at

17  the time, take the hard road and try to make

18  something of my life and realize what I did and

19  correct what I could.  And at that point I

20  started trying to come out of that blackness.

21  And everyday I try -- and I realize, I could

22  live for another hundred years and would never,

23  you know, come close to correcting what I did,

24  but that's when it began.

25        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

26  So, this, you know, when I read this crime I

27  couldn't believe it.  And I think in one of the

29

1  previous transcripts the Commissioner said this

2  is like a T.V. movie.  I mean, there's a

3  phenomenal series of events here.  And amazing

4  cruelty.  Obviously, the documentation shows

5  that you have done everything that you've been

6  asked to do.  You haven't been in any trouble.

7  How we over here get over this crime?

8       INMATE JAY:  I can -- the crime is never

9  going to change.

10       PRESIDING COMMISSIONER ST.JULIEN:  Uh

11  huh.

12       INMATE JAY:  The violence that was in

13  that crime is never going to change.  The only

14  thing that I have control over is who I am

15  today.  I mean, really, I mean, I can't change

16  the past.  I wish I could.  All I can do is

17  instill in you that today I am genuinely a good

18  person.  I am a safe person.  I am a person

19  aware of who I am, and what my responsibilities

20  are to myself and to my family and to my

21  community.

22       PRESIDING COMMISSIONER ST.JULIEN:  Okay.

23  Why do you think that you haven't gotten a date

24  yet?

25       INMATE JAY:  Because of the crime.  They

26  have told me, past Board members, if I may say,

27  have told that my parole plans are perfect --

30

1          PRESIDING COMMISSIONER ST.JULIEN:  Yeah.

2          INMATE JAY:  My institutional programming

3    is very good.  I have psych clearance and so,

4    it's very clear why.

5          PRESIDING COMMISSIONER ST.JULIEN:  Okay,

6    so on the note of parole plans. I notice that in

7    some of your -- now, I don't know what stack to

8    look at, I've got so many stacks here.  But in

9    some of your letters it is clear that you have

10   residence offers.  You have job offers.  And you

11   have many of them.  So, why don't we talk about

12   what your plans are, because, like I said, you

13   have numerous offers and numerous places of

14   residence.  Do you have like a one, two, three,

15   four?

16         INMATE JAY:  If I may ask my attorney

17   something real quick.  I just wanted to -- I

18   don't know if you can see it --

19         PRESIDING COMMISSIONER ST.JULIEN:  No, I

20   don't have that here.

21         INMATE JAY:  Well, I just --

22         PRESIDING COMMISSIONER ST.JULIEN:

23   (indiscernible).

24         INMATE JAY:  No, it's basically parole

25   plans.

26         PRESIDING COMMISSIONER ST.JULIEN:  Oh,

27   okay.

31

1        INMATE JAY:  Just to kind of --

2        PRESIDING COMMISSIONER ST.JULIEN:  Why

3   don't you go through those and then you can

4   leave them with us.

5        INMATE JAY:  Okay.  I have five or six

6   different areas on parole plans.  The first is

7   place of residence.

8        PRESIDING COMMISSIONER ST.JULIEN:  Uh

9   huh.

10       INMATE JAY:  As you know, I have many

11  places that have been offered to me and my

12  immediate plans are to live with my parents in

13  Valencia.

14       PRESIDING COMMISSIONER ST.JULIEN:  Uh

15  huh.

16       INMATE JAY:  They have a beautiful home

17  and the size is appropriate for me.  I wouldn't,

18  you know, be crowding them or anything.  And

19  they do want this.

20       PRESIDING COMMISSIONER ST.JULIEN:  Uh

21  huh.

22       INMATE JAY:  But I eventually plan on

23  getting my own place, my own apartment.  I do

24  want that for myself, you know, for various

25  reasons.  But that is definitely where I plan on

26  staying.  Also, because it's close to the church

27  where my mom is the Minister.

32

1    PRESIDING COMMISSIONER ST.JULIEN:    Uh

2    huh.

3    INMATE JAY:    St. Stevens [phonetic].    And

4    there are a lot of people at church who over the

5    years that I have come in contact with.

6    PRESIDING COMMISSIONER ST.JULIEN:

7    There's a lot of letters from people --

8    INMATE JAY:    Through letters --

9    PRESIDING COMMISSIONER ST.JULIEN:    Right.

10   INMATE JAY:    -- and phone calls and

11   stuff.    And they have invited me to be a part of

12   that church and I look forward to that.

13   PRESIDING COMMISSIONER ST.JULIEN:    Now,

14   did you go there when you were younger?

15   INMATE JAY:    I have been there a few

16   times.    Because --

17   PRESIDING COMMISSIONER ST.JULIEN:    At

18   what point in time did your mother become a

19   Minister?

20   INMATE JAY:    She became a Minister

21   probably five years before my arrest.

22   PRESIDING COMMISSIONER ST.JULIEN:    Wow.

23   INMATE JAY:    Maybe six.

24   PRESIDING COMMISSIONER ST.JULIEN:    So,

25   she was studying and going to school and things

26   like that when you were --

27   INMATE JAY:    Right, she was in Seminary.

33

1         PRESIDING COMMISSIONER ST.JULIEN:    -- on

2    the brink?

3         INMATE JAY:    Yeah.    She was away a lot of

4    the time.    Part of the requirement in becoming a

5    Minister or Priest is spending a year or two at

6    Patton State Hospital or a correctional facility

7    or something like that.    And she chose Patton

8    State Hospital.    So, a lot of the parenting was

9    left to my dad at that time.

10        PRESIDING COMMISSIONER ST.JULIEN:    Did

11   you feel that perhaps your mother should have

12   been --

13        INMATE JAY:    Yes.

14        PRESIDING COMMISSIONER ST.JULIEN:    Okay.

15        INMATE JAY:    Should have been home?    Is

16   that what you were referring to.

17        PRESIDING COMMISSIONER ST.JULIEN:

18   Attending to your issues?

19        INMATE JAY:    Yes, absolutely, absolutely.

20   And --

21        PRESIDING COMMISSIONER ST.JULIEN:    You

22   knew what she was doing?    I mean, you knew --

23        INMATE JAY:    She asked us.    She asked us

24   and --

25        PRESIDING COMMISSIONER ST.JULIEN:    So,

26   you --

27        INMATE JAY:    -- wanting my mom to be

34

1  happy, I said, "Go ahead.  Yeah, that's great."

2  Not realizing what I just said.  You know, not

3  realizing that she was going to be away all this

4  time, you know.  So, it had a great impact on my

5  life, absolutely.  I'm very proud of her today.

6        PRESIDING COMMISSIONER ST.JULIEN:  Have

7  you resolved that?

8        INMATE JAY:  Absolutely.

9        PRESIDING COMMISSIONER ST.JULIEN:  Does

10  she know now that you felt -- I will just say

11  somewhat out in the (indiscernible) or rejected

12  or something like that?

13        INMATE JAY:  Oh, absolutely.

14        PRESIDING COMMISSIONER ST.JULIEN:  She

15  has.

16        INMATE JAY:  Yes, definitely, we've

17  talked about it.  And today I'm very proud of

18  her.  She's an incredible Minister; she really

19  is.  And also at the church there are AA groups.

20  There are four AA groups.  One is on Friday.

21  One is on Saturday, and there are two on

22  Wednesday.  There's an H and I meeting once a

23  month.

24        PRESIDING COMMISSIONER ST.JULIEN:  do you

25  have a sponsor?

26        INMATE JAY:  I don't have a person, you

27  know, a name sponsor.  But I have many people

35

1   that are willing to sponsor me if I -- you know,

2   because sponsorship you have to meet the person.

3   But I have many people willing --

4        PRESIDING COMMISSIONER ST.JULIEN:   So,

5   you know people who attend those groups?

6        INMATE JAY:   Absolutely.

7        PRESIDING COMMISSIONER ST.JULIEN:   Okay.

8        INMATE JAY:   Absolutely.   Transportation.

9   Transportation I have bus schedules as well as -

10  - but the main thing that I have is a support

11  letter from Melissa and Jerry Ryke [phonetic].

12  You'll see it in there.

13       PRESIDING COMMISSIONER ST.JULIEN:   Yeah,

14  it's right here.

15       INMATE JAY:   Okay.   In there they talk

16  about --

17       PRESIDING COMMISSIONER ST.JULIEN:

18  Offering you a job with, is it Kreiger?

19       INMATE JAY:   Kreiger.

20       PRESIDING COMMISSIONER ST.JULIEN:

21  Kreiger Sales and Services, K-R-E-I-G-E-R, as an

22  apprentice inventory control clerk, starting at

23  $10 an hour.   After 60-days you would get

24  medical coverage.

25       INMATE JAY:   Right.   And if you read just

26  a little bit further they talk about

27  transportation.

36

1              PRESIDING COMMISSIONER ST.JULIEN:   Oh,

2   you would have a car pool --

3              INMATE JAY:   Or rental.

4              PRESIDING COMMISSIONER ST.JULIEN:   --

5   loan or rental of a car.

6              INMATE JAY:   I spoke to them on the phone

7   and they said --

8              PRESIDING COMMISSIONER ST.JULIEN:   You

9   have to drive around a lot?  Or just to and

10  from?

11             INMATE JAY:   To and from.  To and from.

12  Also, school.  School is an important thing for

13  me.

14             PRESIDING COMMISSIONER ST.JULIEN:   You

15  want to continue your education?

16             INMATE JAY:   Absolutely.  I'm currently

17  enrolled in the University of Iowa.  I'm trying

18  to earn my BLS Degree, which is Bachelor of

19  Liberal Studies.

20             PRESIDING COMMISSIONER ST.JULIEN:   Uh

21  huh.

22             INMATE JAY:   With an emphasis in drug

23  abuse counseling.  If I am paroled before I

24  finish that I'm going to transfer to CSUN, Cal

25  State University of Northridge, which is fairly

26  close to my parents' home.

27             PRESIDING COMMISSIONER ST.JULIEN:   Uh

37

1    huh..

2         INMATE JAY:  To obtain credentials for

3    drug counseling for young adults.  And also, I

4    didn't know if you were interested in this, some

5    people who I've talked to, my fellow peers, have

6    suggested that I put down hobbies and

7    recreation.  And I just figured if you would be

8    interested in that I --

9         PRESIDING COMMISSIONER ST.JULIEN:  What

10   you would do in your spare time?

11        INMATE JAY:  Well, I do want to -- in

12   here I write poetry, I listen to music, I

13   workout, I run.  I also write letters to various

14   Church Youth Groups and different relatives,

15   people that have problems.  I enjoy writing and

16   I enjoy helping them when they do have problems.

17        PRESIDING COMMISSIONER ST.JULIEN:  Have

18   you read "A Million Little Pieces?"

19        INMATE JAY:  I waiting to read that right

20   now; my dad sent it to me.  I asked for it.  By

21   James Fray [phonetic], Fry [phonetic].  Yes.

22        PRESIDING COMMISSIONER ST.JULIEN:  Uh --

23        INMATE JAY:  But I'm also -- one last

24   thing.  I also want to be a part of the church

25   and they have a lot of activities, sports and

26   just all kinds of things that I can get involved

27   in.

38

1          PRESIDING COMMISSIONER ST.JULIEN:  What

2     are your brother and sister doing?

3          INMATE JAY:  My brother, my older

4     brother, Andrew, he's 40.  He lives back east

5     with his family.  He's in the restaurant

6     business, and lives in Pennsylvania.  My sister

7     just got her Masters Degree for becoming a

8     school administrator.

9          PRESIDING COMMISSIONER ST.JULIEN:  Oh.

10         INMATE JAY:  And she is happily married.

11    She lives right down the street from my parents

12    in Valencia.

13         PRESIDING COMMISSIONER ST.JULIEN:  And

14    how do they feel about -- because it seems that

15    your parents now are really active on your

16    behalf.  On getting you released and your life

17    after that.  How are your brother and sister?

18    Because sometimes it seems like the prodigal

19    child gets a lot of the attention.

20         INMATE JAY:  Yeah.  We've had our issues,

21    we have.  It's interesting that you say that.

22    First of all, my brother and his family, they

23    have letters in there and they support my

24    release.  They are 100 percent behind me.  My

25    sister and I are as close as ever.  And, in

26    fact, her husband and I get along great, we're

27    like brothers.  But I think that's never

39

1    changed, from when we were kids to now.  It's
2    like we all want our parents' attention.  And my
3    dad writes me everyday, a letter.  He has
4    written me a letter everyday that I've been in.
5    And it is just incredible.  And my sister has
6    even told him of her jealousy, because of that.
7         PRESIDING COMMISSIONER ST.JULIEN:  Uh
8    huh.
9         INMATE JAY:  And has mentioned it to me.
10        PRESIDING COMMISSIONER ST.JULIEN:  Uh
11   huh.
12        INMATE JAY:  And I said, I said, "Sarah,
13   it is a wonderful thing.  But I said the one
14   thing you get that I don't get, and that's my
15   fault, is that you get to actually spend time
16   with him whenever you want."
17        PRESIDING COMMISSIONER ST.JULIEN:  Uh
18   huh.
19        INMATE JAY:  And I don't and he doesn't
20   get to spend that time.  So, that's his way of
21   spending time with me.  You know, it's been a
22   gift, it really has.
23        PRESIDING COMMISSIONER ST.JULIEN:  Do you
24   think that he's also trying to make amends to
25   you?
26        INMATE JAY:  Oh, absolutely.  He has said
27   as such.

40

1          PRESIDING COMMISSIONER ST.JULIEN:  Okay,

2     so, I will note for the record that you had in

3     this packet there are 39 support letters.  I

4     think that I have -- there was an additional

5     packet today.  And we noted that some were

6     duplicates, so, that's why I didn't want to

7     recount everything.  You have an enormous amount

8     of support from people from church, from people

9     through different States, your brother.  And I

10    think your brother has also stated that if you

11    were going to go -- I guess you could go to --

12    he's offered you --

13          INMATE JAY:  Right, right.

14          PRESIDING COMMISSIONER ST.JULIEN:  -- to

15    go to Pennsylvania.  "I don't think that's

16    necessarily something that you want to do, but

17    if you did you would make a lot of money as a

18    cook, or waiter with tips," and that type of

19    thing.

20          INMATE JAY:  Uh huh.

21          PRESIDING COMMISSIONER ST.JULIEN:  So,

22    you do have a tremendous amount of positive

23    support and also, as you've mentioned, the

24    support and involvement from the Episcopal --

25    It's Episcopal, right?

26          INMATE JAY:  Episcopal, yes.

27          PRESIDING COMMISSIONER ST.JULIEN:

# EXHIBIT 2
# PART 2 OF 3

41

1    Episcopal Church that your mother is the Priest

2    at.  And then we also have a letter, I think we

3    have three letters from three different times

4    from the VanHoves?

5         INMATE JAY:  VanHove.

6         PRESIDING COMMISSIONER ST.JULIEN:

7    VanHove, okay.  And that is a Joyce and Gus,

8    G-U-S, VanHove, V-A-N, capital H-O-V-E, who are

9    the parents of the murder victim.

10        DEPUTY COMMISSIONER SMITH:  And the most

11   recent letter from them was October 2002.

12        PRESIDING COMMISSIONER ST.JULIEN:  Okay,

13   thank you.  And then --

14        DEPUTY COMMISSIONER SMITH:  Correct?

15        INMATE JAY:  Correct.

16        PRESIDING COMMISSIONER ST.JULIEN:  -- in

17   response to 3042 Notices, which are notices that

18   go the Courts and law enforcement and your

19   previous lawyer, we do have a letter of

20   opposition from the Los Angeles County Sheriff.

21   We were --

22        ATTORNEY DEFILIPPIS:  I don't have that.

23        PRESIDING COMMISSIONER ST.JULIEN:  It was

24   in my -- it was in, I think it was in this -- I

25   pulled it out of one of these packets.  Maybe

26   the big one there.  -- in opposition as we have

27   the presents here today of the Los Angeles

42

1    County District Attorney.  Do you want to see

2    this?

3         ATTORNEY DEFILIPPIS:  I'm just wondering

4    where my packets went.

5         PRESIDING COMMISSIONER ST.JULIEN:  It's

6    something that looks like this.  Because, when

7    you came in wasn't there something on the table

8    there.

9         ATTORNEY DEFILIPPIS:  Yes.

10        PRESIDING COMMISSIONER ST.JULIEN:  Yeah.

11        ATTORNEY DEFIIPPIS:  And I did pick them

12    up.  I think I left them in the other room.  Can

13    we break for just 30 seconds?

14        PRESIDING COMMISSIONER ST.JULIEN:  Do you

15    want this?

16        ATTORNEY DEFILIPPIS:  That would be fine.

17        PRESIDING COMMISSIONER ST.JULIEN:  Do you

18    want me to just --

19        ATTORNEY DEFILIPPIS:  Or do you want to

20    take a break for a moment?

21        PRESIDING COMMISSIONER ST.JULIEN:

22    Because the rest of them were --

23        DEPUTY COMMISSIONER SMITH:  I'm about

24    ready to turn the tapes over anyway so this

25    would be a good --

26        ATTORNEY DEFILIPPIS:  I'll go ahead and

27    grab those --

43

1        DEPUTY COMMISSIONER SMITH:   Okay.

2        INMATE JAY:   Do I stay here.

3        DEPUTY COMMISSIONER SMITH:   You can stay

4    here, sure.

5               (TAPE 1, SIDE A, ENDS)

6               (TAPE 1, SIDE B, BEGINS)

7        DEPUTY COMMISSIONER SMITH:   We're back on

8    the record.   Everyone previously identified is

9    back in the Hearing room.

10        PRESIDING COMMISSIONER ST.JULIEN:   Okay.

11    Now, did you go to a treatment program to try to

12    stop your drugs?

13        INMATE JAY:   No.   I --

14        PRESIDING COMMISSIONER ST.JULIEN:   For

15    nutrition.

16        PRESIDING COMMISSIONER ST.JULIEN:   Are

17    you talking about --

18        PRESIDING COMMISSIONER ST.JULIEN:   It

19    says Sugar Blues Syndrome.

20        PRESIDING COMMISSIONER ST.JULIEN:   Oh, I

21    went to a few sessions with a doctor.

22        PRESIDING COMMISSIONER ST.JULIEN:   For

23    depression?

24        INMATE JAY:   Yeah, it was for depression.

25        PRESIDING COMMISSIONER ST.JULIEN:   Was

26    that before Prozac and thing like that?   I mean,

27    did they ever suggest that take medication?

44

1          INMATE JAY:  No.  I mean, Prozac wasn't

2   around at that point.  But a lot of it had to do

3   with my diet and not understanding the effects

4   sugar had on me.

5          PRESIDING COMMISSIONER ST.JULIEN:  We're

6   all learning that.

7          INMATE JAY:  Yeah.

8          PRESIDING COMMISSIONER ST.JULIEN:  As

9   time goes on.  Okay.  Is there anything that you

10  want to add to anything that we've discussed so

11  far, before we move on to your post-conviction?

12         INMATE JAY:  I think at this point

13  everything is good.

14         PRESIDING COMMISSIONER ST.JULIEN:  Okay.

15  Commissioner Smith.

16         DEPUTY COMMISSIONER SMITH:  Mr. Jay, you

17  were received by the Department of Corrections

18  on June 10, 1987.  You were received here at CTF

19  on April 19, 1999.  You have a classification

20  score of 19, which the lowest score that a life

21  inmate can obtain.  Your last Hearing, which was

22  your fifth Subsequent Hearing, was held on

23  May 5, 2004, and you received a one-year denial

24  at that time.  To say that you have been

25  programming in an exemplary way doesn't do you

26  justice.  Your programming far exceeds what this

27  Panel or I'm sure most other Panels would see.

45

1    Since you've been incarcerated you have had no

2    disciplinary actions, 115s or 128s.  And we

3    realize that, in and of itself, is quite an

4    accomplishment, it is not an easy thing to do.

5    You have received six recently laudatory chronos

6    for your attendance with AA, and that's from

7    July '04 to January  '06, and you have been

8    involved in AA for certainly a longer period

9    than that, but I'm focusing primarily what your

10   adjustment has been since your last Hearing.

11           INMATE JAY:  Okay.

12           DEPUTY COMMISSIONER SMITH:  And certainly

13   when I complete that overview if there is

14   anything that you want to add that may go beyond

15   or that has taken place prior to the last

16   Hearing, we will certainly allow you to do that.

17           INMATE JAY:  Okay, thank you.

18           DEPUTY COMMISSIONER SMITH:  You have a

19   general chrono that is dated February 2005 for

20   your donation of five books to the Prison

21   Library.  A laudatory chrono dated July 2005 for

22   participating in a three-hour Anger Management

23   course.  You have a laudatory chrono dated

24   November 25, wherein you completed nine two-hour

25   sessions of the Impact Workshop.  You have

26   completed the Hepatitis Prevention Course in

27   November 2005.  And you have a laudatory chrono

46

1   dated December 2005 for completing the third-

2   phase of the Inmate Employability Program.  You

3   received a Certificate as a Customer Service

4   Specialist from the Electronics' Technician

5   Association, and you received that in October

6   2004.  You were assigned to the PIA Furniture

7   Assembler area until December 2004, and you

8   received above average to exceptional work

9   reports in that assignment.  And then in

10  December 2004 you were reassigned as a labor

11  expeditor, in PIA.  Are you still in that

12  assignment?

13          INMATE JAY:  Yeah, there was a little

14  confusion as to the dates.  Before the labor

15  expeditor, I was a production coordinator.  And

16  what that was is the two go hand-in-hand, they

17  both deal with inventory control and the work is

18  similar, you know, to inventory.

19          DEPUTY COMMISSIONER SMITH:  So, you went

20  from an assembler to --

21          INMATE JAY:  To the inventory clerk, or

22  to the production coordinator

23          DEPUTY COMMISSIONER SMITH:  production

24  coordinator --

25          INMATE JAY:  Right.

26          DEPUTY COMMISSIONER SMITH:  And then to

27  labor expeditor.

47

1          **INMATE JAY:**  right, correct.

2          **DEPUTY COMMISSIONER SMITH:**  And what are

3    you functions as labor expeditor?

4          **INMATE JAY:**  Well, there are many.  One

5    thing that I do is that I am in charge of

6    ensuring that all of the shop orders that we do,

7    for example, building desks, and that all the

8    material that is required in that is issued to

9    that in the appropriate amounts.  Also, I'm in

10   charge of keeping track of all the finished

11   product that the factory makes, and what gets

12   shipped out of the prison.  And other materials,

13   I have to make sure that the materials are

14   actually sent to the floor, each different

15   factory, there are seven factories, seven shops,

16   all requiring different material, and they

17   request it through me and I have type up

18   different forms and make sure that they get

19   those materials.

20         **DEPUTY COMMISSIONER SMITH:**  There is also

21   a letter in the packet from PIA, from a number

22   of your supervisors, complementing you the work

23   that you are doing and have done for PIA.  And

24   they talk about what an asset you are to the

25   program.  You received a Certificate from

26   Criminon, that's C-R-I-M-I-N-O-N, dated April

27   2005 regarding your completion of a program

48

1    entitled A Way to Happiness.

2         INMATE JAY:  Correct.

3         DEPUTY COMMISSIONER SMITH:  How long --

4    it doesn't indicate how long that program was,

5    whether it is on-going or --

6         INMATE JAY:  Yeah, it's a self-study

7    program that pretty much you can go at your own

8    pace.  But there are 20 lesson plans, each

9    dealing with different issues, ranging from

10   self-esteem to parenting, and how to raise

11   children who know right from wrong.  And it also

12   depends on the mail, because it's a

13   correspondence course and you have a proctor

14   through this Criminon.  And it took me about a

15   year to complete the course, corresponding back

16   and forth with my instructor.  So, it varies, it

17   really does.

18        DEPUTY COMMISSIONER SMITH:  It was a

19   long-term program.

20        INMATE JAY:  Right, it wasn't --

21        DEPUTY COMMISSIONER SMITH:  Because, some

22   programs might be like the three-hour Anger

23   Management Program --

24        INMATE JAY:  Exactly.

25        DEPUTY COMMISSIONER SMITH:  -- that you

26   completed.

27        INMATE JAY:  I would call this a course

49

1    more than a class.

2        DEPUTY COMMISSIONER SMITH:  Okay.  I

3    appreciate that, because again just looking at

4    the Certificate, other than the Certificate

5    being in existence, --

6        INMATE JAY:  Right.

7        DEPUTY COMMISSIONER SMITH:  -- it doesn't

8    tell us what it was.  It certainly doesn't, you

9    know, reference the amount of activity --

10       INMATE JAY:  Right.

11       DEPUTY COMMISSIONER SMITH:  -- you know,

12   that you put into it.  You enrolled in Western

13   Civilization and Word Power.  Is that through

14   the University that you commented on?

15       INMATE JAY:  Excuse me.  Real quick if I

16   may?  I have this Welcome Way of Happiness.  And

17   it's a little introductory thing that I thought

18   you might need to read.  So, if my attorney

19   could pass it to you.

20       DEPUTY COMMISSIONER SMITH:  Sure, when we

21   take --

22       INMATE JAY:  And the Certificate --

23       DEPUTY COMMISSIONER SMITH:  -- our

24   recess.

25       INMATE JAY:  Okay.

26       DEPUTY COMMISSIONER SMITH:  If that's all

27   right with you?

50

1          INMATE JAY:  Okay, that would be fine.

2          DEPUTY COMMISSIONER SMITH:  Then we can

3  read it at that time.

4          INMATE JAY:  And my Certificate is on the

5  backside of that.

6          DEPUTY COMMISSIONER SMITH:  Right, and

7  I've got a copy --

8          INMATE JAY:  Okay.

9          DEPUTY COMMISSIONER SMITH:  -- of your

10  Certificate here.

11          INMATE JAY:  Okay, great.

12          DEPUTY COMMISSIONER SMITH:  That's why I

13  came up with the question.

14          INMATE JAY:  Yes.

15          DEPUTY COMMISSIONER SMITH:  The Western

16  Civilization Word Power Course, is that through

17  the University?

18          INMATE JAY:  Yes.  Those are two separate

19  courses.  One is Western Civilization II, and

20  the other one other one is an English course,

21  Word Power, that is based on Latin and Greek

22  elements.

23          DEPUTY COMMISSIONER SMITH:  Okay.  And

24  that's the University of Iowa?

25          INMATE JAY:  University of Iowa.

26          DEPUTY COMMISSIONER SMITH:  Okay.

27          INMATE JAY:  Yeah, they're required

51

1   courses.   Two of many required courses that I

2   took, you know, trying to get closer and closer

3   to my -- I have 81 units completed, and I am 39

4   units shy of a degree.

5         DEPUTY COMMISSIONER SMITH:   Are you

6   currently enrolled in those courses --

7         INMATE JAY:   Actually --

8         DEPUTY COMMISSIONER SMITH:   -- or have

9   you completed them?

10        INMATE JAY:   I have completed those

11   courses, I'm just waiting for the grades, the

12   final grades.   I took the finals in October

13   2005, and my dad just called the school because

14   I still haven't received the final grades,

15   though I did receive "A"s on the final.

16        ATTORNEY DEFILIPPIS:   Does the 81 units

17   count those two courses?

18        INMATE JAY:   Yes, those two courses, yes.

19        DEPUTY COMMISSIONER SMITH:   Should you

20   not receive a grant of a date today, and we are

21   certainly a long way from making that decision,

22   do you plan on continuing in this curriculum?

23        INMATE JAY:   Oh, absolutely.

24   Absolutely.   I'm going to work until I get my

25   degree.   Absolutely.

26        DEPUTY COMMISSIONER SMITH:   And if you

27   are granted a date, then you would continue to -

52

1    — you would enroll some program out in the

2    community to continue working towards the

3    degree.  Is that correct?

4         **INMATE JAY:**  Absolutely, yes, that's my

5    plan.

6         **DEPUTY COMMISSIONER SMITH:**  Okay.

7         **INMATE JAY:**  Definitely.

8         **ATTORNEY DEFILIPPIS:**  Those were taken in

9    the Northridge school.

10        **DEPUTY COMMISSIONER SMITH:**  Northridge.

11        **ATTORNEY DEFILIPPIS:**  CSU, Northridge.

12        **INMATE JAY:**  CSUN, which is located near

13   my parents' home, not too far.

14        **DEPUTY COMMISSIONER SMITH:**  There's been

15   an extensive and very positive list of things

16   that you have been involved in since your last

17   Hearing.  Before I go to the psychological

18   evaluation, are there any other activities that

19   you have been involved in that I have not

20   addressed?

21        **INMATE JAY:**  I'm looking at my list here,

22   because I had an institutional programming and

23   you have really done a thorough job, so, I think

24   we have covered everything up to this point,

25   that I can think of.

26        **DEPUTY COMMISSIONER SMITH:**  Certainly

27   during the course of this Hearing if you or

53

1   Counsel something comes to mind that I did not

2   cover, we will give you every opportunity to

3   bring it up so that it's on the record.

4           INMATE JAY:   Thank you.

5           DEPUTY COMMISSIONER SMITH:   The

6   psychological evaluation is dated December 2005,

7   prepared by Dr. Macomber, M-A-C-O-M-B-E-R.   It

8   is a positive evaluation.   And I'm going to

9   identify what I consider just to be some of the

10  highlights in the evaluation.   And if you or

11  Mr. DeFilippis want to make any comments or

12  reference any other parts of the evaluation for

13  the record that I have not or will not do, I

14  will certainly give you an opportunity to do

15  that as well.

16          INMATE JAY:   Thank you.

17          DEPUTY COMMISSIONER SMITH:   On the first

18  page or actually the second page, the doctor

19  writes that the result of the mental status

20  examination shows you to be within the normal

21  limits, that intellectually bright, you are

22  functioning in the high average ranges

23  intellectually, your judgment is sound and you

24  have good self-awareness and insight, you have a

25  GAF score of 90, which is extremely high.   And

26  under the review of the life-crime the doctor

27  writes:   "That in addressing the question of

54

1    causative factors, the Youth Authority

2    evaluation of '87 lends some insight into your

3    functioning at the time of the commitment

4    offense.  And quoting a prior psychological

5    evaluation, you were described as a passive

6    dependent personality and there was evidence of

7    a chronic childhood depression, which increased

8    the demands of adolescence and developed a

9    strong dependence on drugs, which combined in a

10   spiraling psychiatric deterioration, resulting

11   in an apathetic, severely depressed, severely

12   drug dependent and non-functioning adolescent.

13   And clearly drugs was a significant precipitant

14   with regard to your behavior."  And the doctor

15   goes on to write:  "At the time of the

16   commitment offense, you were severely

17   intoxicated on LSD, which you had taken for the

18   first time in conjunction with Hashees and

19   alcohol.  And the prior psychiatrist noted that

20   you were very remorseful for the offense and

21   that you are now very anti-drug and would like

22   to spend your life trying to help other people

23   get off drugs."  Towards the bottom of that

24   page, the doctor writes:  "When questioned by

25   Dr. Macomber, you stated that at that time in

26   your life, as an 18 year-old, due to the chronic

27   drug use that you couldn't think right and that

55

1    you had no appreciation for life's values.

2    Since that time you have accepted responsibility

3    for your participation in the offense, and that

4    you understand that if it were not for your role

5    in the crime that the crime probably would not

6    have happened."  Going on to the next page, the

7    doctor writes that:  "You have accepted

8    responsibility for the offense.  And stated that

9    if you had not participated in it that it might

10   not have happened and that your feelings," and

11   I'm thinking that's supposed to be of remorse

12   not or remorse --

13          **ATTORNEY DEFILIPPIS:**  I think you are

14   right.

15          **DEPUTY COMMISSIONER SMITH:**  "appear to be

16   sincere and genuine, and that you were very

17   happy with the victim's parents forgiving you

18   and you do correspond with them regularly."

19   Under assessment of dangerousness, the doctor

20   writes:  "That in considering your potential for

21   dangerous behavior in the institution, that you

22   have remained entirely disciplinary free.  You

23   have demonstrated strong pro-social values.

24   There are no anti-social values or thinking in

25   this case.  And your violence potential is

26   definitely below average in comparison to other

27   inmates."  With regard to your potential for

56

1   dangerousness in the community, he discusses an

2   exam a measurement that was administered to you.

3   And the doctor indicates that as a result of

4   that exam, that "of a 100 men that were to be

5   released on parole, that you success on parole

6   would be estimated to be better than 90 percent

7   --"

8        INMATE JAY:  Thank you.

9        DEPUTY COMMISSIONER SMITH:  -- 'of that

10  total 100 population."

11       ATTORNEY DEFILIPPIS:  Ninety-eight

12  percent.

13       DEPUTY COMMISSIONER SMITH:  What did I

14  say?  I'm sorry.

15       ATTORNEY DEFILIPPIS:  Ninety.

16       DEPUTY COMMISSIONER SMITH:  Oh, I

17  apologize.  Ninety-eight percent.  Thank you for

18  clarification, Counsel.  "This indicates an

19  extremely low risk level, and as a result your

20  potential for violence is no more than the

21  average citizen in the community, and it is

22  probably less than the average citizen in the

23  community due to your life experiences."  A

24  comment simply for the record is:  I was

25  tracking pretty well with Dr. Macomber until he

26  got to the last sentence.  I certainly don't

27  have quarrel with his conclusion that your

57

1    potential for violence is no more than the

2    average citizen in the community, with an

3    asterisk, obviously, most people in the

4    community have not been committed to a life-

5    crime.  But to indicate that your potential for

6    violence is less than the average citizen, I

7    personally have some difficulty with and in no

8    way when we get to discussing your potential

9    being granted will I use that as a negative.

10   But I just wanted to comment on that for the

11   record.

12           ATTORNEY DEFILIPPIS:  It's actually just,

13   I think, a philosophical approach that if you

14   had done something like and rehabilitated

15   yourself after that, that you recognize the

16   potential within yourself and probably will

17   exercise more controls than the average citizen

18   would.  And therefore, the theory is that you

19   would be less likely to commit an offense than

20   the average citizen.

21           DEPUTY COMMISSIONER SMITH:  If

22   Dr. Macomber were here, he and I could have

23   quite a detailed conversation about that

24   conclusion.  Which is neither here nor there.

25   It's certainly a very positive evaluation.  But

26   since I'm sitting on this site of the table,

27   when I see that kind of a conclusion I will

58

1    comment.  With regard to your current maturity

2    and coming of age, and with the experience that

3    you have shown and the adjustment that you have

4    made, the doctor concludes that there are no

5    significant risk factors at this time, and that

6    the prognosis for successful adjustment in the

7    community is excellent in your case.  And with

8    that, do you do not have comments or additions

9    regarding the evaluation report or the

10   adjustment, I'll return to Commissioner

11   St.Julien.

12        INMATE JAY:  If I may at this time, since

13   I recovered this, you told me to give this

14   paperwork to you guys.  I'm going to have my

15   attorney do so.

16        DEPUTY COMMISSIONER SMITH:  Actually,

17   Counsel, if you could hand it to one of the --

18   okay, I can get it.

19        PRESIDING COMMISSIONER ST.JULIEN:  Okay.

20        DEPUTY COMMISSIONER SMITH:  And we will

21   review this as well.

22        PRESIDING COMMISSIONER ST.JULIEN:  I was

23   looking for -- and maybe I just didn't find it,

24   but I was looking for -- tell me about what

25   happened to Lora?

26        INMATE JAY:  To who?

27        PRESIDING COMMISSIONER ST.JULIEN:  Lora.

59

1    Is there a letter from her this years.

2        INMATE JAY:  No.  And she really is --

3    it's nothing to do with any unwavering support

4    or anything like that, she lost track of time,

5    she has three kids and she is a single mother --

6        PRESIDING COMMISSIONER ST.JULIEN:  So,

7    are you still engaged?

8        INMATE JAY:  We're still very much a part

9    of each other's life and love each other

10   greatly.

11       PRESIDING COMMISSIONER ST.JULIEN:  Okay,

12   so you --

13       INMATE JAY:  Absolutely.  In fact, her

14   and the kids just came to see me two weeks ago.

15       PRESIDING COMMISSIONER ST.JULIEN:  So, do

16   you plan to embark on a relationship with her?

17       INMATE JAY:  Well, --

18       PRESIDING COMMISSIONER ST.JULIEN:  Or

19   have?

20       INMATE JAY:  -- we are always going to be

21   significant to one another.

22       PRESIDING COMMISSIONER ST.JULIEN:  Uh

23   huh.

24       INMATE JAY:  And when I get out --

25       PRESIDING COMMISSIONER ST.JULIEN:  Uh

26   huh.

27       INMATE JAY:  We'll see.  We'll see what

60

1  happens.  And we are both on the same page as

2  far as that's concerned.  We don't want to

3  promise something -- she doesn't want me to be

4  responsible for her kids as soon as I get out.

5  And I don't want her to marry me in here --

6      PRESIDING COMMISSIONER ST.JULIEN:  Uh

7  huh.

8      INMATE JAY:  -- given my sentence --

9      PRESIDING COMMISSIONER ST.JULIEN:  Uh

10  huh.

11      INMATE JAY:  -- and limitations.  So, we

12  definitely have talked about that, our future

13  together.  And we are hoping that that could be

14  a possibility.

15      PRESIDING COMMISSIONER ST.JULIEN:  Okay.

16  And you have known each other since you were

17  kids?

18      INMATE JAY:  Yes.  We were in Youth

19  Groups together at St. Ander [phonetic] and

20  St. Charles.  We met when we were about 12 years

21  of age.  We are the same age today.

22      PRESIDING COMMISSIONER ST.JULIEN:  Okay.

23  And what about Bishop Bruno [phonetic]?

24      INMATE JAY:  Bishop Bruno.  Yeah, he is

25  very much in my corner.  A very, very wonderful

26  man.

27      PRESIDING COMMISSIONER ST.JULIEN:  So, do

61

1    you still plan to work there?

2           INMATE JAY:  Actually, that's --

3           PRESIDING COMMISSIONER ST.JULIEN:  Or did

4    you --

5           INMATE JAY:  -- my secondary job.  One

6    thing that I didn't cover and I don't know why I

7    passed right over it on my plans.

8           PRESIDING COMMISSIONER ST.JULIEN:  Uh

9    huh.

10          INMATE JAY:  Was work.  And the primary

11   work is working with Kreiger.

12          PRESIDING COMMISSIONER ST.JULIEN:  Uh

13   huh.

14          INMATE JAY:  With my friends.

15          PRESIDING COMMISSIONER ST.JULIEN:  Uh

16   huh.

17          INMATE JAY:  Melissa and Jerry.  And my

18   secondary -- because it is more feasible, given

19   where I'm going to live, the transportation and

20   what they're offering, you know, given my skills

21   that I have learned.  And then my secondary job,

22   if that doesn't work out for whatever reason,

23   Bishop Bruno's offer is still good.

24          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

25   And I know that you have done a tremendous

26   amount and you have a set and firm career path

27   and all that, but just for the record, have you

62

1   resisted obtaining a CDC vocation?

2          INMATE JAY:  No.  In fact, I have one.

3          PRESIDING COMMISSIONER ST.JULIEN:  You

4   do?

5          INMATE JAY:  Well, I --

6          PRESIDING COMMISSIONER ST.JULIEN:  You

7   know, because it seems like in the past

8   transcripts they talked to about that.

9          INMATE JAY:  They did and then at the

10  last Hearing --

11         PRESIDING COMMISSIONER ST.JULIEN:  Uh

12  huh.

13         INMATE JAY:  -- they recognized that I

14  had two vocations.  One was as a production

15  coordinator, which I received certification --

16         PRESIDING COMMISSIONER ST.JULIEN:  Oh, so

17  was that -- okay.  So, was that something that

18  didn't stand out initially?

19         INMATE JAY:  Yeah, well, no.  I had

20  achieved that not two Hearing ago, but for the

21  last Hearing.

22         PRESIDING COMMISSIONER ST.JULIEN:  Uh

23  huh.

24         INMATE JAY:  I had just --

25         PRESIDING COMMISSIONER ST.JULIEN:  Oh,

26  okay.

27         INMATE JAY:  -- achieved that.  So, two

63

1    Hearings ago and prior to that I didn't have

2    that.

3            PRESIDING COMMISSIONER ST.JULIEN:   Okay,

4    because I noticed that they were saying …

5            INMATE JAY:   Right.   And they did and

6    that's why at the last Hearing they did

7    recognize that and my forklift driver's license,

8    which I achieved as being a vocation or a job

9    skill, I guess.   That's what the Board Panel

10   said.   And they said to continue in that

11   vocation or upgrading that in their decision.

12           PRESIDING COMMISSIONER ST.JULIEN:   Okay.

13   Do you have any question, Commissioner?

14           DEPUTY COMMISSIONER SMITH:   No, I don't.

15           PRESIDING COMMISSIONER ST.JULIEN:   Okay.

16   Mr. Turley, do you have any questions?

17           DEPUTY DISTRICT ATTORNEY TURLEY:   Given

18   the inmates stated position of not discussing

19   the life-crime, I have no questions.

20           PRESIDING COMMISSIONER ST.JULIEN:

21   Mr. DeFilippis.

22           ATTORNEY DEFILIPPIS:   I think that we

23   have pretty much covered everything.

24           PRESIDING COMMISSIONER ST.JULIEN:   Okay.

25   I have a question before we go to closing

26   statements.

27           INMATE JAY:   Also, will I have a chance

64

1   to say --

2          PRESIDING COMMISSIONER ST.JULIEN:   Yes,

3   you get a chance.

4          INMATE JAY:   All right.

5          PRESIDING COMMISSIONER ST.JULIEN:   You

6   know, you came from a good family, suburban,

7   middleclass, you know, no alcoholic parents or

8   visible signs of trauma and problems, and you

9   get caught in this life.  And, you know, you

10  mentioned, you know, you're in here with

11  criminals.  I mean, I'm sure you know that there

12  are people in here who some of them they just

13  really didn't have a chance, okay.  And they

14  just kind of did what they saw going on around

15  them and what they usually do.  You had a lot of

16  opportunities, chances, you fell into, you know,

17  you went the wrong way.  How do we get over

18  that?  There was no reason for you to be a part

19  of this crime.

20         INMATE JAY:   Well, you said a keyword,

21  and there was no visible reason.  A lot of times

22  other inmates, since you mentioned it, that come

23  from obvious backgrounds that are poor -

24         PRESIDING COMMISSIONER ST.JULIEN:   Yeah,

25  there is no excuse for them either.  It's --

26         INMATE JAY:   No, no, no.  Gang infested,

27  but it is obvious.  It is more obvious.

65

1          **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.

2          **INMATE JAY:**  It is more apparent.

3          **PRESIDING COMMISSIONER ST.JULIEN:**  Yeah.

4          **INMATE JAY:**  Whereas, somebody who comes

5    from the middleclass family, you know, I have a

6    roof over my head, I had clothes, I had food on

7    the table, all the necessities.  And from the

8    outside looking in, I've heard a lot of my

9    family and my friends tell me, "Man, I really

10   thought that you guys had like the American

11   family."

12         **PRESIDING COMMISSIONER ST.JULIEN:**  Uh

13   huh.

14         **INMATE JAY:**  But on the inside we were

15   dysfunctional in the sense that we didn't act

16   like a family.  I had a mom, I had a dad, I had

17   a brother and a sister, and that's what

18   constituted our family.  But as far as

19   communicating -- knowing how if we had a problem

20   not to internalize it but to, you know, let it

21   out, because what happens is, is when people --

22   when I internalized my problems it became worse,

23   you know, they didn't go away, so I began

24   fooling myself from an early age.  And part of

25   that stems from the lack of communication that

26   and my mom being away played a vital role in

27   that, and my dad being a perfectionist, you

66

1    know, demanding things.  And that pressure, I

2    think, all those things added up to allowing me

3    to make the decision that I did, and they were

4    awful decisions, they were terrible decisions.

5            PRESIDING COMMISSIONER ST.JULIEN:  Okay,

6    let's say you go out and you have this

7    overwhelming support and two months, three

8    months down the road, you know, people are like,

9    "Okay, well, you know I'm busy with this and

10   busy with that," and, you know, your parents are

11   overjoyed but their doing their own thing and

12   they're used to being on their own.  And, you

13   know, you're starting to feel alone again.

14           INMATE JAY:  Sure.

15           PRESIDING COMMISSIONER ST.JULIEN:  What

16   do you do?

17           INMATE JAY:  Well, I've felt alone for

18   many years in here.  And I've learned that I

19   have to be happy with myself and alone with

20   myself before I can be happy with others.  And I

21   am today.  I am at peace with who I am.  I love

22   myself today and who I am today.  I am a caring

23   --

24           PRESIDING COMMISSIONER ST.JULIEN:  How

25   have you forgiven yourself?

26           INMATE JAY:  How?

27           PRESIDING COMMISSIONER ST.JULIEN:  Uh

67

1   huh.

2       **INMATE JAY:**  Early on, that was one of my

3   biggest difficulties.  And I had a spiritual

4   leader by the name of Father Jess [phonetic]

5   Taylor [phonetic], who used to come in and see

6   me, I knew him from the streets, he was my

7   Minister.  And he would come in and see me.  And

8   one day he asked me a question, he said:

9   "Matthew, what is wrong?  What is your problem,

10  you just look so, besides the obvious, but you

11  look terrible."  And I said, I said, "I don't

12  know if God's ever going to forgive me or my

13  family."  He said, "God has already forgiven

14  you, but you must forgive yourself."  He goes,

15  "As far as your family goes, that's something

16  you need to discuss with them."  But he said,

17  "But you have to forgive yourself."  And from

18  that day on he helped me to instill that in me.

19  And surely, certainly the forgiveness that I

20  received from the family was a tremendous gift

21  and a weight that they gave me, a weight that

22  they lifted off that allowed me to continue to

23  grow in the matter that I have shown you through

24  the programming, that's I've tried to show you.

25  One last thing that I would like to say, because

26  I know that it is a major concern:  You know,

27  these support letters, I don't want you just to

68

1    see what they are offering.  I want you to --
2    because it's hard for you, I could see -- I've
3    tried to put myself in your position, and I
4    know, you know, we're coming in front of you
5    with these crimes and stuff, and you have the
6    responsibility of letting me back out there.
7    And one thing that I want to ask you:  Is that
8    when you read these support letters is that you
9    look at how -- not just what they are offering
10   me, but who they see me to be.  Not what I'm
11   telling you, but what they are telling you.
12   Along with what the evidence says, and how I am
13   changed.  You know, and how I do want to help.
14   I don't want to destroy.  I don't want to take;
15   I want to give.
16         PRESIDING COMMISSIONER ST.JULIEN:  Okay,
17   thank you very much.  Mr. Turley, closing
18   statement, please.
19         DEPUTY DISTRICT ATTORNEY TURLEY:  Yes,
20   thank you.  As was pointed out at the very
21   beginning in the reading of the Statement of
22   Facts and all of the facts of the crime that are
23   revealed in the file here, this is a virtually
24   unimaginable horrific crime.  A person holding
25   down an adult while that person is strangled
26   over a 15-minute period, helping haul the body
27   around, making a trip to the store to obtain

69

1    poison, knowing that that poison is going to be

2    attempted to be given to an eight-year old

3    child.  Helping haul the body of the adult and

4    helping take the child to the location, where

5    the person knows that they are going to try to

6    destroy the evidence of their crimes by burning

7    the body of the victim and binding an eight-year

8    old child, who for whatever excuse, might have

9    been given for the murder of the adult, did

10   nothing other than simply walk into the room

11   when the crime was taking place.  Taking that

12   child, binding him, watching him be put in the

13   car, throw gasoline and push the car over the

14   cliff, assuming that both people were going to

15   be burned beyond recognition.  Not just a made

16   for T.V. movie, it is just bone chilling to

17   think that someone could participate in all

18   that.  Beyond that, though the gravity of the

19   offense itself gives every reason to consider

20   whether at this time, even after this amount of

21   time, just simply based on the gravity of the

22   offense alone, whether or not this inmate should

23   be released on parole.  The inmate had some

24   difficulties with his parents.  His dad was a

25   perfectionist, his mother was studying in

26   Seminary on the way to being Ordained and became

27   a Minister.  They didn't communicate with him

70

1   real well.  That's a lot more than most of the

2   folks we see in here got.  Probably more than

3   some of us sitting here in this room got.

4   Educated people, concerned people, ,people who

5   had a mission in their life, people who had a

6   concern for their children, and from everything

7   that we see here went beyond providing food,

8   clothing and shelter, but attempted to provide a

9   stable, healthy, loving environment, which their

10  children could grow up.  And yet that support

11  was insufficient to prevent the inmate from

12  embarking on a life of crime.  His 39 letters of

13  support, according to his attorney, I didn't

14  count them, are here today.  At the time he was

15  sentenced, the Judge indicated in the Sentencing

16  Hearing that he had 44 letters of support.  So,

17  in addition to the support of his parents, he

18  had the support of a whole community, lots of

19  people who were around this individual, who were

20  apparently believed that they were in a position

21  to provide with support prior to his committing

22  this offense, and he chose to ignore the

23  assistance of his parents.  He chose to ignore

24  the assistance of these 44 people who wrote

25  letters of support at that time.  He chose

26  instead to go his own way.  It is hard to

27  imagine why someone would do that.  The psych

71

1  report certainly is positive.  However, all of

2  the psych report appears to be based upon the

3  psychologist believe, and I assume he gained his

4  assumption or belief from the statements of the

5  inmate, that at the time of this crime the

6  inmate was under sever intoxication.  I think

7  that conclusion is questionable at best.  The

8  inmate was capable of walking, capable of

9  talking, capable of assisting and holding an

10  adult, capable of driving, capable of going to

11  the store, capable of finding an item, capable

12  of bringing it back.  Doing all the things that

13  he did over a rather extended period of time.

14  And I'm not sure what the good doctor's

15  definition of sever intoxication is, but under

16  most circumstances and conventional use, being

17  able to conduct oneself in that manner would

18  suggest that the person is not severely

19  intoxicated.  I'm certainly not going to

20  question that the inmate was a regular drug

21  abuser and a regular alcohol abuser.  But there

22  isn't anything in his conduct, which is the only

23  thing that we have to go on, and his conduct on

24  the day of this offense and at the time that

25  these crimes were committed, to suggest anything

26  other than the fact that the inmate was fully

27  aware of what was happening.  Fully aware of

72

1  what he was doing, and fully aware of the

2  consequences to the victim, particularly the

3  direct victims of the crime, the adult female

4  and the eight-year old boy.  He was fully aware

5  of the intended consequences to those people.

6  There is nothing at all to suggest that there

7  was any lack of awareness on his part.  Finally,

8  the inmate recognizes that there is a broad

9  range of victims that resulted from his

10  behavior.  And he does have the insight to

11  recognize that among the victims are

12  neighborhoods.  And as he suggested the

13  neighbors of the victim felt unsafe in their own

14  homes, "How could this happen on our street?

15  How could this happen on our block?  How could

16  this happen to someone to right here?  How could

17  this happen to a person from our high school?"

18  Neighbors of his own family, can you imagine the

19  boy who lived next-door engaging in this kind of

20  behavior?  Can you imagine the person who lived

21  down the street doing this?  Well, if he is

22  given parole, he is going to have new neighbors

23  and they are going to be confronted with the

24  reality that next-door to them or down the

25  street from them or someplace close to them,

26  there's a person who engaged in horrific crimes

27  that this person has.  And at this point in

73

1    time, I'm not prepared to reach a conclusion

2    that those new neighbors don't need protection.

3    That those new potential neighbors would be

4    safe.  That those new neighbors could rest

5    assured that this man is not once again going to

6    feel lonely and depressed.  That this man is not

7    once again going to be lead by other who may be

8    stronger than him emotionally or

9    psychologically, or for whatever reason that

10   this man once more isn't going to be enticed,

11   directed, or fallen to this kind of violent

12   behavior.  And on behalf of those neighbors and

13   the People of Los Angeles County we would

14   recommend denial of parole at this time.  Thank

15   you.

16          **PRESIDING COMMISSIONER ST.JULIEN:**  Thank

17   you.  Mr. DeFilippis.

18          **ATTORNEY DEFILIPPIS:**  Thank you.  It is

19   always interesting listening to the District

20   Attorney give an assessment of the case.  When I

21   look back the case and think about how this went

22   through the Court system and one of the reasons

23   that I provided you with some declarations that

24   had been submitted, and I did that for a fairly

25   specific reason.  If you will look at the last

26   one, Exhibit E, it's the declaration of Elliot

27   Stanford, and he talks about the expectations

74

1    that the District Attorney had at the time of

2    the conviction in this case.  That Mr. Jay would

3    spend approximately seven to ten years in

4    custody.  And so, at the time that this offense

5    occurred, the District Attorney's Office, the

6    same District Attorney's Office that Counsel is

7    here from, agreed to a plea agreement where they

8    believed Mr. Jay would only spend seven to ten

9    years in custody.  And that was a satisfactory

10   resolution of the case from their standpoint.

11   And we talked a lot about the circumstances of

12   this offense, and I will not in any way attempt

13   to diminish the circumstances of this crime, but

14   I think that it does have to be put into some

15   perspective.  And I don't know exactly how in

16   depth you looked at the legal background of this

17   case, but the co-defendant, Torran Meier --

18   there was a lot of different evaluations that

19   occurred in this case.  As you may be aware,

20   Mr. Meier actually went to trial on the case.

21   And again, the same District Attorney's Office

22   prosecuted Mr. Meier.  Now, remember that

23   Mr. Meier was the mastermind of this offense.

24   It was his mother.  It was an alleged pattern of

25   abuse by her of him that lead him to commit the

26   offense, that lead him to solicited Mr. Jay and

27   Parker to participate.  And he ended up

75

1    convicted of manslaughter, and attempted

2    voluntary manslaughter as to Rory.  He was given

3    a 12 sentence and has served that and has been

4    out since, I think it was around 1990.  And has

5    been out of custody -- or the early '90s, and

6    has been out of custody ever since then.  In

7    those evaluations that were done back then --

8         **DEPUTY COMMISSIONER SMITH:**  Excuse me,

9    Counsel.  So that I don't break or interrupt you

10   right at a major point, let me go ahead --

11              (Tape 1, Side B, Ends)

12              (Tape 2, Side A, Begins)

13        **DEPUTY COMMISSIONER SMITH:**  Go ahead.

14        **ATTORNEY DEFILIPPIS:**  Let me just step

15   back a moment.  One of the things that I think

16   is a very crucial fact in this case is that

17   first of all you are dealing with a youngster,

18   Matthew Jay was barely 18 years old in probably

19   just about every way conceivable.  He didn't

20   have the maturity level of even an 18 year old

21   even at the time.  But what we do know, and

22   Counsel suggests that there may be something a

23   rye about the intoxication issue, I think all

24   you have to do is look back at what happened a

25   year before this crime.  Torran Meier came to

26   Mr. Jay one year prior to this offense and

27   attempted to talk him into helping him kill his

76

1    mother.  Mr. Jay went to the police and he

2    notified them that this had occurred.  The

3    police at the time didn't do anything.  Mr. Jay

4    then went about his business.  But what happened

5    over the course of that year was very

6    significant, because that's the year that

7    Mr. Jay severely deteriorated.  He dropped out

8    of school.  He started doing very poorly

9    basically in life.  He was described in the

10    probation report as his mind was fried, he was

11    like a zombie, he was out of his mind, he was

12    drug-dazed.  These are all descriptors that are

13    used in the probation report talking about the

14    way that Mr. Jay was that relevant period of

15    time when he made the decision to involve

16    himself in this offense.  At the same time, the

17    co-defendant Torran Meier was described as,

18    although younger, was the influential one; he

19    was the one that had the power.  He was

20    described as being influential, not only Mr. Jay

21    but over the even older Mr. Parker.  He was

22    described by the probation officer, and again

23    this based on assessments that were done, I

24    believe it was at the Youth Authority of

25    Mr. Meier, that he was, quote, "a rather

26    imposing figure, quite sophisticated, poised and

27    apparently persuasive, always calm and seemed in

77

1    command of everything, seemed and looked much

2    older than his years."  These are the

3    descriptors that the probation officer is using

4    in the report to describe Mr. Meier.  The reason

5    that I bring those things up is not to diminish

6    this offense and I don't want to diminish this

7    offense, it is what it is, but it will never

8    change.  What I want you to look at when you are

9    looking at this offense, is the conduct of

10   Mr. Jay.  And a lot of times the facts in this

11   case somewhat get blurred together; it's all

12   three made these decisions and all three did

13   this and all three did that.  And that wasn't

14   how it actually happened.  The decisions that

15   were made were decisions made by Mr. Meier and

16   them him influencing the others to participate

17   in those decisions.  Then there were things like

18   -- after the homicide, Mr. Jay went and made the

19   purchase of the rat poison and came back to the

20   premises, but at that point he left.  He was no

21   longer there at the time that Torran Meier made

22   the attempts to kill Rory.  He had gone back to

23   his home.  By all descriptors, what he had done

24   was that he went home and essentially collapsed

25   on the floor and was crying most of the time

26   that he was there.  The other two put the body

27   into the trunk during that period of time, and

78

1  drove over to Mr. Jay's house and had Mr. Jay

2  follow them in a separate vehicle.  At that time

3  he was not aware that Rory was in car.  So, when

4  Counsel describes this, you know, throwing

5  gasoline and how could somebody participate in

6  that.  That's conduct that is attributable to

7  Mr. Parker and Mr. Meier, who were present in

8  that car.  It is not conduct that is

9  attributable to Mr. Jay.  And again, this does

10  not diminish the overall offense, but at the

11  same time you need to look at his participation

12  and what he was doing.  What he was doing was

13  following these guys to a location where what

14  was going to happen was the decision of

15  Mr. Meier and then he drove them away from the

16  scene of that.  That being said, then we have to

17  somewhat fast forward to today.  When you are

18  looking at this offense, and you are looking at

19  suitability, the determining factor is going to

20  be:  Does Mr. Jay at this time present an

21  unreasonable risk or harm to society if he is

22  released on parole.  The problem with continuing

23  to rely upon the commitment offense is that what

24  it does is that it ignores how out of character

25  this particular offense was for Mr. Jay.  This

26  was not something that was typical of his life.

27  And if you go back to the psychological report

79

1    that was prepared back in 1986 by Dr. Shaftner

2    [phonetic], he talks about the four factors that

3    lead to the offense:  dependency, depression,

4    drugs, and circumstances.  There also have been

5    submitted two reports of Dr. Kennedy, in 1994

6    and in 1999.  And if you recall, Dr. Kennedy was

7    the Counselor that came from, I think, the San

8    Diego area and actually was doing regular on-

9    going therapy with Mr. Jay over the course of

10   1990 to 1999.  She was doing two hours a month

11   for the time that he was at Donovan and

12   Tehachapi and up here at Soledad, it was about

13   once for two hours every other month.  She talks

14   about each of those four issues and she talks

15   about he has gone about correcting himself under

16   those conditions so that those are no longer

17   issues in his life.  So, when you look at where

18   he has come, you will see that you have a young

19   man that -- well, I think that probably the best

20   descriptor that I've ever heard of is from the

21   United States Supreme Court and I will just read

22   this to you.  "Three general differences between

23   juveniles under 18 and adults demonstrate that

24   the juvenile offenders can, with reliability, be

25   classified as the worst offenders.  First, as

26   any parent knows and as the Scientific and

27   Sociological Studies responded in his Meecee

80

1    [phonetic] cite tend to confirm, a lack of

2    maturity and an under developed sense of

3    responsibility are found in youth more often

4    than in adults and are more understandable among

5    the young.  These qualities often result in

6    impetuous and ill-considered actions and

7    decisions.  The secondary difference is that the

8    juveniles are more vulnerable or susceptible to

9    negative influences and outside pressures,

10   including peer pressure.  The third broad

11   difference is the character of the juvenile is

12   not as well formed as that of an adult.  The

13   personality traits of juveniles are more

14   transitory and less fixed.  These difference

15   render suspect any conclusion that a juvenile

16   falls among the worst offenders."  The Supreme

17   Court then went on to say:  "The qualities that

18   distinguish juveniles from adults do not

19   disappear when an individual turns 18."  Those

20   issues, I think, ring very clear in this case.

21   They talk about these three things, the lack of

22   maturity and under developed sense of

23   responsibility, and all of the psychologist

24   talked about that at the time of the offense.

25   The vulnerability or susceptibility to negative

26   influences and peer pressures.  Look at what was

27   happening to him at the time and the peer

81

1  pressure that was put on him by Torran Meier

2  getting him to get into this offense.  How his

3  drug induced state helped lead to that.  And

4  then look at today and what he has done in the

5  20 years that he has been in prison, subjected

6  to the same types of negative types of peer

7  influences that are going to be ramped in the

8  prison.  He has handled those appropriately.

9  So, you know that there is a difference in how

10  he responds to the negative peer influences.

11  And then the third broad difference that they

12  talked about is that his character is not as

13  well formed as that of an adult.  You know,

14  Counsel talked about the fact that he had the

15  same support back out on the streets.  That's

16  not true.  The potential for that support was

17  there and those people came and rallied around

18  him at the time of sentencing and showed up for

19  Court.  They provided letters to the Judge.  And

20  if you look at the Sentencing Transcript the

21  Judge actually chastised those people says,

22  "Where were you.  Where were you when the drug

23  abuse was going on.  What were you doing for

24  Mr. Jay."  Because the support was there in a

25  potentiality, it was not there in actuality.

26  Today that support is there in actuality.  But I

27  think more importantly is that the

82

1   transformation of Mr. Jay makes him a person

2   with or without support, he is going to be able

3   to walk the straight line.  He's going to be

4   able to make the decisions, which he does on a

5   day-to-day basis in here, to make the decisions

6   to stay away from drugs and alcohol.  It is not

7   a mystery that drugs and alcohol are ramped in

8   prison.  Any body that wants drugs in prison can

9   get them.  I mean I see 115s all the time for

10  people having marijuana, heroin, needles, you

11  name it, I don't think there's a substance that

12  I haven't seen a inmate get his hands on in

13  prison.  And Mr. Jay stays away from all of that

14  and completely stays out of trouble.  The things

15  that he has done in prison -- I have

16  represented, you know, some guys with some

17  pretty clean records, some guys that have really

18  turned themselves around in prison, and --

19  published decision on Edward Ramero [phonetic],

20  Earnest Smith, you know, these are John

21  Danenburg, these are guys that have really

22  walked the line in prison or like Eddie Ramero

23  started out poorly and really turned himself

24  around.  I haven't seen a program, maybe one or

25  two that come close, but pretty tough to match

26  the program that this young man has done in the

27  time that he has been in prison.  He has been

83

1    before the Board -- this is the seventh time.

2    The crime has been the impediment to parole on

3    every occasion.  That crime is never going to

4    change.  His involvement differs than the

5    involvement of the two co-defendants.  If you

6    look that the Sentencing Transcript the Judge

7    makes some evaluations of the evidence.  He

8    actually makes some ruling.  And as this Board

9    says at the beginning of every Hearing, you are

10   bound by the decisions the Court makes, and the

11   Court made a determination that the factors and

12   aggravation do not outweigh the factors in

13   mitigation, and the factors in mitigation do not

14   outweigh the factor in aggravation.  And what

15   that Judge concluded was that this young man,

16   with his involvement, with all the

17   circumstances, that this was not an aggravated

18   case.  And I think that is how this should be

19   treated.  The District Attorney at the time that

20   this case was settled agreed to this being a

21   second-degree murder, agreed to this being an

22   offense that would cause this young man to be

23   locked up for seven to ten years and was

24   acceptable with that; that was acceptable to the

25   District Attorney's Office at the time that the

26   plea was entered.  And that should continue to

27   be acceptable to the District Attorney's Office.

84

1   Unfortunately, they don't come in here and say

2   that today.  But that was there position at the

3   time of the resolution of this case and it

4   shouldn't change.  The only thing that has

5   changed since that time is Mr. Jay.  And

6   everything that he has done has shown the

7   positive changes and I think that everything

8   that he has done has shown you that when he goes

9   out there he is going to be a success in the

10  community.  Two things that I think you should

11  look at, let me get the names, was Paul

12  Mercoglianos, M-E-R-C-O-G-L-I-A-N-O-S, and Alex

13  Mouton, M-O-U-T-O-N.  These were two youngsters

14  that -- one is a cousin and, you know, these are

15  two youngsters that basically what happened is

16  that Mr. Jay talked to them at a point in time

17  when they were going down the wrong path and

18  successfully turned both of these youngsters

19  around.  So, he is somebody who wants to give

20  back to the community.  And the desires that he

21  has are genuine.  These are not, you know, pie-

22  in-the-sky, "let me just tell you what you want

23  to hear."  This is a young man that wants to

24  give back to the community and I think he has

25  already been doing.  And the time that he has

26  been in here he has been doing that in how he

27  handles his relationships with people out in the

85

1   community.  He has turned a situation, you know,

2   where he didn't really have relationship, I

3   think, before he -- I don't think you can truly

4   say -- it like he says, "They didn't really have

5   a family.  They had something that looked like a

6   family."  But what he has done is that he has

7   participated with the rest of his siblings and

8   his parents in putting that back into a family

9   and creating a strong bond of community support

10  that rests behind him.  He will keep doing that

11  when he gets out in the streets.  This is going

12  to be one of your success stories.  And I would

13  urge you to give him a parole date at this time.

14        **DEPUTY COMMISSIONER SMITH:**  Thank you.

15        **PRESIDING COMMISSIONER ST.JULIEN:**  Thank

16  you.  Mr. Jay --

17        **DEPUTY DISTRICT ATTORNEY TURLEY:**  If I

18  may Commissioner.

19        **PRESIDING COMMISSIONER ST.JULIEN:**  Okay.

20        **DEPUTY DISTRICT ATTORNEY TURLEY:**  Counsel

21  suggested a disparity in crime charging and

22  sentencing between the inmate and Mr. Meier --

23        **ATTORNEY DEFILIPPIS:**  Excuse me.  The

24  District Attorney is here solely for the purpose

25  of stating the position of the District

26  Attorney's Office on parole.  It is not his job

27  to be making objections.  And there is no

86

1   business of him responding to anything that has

2   been said.

3          PRESIDING COMMISSIONER ST.JULIEN:  Were

4   you going to make an objection?

5          DEPUTY DISTRICT ATTORNEY TURLEY:  No.  I

6   wanted to elaborate on the legal reasons for the

7   disparity between the crime charging and the

8   sentencing for Mr. Meier --

9          ATTORNEY DEFILIPPIS:  He also --

10         DEPUTY DISTRICT ATTORNEY TURLEY:  -- and

11  the inmate.

12         ATTORNEY DEFILIPPIS:  He also may not

13  give legal advice to the Board.  This is highly

14  inappropriate.

15         PRESIDING COMMISSIONER ST.JULIEN:  Can we

16  -- I will just let Mr. Jay finish.

17         DEPUTY DISTRICT ATTORNEY TURLEY:  Okay,

18  that's fine.

19         PRESIDING COMMISSIONER ST.JULIEN:  Thank

20  you.

21         INMATE JAY:  I will keep this brief.  I

22  in no way want to impress upon you that I think

23  that I wasn't responsible for this crime.  My

24  participation allowed this crime to take place.

25  I am fully aware of that today.  I wasn't 20

26  years ago, but I am today.  There are key

27  factors that lead me to be involved in that

87

1  crime, in doing that crime, in participating.

2  And I believe that over the last 20 plus years

3  that I have addressed those issues with the help

4  of my family, loved ones, and the groups that

5  are offered.  That being depression.  I still

6  get depressed, but I know how to deal with it in

7  a constructive manner.  Drug use, I have been

8  clean and sober for over 20 years, my entire

9  incarceration.  In fact the night of the crime

10  is the last time that I was intoxicated.  I am -

11  - I want to say, I am avid in my sobriety.  I am

12  proud of my sobriety.  I love my sobriety.  It

13  allows me to be human, to be what I really know

14  that God intended me to be.  Mostly I want this

15  Panel, District Attorney, Attorney General to

16  know that the biggest difference between Matthew

17  as a teenager and Matthew as a full grown adult

18  is my belief and my relationship with Christ

19  today.  I knew about God, but I never had a

20  relationship with him.  It wasn't real it was

21  just something that I heard about.  And with

22  that as my foundation it has allowed me to grow

23  in ways that are apparent to the Board, you

24  know, with the groups and the chronos and the

25  schooling and the relationships that I have been

26  able to maintain, the new people that I've been

27  able to meet, the trouble that I've been able to

88

1  stay out of.  It is so different than who I was

2  back then.  I can never change what I did.  And

3  if the Panel continues to look at the crime as a

4  suitability factor I will never be released.  I

5  am only hoping and asking that you look at who I

6  am today and not who I was back then.  I do

7  recognize the severity of the crime.  And I will

8  close with that.

9        DEPUTY COMMISSIONER SMITH:  Thank you.

10       PRESIDING COMMISSIONER ST.JULIEN:  Thank

11  you, sir.  We will recess now for deliberations.

12                  R E C E S S

13                  --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

89

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER SMITH:  We're back on

4     record.  And everyone that was previously

5     identified is back in the Hearing room.

6          PRESIDING COMMISSIONER ST.JULIEN:  Okay.

7     Well, Mr. Jay, I want you to know that we really

8     struggled with this.  We really struggled with

9     trying to balance the commitment offense and

10    your significant and undeniable strides that you

11    have made since coming to prison.  However, the

12    severity of the crime and our duty to the public

13    interest, we are going to deny you parole today.

14    And we are going to deny you parole for one

15    year.  Okay.  I usually say at this point that

16    I'm going to read the decision and give you some

17    recommendations, but I don't have any

18    recommendations for you.  You are doing an

19    excellent program.  You are doing everything

20    that we could ever ask somebody to do, but, you

21    know, the crime and I think the opportunities,

22    at least for me what sticks in my mind, is the

23    opportunities that there were for you to stop,

24    and I counted seven.  So, you know, it really,

25    like I said, it is a very, very tough decision.

26    But nevertheless that's the decision we have for

27    MATTHEW JAY  D-55653   DECISION PAGE 1   1/26/06

90

1    you today.  And the Panel has reviewed all

2    information received from the public and relied

3    on the following circumstances in concluding

4    that the inmate is not yet suitable for parole

5    and would pose an unreasonable risk of danger to

6    society or a threat to public safety if released

7    from prison.  As I mentioned, the commitment

8    offense and there are multiple victims and one

9    was killed and one was attacked and, I imagine,

10   injured as well.  And these are the mother of

11   one of the crime partners, Shirley Rizk,

12   R-I-Z-K.  She was murdered and she was

13   strangled.  And her son, eight years old at the

14   time, Rory, R-O-R-Y, who, for all intents and

15   purposes, would be dead if he had not been able

16   to escape from the burning car.  And this

17   happened on October 15, 1985, and it was a plan

18   that was hatched by the son of Shirley Rizk,

19   Torran Meier.  And apparently he had had this

20   plan for some time.  And unfortunately for

21   Mr. Jay was able to entice Mr. Jay along with

22   another crime partner, Mr. Parker, into carrying

23   out the unfortunate and atrocious events that

24   lead to the death of his mother, Shirley.  And

25   the offense was carried out in a dispassionate

26   and calculate manner, in that they discussed how

27   **MATTHEW JAY  D-55653   DECISION PAGE 2   1/26/06**

91

1    they would kill the victim and proceeded to

2    strangle her and then the inmate actually went

3    to a store and bought rat poison to poison eight

4    year old Rory, who happened to come upon the

5    scene and witness his mother being strangled.

6    And the offense was carried out in a manner that

7    demonstrates a callous disregard for human

8    suffering, in that Mrs. Rizk was vulnerable, she

9    was in her own home, and I am assuming she was

10   unarmed and defenseless, and it took

11   approximately 15 minutes to strangle her.  So,

12   indeed, there must have been a significant

13   amount of terror and trauma going through her

14   mind at that time.  And these conclusions are

15   drawn from the Statement of Facts as they

16   appeared in the May 2005 Board Report.  And in

17   terms of a previous record, the inmate does not

18   have one.  He has admitted, which is all behind

19   him now, thank goodness, significant history of

20   narcotics and alcohol abuse.  Institutionally --

21   I have seen people refer to themselves before as

22   model inmates, I have rarely seen a model

23   inmate, but you are a model inmate.  Actually, I

24   have seen a couple of others, but I think they

25   are very few and far between, and I would put

26   you amongst those.  And the psychological

27   **MATTHEW JAY  D-55653   DECISION PAGE 3   1/26/06**

92

1   report, dated December 15th, authored by

2   Dr. Macomber, it says that you would be a low

3   risk.  So, it is a favorable report.  Your

4   parole plans are excellent.  You have viable

5   residential plans and numerous offers of

6   residence.  You even laid out your different

7   options for us.  You do have acceptable

8   employment plans and you do have marketable

9   skills.  We note that in response to opposition

10   from 3042 Notices, the District Attorney of Los

11   Angeles County has spoken today in opposition

12   and we did have a letter from the L.A. Sheriff's

13   Department.  And we make the following findings:

14   that the inmate continues to need self-help in

15   order to face, discuss, understand and cope with

16   stress in a non-destructive manner.  And

17   Commissioner Smith is going to give you

18   commendations, but I just would like to say --

19   well, I've already said it enough.  I know that

20   you are discouraged.  You can't help but being

21   discouraged.  And I know other Panels have said

22   this to you before, but your time is going to

23   come and it's going to be sooner rather than

24   later.  I would like to see you again.  Maybe

25   I'll see you again.  It's just, you know,

26   somebody has to get over this crime, okay, and

27   MATTHEW JAY D-55653   DECISION PAGE 4   1/26/06

93

1   obviously nobody has been able to do that yet.

2   Okay, but I'm confident that it will be in the

3   near future, okay.  Commissioner Smith.

4         **DEPUTY COMMISSIONER SMITH:**  Certainly in

5   terms of programming, Mr. Jay, you have done

6   just exceptionally well.  You have got 81

7   college units completed.  No disciplinaries.

8   Since your last Hearing you have had nine

9   laudatory chronos for your involvement in AA,

10  Anger Management, Impact Workshop, the Inmate

11  Employability Program, and an excellent current

12  work history.  And typically our recommendations

13  would be for an individual to do something that

14  they haven't done.  Our recommendation, as the

15  Commissioner indicated, was that you continue to

16  do what you are doing.  I know very well that

17  there's the impression at both this institution

18  as well as other institution that the Board

19  never gives a date anyway.  Your Counselor knows

20  that although there aren't many dates that are

21  given, there are dates that are given.  And

22  Mr. DeFilippis knows that I was on a Panel that

23  granted a date.  So, it does happen, and it does

24  happen with me sitting on the Panel as well as

25  with Commissioner St. Julien.  This was just

26  such a horrific crime, and not that your

27  **MATTHEW JAY  D-55653    DECISION PAGE 5    1/26/06**

94

1  positive changes are recent, because they are

2  certainly not, but we need to see them going on.

3  We need to be more comfortable with the overall

4  of who you are than we are right now.  And

5  you're right, the circumstances of the crime

6  will never change.  But speaking for the two of

7  us, we can get over that.  You know, that's a

8  hill that you can help us get over.  You know, I

9  can't speak for other Panels, but I would expect

10  that that being said it would apply to them as

11  well.  We certain went through extensive

12  conversations, you know, that we had during the

13  recess, this was not an easy decision by any

14  stretch of the imagination.  And very much we

15  felt that your extremely positive programming is

16  kind of pushing us in the back to get us up and

17  over that hill.  And that is not something that

18  I say frequently by any stretch of the

19  imagination.

20      **INMATE JAY:**  Okay.

21      **DEPUTY COMMISSIONER SMITH:**  So, I can

22  understand you being disappointed.  But do the

23  best you can.  Take heart in what you're doing.

24  Take heart and be encouraged that the path that

25  you are on, that you need to continue being on,

26  is going to show you that door.  Commissioner

27  **MATTHEW JAY  D-55653    DECISION PAGE 6    1/26/06**

95

1   St. Julien said:  "I have no doubt that that's

2   going to be the case.  And it's going to be the

3   case sooner than later."  And in every possible

4   way I concur with that.  I wish you well.

5   Counsel, thank you very much.

6        **ATTORNEY DEFILIPPIS:**  Thank you both.

7        **INMATE JAY:**  Thank you.

8        **DEPUTY DISTRICT ATTORNEY TURLEY:**

9   Counsel, thank you.

10        **ATTORNEY DEFILIPPIS:**  Thank you.

11        **PRESIDING COMMISSIONER ST.JULIEN:**  I will

12   adjourn the Hearing and it is 11:40 A.M.

13        **INMATE JAY:**  Thank you.

14                    oOo--

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR          MAY 2 6 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   MATTHEW JAY  D-55653   DECISION PAGE 7   1/26/06

96

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, JUDY K. FARNCOMB, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total Two in number and

cover a total of pages numbered 1 - 95, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of MATTHEW

JAY, CDC NO. D-55653, on JANUARY 26, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 9, 2006, at Sacramento,

California.

*Judy K. Farncomb*

JUDY K. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT

## 2

**PRESENT OFFENSE:**
**(CONTINUED)**

| SOURCES OF INFORMATION (this page) |
|---|
| D.A. FILE, PROBATION RECORDS |

| REST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 10-16-85 | 1740 HRS | SAME | 187 PC | EL CAMINO HIGH SCHOOL | LASO |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| RICHARD PARKER | A-811060 | 11-10-86 PLED GUILTY TO 187 PC AND 664/187 PC – P&S HEARING 2-10-87. |

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

TORRAN MEIER          A-811060          6-24-86 FOUND GUILTY OF 192 PC (VOLUNTARY MANSLAUGHTER) AND 664/192 PC (ATTEMPTED VOLUNTARY MANSLAUGHTER) AND 182/192 PC (CONSPIRACY TO COMMIT MANSLAUGHTER) ON 12-19-86 SENTENCED TO CALIFORNIA YOUTH AUTHORITY FOR 12 YEARS.

DEFENDANT JAY, IN CONSPIRACY WITH CO-DEFENDANTS MEIER AND PARKER, STRANGLED AND KILLED MEIER'S MOTHER, SHIRLEY RIZK, AND ATTEMPTED TO KILL, BY VARIOUS METHODS, THE EIGHT YEAR OLD HALF BROTHER OF MEIER, RORY RIZK.

ON THE EVENING OF OCTOBER 13, 1985, DEFENDANT MEIER, AT THAT TIME, AGE 16, WAS AT HIS PLACE OF EMPLOYMENT, AND APPARENTLY DECIDED TO KILL HIS MOTHER THAT NIGHT. HE WAS ABLE TO OBTAIN A PROMISE OF ASSISTANCE FROM DEFENDANT JAY. LATER, WHILE STILL AT WORK, DEFENDANT MEIER TOLD DEFENDANT PARKER, AGE 23 OF HIS PLANS AND PARKER ALSO AGREED TO ASSIST HIM. AT SOME POINT, THE THREE DEFENDANTS WENT TO A NEARBY RESTAURANT WHERE THEY DISCUSSED HOW THEY WOULD KILL DEFENDANT MEIER'S MOTHER. DEFENDANT MEIER PRODUCED A ROPE

-2-   (JAY)

THAT HE HAD FASHIONED INTO A NOOSE, AND IT WAS DECIDED THAT THEY
WOULD STRANGLE HER IN MEIER'S BEDROOM AND THEN TRANSPORT HER BODY,
IN HER CAR, TO THE MALIBU CANYON AREA, LIGHT THE CAR ON FIRE, AND
PUSH IT OVER A CLIFF IN ORDER TO MAKE IT APPEAR AN ACCIDENT.

THE THREE DEFENDANTS' THEN PROCEEDED TO THE HOME OF
DEFENDANT MEIER IN CANOGA PARK. MEIER LET HIS TWO CO-DEFENDANTS
INTO HIS ROOM THROUGH A WINDOW. WHILE PARKER AND JAY LAID IN WAIT,
DEFENDANT MEIER LURED HIS MOTHER INTO THE ROOM. PARKER PLACED A NOOSE
AROUND THE NECK OF SHIRLEY RIZK, DEFENDANT MEIER'S MOTHER AND BEGAN
TO STRANGLE HER. PARKER PULLED ON THE ROPE AROUND HER NECK, WHILE
THE OTHER TWO CO-DEFENDANTS PULLED ON HER LEGS. AT SOME POINT DURING
THE STRANGULATION, HER EIGHT YEAR OLD SON, RORY, AWAKENED TO HER
SCREAMS AND WENT TO INVESTIGATE. HE WAS ABLE TO LOOK INTO MEIER'S
BEDROOM AND OBSERVED JAY AND DEFENDANT PARKER IN THAT ROOM AND HIS
MOTHER ON THE FLOOR. WHILE PARKER AND JAY CONTINUED TO ATTEMPT
THE STRANGULATION, DEFENDANT MEIER TOOK VICTIM RORY AWAY FROM THE
ROOM IN AN EFFORT TO KEEP HIM FROM KNOWING WHAT WAS HAPPENING.
MEIER TOLD HIS HALF BROTHER TO WATCH TELEVISION AND THEN RETURNED TO
HIS BEDROOM. THE THREE DEFENDANTS THEN APPARENTLY STRANGLED
SHIRLEY RIZK FOR APPROXIMATELY 15 MINUTES BEFORE SHE DIED. DURING
THIS PERIOD OF TIME, DEFENDANT MEIER REPEATEDLY LEFT THE ROOM TO
DEAL WITH HIS BROTHER WHO WANTED TO KNOW WHAT WAS GOING ON. THE
DEFENDANTS CAME TO THE REALIZATION THAT RORY WAS A POTENTIAL WITNESS

-3-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1   AND THEN IT WAS DETERMINED THAT HE MUST ALSO BE KILLED.  IT WAS

2   DECIDED THAT THEY WOULD POISON HIM AND DEFENDANT MEIER GAVE DEFENDANT

3   JAY SOME MONEY TO GO TO A STORE AND PURCHASE SNAROL SNAIL POISON AND

4   D-CON RAT POISON.  WHILE JAY WENT TO GET THE POISON, PARKER AND MEIER

5   PLACED SHIRLEY RIZK'S BODY IN THE TRUNK OF THE CAR AND DEFENDANT

6   MEIER CLEANED BLOOD OFF THE FLOOR OF HIS BEDROOM RUG.

7            DEFENDANT JAY PURCHASED THE POISON AND RETURNED TO THE

8   MEIER RESIDENCE WITH IT.

9            DEFENDANT MEIER THEN ATTEMPTED TO POISON HIS BROTHER,

10  VICTIM RORY RIZK, AFTER TESTING HIS BLOOD SUGAR, AS RORY IS A DIABETIC,

11  DEFENDANT MEIER TRIED TO INDUCE HIM TO EAT A PEANUT AND BUTTER

12  SANDWICH LACED WITH SNAIL BAIT.  RORY DID NOT LIKE THE TASTE OF THE

13  SANDWICH AND WOULD NOT EAT IT.  MEIER THEN TRIED TO INDUCE RORY TO

14  DRINK SOME TYPE OF MALT WHICH HE MADE, ALSO LACED WITH POISON.  RORY

15  AGAIN REFUSED BECAUSE OF ITS TASTE.  AT SOME POINT RORY WENT INTO

16  THE GARAGE AND SAW HIS MOTHER'S BODY IN THE OPEN TRUCK OF HER VEHICLE

17  WITH HER LEGS EXTENDING FROM UNDER HER ROBE.

18           DEFENDANT MEIER THEN ASKED RORY IF HE WANTED TO GO FOR

19  A RIDE IN MALIBU CANYON.  RORY AGREED.  WITH HIS MOTHER'S BODY IN THE

20  TRUNK AND RORY IN THE BACK SEAT, DEFENDANT MEIER AND THE CO-DEFENDANTS

21  THEN DROVE AWAY FROM THE FAMILY HOME.  EN ROUTE THEY STOPPED AT A GAS

22  STATION AND PURCHASED A GALLON OF GAS.  AFTER DRIVING THROUGH THE

23  MALIBU CANYON AREA AND FINDING A GOOD LOCATION TO PUSH THE CAR OVER

        -4-   (JAY)

76t692G — PROB. 5A —   PS 11-85

1  A CLIFF, THEY DROVE BACK TO DEFENDANT JAY'S HOUSE.  JAY THEN FOLLOWED

2  THEM TO THE AGREED-UPON LOCATION IN MALIBU CANYON.  DEFENDANT MEIER

3  THEN POURED GASOLINE ON A RAG AND STUFFED THE RAG INTO THE GAS TANK

4  FILLER OF SHIRLEY RIZK'S CAR.  MEIER THEN BLINDFOLDED RORY, TIED HIS

5  HANDS BEHIND HIS BACK, AND PUT HIM IN THE BACK SEAT OF THE CAR.

6  DEFENDANT PARKER THEN PLACED THE BODY OF SHIRLEY RIZK BEHIND THE

7  STEERING WHEEL.  THE CAR WAS THEN PUSHED OVER THE EMBANKMENT AS

8  DEFENDANT PARKER LIT THE RAG ON FIRE.  THE CAR ROLLED DOWN THE

9  EMBANKMENT, POSSIBLY ROLLING OVER, AND COMING TO REST APPROXIMATELY

10  THIRTY FEET BELOW.  WITH THE CAR BURNING, THE DEFENDANTS THEN LEFT

11  IN DEFENDANT JAY'S CAR.  AS THE CAR BECAME CONSUMED BY FLAMES, RORY

12  WAS ABLE TO UNTIE HIMSELF AND REMOVE HIS BLINDFOLD.  HE SAW HIS

13  DECEASED MOTHER IN THE FRONT SEAT WITH BLOOD ON HER FACE.  AFTER

14  OPENING A WINDOW, HE CLIMBED OUT OF THE BURNING CAR AND BEGAN TO

15  CALL FOR HELP.

16        A PASSING MOTORIST OBSERVED THE FIRE AND STOPPED TO

17  INVESTIGATE.  HE HEARD RORY'S CALL FOR HELP AND ASSISTED HIM UP THE

18  HILL.  LATER, SHERIFFS DEPUTIES AND FIRE DEPARTMENT PERSONNEL

19  ARRIVED ON THE SCENE AND RORY TOLD THEM WHAT HAPPENED.  WHILE RORY

20  WAS BEING TRANSPORTED TO A HOSPITAL BY AMBULANCE, A DEPUTY SHERIFF

21  FOLLOWING THE AMBULANCE OBSERVED THE CAR DESCRIBED BY RORY AS THE

22  ONE OWNED BY RORY'S BROTHER, DEFENDANT MEIER.  THE VEHICLE WAS

23  STOPPED.  DEFENDANT MEIER AND DEFENDANT PARKER WERE ARRESTED AT THAT

     -5-  (JAY)

76C692G — PROB FA — PS 11-85

POINT.

DEFENDANT PARKER MADE A FULL STATEMENT TO HOMICIDE INVESTIGATORS IMPLICATING HIMSELF, DEFENDANT MEIER AND DEFENDANT JAY. ON OCTOBER 16, 1985, DEFENDANT JAY WAS ARRESTED.

SUBSEQUENT INVESTIGATION BY SHERIFFS DEPUTIES REVEALED THAT SOME TIME PRIOR TO COMMITTING THESE OFFENSES, DEFENDANT MEIER APPROACHED OTHER INDIVIDUALS INFORMING THEM OF HIS DESIRE TO PLAN TO KILL HIS MOTHER. ACCORDING TO A SHERIFF'S REPORT, DEFENDANT MEIER REPORTEDLY TOLD ONE MICHAEL MENDELSOHN OF HIS PLAN IN THE SUMMER OF 1985. THEN IN SEPTEMBER OF 1985, DEFENDANT MEIER TOLD MENDELSOHN, "I'M GOING TO KILL HER AT HOME, I COULD CHOKE HER OR POISON HER, I'LL PUT HER IN A CAR, DRIVE HER TO MALIBU CANYON, PUSH THE CAR OVER THE CLIFF AND MAKE IT LOOK LIKE AN ACCIDENT. MATT (DEFENDANT JAY) WILL PICK ME UP." MENDELSOHN FURTHER TOLD OFFICERS THAT AT APPROXIMATELY 8:00 P.M., ON OCTOBER 13, 1985, HE WENT TO DEFENDANT MEIER'S PLACE OF WORK AND MEIER TOLD HIM "I'M GOING TO DO IT TONIGHT, RICK (CO-DEFENDANT RICHARD PARKER) KNOWS ALL ABOUT IT."

ANOTHER INDIVIDUAL, MARK DAVID SAFRAN, TOLD INVESTIGATING OFFICERS THAT THE DAY AFTER THE KILLING, DEFENDANT MATTHEW JAY TOLD HIM THAT THE DEFENDANT OFFERED HIM $2,000 TO HELP KILL HIS MOTHER.

-6- (JAY)

TEL692G — PROB. 5A — PS 11-85

VICTIM:

SOURCES OF INFORMATION (II

PROBATION RECORDS

| NAME | COUNT(S) |
|---|---|
| RORY RIZK   (AGE EIGHT AT TIME OF OFFENSE ) | II AND IV |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

UNINJURED, BUT LATER PARTICIPATED IN THERAPY.

INSURANCE COVERAGE

| LOSS: ☐ YES ☐ NO | ESTIMATED LOSS | RESTITUTION ALREADY MADE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK  ☐ YES  ☐ NO |
|---|---|---|---|

**VICTIM STATEMENT:**

THE UNDERSIGNED OFFICER DID NOT INTERVIEW THE VICTIM AS HE HAD ALREADY BEEN INTERVIEWED EXTENSIVELY BY ANOTHER PROBATION OFFICER IN RELATION TO THE INVESTIGATION OF TORRAN MEIER.  DURING THAT INVESTIGATION, THE VICTIM'S STATEMENT WAS IN GENERAL AGREEMENT WITH THE FACTS PRESENTED UNDER THE OFFENSE.  ESSENTIALLY, RORY TOLD THE PROBATION OFFICER THAT HIS BROTHER, MEIER, TRIED TO KILL HIM IN A WAY THAT WAS CONSISTENT WITH THE OFFICIAL VERSION.  HE DID NOT BELIEVE THAT HIS BROTHER HAD THE RIGHT TO KILL HIS MOTHER AND DID NOT BELIEVE SHE HAD TREATED HIM AS BADLY AS HE SAID, THAT SHE WOULD YELL AT HIM SOMETIME IF HE DID NOT DO WHAT HE WAS SUPPOSED TO DO AND SHE WOULD SLAP HIM ONCE IN A WHILE.  HE MADE NO COMMENTS AS TO THE OTHER TWO DEFENDANTS.

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES  ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-7-  (JAY)

VICTIM LIST CONTINUES NEXT PAGE

PoP725B—Prob. 195C (Rev. 6/85)

PRIOR RECORD:

SOURCES OF INFORMATION (this page)

AUTOMATED RECORD CHECK, PROBATION DEPT.
RECORD CHECK, INFORMATION FROM THE DISTRICT
ATTORNEY'S FILE, DEFENDANT'S STATEMENT

AKA'S:

NONE.

JUVENILE HISTORY:

NONE.

ADULT HISTORY:

NONE.

-8-   (JAY)

1 | PERSONAL HISTORY:

2 |       DEFENDANT, BARELY EIGHTEEN YEARS-OF-AGE AT THE TIME

3 | OF THE OFFENSE, HAS ALWAYS LIVED WITH HIS PARENTS, HAS NEVER MARRIED,

4 | HAS NO CHILDREN, PERFORMED VERY WELL IN HIGH SCHOOL UNTIL THE

5 | TWELFTH GRADE WHEN HIS GRADES DETERIORATED BECAUSE OF DRUG USE,

6 | FINALLY DROPPING OUT.  HE HAS COMPLETED HIS HIGH SCHOOL EDUCATION

7 | WHILE IN THE COUNTY JAIL.  AS TO EMPLOYMENT, HE HAS BEEN A COOK AT

8 | MARIE CALENDAR'S AND CARL'S JR., AND HAS ALSO WORKED AS A BUS BOY.

9 | HE HAS $1,500 IN SAVINGS AT THE PRESENT TIME AS A RESULT OF GIFTS

10 | THAT HAVE BEEN GIVEN TO HIM BY FRIENDS AND RELATIVES.

11 |       OTHERWISE, SIGNIFICANT ASPECTS OF HIS PERSONAL HISTORY

12 | ARE BELOW.

13 | ALCOHOL AND CONTROLLED SUBSTANCE ABUSE:

14 |       (SOURCES OF INFORMATION: DEFENDANT AND INTERESTED

15 |       PARTIES.)

16 |       DEFENDANT FIRST USED MARIJUANA AND ALCOHOL IN THE

17 | SEVENTH GRADE, TAKING BOTH ON THE SAME EVENING.  HE IMMEDIATELY SAID

18 | YES AND AFTERWARDS HE LIKED THE EFFECT AND THE EUPHORIA.  AT AGE 15,

19 | HE WAS A REGULAR MARIJUANA USER.  DAILY CONSUMPTION GREW TO 15 TO 20

20 | "BOWLS" (PIPE LOADS) FOR AN AVERAGE OF $20 A DAY HABIT.  MARIJUANA

21 | STATES DEFENDANT, WAS GIVEN TO HIM BY A FRIEND AND HE BOUGHT SOME OF

22 | IT HIMSELF.  AT AGE 17, HE WAS USING COCAINE AND USED FIVE TO SEVEN

23 | TIMES A MONTH FOR A COST OF APPROXIMATELY $150 A MONTH.  DEFENDANT

-9- (JAY)

1  SAYS HE WAS ABLE TO FINANCE THIS FROM WORKING AND FROM MONEY HE HAD

2  IN THE BANK.  DEFENDANT STATES HE HAS ALSO USED METHAMPHETAMINE

3  ORALLY.

4           FROM AGE 14 TO AGE 16, HE WAS DRINKING EACH WEEKEND.

5  HE SAW IT AS A GAME, TRYING TO OUTDRINK OTHERS AND SEEING JUST HOW

6  MUCH HE COULD CONSUME, AND SOME RECORDS SHOW THAT HE SOMETIMES DRANK

7  UNTIL HE BECAME ILL.  HE BELIEVES HE WAS AN ALCOHOLIC FROM AGE 14 TO

8  AGE 16.

9           DEFENDANT STATES HE WAS IN TREATMENT WITH A

10  PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS, BUT CANNOT REMEMBER

WHAT SHE SAID ABOUT DRUG USE OR ALCOHOL USE.  DEFENDANT'S MOTHER SAYS

12  THE PSYCHOLOGIST DISMISSED IT AS "CHILDHOOD REBELLION".

13           FURTHER, DEFENDANT STATES THAT HE WAS USING MARIJUANA

14  EVERY DAY FOR SIX MONTHS PRIOR TO THE PRESENT OFFENSE.

15  PHYSICAL/MENTAL/EMOTIONAL HEALTH:

16           (SOURCES OF INFORMATION:  DEFENDANT AND PARENTS)

17           DEFENDANT'S PARENTS SENT HIM TO COUNSELING WHEN

18  DEFENDANT WAS IN THE SECOND GRADE AS HE ALWAYS "GAVE UP" WITH RESPECT

19  TO HIS OLDER BROTHER, ANDREW, WHO IS EXCEEDINGLY BRIGHT AND VERY

20  COMPETITIVE.

21           AT ABOUT AGE 15, DEFENDANT WAS IN TREATMENT WITH A

22  PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS AND THAT PERSON

23  DISMISSED DEFENDANT'S DRUG AND ALCOHOL USE "REBELLION" AS INDICATED

   -10-  (JAY)

1   ABOVE.

2            IN RELATION TO THE PRESENT OFFENSE, DEFENDANT WAS

3   EXTENSIVELY EXAMINED BY PSYCHIATRIST, DR. DAVID SHEFFNER, WHO

4   RECEIVED TESTING RESULTS INPUT FROM PSYCHOLOGIST MARTHA ROGERS.

5   DR. SHEFFNER SAYS IN A LETTER DATED OCTOBER 7, 1986, THAT DEFENDANT

6   IS NOT BASICALLY ANTI-SOCIAL, THAT FOUR PROMINENT ELEMENTS,

7   DEPENDENCY, DEPRESSION, DRUGS AND CIRCUMSTANCES PRODUCED DEFENDANT'S

8   INVOLVEMENT IN THE PRESENT OFFENSE.  A MORE DETAILED ACCOUNT IS

9   CONTAINED UNDER PARAGRAPH HEADING  PSYCHIATRIC REPORT.

10           DEFENDANT HAS BEEN AN ASTHMA SUFFERER.

OTHER RELEVANT DEFENDANT INFORMATION:

12           CHILDHOOD/UPBRINGING:

13           DEFENDANT IS THE SECOND OF THREE CHILDREN BORN TO

14  DAVID JAY AND LYNN DEBA.  THE FATHER IS A TEACHER OF FILM LITERATURE

15  AND ENGLISH IN THE LOS ANGELES CITY SCHOOL SYSTEM.  THE MOTHER IS AN

16  EPISCOPALIAN PRIEST.  IN REVIEWING THE PYCHIATRIC REPORT BY

17  DR. SHEFFNER AND TALKING WITH INTERESTED PARTIES, AS WELL AS

18  INTERVIEWING DEFENDANT AND DEFENDANT'S PARENTS, IT IS CONCLUDED THAT

19  THE FAMILY HAS ALWAYS BEEN STABLE AND HARMONIOUS.

20  EDUCATION:

21           FROM ALL REPORTS, DEFENDANT WAS A VERY GOOD STUDENT

22  IN SCHOOL, RECEIVING A'S AND B'S UNTIL THE TWELFTH GRADE WHEN

23  EVERYTHING BEGAN TO DETERIORATE BECAUSE OF DRUG USE.

        -11-  (JAY)

DEFENDANT'S STATEMENT:

DEFENDANT ADMITS TO HELPING IN THE STRANGULATION OF VICTIM SHIRLEY RIZK, TO BUYING THE POISON THAT WAS TO BE USED TO MURDER RORY RIZK AND TO GENERALLY PARTICIPATING IN THE CONSPIRACY.

HE SAYS HE HELD THE VICTIM'S RIGHT SHOULDER AND HER RIGHT ARM WHILE DEFENDANTS PARKER AND MEIER STRANGLED HER WITH A NOOSE. HE COMMENTED, "I WAS TOO SCARED TO JUST GET OUT (BEFORE COMPLETION OF THE STRANGLING ... I FROZE." FURTHER, HE RECALLS CRYING WHILE IT WAS HAPPENING. HE ASKED TO LEAVE AND GO HOME WHILE THE VICTIM WAS STILL STRUGGLING, AND ACCORDING TO DEFENDANT, MEIER TOLD HIM THAT NO, HE COULD NOT, AS "WE STILL NEED YOU."

THEN, SAYS DEFENDANT, "TORRY" SENT HIM TO THE STORE FOR RAT POISON THAT WAS TO BE USED TO KILL RORY, WHO UNEXPECTEDLY HAD BECOME A WITNESS WHEN HE SAW HIS MOTHER BEING STRANGLED. AT THAT TIME DEFENDANT DESCRIBES HIS STATE OF MIND AS THAT OF "MASS CONFUSION, HYSTERIA, FEAR ... I FELT LIKE I HAD NO ANSWERS."

HE BOUGHT THE POISON AND WENT BACK TO THE SCENE OF THE MURDER. BY THAT TIME, MEIER AND PARKER HAD THE VICTIM'S BODY IN THE TRUNK OF THE VICTIM'S VEHICLE. HE TOLD TORY THAT HE NEEDED TO LEAVE. HE TOLD TORRY THAT HE NEEDED TO LEAVE. TORRY REPLIED THAT IT WAS ALL RIGHT FOR HIM TO LEAVE, BUT THEY (CO-DEFENDANTS) WOULD PICK HIM UP IN ABOUT TWO HOURS. THEY DID, AND DEFENDANT FOLLOWED THEM IN HIS FATHER'S CAR. HE STOPPED ABOUT TWENTY YARDS

-12-   (JAY)

1  BEHIND.  THE CO-DEFENDANTS TOLD HIM THAT VICTIM RORY WAS IN THE CAR

2  ASLEEP.  WHILE STILL SITTING IN HIS FATHER'S VEHICLE HE SAW THE

3  CO-DEFENDANTS PUSH THE CAR OVER A CLIFF.  THEY GOT IN DEFENDANT'S

4  VEHICLE AND DEFENDANT DROVE THEM BACK TO MEIER'S RESIDENCE.

5  DEFENDANT THEN WENT HOME AND WENT TO SLEEP.  THE NEXT DAY HE HAD NO

6  IDEA WHAT HAD HAPPENED.  IT DID NOT REGISTER UNTIL HE SAW IT ON THE

7  NEWS.  HE THEN TOLD HIS BROTHER AND "SOMEONE ELSE" WHAT HE HAD DONE.

8  LATER, THE POLICE ARRIVED AND ARRESTED HIM.

9          DEFENDANT RELATES, "I FEEL MUCH REMORSE FOR WHAT

10  HAPPENED, BUT I'M GLAD THAT THE KID LIVED ... I'M ECSTATIC THAT I'M

.   SOBER.  ... I NEED TO GO ON WITH MY LIFE.  I GET DEPRESSED WHEN I

12  THINK WHAT I HAVE TAKEN PART IN."  HE FURTHER EXPLAINED, "I FELT

13  SUCKED INTO IT ... POWERLESS."  HE FEELS IT WOULD NOT HAVE HAPPENED

14  HAD HE REJECTED ALCOHOL AND MARIJUANA WHEN IT WAS OFFERED HIM AT AN

15  EARLY AGE, OR WHEN HIS PARENTS FIRST COUNSELED HIM CONCERNING

16  SUBSTANCE ABUSE.  ABOUT THAT, DEFENDANT SAID THAT HIS PARENTS FOUND

17  HIM UNDER THE INFLUENCE AT ABOUT THE AGE OF FIFTEEN OR SIXTEEN.

18  THEY SAT HIM DOWN FOR ABOUT AN HOUR AND TOLD HIM HOW FRIGHTENED THEY

19  WERE FOR HIS FUTURE.  THEY TOLD HIM ABOUT THE DELETERIOUS EFFECTS OF

20  SUBSTANCE ABUSE.  HE TOLD THEM THAT IT WOULD BE THE LAST TIME.

21  HOWEVER, HE DID NOT STOP BECAUSE HE LIKED IT.  HE LIKED THE FEELING

22  IT GAVE HIM.  HE KNEW IT WAS ILLEGAL, BUT USED IT ANYWAY.

23          SO, THE USE WENT ON AND HIS CONSUMPTION INCREASED,

   -13-  (JAY)

1 FINALLY RESULTING IN A SHARPLY DETERIORATING STATE AND LEADING TO

2 HIS SCHOOL GRADES FALLING FROM A'S AND B'S TO F'S, ACCOMPANIED BY

3 CHRONIC TRUANCY.  FOR A SIX MONTH PERIOD PRIOR TO THE MURDER HE WAS

4 IN A DAILY STATE OF MARIJUANA INTOXICATION, AND WENT TO GREAT LENGTHS

5 TO CONCEAL THIS FROM HIS PARENTS.

6       AS TO TORRAN MEIER, DEFENDANT STATES HE FIRST BECAME

7 ACQUAINTED WHILE THEY WERE WORKING TOGETHER IN A FAST FOOD RESTAURANT.

8 HE SAW HIM AS A "VERY BIG GUY" AND "INTIMIDATING".  ON A NUMBER OF

9 OCCASIONS DEFENDANT HAD OBSERVED HIM IN AFTER SCHOOL FIGHTS.  HE

10 SEEMED "CRAZY".  HE, MEIER, COMMENTED ON NUMEROUS OCCASIONS THAT HE

   WAS GOING TO KILL HIS MOTHER.  DEFENDANT SAYS HE TURNED DOWN AN

12 EARLIER OFFER TO HELP MURDER MEIER'S MOTHER AND AT THAT TIME HE,

13 MARK SAFRON AND ERIC LORDAHAL WENT TO THE WEST VALLEY POLICE STATION

14 AND REPORTED IT.

15       HE TRIED TO SEVER HIS RELATIONSHIP WITH MEIER AND TO

16 AVOID HIM AS MUCH AS POSSIBLE, AND DID SO FOR THE MOST PART.

17 HOWEVER, ONE DAY MEIER CALLED AND THEN CAME TO DEFENDANT'S HOME.

18 THEY HELD A CONVERSATION OUTSIDE.  MEIER SAID HE NEEDED A FAVOR.

19 THEN HE PULLED OUT A ROPE FROM BEHIND HIS BACK AND ALLEGEDLY SAID,

20 "TONIGHT'S THE NIGHT, WILL YOU HELP ME?"  DEFENDANT NODDED HIS HEAD,

21 YES.  HE BELIEVES HE DID SO BECAUSE HE WAS UNDER THE COMBINED

22 INFLUENCE OF MARIJUANA, ALCOHOL, COCAINE AND HASHISH.

23       DEFENDANT ADMITS THAT MEIER OFFERED HIM $1,000 FOR

-14-   (JAY)

1  HIS ROLE, BUT DEFENDANT AGREED TO THE CONSPIRACY BEFORE THE OFFER

2  WAS MADE. IN ANY EVENT, HE DID NOT EXPECT TO RECEIVE THE MONEY AS

3  HE DID NOT BELIEVE THAT MEIER HAD THAT KIND OF CASH. WHEN THE OFFER

4  WAS MADE HE, DEFENDANT, RESPONDED, "OKAY" ... "SURE", OR SOMETHING TO

5  THAT EFFECT.

6          AS TO RICHARD PARKER, DEFENDANT STATES HE KNEW HIM FOR

7  ONLY ONE WEEK. HE WAS AWARE THAT HE HAD JUST RECENTLY GOT OUT OF

8  JAIL AND THAT PARKER WANTED TO GET INTO THE RIGHT CROWD SO THAT HE

9  COULD GO STRAIGHT. HE DID NOT KNOW FOR WHAT TYPE OF OFFENSE PARKER

10 HAD BEEN INCARCERATED FOR.

11         AGAIN, DEFENDANT SAID THAT IT WAS DIFFICULT TO EXPLAIN,

12 BUT FOR MONTHS PRECEDING THE OFFENSE HE FELT HE HAD LOST CONTROL OF

13 HIS LIFE AND WAS TOTALLY POWERLESS.

14         DEFENDANT IS REQUESTING THAT HE BE HOUSED IN A YOUTH

15 AUTHORITY FACILITY.

16 PSYCHIATRIC REPORT:

17         AS REPORTED EARLIER IN THE REPORT, DEFENDANT HAS BEEN

18 EXAMINED BY DR. DAVID J. SHEFFNER, NEWPORT BEACH, TELEPHONE NUMBER

19 714/645-4323. DEFENDANT REPORTED TO THE DOCTOR THAT HE SAW A

20 PSYCHOLOGIST FOR AT LEAST TWO YEARS, THE LAST TIME BEING IN JANUARY

21 OF 1985. THEY WORKED ON FAMILY, SCHOOL PROBLEMS AND DRUG PROBLEMS.

22 DEFENDANT TOLD THE PSYCHIATRIST THAT HE WAS AN ALCOHOLIC IN ABOUT

23 1981 OR 1982. HE ALSO REPORTED THAT HIS MOTHER HAD BEEN VERY BUSY

     -15-   (JAY)

76C692G — PROE EA — PS 11-85

1  FOR THE LAST 8 YEARS, BUT ALSO REPORTED A VERY GOOD FAMILY LIFE, AND

2  THAT THE FAMILY SPENT A LOT OF TIME TOGETHER.

3              IT WAS THE DOCTOR'S PSYCHIATRIC IMPRESSION THAT

4  DEFENDANT WAS NOT BASICALLY ANTI-SOCIAL IN PERSONALITY

5  STRUCTURE-BEHAVIOR.  AS REPORTED EARLIER, HE BELIEVED THAT DEFENDANT'S

6  PARTICIPATION IN THE OFFENSE WAS MULTI-DETERMINED WITH FOUR PROMINENT

7  ELEMENTS, EACH NECESSARY, BUT NOT SUFFICIENT IN ITSELF TO PRODUCE

8  DEFENDANT'S INVOLVEMENT AND THEY WERE DEPENDENCY, DEPRESSION, DRUGS

9  AND CIRCUMSTANCES.

10             HE WENT ON TO DESCRIBE DEFENDANT AS PASSING-DEPENDENT

   PERSONALITY AND BEING A FOLLOWER VERSUS AN INSTIGATOR,

12 SELF-SACRAFICING IN INTERPERSONAL RELATIONSHIPS.  HE WAS NOT

13 CONSIDERED TO BE SOCIALLY OR PHYSICALLY AN AGGRESSIVE PERSON.

14             THERE WAS EVIDENCE OF CHRONIC CHILDHOOD DEPRESSION

15 WHICH INCREASED WITH DEMANDS OF ADOLESCENCE, WITH ALCOHOLISM AND

16 DEPRESSION INCREASED EVEN MORE WHEN DEFENDANT BROKE UP WITH A

17 GIRLFRIEND IN 1984.  THE DOCTOR WROTE:  "DEPENDENCY, DRUGS AND

18 DEPRESSION ALL COMBINED IN A SPIRALING PSYCHIATRIC DETERIORATION

19 RESULTING IN APATHETIC, SEVERELY DEPRESSED, SEVERELY DRUG-DEPENDENT,

20 NON-FUNCTIONING ADOLESCENT.  DOING DRUGS BECAME THE FOCAL POINT OF

21 HIS LIFE AND DRUG DEPRESSION-DEPENDENCY WERE INTERTWINED, EACH

22 REINFORCING THE OTHER."

23             THE DOCTOR CITED AN EXAMPLE OF BEHAVIOR CHANGE IN THAT

   -16-   (JAY)

1  DEFENDANT ALLEGEDLY TRIED TO TURN IN CO-DEFENDANT MEIER A YEAR

2  EARLIER AND THEN AFTER SEVERE DRUG USE, AGREED TO PARTICIPATE IN THE

3  CRIME.

4        THE DOCTOR FURTHER WROTE THAT "DEPENDENCY,

5  DEPRESSION AND CHRONIC APATHY, SECONDARY TO DEPRESSION AND MARIJUANA

6  SET THE STAGE FOR THE OFFENSE, BUT ... THERE WAS A VERY PROMINENT

7  CIRCUMSTANTIAL ELEMENT OPERATING AS WELL, I.E., GIVEN THE

8  "LEADERSHIP" (AND MOTIVATION) OF TORRY..." FURTHER, ... IT IS HARD

9  TO IMAGINE MATT'S INVOLVEMENT IN THE MURDER WITHOUT THE VERY

10  SPECIFIC CIRCUMSTANCES OF HIS EXPOSURE TO TORRY."

        THE DOCTOR CONCLUDED THAT IF DEFENDANT IS TO BE

12  INCARCERATED, HE SHOULD BE PLACED WHERE THERE ARE MAXIMUM

13  POSSIBILITIES FOR GROWTH MIGHT OCCUR, SUCH AS SCHOOLING,

14  PSYCHOTHERAPEUTIC FACILITIES.

15        THE DOCTOR'S REPORT WHICH WAS PROVIDED TO THE PROBATION

16  OFFICER BY DEFENDANT'S ATTORNEY, IS ATTACHED FOR THE COURT'S

17  CONSIDERATION.

18  INTERESTED PARTIES:

19        PROBATION OFFICER ATTEMPTED TO REACH INVESTIGATING

20  DEPUTIES IN THIS CASE.  A MESSAGE WAS LEFT, BUT AS THE TIME OF

21  DICTATION, THERE HAVE BEEN NO RESPONSE.  HOWEVER, SERGEANT RENE LAPORTE

22  SHERIFF'S DEPARTMENT INVESTIGATOR SPOKE WITH THE PREVIOUS PROBATION

23  OFFICER WHO DID THE PRE-SENTENCE INVESTIGATION IN THE MEIER CASE.

    -17-  (JAY)

76C692G – PROB. 5A –  PS 11-85

1   HE TALKED MOSTLY ABOUT MEIER'S INVOLVEMENT AND HIS DISENCHANTMENT

2   WITH THE JURY VERDICT.  HE DID SAY, HOWEVER, THAT DEFENDANT MEIER

3   INFLUENCE JAY AND PARKER IN THIS CASE AND HE POINTED OUT THAT THERE

4   WAS SOME EVIDENCE THAT DEFENDANT WAS OFFERED MONEY TO HELP OUT.

5          ANOTHER JUVENILE OFFICER IN THE PROBATION DEPARTMENT

6   SPOKE WITH ANOTHER SHERIFF'S INVESTIGATOR, RUSSELL ULOTH, WHO SAID

7   THAT HE FELT DEFENDANT MEIER HAD THE ABILITY TO LEAD OTHERS AND

8   INFLUENCED THE CO-DEFENDANTS TO HELP HIM KILL HIS MOTHER.  HE ALSO

9   POINTED OUT THAT JAY WAS OFFERED $2,000 TO HELP DEFENDANT MEIER.

10          PROBATION OFFICER INTERVIEWED DEFENDANT'S PARENTS IN

    PERSON.  THEY INDICATED THAT THEY HAD DONE WHAT THEY FELT WAS

12  EVERYTHING, INCLUDING GOING TO SUCH LENGTHS AS SEARCHING DEFENDANT'S

13  ROOM.  THEY ONCE CONSIDERED INSTITUTIONALIZATION.  PRIOR TO THAT

14  THEY HAD SEEN A PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS WHO

15  DISMISSED THE MATTER AS TEENAGE REBELLION, AND ACCORDING TO THE

16  MOTHER AND FATHER, SAID THAT THE MOTHER WAS OVERREACTING TO HER

17  BACKGROUND.  IN THIS REGARD, THE MOTHER STATES THAT HER MOTHER AND

18  FATHER WERE ALCOHOLICS, AND IT IS HER UNDERSTANDING THAT IT IS

19  COMMON KNOWLEDGE THAT ALCOHOLISM TENDS TO RUN IN FAMILIES.  THEY SAID

20  THAT THE WHOLE THING IS EXTREMELY FRIGHTENING, AS THEY WERE JUST

21  TAKEN OVER AND THEY FELT HELPLESS.  AS TO DEFENDANT, THEY SAY THAT HE

22  WAS LIKEABLE TO EVERYONE AND WAS GOOD AT ALL AGE LEVELS UNTIL JUST

    PRIOR TO THE OFFENSE.  THEY ACKNOWLEDGE THAT HE HAD BEEN REFERRED

    -18-  (JAY)

1   FOR COUNSELING IN THE SECOND GRADE BECAUSE OF A POOR SELF-IMAGE,

2   EXPLAINING THAT HE WAS FAR OVERSHADOWED BY HIS BROTHER ANDREW WHO

3   WAS VERY COMPETITIVE.   HIS YOUNGER SISTER WAS EXCEPTIONALLY CUTE

4   AND APPARENTLY SHE GOT A LOT OF ATTENTION, BUT THEY ARE NOT SURE IF

5   THAT IS PART OF THE PROBLEM.

6           IN GENERAL, THE PARENTS ARE VERY DISTRESSED, AND

.7   EXPRESSED HOPE THAT THEIR SON CAN STILL MAKE SOMETHING OF HIS LIFE.

8   THEY WERE VERY CONCERNED THAT HE IS NOT STRONG ENOUGH TO WITHSTAND

9   A STATE PRISON INSTITUTION AND HOPE THAT HE WILL BE INCARCERATED IN

10  A YOUTH AUTHORITY FACILITY, AND THAT HE WILL BE GIVEN PROTECTION

    THAT HE NEEDS, AS HE IS NOT A STRONG PERSON EITHER EMOTIONALLY OR

12  PHYSICALLY.   THE PARENTS GAVE REFERENCES OF THE REVEREND JESS TAYLOR

13  AND A "MRS. MENDOZE, A BIOLOGY TEACHER AT EL CAMINO HIGH SCHOOL."

14          PROBATION OFFICER SPOKE WITH A LONG-TIME FRIEND OF

15  DEFENDANT, 19 YEAR OLD MICHAEL LITTLE, TELEPHONE NO. 805/544-5619

16  AND 818/889-1945.   HE DESCRIBES DEFENDANT AS VERY EASY-GOING AND

17  FRIENDLY, AS NOT A STRONG PERSON, BUT INSTEAD A FOLLOWER.   HE JUST

18  LIKES TO SAY YES AND WANTS NO "HASSLES".   HE WANTS TO GET ALONG WITH

19  EVERYONE.   HE WAS A CHURCH ALTAR BOY AND A B-PLUS STUDENT UNTIL HIS

20  SENIOR YEAR.   HE BROKE UP WITH A GIRLFRIEND AT ABOUT THAT TIME AND

21  WAS USING A LOT OF DRUGS.   HIS DRUGS WERE PROVIDED BY TWO OR THREE

22  DIFFERENT PEOPLE, BUT HE WAS ALSO DOING SOME SELLING TO SUPPORT HIS

23  HABIT.  HE SMOKED MARIJUANA EVERY DAY AND WAS ALSO USING COCAINE AND

    -19-   (JAY)

1  DRINKING.  HE WOULD ESTIMATE THAT HIS MARIJUANA USAGE WAS FOUR TO

2  FIVE "JOINTS" A DAY FOR A PERIOD OF SEVERAL MONTHS PRIOR TO THE

3  PRESENT OFFENSE.  HE WAS WITH THE DEFENDANT ON THE EVENING OF THE

4  OFFENSE ABOUT 6:30 P.M., AND HE WAS ALREADY UNDER THE INFLUENCE OF

5  MARIJUANA.  THE DEFENDANT WAS DRINKING ~~AND~~ BEER AND LATER DRANK RUM

6  AND WINE COOLERS.  HE PERSONALLY SAW HIM TAKE "SIX LINES OF COKE",

7  AND FINISHED UP WITH HASHISH.  HE HAD LSD THE NIGHT BEFORE.

8  MR. LITTLE STATES, "HIS MIND WAS FRIED, HE DIDN'T KNOW WHAT HE WAS

9  DOING."  HE EMPHASIZES THAT THE PERSON HE KNEW THAT NIGHT WAS NOT

10  THE PERSON HE USED TO KNOW BECAUSE, "I KNOW HOW MATT ACTS."  HE HAS

   SEEN HIM RECENTLY AND DESCRIBES HIM AS THE "NEW MAN".

12         FURTHER, AS TO DEFENDANT'S STATE JUST PRIOR TO THE

13  OFFENSE, MR. LITTLE STATES THAT HE LOOKED TO BE IN A "ZOMBIE".

14  SOMETIMES IT WOULD TAKE HIM FIVE TO TEN MINUTES TO RESPOND TO A

15  QUESTION.  FURTHER, HE SAYS THE DEFENDANT WAS ABLE TO FOOL HIS

16  PARENTS BY GETTING UP EARLY AND PRETENDING TO GO TO SCHOOL, BUT

17  INSTEAD HE WOULD GET "STONED" AND COME HOME AND GO TO HIS ROOM.

18         PROBATION OFFICER TALKED WITH MR. PATRICK DICKINSON,

19  THE PROBATION OFFICER WHO PREPARED THE PRE-SENTENCE INVESTIGATION IN

20  THE CASE OF TORRAN MEIER.  HE DESCRIBED MEIER AS A RATHER IMPOSING

21  FIGURE, QUITE SOPHISTICATED, POISED AND APPARENTLY PERSUASIVE.  HE

22  WAS ALWAYS CALM AND SEEMED IN COMMAND OF EVERYTHING, EVEN WHILE

23  INCARCERATED AT JUVENILE HALL WHERE HE SEEMED TO HAVE ALREADY

   -20-  (JAY)

1  ESTABLISHED RAPPORT WITH THE STAFF.  HE SEEMED AND LOOKED MUCH OLDER

2  THAN HIS YEARS.

3          PROBATION OFFICER HAS REVIEWED THE PROBATION REPORT

4  OF RICHARD PARKER.  IT SHOWS THAT PARKER WAS A TRANSIENT, AND

5  APPARENTLY HAD NO PLACE TO LIVE.  INFORMATION RECEIVED BY THE

6  PROBATION OFFICER INDICATES THAT HE WAS LIVING IN A BOX AT THE TIME

7  OF THE OFFENSE.  HIS RECORD SHOWS CONVICTIONS FOR AUTO BURGLARY,

8  PROPERTY THEFT, PETTY THEFT, ET CETERA.  HE REPORTED AT THE TIME

9  OF THE PROBATION INTERVIEW THAT HE WAS "LIVING ON THE STREETS AND

10  TORRY ASKED ME IF I WANTED TO HELP HIM DO SOMETHING ..."

11          THE REVEREND JESS TAYLOR OF WOODLAND HILLS, SAYS HE

12  HAS KNOWN THE FAMILY A LONG TIME.  AND THAT DEFENDANT GREW UP AS A

13  PART OF HIS CONGREGATION.  HE WAS ACTIVE IN THE CHURCH UNTIL ABOUT

14  TWO YEARS AGO.  HE DESCRIBES THE FAMILY AS "TOP FLIGHT PEOPLE", AND

15  SAYS, "SO WAS MATT."  HE SAYS THAT DEFENDANT WAS ALWAYS A

16  COOPERATIVE PERSON AND TRIED TO GET ALONG.  FURTHER, THAT HE WAS

17  "JUST A GOOD KID."  HE SUBSTANTIATES THAT THE DEFENDANT WAS AN ALTAR

18  BOY.  HE HAS VISITED DEFENDANT IN CUSTODY AND FEELS THAT HE IS WELL

19  ON HIS WAY TO A REORDERED LIFE.  HE HOPES THAT THE

20  DEPARTMENT OF CORRECTIONS WILL TAKE MEASURES TO PROTECT HIM.

21          MRS. MENDOZA, A BIOLOGY TEACHER AT EL CAMINO HIGH

22  SCHOOL STATES THAT DEFENDANT WAS "OUTSTANDING."  HE RECEIVED ONLY

23  A'S AND B'S, AND SHE BELIEVES THIS WAS IN THE TENTH AND ELEVENTH

    -21-  (JAY)

GRADES.  HE WAS ALSO HER TEACHING ASSISTANT.  OF ALL THE STUDENTS

SHE HAS TAUGHT SHE WOULD PLACE HIM IN THE UPPER FIVE.  SHE

DESCRIBES HIM AS BRIGHT AND AS HAVING STUDIED HARD AND HAVING A GOOD

PERSONALITY.

ADDITIONAL INFORMATION:

PROBATION OFFICER HAS REVIEWED THE AMENABILITY

DETERMINATION REPORT FROM THE YOUTH AUTHORITY IN THE *CASE OF* TORRAN LEE MEIER.

DEFENDANT MEIER WAS REFERRED TO DIAGNOSTIC STUDY PRIOR TO HIS

SENTENCE AND DURING THAT STUDY DEFENDANT MEIER, ON PAGE 17 OF THE

REPORT TOLD AN EXAMINER THAT HE FELT DEFENDANT JAY, AT THE TIME OF

THE OFFENSE, WAS OUT OF HIS MIND FROM THE RESULTS OF HIS HISTORY OF

CHRONIC DRUG ABUSE.

EVALUATION:

THIS YOUNG DEFENDANT'S PARTICIPATION IN MURDER AND

ATTEMPTED MURDER HAS ITS ROOTS IN A SUBMISSIVE NATURE, DEPRESSION

AND PRONENESS TO SUBSTANCE ABUSE AND HIS PRESENCE IN A SOCIETY AT A

TIME WHEN INTOXICANTS WERE GENERALLY DISMISSED AS A HARMLESS PHASE

OF GROWING UP.  THE LATTER ELEMENT WAS A VIEWPOINT THAT APPARENTLY

PREVAILED AT A TIME WHEN HIS PARENTS WERE SEEKING SOLUTIONS.

BY ALL ACCOUNTS, DEFENDANT WAS A FAIRLY WELL-ADJUSTED,

CONTENTED MEMBER OF A HIGHLY STABLE FAMILY.  WHILE HE WAS PROBABLY

THE WEAKEST OF THE THREE CHILDREN, HE DID WELL IN SCHOOL, HAD FRIENDS

AND WAS WELL LIKED BY EVERYONE.  ALL THIS WAS ABOUT TO END UPON THE

-22-  (JAY)

INTRODUCTION OF MARIJUANA AND ALCOHOL WHICH HE LIKED VERY MUCH, AS

IT MADE HIM FEEL GOOD.  HE SUCCUMBED AND THE SPIRAL BEGAN.  THERE

WAS LITTLE IMPEDIMENT TO WHAT WAS TO BE A SEARCH FOR OBLIVION.

BY THE TIME HE BEGAN HIS ASSOCIATION WITH TORRAN MEIER,

DEFENDANT WAS RAPIDLY DETERIORATING.  MEIER HAD A PLAN, BUT NEEDED

HELP.  IT WAS NOT EASY TO RECRUIT OTHERS TO HELP STRANGLE HIS MOTHER,

BUT EVENTUALLY THE STRONG, PERSUASIVE MEIER FOUND ACQUIESCENCE FROM

PARKER, A HOMELESS DRIFTER AND THIEF, AND THE DRUG-DAZED JAY, WHOM

MEIER DESCRIBED TO PAROLE AUTHORITIES AS BEING OUT OF HIS MIND FROM

THE RESULTS OF CHRONIC DRUG ABUSE AT THE TIME OF THE OFFENSE.

THUS, THE DEPENDENCY, DEPRESSION, DRUGS, CIRCUMSTANCES

CYCLE REFERRED TO IN DR. DAVID SHEFFNER'S THOROUGH AND INCISIVE

ANALYSIS WAS COMPLETED WITH THE TRAGIC RESULTS THAT ARE NOW A MATTER

OF RECORD.

THE UNDERSIGNED OFFICER AGREES WITH THE ABOVE DOCTOR'S

ASSESSMENT OF THIS DEFENDANT.  HE DOES NOT APPEAR TO BE BASICALLY

ANTI-SOCIAL, AND ANY INCARCERATION SHOULD TAKE THIS INTO ACCOUNT,

AS WELL AS DEFENDANT'S POTENTIAL TO BE A PRODUCTIVE CITIZEN.  HE

NEED ONLY TO LIVE A LIFE OF SOBRIETY.  HE IS APPARENTLY REMORSEFUL

AND UNDERSTANDING OF WHAT LED TO THE CATASTROPHIC EVENTS ON THE

EVENING OF THE OFFENSE.

SENTENCING CONSIDERATIONS:

-23-  (JAY)

75C692G — PROB. 5A —  PS 11-85

CIRCUMSTANCES IN MITIGATION:

1.  OF THE THREE DEFENDANTS, DEFENDANT WAS THE MOST
    PASSIVE PARTICIPANT, AND WHILE HIS ROLE CANNOT
    BE SAID TO BE A MINOR ONE, IT WAS THE MOST
    MINOR OF THE THREE.

2.  THE DEFENDANT PARTICIPATED IN THE CRIME UNDER
    THE CIRCUMSTANCES OF EXTREME DRUG USE, WHICH WAS
    EVEN ACKNOWLEDGED BY CO-DEFENDANT MEIER, WHO
    INSTIGATED THE CRIME.  THIS WOULD INDICATE THE
    DEFENDANT'S CONDUCT WAS PARTIALLY EXCUSABLE FOR
    SOME OTHER REASON NOT AMOUNTING TO A DEFENSE.

3.  THE DEFENDANT WITH NO APPARENT PRE-DISPOSITION
    TO DO SO, WAS INDUCED BY DEFENDANT MEIER TO
    PARTICIPATE IN THE CRIME.

4.  DEFENDANT HAS NO PRIOR RECORD.

5.  DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING
    THE CRIME BEFORE HE WAS APPREHENDED, THUS
    INSURING HIS EVENTUAL ARREST AND CONVICTION.

CIRCUMSTANCES IN AGGRAVATION:

1.  THE CRIME INVOLVED GREAT VIOLENCE, DISCLOSING A
    HIGH DEGREE OF CRUELTY AND CALLOUSNESS, WHETHER
    OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT
    UNDER SECTION 12022.7 PENAL CODE.

DEFENDANT APPEARS TO BE INELIGIBLE FOR PROBATION
UNLESS THE COURT FINDS THIS IS AN UNUSUAL CASE.

DUE TO THE NATURE OF THE OFFENSE, THE PROBATION
OFFICER CANNOT RECOMMEND ANYTHING OTHER THAN DENIAL PROBATION AND
A COMMITMENT TO THE DEPARTMENT OF CORRECTIONS.  AS POINTED OUT IN
VARIOUS PARTS OF THE REPORT, DEFENDANT IS NOT A STRONG PERSON, BUT
HE IS BRIGHT, USEFUL AND SALVAGEABLE.  IT IS SUGGESTED THAT THE

-24-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1   DEPARTMENT OF CORRECTIONS PLACE DEFENDANT IN A MINIMUM SECURITY

2   INSTITUTION IN A PLACE THAT IS REASONABLY SAFE AND DUTIES THAT WILL

3   ENHANCE THE FUNCTION OF THE INSTITUTION.

4   RECOMMENDATION:

5         IT IS RECOMMENDED THAT PROBATION BE DENIED, AND THAT

6   THE DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT

7   CREDIT OF 482 DAYS, THAT THE COURT ORDER THE DEFENDANT TO PAY A

8   RESTITUTION FINE OF $100 IN SUBDIVISION (A) OF SECTION 13967 OF THE

9   GOVERNMENT CODE.

10   RESPECTFULLY SUBMITTED,

    BARRY J. NIDORF,
    PROBATION OFFICER

12

13   BY

14     ROBERT E. KELSEY, DEPUTY
    EAST SAN FERNANDO VALLEY AREA OFFICE

15     901-4053

16

17   READ AND APPROVED:               I HAVE READ AND CONSIDERED
                                 THE FOREGOING REPORT OF

18                                  THE PROBATION OFFICER

19   BY
    ART KEENER, SDPO

20

                                   JUDGE OF THE SUPERIOR COURT

21   (SUBMITTED 2-2-87)

22   (TYPED 2-3-87)
    REK:RH    (6)

23

    -25-  (JAY)

# EXHIBIT
# PART 3 OF 3

# EXHIBIT

## 3

Doc 6190

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NE "B"                    HON. GEORGE XANTHOS, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                    PLAINTIFF,         )
                                       )
        VS.                            )      NO. A811060
                                       )
MATTHEW ADAM JAY,                      )      STATE PRISON
                                       )
                    DEFENDANT.         )
_____    )

PASADENA, CALIFORNIA; THURSDAY, MARCH 12, 1987 A.M. SESSION

          UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT

IN COURT AND REPRESENTED BY COUNSEL, E. STANFORD; THE PEOPLE

BEING REPRESENTED BY E. FELDMAN, DEPUTY DISTRICT ATTORNEY

OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

          (BARBARA BURLESON, OFFICIAL REPORTER, CSR #2247.)

          THE COURT:  ON THE MATTER OF PEOPLE VERSUS MATTHEW

ADAM JAY, 811060, MR. JAY IS PRESENT WITH HIS ATTORNEY

MR. STANFORD.  PEOPLE ARE REPRESENTED BY MR. FELDMAN.

          MR. JAY, TODAY IS THE DAY SET FOR YOUR PROBATION

1   AND SENTENCING.

2          DID YOU EVER INQUIRE INSOFAR AS THE ARBUCKLE

3   WAIVERS?

4          DID MR. JAY GIVE AN ARBUCKLE WAIVER WHEN HE PLED

5   EARLIER TO JUDGE PEREZ?

6      MR. STANFORD:  YES.

7      THE COURT:  WAS THERE AN ARBUCKLE WAIVER?

8      MR. STANFORD:  YES.

9      MR. FELDMAN:  YES.  IT WAS AN EXPLICIT UNDERSTANDING

10  HE WOULD BE SENTENCED BY YOUR HONOR.

11     THE COURT:  IS THAT YOUR UNDERSTANDING, MR. JAY?

12  YOU ENTERED YOUR PLEA BEFORE JUDGE PEREZ IN VAN NUYS, AND

13  YOUR ATTORNEY HAS INDICATED THAT YOU REQUESTED THAT I SENTENCE

14  YOU.  DO YOU GIVE UP YOUR RIGHT TO BE SENTENCED BY JUDGE PEREZ

15  SO I CAN DO THAT?

16     DEFENDANT JAY:  YES, YOUR HONOR.

17     THE COURT:  THANK YOU.

18         COUNSEL JOIN?

19     MR. STANFORD:  YES, YOUR HONOR.

20     THE COURT:  THANK YOU.

21         AS I SAID, TODAY IS PROBATION AND SENTENCING TIME.

22  DO YOU WANT TO BE HEARD?

23     MR. STANFORD:  YES, YOUR HONOR.

24     THE COURT:  ALL RIGHT.

25     MR. STANFORD:  THANK YOU.

26         IF YOUR HONOR PLEASES AND MR. FELDMAN, I THINK

27  IT MIGHT BE APPROPRIATE TO SAY HERE THAT EVERY BEAUTIFUL WORK

28  OF ART HAS SOME DEFECT IN IT.  SOMETIMES IT IS NOT APPARENT

(2)

1  TO THE EYE OF THE BEHOLDER; SOMETIMES IT IS.

2          SOMETIMES THERE IS A GAP IN THE WAY THE PAINTING

3  IS PREPARED, SOME DEFECT IN THE ARTIST.  THE BLACK SPOT IN

4  THE OTHERWISE ENERGETIC AND LOVELY LIFE OF MATTHEW JAY, THE

5  GAP, THE ABERRATION WAS HIS INVOLVEMENT IN THE CRIME WHICH

6  LED TO THE DEATH OF SHIRLEY RIZK AND WHICH INVOLVED THE ATTEMPTED

7  MURDER OF LITTLE RORY RIZK.

8          THIS CASE HAS RAISED MANY THOUGHTS IN THE MINDS

9  OF THE FAMILY OF MATT JAY.  IT HAS RAISED MANY THOUGHTS IN

10  MY MIND AS COUNSEL.

11          I WOULD SAY THAT I IS AN AMERICAN TRAGEDY NO LESS

12  THAN THE TRAGEDY THAT THEODORE DREISER WAS TALKING ABOUT,

13  ALTHOUGH HIS NOVEL AND HIS ANALYSIS WAS A LITTLE DIFFERENT

14  THAN WHEN HE TALKED ABOUT THE MATERIALISM AND THE FACT THAT

15  AN INDIVIDUAL GOT CAUGHT UP IN THE MATERIALISM OF LIFE AND

16  WHAT HAPPENED TO MATT JAY IS NOT LESS THAN AN AMERICAN TRAGEDY.

17          HE IS JOINED HERE TODAY, AS THE COURT CAN SEE,

18  BY FAMILY AND FRIENDS.  THERE HAVE BEEN NO LESS THAN 40 OR

19  50 LETTERS OF RECOMMENDATION WHICH HAVE BEEN SENT TO THE COURT

20  ON BEHALF OF THIS YOUNG MAN.

21      THE COURT:  FORTY-FOUR TO BE EXACT.

22      MR. STANFORD:  FORTY-FOUR.  THANK YOU.

23          HIS MOTHER IS PRESENT.  HIS FATHER IS PRESENT.

24  HIS BROTHER AND SISTER ARE PRESENT.  THE PEOPLE WHO YOU SEE

25  BEFORE YOU, YOUR HONOR, ARE NOT MERELY HIS RELATIVES, BUT

26  THEY ARE MEMBERS OF THE COMMUNITY, NOT ONLY THE CHURCH

27  COMMUNITY BUT THE GENERAL COMMUNITY IN WHICH MATT JAY LIVED,

28  AND HOPEFULLY A COMMUNITY TO WHICH HE WILL RETURN IN DUE COURSE.

1  THESE LETTERS POINT OUT SEVERAL FACTORS ABOUT

2  MATT JAY WHICH CAN BE CONSIDERED, OF COURSE, AS DESCRIPTIVE

3  OF HIS CHARACTER.  HE IS A LOVING INDIVIDUAL, A RELIGIOUS

4  YOUNG MAN, CAME FROM A GOOD FAMILY.

5  WHEN HE WAS SOBER HE HELPED OTHERS.  HE EVEN

6  EXTENDED HIMSELF TO THE EXTENT -- AND I THINK THERE IS A

7  RELATIONSHIP OR MENTION OF IT IN THE PROBATION REPORT -- HE

8  EVEN TRIED TO DISSUADE OTHER YOUNG PEOPLE TO STAY AWAY FROM

9  DRUGS WHEN HE WAS SOBER, WHEN HE WAS NOT ON DRUGS.

10  HE WAS A LEADER IN HIS CHURCH COMMUNITY WHEN HE

11  WAS IN CONTROL OF HIMSELF.  THESE ARE THE THINGS THAT ARE

12  SAID IN THE LETTERS.  HE HAS A FUTURE AS IT SAYS.  I AM SURE

13  HE DOES.

14  HE COMPLETED HIGH SCHOOL IN THE COUNTY JAIL HALL

15  OF JUSTICE TO SHOW HIMSELF THAT HE COULD DO IT AND TO HELP

16  HIS REHABILITATION AND TO SHOW HIS PARENTS THAT YOU COULD

17  DO IT.  HE HAS THE LOVE AND SUPPORT OF HIS COMMUNITY AND OF

18  HIS FAMILY, BUT NOT ONE LETTER HAS OVERLOOKED THE SERIOUSNESS

19  OF THIS CRIME.  NOT ONE LETTER HAS SAID THAT HE OUGHT TO NOT

20  BE PUNISHED FOR HIS CRIME, BUT IT IS -- IT IS SIMPLY A HARD,

21  DIFFICULT THING TO TALK ABOUT WHEN ONE FINDS A YOUNG MAN WHO

22  COULD NOT SAY NO TO TORRY MEIER, WHO I THINK WAS REFERRED

23  TO IN MATT JAY'S REPORT AS BEING A LEADER AND A RATHER

24  AGGRESSIVE INDIVIDUAL.

25  BE THAT AS IT MAY, THAT IS IN THE PAST.  THE

26  PROBATION DEPARTMENT HAS THOROUGHLY REVIEWED MATT JAY'S CASE.

27  THEY HAVE SEEN FIT -- PRECISELY ROBERT KELSEY, THE PROBATION

28  OFFICER IN THIS CASE, HAS SEEN FIT TO NOTICE NO LESS THAN

1   FIVE CIRCUMSTANCES IN MITIGATION FOR THIS YOUNG MAN WHO, I

2   MIGHT ADD, WAS 18 YEARS AND 76 DAYS AT THE TIME THIS EVENT

3   OCCURRED.

4         WITH REGARD TO THE FACT OF THE CRIME, I AM GOING

5   TO SAY PROBABLY THREE SENTENCES, AND THE FIRST SENTENCE I

6   WOULD SAY THAT MATT JAY PARTICIPATED BUT WAS NOT THE PRIME

7   ACTOR IN THE CRIME IN THE HOUSE WHERE SHIRLEY RIZK DIED.

8   HE DID NOT EVEN TOUCH ANY ROPE OR ANYTHING OF THIS SORT.

9         SECONDLY, IT WAS ALLEGED -- AND HE HAS ADMITTED

10  THAT HE PURCHASED POISON.  HOWEVER, IT WAS SOMEBODY ELSE WHO

11  DID SOMETHING WITH THAT POISON IN AN ATTEMPT TO DO AWAY WITH

12  RORY RIZK, AND NOT ONLY DID TORRY MEIER -- MY REMARKS ARE

13  NOT INTENDED TO IN ANY WAY EXPLAIN OR DIMINISH THIS YOUNG

14  MAN'S RESPONSIBILITY, BUT TWICE TORRY MEIER TRIED TO USE THE

15  POISON, ONCE IN A SANDWICH AND ONCE IN SOME MALTED MILK

16  SUBSTANCE.

17        I AM SAYING THAT THERE IS SOME REMOVAL AS FAR

18  AS A COMPLETE PARTICIPATION IN THE RORY RIZK SITUATION.

19        MY CLIENT DID NOT  SET FIRE TO ANY CAR IN MALIBU,

20  ALTHOUGH THERE IS INFORMATION THAT HE WAS ON THE ROAD IN A

21  SEPARATE CAR.  I AM NOT GOING TO TALK ABOUT THE FACTS ANYMORE

22  BECAUSE THOSE ARE THE ACCURATE FACTS AS THE REPORT SEEMS TO

23  INDICATE.

24        ONE OF THE INTERESTING FACETS OF MY CLIENT'S

25  BACKGROUND IS REALLY MENTIONED IN THE CIRCUMSTANCES MITIGATION

26  NUMBER FIVE IN WHICH THE PROBATION DEPARTMENT MENTIONS THAT

27  THE DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING THE CRIME

28  BEFORE HE WAS APPREHENDED THUS ENSURING HIS EVENTUAL ARREST

1  AND CONVICTION.

2  WHY DID HE -- MATT JAY -- AN OTHERWISE FINE YOUNG

3  MAN TALK THE DAY AFTER OR TWO DAYS AFTER THE EVENT?  I DON'T

4  KNOW, AND GOD ONLY KNOWS THAT, BUT I CAN SUGGEST THAT HAVING

5  SOBERED UP THE DAY AFTER AND HAVING HEARD ON THE TELEVISION

6  OR SEEING ON THE TELEVISION OR HAD SOME INFORMATION AS TO

7  WHAT HAPPENED, THE REAL REALIZATION OF WHAT HE WAS INVOLVED

8  IN CAME UPON HIS SHOULDERS AND HE SIMPLY WAS INVOLVED IN SOME

9  EFFORT TO RELEASE HIS GUILT TO WHOMEVER WOULD LISTEN TO HIM.

10  THIS MAN HAS BEEN -- AND I SAY "MAN" ADVISEDLY --

11  HAS BEEN REMORSEFUL FROM THE TIME BEFORE HE WAS EVEN ARRESTED.

12  HE HAS BEEN COMPASSIONATE WITH PEOPLE THAT HE HAS KNOWN AND

13  HE IS DEEPLY, DEEPLY SORRY FOR WHAT HE HAS DONE.  HE HAS NO

14  PRIOR RECORD.

15  FURTHERMORE, AS THE PROBATION DEPARTMENT HAS

16  MENTIONED AS A FURTHER CIRCUMSTANCE IN MITIGATION, HE WAS

17  A PASSIVE PARTICIPANT.  THAT IS NUMBER ONE IN THIS EVENT,

18  AND WHILE HIS ROLE CANNOT BE SAID TO BE A MINOR ONE, HE WAS

19  THE MOST MINOR OF THE THREE.  HE WAS A PASSIVE PARTICIPANT

20  BECAUSE, AS THE COURT KNOWS PARTICULARLY FROM THE REPORT OF

21  THE PSYCHIATRIST WHO EXAMINED HIM AND HOSPITAL REPORTS

22  MENTIONED IN THE PROBATION REPORT -- THIS YOUNG MAN WAS

23  UNFORTUNATELY FOR HIMSELF AND HIS FAMILY USING DRUGS, BUT

24  HE WAS USING DRUGS ON THE DAY AND ON THE NIGHT OF THE CRIME.

25  HE WAS USING MARIJUANA.  THERE WAS A SUGGESTION OF A LITTLE

26  COCAINE.  THERE WAS HASHISH AND THERE WAS DRINKING OF SOME

27  BEER,  AND THE PSYCHIATRISTS' REPORTS INDICATE THAT WERE IT

28  NOT FOR THE STUPOROUS CONDITION OF THIS YOUNG MAN OR THE

1  CONDITION THAT HE WAS IN OF BEING PASSIVE AND NONRESISTANT

2  TO FORCE BECAUSE OF HIS DRUG INVOLVEMENT AND, NUMBER TWO,

3  BECAUSE OF THE FORCEFUL CHARACTER OF TORRY MEIER HE WOULD

4  HAVE NAMELY -- MATT JAY WOULD HAVE NEVER BEEN INVOLVED IN

5  THIS CRIME, ALL OF WHICH IS FINE, BUT HE DID GET INVOLVED.

6          BUT I AM SUGGESTING TO THE COURT THAT HE DID NOT

7  GET INVOLVED AS A PERSON WITH COMPLETE CONTROL OVER HIMSELF,

8  ALTHOUGH IT IS TRUE AND IT WILL BE ARGUED THAT HE DROVE A

9  CAR AND WENT TO A STORE.  I DON'T KNOW.  I AM NOT ENOUGH OF

10  A DOCTOR TO KNOW HOW MUCH A PERSON HAS TO BE IN CONTROL OF

11  THEMSELVES TO GO TO A STORE OR DRIVE A CAR, BUT THERE IS A

12  BACKGROUND TO THIS YOUNG MAN SHOWING THAT HE USED DRUGS BECAUSE

13  OF A DISAPPOINTMENT THAT WENT ON.

14          HIS FAMILY TRIED TO HELP HIM AND IT CAME TO A

15  CLIMATIC END WITH THIS CASE.  FOR EXAMPLE, PAGE 4 *OF THE

16  PROBATION REPORT, LINES 12 TO 14 -- "IN A DAZED, STUPOROUS

17  CONDITION THIS YOUNG MAN BOUGHT POISONS AT MEIER'S DIRECTION."

18  PAGE 4, LINES 12 TO 14.

19          THE COMMENT ABOUT THE EVENTS FROM THE LITTLE

20  VICTIM HIMSELF, PAGE 7, LINES 15 TO 16, RORY SAYS THE BROTHER

21  TRIED TO KILL HIM AND THERE WAS NO COMMENT BY RORY AS TO THE

22  OTHER TWO.  I DON'T KNOW WHY, BUT I'M JUST MENTIONING THESE

23  THINGS SO THAT THE ACCURATE FACTS AS AT LEAST I VIEW THEM

24  ON BEHALF OF MY CLIENT WOULD BE UNDERSTOOD BY THE COURT.

25          OF COURSE, THE SINGLE MOST AGGRAVATING CIRCUMSTANCE

26  AND THE ONLY CIRCUMSTANCE THAT IS USED IN AGGRAVATION IS THE

27  CRIME ITSELF.  IT WAS A CRIME OF GREAT VIOLENCE AND WAS A

28  HIGH DEGREE OF CRUELTY, BUT AS THE COURT MAY HAVE NOTICED --

1    AGAIN RETURNING TO THE FACTS OF THE CRIME, THIS NOW FROM THE

2    MOUTH OF THE DEFENDANT HIMSELF TO THE PROBATION OFFICER --

3    PAGE 12, LINES 7 TO 10:

4            "MATT JAY WAS CRYING, TOO SCARED TO WITHDRAW

5    BEFORE THE CRIME WAS COMPLETED. 'I FROZE,' SAYS HE.  MEIER

6    SAYS, 'WE NEED YOU.'"

7            AT LEAST MATT JAY IS TELLING THE PROBATION OFFICER

8    THAT HE -- MATT JAY -- WAS AFRAID OF WHAT WOULD HAPPEN TO

9    HIM HAD HE ATTEMPTED TO WITHDRAW -- WAS IN A STATE OF MASS

10   CONFUSION AND SO ON AND SO FORTH, AND HE DIDN'T HAVE THE

11   COURAGE TO WITHDRAW OR ANYTHING OF THAT SORT.

12           BUT A YEAR BEFORE THE CRIME HE HAD GREAT COURAGE,

13   WHICH IS AN INDICATION OF HIS FUTURE ABILITY TO RETURN TO

14   SOCIETY, BECAUSE HE WENT TO THE WEST VALLEY POLICE DEPARTMENT

15   AND REPORTED TO THE WEST VALLEY LOS ANGELES POLICE DEPARTMENT

16   WITH TWO OTHER FRIENDS OF HIS THAT MR. MEIER HAD MADE OVERTURES

17   ABOUT KILLING HIS MOTHER A YEAR BEFORE THIS CRIME OCCURRED,

18   AND THAT INFORMATION IS CONTAINED IN THE REPORTS THAT ARE

19   IN OUR POSSESSION.  GOD ONLY KNOWS WHY HE DIDN'T DO IT IN

20   OCTOBER OF 1985, BUT I AM MERELY MENTIONING IT TO THE COURT

21   BECAUSE IT SHOWS THAT THE MAN -- ALMOST A MAN  -- HAS MANY,

22   MANY BEAUTIFUL QUALITIES.

23           THERE ARE OTHER MITIGATING CIRCUMSTANCES THAT

24   HAVE BEEN MENTIONED BY THE PROBATION OFFICER.  OF COURSE,

25   POINT TWO CIRCUMSTANCE WAS THAT THE DEFENDANT HERE PARTICIPATED

26   IN THE CRIME UNDER CIRCUMSTANCES OF EXTREME DRUG USE WHICH

27   WAS EVEN ACKNOWLEDGED BY THE CO-DEFENDANT MEIER.

28           THE LAST SENTENCE OF THE PROBATION OFFICER'S

REPORT AS TO POINT TWO SAYS:

"THIS WOULD INDICATE THE DEFENDANT'S CONDUCT WAS PARTIALLY EXCUSABLE FOR SOME OTHER REASON NOT AMOUNTING TO A DEFENSE."

THAT IS THE ESSENCE OF THIS CASE, YOUR HONOR. MATT JAY IS NOW THE WAY HE WAS WHEN HE WAS RIGHT, AND GOD WILLING, HE WILL BE RIGHT AGAIN.

ONE OF THE OTHER MITIGATING CIRCUMSTANCES THAT HAS BEEN MENTIONED IS THAT HE HIMSELF WAS INDUCED BY DEFENDANT MEIER TO PARTICIPATE IN THE CRIME AND, OF COURSE, MR. JAY HAS NO PRIOR RECORD.

ANOTHER MITIGATING CIRCUMSTANCE THAT I WOULD LIKE TO MENTION SIMPLY TO ASSIST MY CLIENT HERE IS THAT UNDER RULE 414 OF THE CALIFORNIA RULES OF COURT SUBSECTION D AND SUBPARAGRAPH 7, THE EFFECTIVE IMPRISONMENT UPON HIM AND IN MY OPINION THE REMORSEFUL EFFECT OR THE REMORSEFULNESS OF THE DEFENDANT HIMSELF MIGHT CERTAINLY BE TAKEN INTO CONSIDERATION, BUT I THINK IT IS SIGNIFICANT THAT THIS YOUNG MAN HAS IMPRESSED SO MANY PEOPLE. HE HAS IMPRESSED NOT ONLY THE PEOPLE IN THIS COURTROOM WHO HAVE COME TO SUPPORT HIM, BUT HE HAS IMPRESSED THE PROBATION OFFICER WHO HAS DONE EVERYTHING THAT HE COULD DO EVEN TO THE POINT OF SUGGESTING THAT THIS MAY VERY WELL BE AN UNUSUAL CASE FOR THE COURT TO CONSIDER.

THERE ARE CERTAIN CRITERIA WHICH MAY FALL INTO THAT CATEGORY UNDER RULE 416 OF THE CALIFORNIA RULES OF COURT. I WILL JUST MENTION THOSE POINTS IN PASSING.

SUBSECTION D, "THERE MIGHT HAVE BEEN SOME COERCION

1  OR DURESS NOT AMOUNTING TO A DEFENSE." I AM NOT SURE WHETHER

2  THE FACTS THAT I HAVE RELATED AMOUNT TO ACTUAL COERCION, BUT

3  IT BORDERS ON THAT.

4  SUBSECTION E, RULE 416 DISCUSSES "BECAUSE OF SOME

5  PSYCHOLOGICAL PROBLEMS NOT AMOUNTING TO A DEFENSE THIS COULD

6  BE CONSIDERED AN UNUSUAL CASE," BUT LAST AND NOT LEAST, I

7  WOULD SAY THAT THE DEFENDANT'S AGE, HIS BEING NOW 19 YEARS

8  OF AGE BUT ONLY 76 DAYS BEYOND 18 AT THE TIME OF THE CRIME,

9  SHOULD HAVE SOME BEARING ON THE COURT'S CONSIDERATION IN THIS

10  CASE.

11  HE WAS A PASSIVE PARTICIPANT IN A TRAGEDY THAT

12  WILL KEEP HIM OUT OF SOCIETY, YOUR HONOR, FOR A LONG WHILE.

13  IF IT WERE NOT FOR THIS CASE, IF IT WERE NOT FOR THIS ONE

14  BLACK MARK, THIS IS ON HIS RECORD ON AN OTHERWISE BEAUTIFUL

15  PAINTING, THIS YOUNG MAN IS THE TYPE OF PERSON THAT ANYBODY

16  IN THIS ROOM WOULD LOVE TO HAVE OVER TO THEIR HOMES, TO A

17  YOUTH GROUP OUTING, TO KNOW AND TO LOVE FOR MANY, MANY YEARS.

18  I WOULD, OF COURSE, EXPECT THE COURT TO TAKE ALL

19  THESE ITEMS INTO CONSIDERATION AS I'M SURE THE COURT WILL,

20  AND I MUST SAY THAT THE DISTRICT ATTORNEY'S OFFICE IN A

21  CURIOUS WAY HAS BEEN HELPFUL IN THIS CASE, BECAUSE I THINK

22  THE DISTRICT ATTORNEY'S OFFICE HAS REALIZED THE TRAGEDY OF

23  THIS SITUATION. THEY HAVE REALIZED THE PROBLEM THAT MR. JAY

24  FACES WHEN THE MAIN CULPRIT HAS BEEN SENTENCED IN A DIFFERENT

25  WAY. I DON'T KNOW WHAT CAN BE DONE ABOUT THAT, BUT THE

26  SYMPATHIES THAT MR. JAY HAS FOR HIM SHOULD BE CONSIDERED.

27  HE IS AN EXCELLENT YOUNG MAN SAVE FOR THIS CASE.

28  I WOULD THINK, YOUR HONOR, THAT ONE POINT IN ADDITION TO WHAT

1    I HAVE MENTIONED BEFORE IS THAT -- AND THIS HAS BEEN MENTIONED

2    BY THE COURT -- WHATEVER THE COURT DOES, IT IS IMPORTANT THAT

3    THIS YOUNG MAN WHO DEEPLY UNDERSTANDS WHAT HE HAS DONE, BE

4    GIVEN A CHANCE TO GROW AND DEVELOP AND TO LIVE IN AN

5    ENVIRONMENT WHERE THERE IS AS MUCH EDUCATION AS POSSIBLE AND

6    AS MUCH CHANCE FOR DEVELOPMENT AS POSSIBLE, AND IN THAT RESPECT,

7    OF COURSE, WE WOULD REQUEST THAT IN THE COURT'S SENTENCING,

8    THERE BE A DEFINITE AND CONCRETE RECOMMENDATION THAT HE BE

9    HOUSED IN THE CALIFORNIA YOUTH AUTHORITY.

10          HAVING SAID WHAT I HAVE JUST SAID, YOUR HONOR,

11   I SIMPLY WOULD ASK THE COURT TO FORGIVE THE LENGTH OF MY

12   REMARKS.  I HAVE BEEN AFFECTED BY THIS YOUNG MAN AS HAS

13   EVERYBODY ELSE.  BUT FOR THIS ONE BLACK MARK HE WOULD BE A

14   FINE CITIZEN, AND I AM CERTAIN THAT HE WILL AGAIN BE A USEFUL

15   AND PRODUCTIVE MEMBER OF SOCIETY.

16          THANK YOU.

17       THE COURT:  THANK YOU, MR. STANFORD.

18          MR. FELDMAN.

19       MR. FELDMAN:  THANK YOU.

20          YOUR HONOR, COUNSEL, AS THIS COURT WELL KNOWS

21   THE FUNCTION OF THE DISTRICT ATTORNEY'S OFFICE IS GENERALLY

22   NOT SIMPLY TO CONVICT OR SIMPLY TO SEEK MAXIMUM SENTENCING,

23   BUT BASICALLY TO SEEK SUBSTANTIAL JUSTICE WHEREVER AND HOWEVER

24   IT PERCEIVES IT AND, INDEED, IN MY COMMENTS TO THE COURT I

25   WILL TRY TO REFLECT OUR HONEST APPRAISAL OF MATTHEW JAY AND

26   WHAT WE FEEL THE ACCURATE PROSPECTIVE SHOULD BE BOTH BEFORE

27   THIS COURT AND SUBSEQUENT AUTHORITIES THAT WILL BE VIEWING

28   HIM AND HIS INCARCERATION.

1    COUNSEL REFERS TO MATTHEW JAY AS AN ALMOST PRIME

2  EXAMPLE OF A 1980'S AMERICAN TRAGEDY.  IN MANY OF COUNSEL'S

3  REMARKS I FIND MYSELF IN AGREEMENT.  IN A FEW PARTICULARS,

4  I VARY.

5    IN HIS REFLECTION OF THE TRAGEDY OF MATTHEW JAY,

6  I HAVE TO AGREE.  IN MANY PARTS OF SOCIETY, PERHAPS UNTIL

7  RECENTLY MAYBE STILL IN SOME COURTS TODAY WE HEAR REFERENCES

8  TO DRUG OFFENSES AS VICTIMLESS CRIMES, AND I THINK PERHAPS

9  AS MUCH AS ANY CASE THAT I CAN RECALL THE PROSECUTION -- THE

10  OFFENSE OF MATTHEW JAY REALLY DISAPPROVES OF THE CONCEPT THEY

11  ARE VICTIMLESS CRIMES.

12    MATTHEW JAY AND THE OTHERS WERE VICTIMS IN THE

13  MORE TRADITIONAL WAYS OF THE CRIME INVOLVING THE DEATH OF

14  SHIRLEY RIZK AND NEAR DEATH OF RORY RIZK IS VERY MUCH THE

15  VICTIM OF THE DRUG LIFE AND THE DRUG CRIMES THAT WERE A PART

16  OF MATTHEW JAY UNTIL OCTOBER OF 1985.

17    AS COUNSEL HAS STATED, IT IS CLEARLY A FACT THAT

18  THE YEAR BEFORE THIS DEFENDANT JOINED WITH TORRY MEIER AND

19  MR. PARKER IN THE KILLING OF SHIRLEY RIZK AND THE ATTEMPTED

20  MURDER OF RORY RIZK, THERE HAD BEEN ANOTHER OVERTURE MADE

21  AND, INDEED, THIS DEFENDANT AT THAT TIME SAID, "NO," AND

22  PERHAPS WITH THE PEER PRESSURE THAT HE AND HIS FRIENDS WERE

23  ABLE TO DISSUADE TORRY MEIER FROM GOING FORWARD AT THAT TIME

24  AND CERTAINLY DID NOT JOIN IN WITH TORRY MEIER.

25    I THINK THE EVIDENCE IS FAIRLY CLEAR THAT INDEED

26  IN OCTOBER OF 1985 MATTHEW JAY HAD GONE VERY FAR DOWN THE

27  ROAD FROM A YEAR EARLIER IN HIS INVOLVEMENT IN DRUGS AND THE

28  EFFECTS THAT IT HAD ON HIS LIFE, AND, INDEED, ON THAT OCCASION

1  WHEN THE OVERTURE WAS MADE HE DIDN'T DISSUADE, HE PARTICIPATED

2  AND HE JOINED IN THE KILLING OF SHIRLEY RIZK AND ATTEMPTED

3  MURDER OF RORY RIZK.

4         I'M NOT SO SURE THAT I TOTALLY AGREE WITH

5  COUNSEL'S REFERENCE TO MATTHEW JAY OR THE PROBATION OFFICER'S

6  REFERENCES TO MATTHEW JAY AS A PASSIVE PARTICIPANT AND THAT

7  HE WAS TRUELY AND COMPLETELY DAZED AND STUPOROUS IN HIS

8  INVOLVEMENT IN THE CRIME AND THE FACTS TO REFLECT THAT AT

9  THE TIME WHEN TORRY MEIER WOULD LEAVE THAT 15 TO 20 MINUTE

10 STRANGULATION OF SHIRLEY RIZK TO ABATE THE FEARS OF RORY TO

11 MAKE SURE THAT RORY WAS TAKEN CARE OF AND NOT INERTERFERING

12 IN IT, THE TWO REMAINING DEFENDANTS -- THIS DEFENDANT AND

13 RICHARD PARKER -- CONTINUED IN THAT STRANGULATION, AND TO

14 THAT EXTENT THE EVIDENCE WE SUBMIT IS FAIRLY CLEAR THERE WAS,

15 INDEED, ACTIVE PARTICIPATION IN THAT STRANGULATION AND,

16 INDEED, AS COUNSEL HAS INDICATED WHEN THE DECISION WAS MADE

17 AMONGST THEM THAT RORY RIZK COULD NOT BE ALLOWED TO LIVE,

18 THIS DEFENDANT DID -- WHETHER HE TOOK THE INITIATIVE OR UPON

19 THE INSTRUCTION OF TORRY MEIER -- HE DID GO OUT AND GET THE

20 POISONS WHICH SUBSEQUENTLY WERE USED IN AN ATTEMPT TO TAKE

21 THE LIFE OF EIGHT-YEAR-OLD RORY RIZK, AND, LASTLY, AT THE

22 TIME THAT THE BODY OF SHIRLEY RIZK WAS BEING PREPARED TO BE

23 DISPOSED OF AND THE ATTEMPT IS BEING MADE TO BURN RORY RIZK

24 ALIVE, THIS DEFENDANT DRIVES A FAIRLY SIGNIFICANT DISTANCE,

25 FAIRLY SECURITOUS (PHONETICALLY), OUT TO MALIBU CANYON AND

26 PERFORMS THE ROLE OF GETAWAY DRIVER TO ALLOW THE OTHER

27 PARTICIPANTS TO LEAVE THE SCENE.

28         COUNSEL MAY VERY WELL BE RIGHT THAT BUT FOR HIS

1   DRUG INVOLVEMENT THIS IS THE ONLY SIGNIFICANT BLACK MARK ON

2   AN OTHERWISE FINE LIFE LOOKING IN TERMS OF ITS POTENTIAL OF

3   MATTHEW JAY, BUT IT IS A TERRIBLE BLACK MARK AND IT IS A VERY

4   SIGNIFICANT ONE AND THE COURT NEED NOT WEIGH EQUALLY ALL THE

5   VARIOUS CONSIDERATIONS IN DETERMINING WHAT DISPOSITION TO

6   IMPOSE, WHAT PARTICULAR SENTENCE TO IMPOSE AND WHAT

7   ALTERNATIVES.

8          WE DO DISAGREE WITH COUNSEL THAT THIS IS AN

9   UNUSUAL CASE UNDER RULE 416. JUST THE ENORMITY OF THE OFFENSE,

10   THE METHOD IN WHICH IT WAS CONDUCTED, THE PERIOD OF TIME OVER

11   WHICH IT WAS CONDUCTED, THE CRUELTY, THE VIOLENCE, THE

12   EXTREME VULNERABILITY OF RORY RIZK WOULD MAKE THIS AN

13   INAPPROPRIATE CASE IN OUR VIEW TO DETERMINE THIS TO BE AN

14   UNUSUAL CASE WHERE STATE PRISON WOULD NOT BE THE APPROPRIATE

15   SENTENCE ALTERNATIVE.

16          IN CONCLUSION, YES, WE DO BELIEVE THAT MATTHEW

17   JAY IS A TRAGEDY AS WAS THE TRAGEDY OF THE LOSS OF THE LIFE

18   OF SHIRLEY RIZK AND NEAR GREAT TRAGEDY OF THE LOSS OF RORY

19   RIZK'S LIFE, BUT NONETHELESS STATE PRISON SENTENCING IS THE

20   ONLY MEANINGFUL ALTERNATIVE. WE DON'T OPPOSE THE CONCURRENT

21   AND DON'T OPPOSE 1731(C) ORDER REQUESTED BY COUNSEL THAT HE

22   BE HOUSE IN YOUTH AUTHORITY AND GIVEN WHATEVER APPROPRIATE

23   TREATMENT, TRAINING AND PROGRAMS AVAILABLE TO THE YOUTH

24   AUTHORITY UNTIL HE REACHES AGE 25.

25          THE COURT: ANYTHING FURTHER?

26          MR. STANFORD: NO.

27          THE COURT: WAIVE ARRAIGNMENT FOR JUDGMENT?

28          MR. STANFORD: YES. SO WAIVED.

1    THE COURT:  IS THERE ANY LEGAL CAUSE?

2    MR. STANFORD:  NO, YOUR HONOR.

3    THE COURT:  I HAVE HAD THIS PROBATION REPORT AND

4    PRACTICALLY ALL OF THE FORTY-SOME-ODD LETTERS ON MY DESK IN

5    CHAMBERS SINCE I RETURNED TO WORK ON MARCH THE 2ND AND SOME

6    CAME IN AFTER THAT.

7        THE COURT, IN LOOKING AT THIS PROBATION REPORT,

8    LOOKING AT ALL THESE LETTERS, OBVIOUSLY PROPOUND AN ENIGMATIC

9    SITUATION.  MATTHEW JAY IS AN ENIGMA.  HE, IN COMPARISON TO

10   MR. PARKER, SHOULD BE PUNISHED EVEN MORE SO BECAUSE HE CAME

11   FROM AN ENVIRONMENT THAT HE HAD EVERYTHING GOING FOR HIM.

12       HIS FATHER IS AN EDUCATOR; HIS MOTHER IN THE

13   MINISTRY; ACTIVE IN HIS CHURCH, AND THE THING THE COURT WAS

14   ALSO IMPRESSED WITH ALL THESE LETTERS THAT WERE WRITTEN ON

15   BEHALF OF MR. JAY ALL TELLING ME HOW MANY YEARS THEY HAVE

16   KNOWN HIM, ALL OF THESE CLOSE FRIENDS.

17       WELL, NOT ONLY HAS MR. JAY LET THEM DOWN, BUT

18   HIS FRIENDS LET HIM DOWN.  I THINK HIS FRIENDS AND HIS

19   ASSOCIATES AND HIS RELATIVES ARE EQUALLY AS CULPABLE IN HAVING

20   MR. JAY SITTING HERE TODAY AS HE IS.  THIS DOESN'T COME

21   TO JUST ONE YEAR.

22       I HAVE LETTERS FROM HIS FRIENDS TELLING ME THAT

23   THEY HAVE KNOWN HE HAS HAD A PROBLEM SINCE HE WAS 14, 15

24   YEARS OLD.  NOBODY BOTHERED TO BLOW THE WHISTLE ON HIM AND

25   TODAY HE IS FACED WITH LOOKING AT A STATE PRISON COMMITMENT

26   PERHAPS FOR THE REST OF HIS LIFE.

27       THE COURT IS VERY MINDFUL OF THE FACT OF HIS AGE

28   AND HIS PARTICIPATION IN THIS CRIME.  THE COURT IS PERSUADED

1   BY ALL OF THE LETTERS WHO SEEM TO THINK THAT MR. JAY -- AND

2   I AM ALSO SATISFIED WITH THE STATEMENTS HE HAS MADE TO THE

3   PROBATION DEPARTMENT -- MR. JAY CAN LEAD A SUCCESSFUL LIFE,

4   BUT I AM NOT GOING TO FORGET THAT WE HAVE A LIFE THAT HAS

5   BEEN TAKEN ALREADY AND THAT HE PARTICIPATED IN THAT AND,

6   SECONDLY, THAT BUT FOR A FORTUITOUS EVENT THAT AN EIGHT-AND-

7   A-HALF-YEAR-OLD BOY'S LIFE WOULD HAVE BEEN SNUFFED OUT.

8          NOW I DON'T FIND ANYTHING IN THIS FILE THAT WOULD

9   WARRANT ME TO COME TO THE CONCLUSION THAT THERE ARE

10  EXTENUATING CIRCUMSTANCES OR THAT THIS IS AN UNUSUAL CASE

11  THAT WOULD WARRANT MY GRANTING PROBATION TO MR. JAY.

12  ACCORDINGLY, PROBATION WILL BE DENIED.

13         WE NOW COME TO THE SENTENCING.  MR. JAY HAS PLED

14  TO COUNT I OF THE INFORMATION, SECOND DEGREE MURDER, AND IN

15  LOOKING AT THIS ENTIRE MATTER AND READING ALL OF THE REPORTS

16  AND READING EVERYTHING THAT I HAVE BEFORE ME, I AM GOING TO

17  SENTENCE MR. JAY TO STATE PRISON FOR THE TERM PRESCRIBED BY

18  LAW, THAT IS 15 YEARS TO LIFE.  HOWEVER, BECAUSE OF HIS AGE

19  AND BECAUSE OF HIS APPARENT -- AND BECAUSE OF ALL OF THESE

20  FACTORS THAT THIS COURT HAS CONSIDERED, I THINK IT APPROPRIATE

21  THAT PURSUANT TO THE PROVISIONS OF 1731.5 OF THE WELFARE AND

22  INSTITUTIONS CODE SUBSECTION C, THAT MR. JAY WILL BE HOUSED

23  IN THE CALIFORNIA YOUTH AUTHORITY TO UNDERGO WHATEVER PROGRAMS

24  ARE AVAILABLE TO HIM DURING SUCH TIME THAT HE IS IN CUSTODY.

25         UNDER THAT SECTION, MR. JAY, SO YOU UNDERSTAND,

26  YOU WILL BE SENT TO THE CALIFORNIA YOUTH AUTHORITY IF THEY

27  TAKE YOU.  IF THEY DO NOT, THEN YOU HAVE TO COME BACK HERE

28  AND WE WILL SEND YOU TO STATE PRISON, BUT ASSUMING THAT YOU

1    ARE STILL INCARCERATED BY THE TIME YOU ARE AGE 25 AND THERE

2    IS A BALANCE TO BE SERVED ON YOUR TERM, YOU WILL BE SENT TO

3    STATE PRISON UNDER THAT CODE SECTION.  DO YOU UNDERSTAND THAT,

4    SIR?

5            DEFENDANT JAY:  YES, SIR.

6        THE COURT:  NOW, ACCORDING TO THE PROBATION REPORT

7    THAT I HAVE BEFORE ME YOU HAVE BEEN IN CUSTODY AS OF TODAY

8    512 DAYS.

9            IS THAT YOUR CALCULATION?

10        MR. STANFORD:  YES, YOUR HONOR, THAT IS, THAT'S CORRECT.

11        THE COURT:  AND I WILL GIVE YOU CREDIT FOR THE 512 DAYS

12    THAT YOU HAVE ALREADY SERVED TOGETHER WITH AN ADDITIONAL 256

13    DAYS GOOD TIME WORK TIME, MAKING TOTAL CREDITS OF 760 DAYS

14    AGAINST YOUR LIFE SENTENCE.

15            AS TO COUNT II OF THE INFORMATION WHICH IS THE

16    ATTEMPTED MURDER OF RORY RIZK, THE COURT FINDS THAT THERE

17    ARE FACTORS IN MITIGATION WHICH DO NOT PREPONDERATE OVER THE

18    FACTORS IN AGGRAVATION NOR DO I FIND FACTORS IN AGGRAVATION

19    THAT PREPONDERATE OVER THE FACTORS IN MITIGATION, WHICH MEANS

20    THAT BOTH BALANCE OUT.  I AM GOING TO SENTENCE YOU TO THE

21    MID TERM FOR THE ATTEMPTED MURDER OF RORY RIZK AS TO COUNT II,

22    SEVEN YEARS BE SERVED CONCURRENT, BE SERVED AT THE SAME TIME

23    YOU ARE SERVING THE LIFE SENTENCE, WHICH MEANS IN THAT EFFECT

24    OF YOUR SENTENCE WILL BE SERVED 15 TO LIFE, UP TO THE TIME

25    YOU ARE 25 YOU WILL BE IN THE CALIFORNIA YOUTH AUTHORITY.

26    AFTER YOU ARE THROUGH SERVING YOUR TIME IN EITHER THE YOUTH

27    AUTHORITY AND/OR STATE PRISON, YOU WILL BE PUT ON A PERIOD

28    OF PAROLE UNDER 3000.1 OF THE PENAL CODE FOR A PERIOD OF YEARS

1    UP TO THE REST OF YOUR LIFE, AND IF AT SOME POINT IN TIME

2    THE BOARD OF PRISON TERMS OR STATE AUTHORITIES WHO HAVE AUTHORITY

3    OVER PAROLE MAY SET A PAROLE FOR YOU, AND IF YOU ARE

4    RELEASED ON PAROLE YOU WILL BE RELEASED ON PAROLE UNDER CERTAIN

5    TERMS AND CONDITIONS FOR A PERIOD OF TIME THEY SHALL DETERMINE,

6    AND IF YOU VIOLATE ANY TERMS OF PAROLE, THEN YOU ARE LOOKING

7    TO BE RETURNED TO STATE PRISON FOR A LOT LONGER; DO YOU

8    UNDERSTAND THAT?

9    DEFENDANT JAY:  YES, SIR.

10    THE COURT:  PEOPLE'S MOTION?

11    MR. FELDMAN:  DISMISSED, 1385.

12    THE COURT:  MOTION GRANTED.

13    ANYTHING FURTHER?

14    MR. STANFORD:  NOTHING FURTHER.

15    THE COURT:  GOOD LUCK TO YOU, MR. JAY.

16    DEFENDANT JAY:  THANK YOU.

17    THE COURT:  WILL ORDER A COPY OF THIS TRANSCRIPT,

18    ORIGINAL AND TWO COPIES OF THE SENTENCING TRANSCRIPT FOR THOSE

19    WHO WANT IT.

20    MR. STANFORD:  THANK YOU, YOUR HONOR.

21    MIGHT I JUST REQUEST THAT THE COURT MAKE AS PART

22    OF ITS JUDGMENT THAT THE ABSTRACT SHOULD REFLECT IF THE COURT

23    IS SO WILLING THAT SPECIAL CONSIDERATION BE GIVEN TO THE

24    DEFENDANT MATTHEW JAY FOR IMMEDIATE HOUSING WITH THE CALIFORNIA

25    YOUTH AUTHORITY.  THAT LANGUAGE MAY HELP IN SEEING THAT THE

26    COURT'S JUDGMENT IS FOLLOWED OUT, NAMELY, BY HIS GOING TO

27    THE YOUTH AUTHORITY.

28    THE COURT:  SO ORDERED.

1        MR. STANFORD:  THANK YOU.

2        THE COURT:  GOOD LUCK.

3            (PROCEEDING CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1             SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                FOR THE COUNTY OF LOS ANGELES

3  DEPARTMENT NE "B"           HON. GEORGE XANTHOS, JUDGE

4

5  THE PEOPLE OF THE STATE OF CALIFORNIA, )
                               )

6                    PLAINTIFF, )
                               )

7     VS.                     )     NO. A811060
                               )

8  MATTHEW ADAM JAY,        )REPORTER'S CERTIFICATE
                               )

9                    DEFENDANT. )
                               )

10 ───────────────────────────────

11  STATE OF CALIFORNIA,    )
                       ) SS

12  COUNTY OF LOS ANGELES. )

13        I, BARBARA BURLESON, OFFICIAL REPORTER OF

14  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

15  COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING

16  IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD

17  AT THE TIME OF PRONOUNCING SENTENCE; THAT THE VIEWS AND

18  RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN,

19  PURSUANT TO SECTION 1203.01 OF THE PENAL CODE.

20        DATED THIS 20 DAY OF APRIL, 1987.

21

22

23

24

25                                           CSR #2247

26                         OFFICIAL REPORTER

27

28

# EXHIBIT

4

NAME AND NUMBER:    JAY    D-55653    F-235L    CTF-CENTRAL    CDC-128-C

During his recent Board of Prison Terms hearing, inmate Jay stated that the Board told him that he had not participated sufficiently in therapy and self-help. Regarding the need for therapy, he demonstrated an adequate understanding of his commitment offense and the various factors which led up to it during his recent interview. In addition, due to staffing shortages at CTF, we do not provide therapeutic services to non-mental health inmates. Regarding the availability of self-help at CTF, other than Alcoholics Anonymous and Narcotics Anonymous, the Life Skills group (which has a waiting list at least one and a half years long and is only available to CCCMS inmates) is the only treatment that I am aware of at CTF.

orig: C-File
copy: Unit Sergeant
      CC-I
      Assignment Lt.
      Control
      Inmate
      Medical File
      Chrono File

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

DATE:    06/27/00    JAY    D-55653    gmj    MEDICAL-PSYCHIATRIC-DENTAL

NAME   JAY, M          NUMBER  D55653        CELL  D-012U      CDC-128B

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of Sexually Transmitted Disease.

Original:     Central File
cc:           IPEP File
              Inmate

*L. Tyler Kinney*
Peer Education Coordinator

DATE: 7/27/01

C-1813
GENERAL CHRONO

# Inmate Peer Education Program

This is to certify that

## M. JAY

has successfully completed a
course of instruction in

## Sexually Transmitted Diseases

an "Infectious Disease". Date: __7/27/01__

_A. Tyler Jimenez_

Inmate Peer Education Program Coordinator
Correctional Training Facility

__C-1813__

Certificate Number



NAME   JAY, M          NUMBER  D55653        CELL  W-208U     CDC-128B

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of Tuberculosis.

Original:     Central File
cc:           IPEP File
              Inmate

*L. Tyler Kinney*
Peer Education Coordinator

DATE: 3/8/02

C-2192
GENERAL CHRONO

# Inmate Peer Education Program

This is to certify that

## M. JAY

has successfully completed a
course of instruction in

## Tuberculosis

an "Infectious Disease". Date: __3/8/02__

Inmate Peer Education Program Coordinator
Correctional Training Facility

**C-2192**

Certificate Number

NAME   JAY, M              NUMBER  D55653        CELL   FW-208U      CDC-128B

Inmate JAY, M D55653 has successfully completed a course in the cause, prevention, treatment and management of HIV/Aids.

Original:        Central File
cc:              IPEP File
                 Inmate

*L. Tyler Kinner*
Peer Education Coordinator

DATE: 3/14/02

C-2199
GENERAL CHRONO

# Inmate Peer Education Program

This is to certify that

**M. JAY**

has successfully completed a course of instruction in

**HIV/Aids**

an "Infectious Disease".    Date:    **3/14/02**

Inmate Peer Education Program Coordinator
Correctional Training Facility

Certificate Number    **C-2199**

STATE OF CALIFORNIA

NAME and NUMBER    JAY, M    D55663    ED-012U

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

Since the Self Help Program resumed in August, you have attended meetings of the Alcoholics Anonymous "A" Group for the 3rd Quarter of 2003 (August, and September). You provide your service to the group by your attendance and participation. Through this program, you are shown what tools are available to you by your following "The 12 Steps of Recovery." By following these steps in your life, it will show your willingness to improve yourself.

You have been participating at CTF since: 10-06-1999

DATE: 11/3/03    (LAUDATORY CTF- Central Facility)    GENERAL CHRONO

Original : Central File
  cc: Staff Sponsor
    : Inmate

K.L. Villa
A.A. Staff Sponsor
CTF-Central Facility

---

STATE OF CALIFORNIA

NAME and NUMBER    JAY, M    D55663    ED-012U

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

You have attended meetings of the Alcoholics Anonymous "A" Group for the 4th Quarter of 2003 (October , November, and December). You provide service to the Group by your attendance. Through this program, you are shown what tools are available to you. By following "The 12 Steps of Recovery" in your life, you will show your willingness to improve yourself. You have been a participant at CTF since: 10-06-1999

DATE 12/18/03    (LAUDATIRY CTF-Central Facility)    GENERAL CHRC

Original : Central File
  cc: Staff Sponsor
    : Inmate

K.L. Villa
AA Staff Sponsor
CTF-Central Facility

# CERTIFICATE OF PARTICIPATION

May all who come hereafter know that

## *Matthew Jay*

has participated in the
"Alcoholic Anonymous Program"

from __10/6/1999__ to __12/31/2001__



Cindy A. Medina
Sponsor,
Correctional Training Facility
Soledad, CA

December 20, 2001

Date



# *Certificate*
## OF COMPLETION

This is to re-certify that

Matthew Adam Jay

has fulfilled all the theoretical and practical evaluation
requirements of OSHA 1910.178 (I), and, as such,
has maintained the designation of

# Certified Operator

on the following type(s) of equipment:

Class 5, LC 4, 4,000 Lbs.

and is hereby authorized to operate at the following worksite:

Furniture Factory/Corp. Yard

4108-072-R                          January 27, 2007
OPERATOR CERTIFICATION NUMBER
October 03, 2003                    January 27, 2010
ORIGINAL DATE OF CERTIFICATION



P.I.A. Furniture Factory          C.D. Walker, 4108



**PIA**
California Prison Industry Authority

# Certificate of Proficiency

This is to certify that

Matt Joy

has demonstrated proficiency
in the following occupational category:

Institution: CSP-Soledad
CDC #: D-55653

Industry: Wood Products

| Job Title/Specialty | D.O.T. No. | No. of Hours |
|---|---|---|
| Production Coordinator | 22.46/0.18 | 2,250 + |

* US Department of Labor, Dictionary of Occupational Titles

Supervisor

5-22-03
Date

General Manager, Prison Industry Authority



Certificate of Proficiency

Proudly made in California
www.pia.ca.gov
CALIFORNIA REPUBLIC
PIA

This is to certify that

Mathew Jay

has achieved proficiency in the following occupational category:

Institution  Correctional Training Facility

CDC # D-55653

Industry:  Furniture

**Job Title/Specialty**

Clerk, General/Materials Coordinator

*US Department of Labor, Dictionary of Occupational Titles

D.O.T. No.:
209.562-010

No. of Hours
4,750 +

Supervisor

Date
1-12-____

General Manager (A), Prison Industry Authority

liability. Selects reinsurers who may accept part of ceded liability. Types applications. Computes amount of each premium due, using calculating machine. Accepts reinsurers and their liability for cash values and dividends. Prepares abstract for typing of contracts. (2) Receives reinsurance application from prime insurer. Determines amount of insurance already held on risk from company records and calculates reinsurance that company can accept, based on limit of liability. Determines if reinsurance is automatic or must be submitted, and sends application to underwriting department when it is not automatic. Types notice of acceptance or rejection, based on limit of liability, and action of UNDERWRITER (insurance). Operates calculator to verify computations made by prime insurer.
GOE: 07.02.04 STRENGTH: S GED: R4 M3 L3 SVP: 5 DLU: 77

**219.487-010 TAX CLERK (clerical)** alternate titles: revenue-stamp clerk
Computes state or federal taxes on sales transactions, production processes, or articles produced, and keeps record of amount due and paid. May affix revenue stamps to tax reports to cover amount of tax due.
GOE: 07.02.04 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77

**219.587-010 PARIMUTUEL-TICKET CHECKER (amuse. & rec.)** alternate titles: ticket counter
Counts and records number of parimutuel tickets cashed at race track to verify records of cashiers. Compares totals with entries on daily balance sheet. Compares each ticket with sample or examines tickets under fluorescent light to verify validity of tickets. Reports discrepancies.
GOE: 07.05.02 STRENGTH: S GED: R3 M3 L3 SVP: 2 DLU: 77

## 22    PRODUCTION AND STOCK CLERKS AND RELATED OCCUPATIONS

This division includes occupations concerned with compiling and maintaining production records, expediting flow of work and materials, and receiving, storing, shipping, issuing, requisitioning, and accounting for materials and goods.

## 221    PRODUCTION CLERKS

This group includes occupations concerned with compiling records and reports on various aspects of production, such as materials and parts used, products produced, and frequency of production; estimating or measuring amount of material needed and computing material and production costs; counting, measuring, or weighing goods produced or material on hand to tally data for production control or payroll purposes; charting production progress; preparing or distributing work tickets, formula cards, or other production guides; scheduling and expediting flow of work and materials for production or repair; coordinating, scheduling or monitoring production, using electronic equipment; and observing production operations to log products produced, materials used, processes completed, and machine and instrument readings. Occupations concerned with preparing payroll and timekeeping records from production data are found in Group 215.

**221.132-010 CHIEF CLERK, MEASUREMENT DEPARTMENT (petrol. & gas; pipe lines)**
Supervises and coordinates activities of workers engaged in compiling reports concerning quality and quantity of oil or natural gas produced, purchased, transported, and sold: Directs clerks in compiling of production and sales reports, purchase orders, and transportation records. Oversees consolidation of data used to determine heating quality of natural gas. Directs clerks in compiling production records and other reports. Calculates factors used to compute petroleum or gas volumes transported by pipelines, using adding machine or calculator. Performs duties as described under SUPERVISOR (clerical) Master Title. May direct CHART CLERKS (clerical) in compiling data relating to volume of petroleum or gas products passing specified points on pipeline system and be designated Chart Clerk, Chief (clerical).
GOE: 07.02.03 STRENGTH: S GED: R4 M4 L4 SVP: 7 DLU: 77

**221.137-010 CONTROL CLERK, HEAD (clock & watch)**
Supervises and coordinates activities of CONTROL CLERKS (clock & watch) engaged in distributing material to workers and keeping records of parts worked on and completed: Keeps perpetual inventory of watches in department. Totals hours worked by subordinates for payroll purposes. Issues work tickets. Performs duties as described under SUPERVISOR (clerical) Master Title.
GOE: 05.09.02 STRENGTH: S GED: R4 M3 L4 SVP: 6 DLU: 77

**221.137-014 SUPERVISOR, PRODUCTION CLERKS (clerical)**
Supervises and coordinates activities of PRODUCTION CLERKS (clerical) engaged in keeping records and preparing statistical statements and reports on production of manufactured goods, consumption of raw materials, and other production data, performing duties as described under SUPERVISOR (clerical) Master Title.
GOE: 07.02.03 STRENGTH: S GED: R4 M4 L4 SVP: 7 DLU: 77

**221.137-018 SUPERVISOR, PRODUCTION CONTROL (clerical)**
Supervises and coordinates activities of MATERIAL COORDINATORS (clerical) engaged in expediting flow of material, parts, and assemblies within or between departments of industrial plant, and of PRODUCTION COORDINATORS (clerical) engaged in scheduling production operations: Evaluates written data, such as job orders, product specifications and operations sheets,

parts and materials inventory lists, and machine and worker production rate to establish efficient allocation and scheduling of parts, materials, machines, and sequences of operations and workflow. Confers with production personnel to resolve problems affecting production schedules. Performs duties as described under SUPERVISOR (clerical) Master Title.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 8 DLU: 77

**221.162-010 PRODUCTION SCHEDULER, PAPERBOARD PRODUCTS (paper goods)** alternate titles: production clerk; production planner; scheduler
Prepares production schedules and miscellaneous reports for manufacturers: Examines blueprint or drawings to determine type and quantity of materials and equipment required to manufacture number of containers specified. Confers with production personnel to clarify processing methods or establish sequence of operations. Prepares production schedules, issues work orders, and keeps progress records (PRODUCTION CLERK (clerical)). Calculates unit and job lot manufacturing costs of containers, based on size and type, and involving such factors as labor, material, handling, and shipping costs.
GOE: 05.03.03 STRENGTH: S GED: R4 M4 L4 SVP: 6 DLU: 77

**221.167-010 COPY CUTTER (print. & pub.)**
Coordinates activities of workers engaged in setting of copy into type: Examines, apportions, and distributes editorial and classified advertising copy to COMPOSITORS (print. & pub.); LINOTYPE OPERATORS (print. & pub.); MONOTYPE-KEYBOARD OPERATORS (machinery mfg.; print. & pub.). Examines copy to determine time and date for publication, type style, and size specified for headings and body. Determines size of sections to be cut and distributed, according to time available for setting type. Cuts copy into sections, marks sections with type size if cuts are to be used, and distributes to composing room. May mark sections to aid in assembling type and cuts in galley.
GOE: 05.10.05 STRENGTH: S GED: R4 M3 L3 SVP: 8 DLU: 77

**221.167-014 MATERIAL CONTROL EXPEDITER (clerical)** alternate titles: material control expediter; production control scheduler
Coordinates and expedites flow of materials, parts, and assemblies between sections or departments, according to production and shipping schedules or department priorities, and compiles and maintains manual or computerized records: Reviews production schedules and related information and confers with department supervisors to determine material requirements to identify overdue materials and to track material. Requisitions material and establishes sequential delivery dates to departments, according to job order priorities and material availability. Examines material delivered to production departments to verify conformance to specifications. Arranges in-plant transfer of materials to meet production schedules. Computes amount of material required to complete job orders, applying knowledge of product and manufacturing processes. Compiles and maintains manual or computerized records, such as material inventory, in-process production reports, and status and location of materials. May move or transport materials from one department to another, manually or using material handling equipment. May arrange for repair and assembly of material or parts. May monitor and control movement of material and parts on automated conveyor system.
GOE: 05.09.02 STRENGTH: L GED: R4 M3 L4 SVP: 6 DLU: 90

**221.167-018 PRODUCTION COORDINATOR (clerical)** alternate titles: production controller; production expediter; production scheduler; progress clerk; schedule clerk; scheduler
Schedules and coordinates flow of work within or between departments of manufacturing plant to expedite production: Reviews master production schedule and work orders, establishes priorities for specific customer orders, and revises schedule according to work order specifications, established priorities and availability or capability of workers, parts, material, machines, and equipment. Reschedules identical processes to eliminate duplicate machine setups. Distributes work orders to departments, denoting number, type, and proposed completion date of units to be produced. Confers with department supervisors to determine progress of work and to provide information on changes in processing methods received from methods or engineering departments. Compiles reports concerning progress of work and downtime due to failures of machines or equipment to apprise production planning personnel of production delays. Maintains inventory of materials and parts needed to complete production. May expedite material [MATERIAL COORDINATOR (clerical) 221.167-014]. May expedite production of spare parts and establish delivery dates for spare parts and be designated Spares Scheduler (clerical). May coordinate and expedite work in automobile repair and service establishment from control room, using public address system, and be designated Work Coordinator, Tower Control (automotive ser.). May use computer system to track and locate production units.
GOE: 05.09.02 STRENGTH: S GED: R4 M3 L4 SVP: 6 DLU: 87

**221.167-022 RETORT-LOAD EXPEDITER (wood prod., nec)** alternate titles: load tallier
Coordinates tram-car loading activities in wood-preserving plant to expedite movement of wood products into treatment retorts, tallies products loaded to verify against customer orders, and records product-load data for use by processing personnel: Confers with supervisors to determine processing schedules. Determines combinations of orders which can be processed together and number and sizes of tram cars required for each retort charge, according to retort

194



State of California
Department of Corrections and Rehabilitation
Correctional Training Facility – Soledad

**Date:**          Friday, October 27, 2006

**To:**            Board of Prison Hearings

**From:**          Charlie .D. Walker, Superintendent I
                   Inmate Employability Program Coordinator
                   Prison Industry Authority ● P.O. Box 700 ● Soledad, CA 93960-0700

**Subject:**       Inmate Employability Program Participation by Matthew Jay, D55653

Our Inmate Employability Program (IEP) is designed to prepare skilled prisoners assigned to the Prison Industry Authority, Furniture Factory, for gainful employment upon release from custody. As Superintendent I, IEP Coordinator, here at CTF—Soledad, I have developed a series of sessions designed to address employment needs and personal issues that may effect an individual's performance while adjusting to society. Our research has determined that statistically, more than 170,000 men and women are incarcerated here in California and nearly 95% will be released back into the community at some point (including those convicted of life crimes). With 80% of crimes committed being drug and/or alcohol related, I have taken the position to address these issues through our Inmate Employability Program.

During the previous years, inmate Matthew Jay has participated in a number of these developmental programs offered through IEP. They include, but are not limited to: Session 1 – Re-Engaging into Society; Session 2 – Four Phases of Community Re-Entry; Session 3 – finding Employment; Session 4 – How to succeed on the Job; and Session 5 – Anger Management (please refer to related chronos).

In addition to the above, I will continue to address such important issues as addiction, crime, and rejoining society through a series of videos, along with 3 to 4 hours of discussion and dialogue.

Our next session entitled: "Going Home", is a six part video series designed to guide offenders through the process of taking a look at their lives, empowering themselves, the deception of addiction, understanding the rules of the game, giving up the game, and the art of mainstreaming.

As the IEP Coordinator, I lead each class in discussion and dialogue following each video, which allows for a better understanding of the material provided.

The first two videos deal with who they are as individuals and how in connecting with who they really are, can empower themselves. It all begins by looking at and being honest with themselves. By doing so they can better understand how their addictions (to drugs, money, alcohol, The "fast life") controlled the choices they made in life. The class, through dialogue, comes to see how the qualities they exhibited in their addictive states played a key role in empowering them. These qualities include perception, diligence, focus, precision, and communication. Ultimately, the class discussion leads to the understanding that empowerment equals success.

Sessions 3 and 4 focus on "addiction" and "the game", that is, the lifestyles that were lead before incarceration. The deception of addiction helps everyone to understand that whether they used, abused, or sold drugs, the consequences of their actions were the same. After watching The Rules Of The Game, the class soon learns that addiction is a primary disease and if left untreated, other problems will be impossible to fix (whether it is depression or some physical ailment). The "Game" referred to in the video depicts a life of chaos, disrespecting loved ones, insanity and dishonesty. They ultimately learn that the rules of addiction are: Not Trusting, Not Feeling, and Not Caring.



Proudly made in California
www.pia.ca.gov

State of California
Department of Corrections and Rehabilitation
Correctional Training Facility – Soledad

Re: M a t t h e w   J a y , D 5 5 6 5 3

The final two videos teach them how to rejoin society and play by their rules. Once again, truth is of the utmost importance. This is the key, which enables each prisoner to get back on track towards the mainstream of society. By giving up the game, the class learns what normal behavior entails... that is, intellect over emotion. If they continue, "As Is" they move further and further away from society. Finally, the class comes to understand the importance of making adjustments. This involves taking personal inventory.

In closing, I would like to inform the reader that Mr. Matthew Jay has participated in our program for a minimum of three years. His participation is indicative of his desire to do well upon his re-entry into a free society. He is commended for his efforts.

C.D. Walker, Superintendent I
Inmate Employability Program Coordinator
Prison Industry Authority – Soledad

cc:    File

# SHARE A BEAR

## Matthew Jay

This certificate is to thank you for your monetary contribution
to the Third Annual Correctional Training Facility
*"Share a Bear"* Teddy Bear Drive.

Your generous contribution has warmed the hearts of
many needy children in our community.



P. SKINNER, SERGEANT
"Share A Bear" Coordinator
Correctional Training Facility

J. SOLIS
Warden
Correctional Training Facility



# EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

*This Certificate of Achievement is awarded to acknowledge that*

**MATTHEW A. MAY**

Has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

IS-101

Emergency Program Manager
An Orientation to the Position

*Issued this 11th Day of August, 2003*

Stephen G. Sharro
*Director, Training Division*

__UNITED STATES FIRE ADMINISTRATION__



# EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

*This Certificate of Achievement is to acknowledge that*

## MATTHEW A. JAY

Has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

IS-241

**Decision Making and Problem Solving**

Issued this 08th Day of September, 2003

Stephen G. Sharro
Director, Training Division

UNITED STATES FIRE ADMINISTRATION



EMERGENCY MANAGEMENT INSTITUTE

*Certificate of Achievement*

*This Certificate of Achievement is to acknowledge that*

MATTHEW A. FAY

and completion of the independent study course:

IS-242
Effective Communication

Has reaffirmed a dedication to serve in times of crisis through continued professional development

Issued this 14th Day of October, 2003

Stephen G. Sharro
Director, Training Division

UNITED STATES FIRE ADMINISTRATION



# EMERGENCY MANAGEMENT INSTITUTE

## Certificate of Achievement

*This Certificate of Achievement is to acknowledge that*

**MATTHEW A. FAY**

Has reaffirmed a dedication to serve in times through continued professional development
and completion of the independent study course:

IS-244

Developing and Managing Volunteers

Issued this 18th Day of November, 2003

Stephen G. Sharro
*Director, Training Division*

UNITED STATES FIRE ADMINISTRATION



Date of Issue
October 22,
2004

CSS

# Certified Customer
## Service Specialist

### Matthew A. Jay - CSSCA551
### Soledad, California

has successfully completed the technical examinations and requirements to be universally recognized for competence, ability, and knowledge as a Certified Customer Service Specialist. To be recognized for this honor, practicing technical personnel must pass examinations in product technology understanding and customer-relations decision-making skills with at least a 75% score. They also must accept the CSS Code of Conduct. Only well trained technicians with 'people skills' are able to accomplish this feat. The Electronics Technicians Association takes great pride in presenting this official recognition to the above named expert Customer Service Specialist. His/her name has been published in the High Tech News journal, imbedded in the CSS permanent database, and is available for recognition by officials of the industry. This individual may display the CSS identification items or advertise his level of accomplishment as a technical specialist. Congratulations from ETA officers and members and the electronics industry.

The Electronics Technicians Association, International, Inc.
Greencastle, Indiana

Richard L. Glass, CETsr
President, Electronics Technicians Assn., Int'l.



ICAC
International Certification
Accreditation Council



*Certified*
*Customer Service Specialist*

CSS - CSSCA551
Matthew A. Jay
PO Box 689
Soledad CA  93960-0689

Richard L. Glenn, CSTm




## The Electronics Technicians Association, International

800-288-3824/765-653-8262/4301/5592 765 653-4287fax
http://www.etainternational.org   eta@ids.net
President, Richard L. Glass, CETsr
Vice President, Teresa Maher, CSS

**Chairman**
Bill Woodward, CFOI
2500 Almeda Ave , Suite 214
Norfolk, VA 23513-2403
757-858-6000
Wwoodward@wrsystems.com
**Vice Chairman**
Randy Reusser, CETar, MBA
6317 50th St
Kenosha, WI 53144
262-654-1756
randyr@safeaccess.com
**Secretary**
John MacLean III, CET
4014 Ashburner Street
Philadelphia, PA 19136
215-332-5129
ATLAStll@ureach.com
**Treasurer**
Eric M. Funderburk, CETma
6550 First Park Ten Blvd., Ste. 201
San Antonio, TX 78213
210-733-6000
efunderb1@juno.com
**Comm Div Chair**
Tom Janca, CETsr
6229 S. Krameria
Greenwood Village, CO 80111
720-200-0784
trjanca@lucent.com
**Comm Div S/T**
Jim Arcaro, CETar
29451 Valley View Dr
Wickliffe, OH 44092-2030
216-362-8104
jgarcaro@cox.com
**Educ Div Chair**
Clark Adams, CETsr
400 2nd St. NE
Watervoort, SD 57201
605-880-9611
stuff@skybpost.com
**Educ Div S/T**
Dave Koenig, CNST
3700 S Westport Ave, #1185
Sioux Falls, SD 57106-6344
605-260-1353
dkoenig@etainternational.org
**Cert. Tech Div Chair**
Fred Weiss
80 Britain Rd, Rm 240
Akron, OH 44305
330-784-4118
fweiss@akron.k12.oh.us
**Cert Tech Div S/T**
Glen Wolfe, CETar
3609 S Gunderson Ave
Berwyn, IL 60402
847-452-3413
gw1996@hotmail.com
**Shop Div Chair**
Roy Tarter, CET
RR 2 Box 324
Spencer, IN 47460
765-795-6374
Kats@cctc.com
**Shop Div S/T**
Ron Habegger, CSI
1005 N Main
Crete, IL 60417
708-672-6677
midwestslar@starband.net
**WebMaster**
Chris Courson, CET
7109 N 18th St
Tampa, FL 33610
813-236-5279
chris@divebot.com
**Dir. Chap Relations**
Randy Glass, CST
1111 Bishop St #400
Honolulu, HI 96813
808-258-8655
ecommerce@hawaii.rr.com
**Cabling Chair**
Barry McLaughlin, FOI
32 Boulevard Rd
Wellesley Hills, MA 02481
781-235-1455
barry@barrymclaughlin.com
**Cabling Div S/T**
Jim Parker, FOT
5269 Cleveland St
Virginia Beach, Va 23462
757-518-8100
jparker@kutzilo.com
**SDA Chairman**
Bill Yates
PO Box 3704
Victoria, TX 77903
361-575-3278
wyates@mastartechnologies.net
**SDA Vice Chair**
John Zielinski, CETma
167 Orchard Pl Apd1
Lackawanna, NY 14218-1739
716-685-6600
zielinskij@att.net
**SDA Sec.**
Michael King, CSI
3002 Country Rd
Grand Junction CO 81504
Frisco, CO 80443
970-470-3523
king@onaemagn.com
**SDA Treas.**
John Barlow
CVS1139 S Baldwin Ave
Marion, IN 46952
800-825-1100
jbarlow@cvsystems.com

Friday, October 22, 2004

Matthew A. Jay, CSS
POBox 689
Soledad, California ·93960-0689

Dear Matthew A.,

Congratulations on passing the Electronics Technicians Association exam(s)! You have now been registered as a CSS.

Your name will be published in the next issue of ETA's "High-Tech News" journal. We urge you to include the initials of your new title, CSS, behind your name-it means something. By becoming ETA certified, you have raised the level of professionalism one more notch. Thank you for your contribution to the electronics industry. We would also like to encourage you to become a member of our professional trade association. To accept a one-year renewable membership, simply fill out the enclosed brochure and return with your payment to ETA.

Regarding the certification examination itself, ETA has an exam advisory committee of top electronics professionals who continually monitor exam content, and the certification program itself. We encourage your support in helping to mold the program. Any suggestions you would like to submit in the areas of mix, wording, context or subject matter would add to the comprehensiveness of this exam. We welcome your feedback.

To make comments on one or more item, just jot them down and send the to the ETA office in Greencastle at the address at the top of this page.

Again-Congratulations!

Tests: CSS102 92%            Assigned CSS number: CSSCA551

Sincerely,

Richard L. Glass, CETsr
President

# EXHIBIT

# 5

£

INMATE COPY

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### REVISED SEPTEMBER 1998
### PAROLE CONSIDERATION HEARING
### JANUARY 2006 LIFE-TERM INMATE CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### DECEMBER 10, 2005

**NAME:**       JAY, MATHEW
**CDC #:**      D-55653
**DOB:**        07/29/67
**MEPD:**       10/18/95
**DATE OF OFFENSE:** 10/13/85
**OFFENSE:**   Penal Code 187, Murder, Second Degree
               Penal Code 187, Attempted Murder, Second Degree
**SENTENCE:** 15 years to Life
**COUNTY OF COMMITMENT:** Los Angeles County
**EVALUATION DATE:** 12/15/05

## I.   IDENTIFYING INFORMATION:

Inmate Mathew Jay is a first-term, Caucasian, 38-year-old, single male who has served 20 years of his sentence. He is an active Christian.

## SOURCES OF INFORMATION:

This evaluation is based upon a single, 90-minute, psychodiagnostic evaluation, plus review of the Central file and medical file.

The last Board of Prison Terms' panel asked for a current psychological evaluation because they noted that the 1990 psychological evaluation by Dr. Charlens at R.J. Donovan, and the 1994 psychological evaluation by Ronald Kitt, Ph.D., raised questions about the motivational issues that caused this offense. The Board felt that these issues have not been addressed.

The previous psychological evaluation, dated 10/09/02, by J. Howlin, Ph.D., is still quite current and valid.

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

## CLINICAL ASSESSMENT

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

The mental status examination is entirely within normal limits. Inmate Jay is quite bright intellectually. He is functioning in the high average ranges intellectually. His judgment is sound. He had good self-awareness and insight.

Inmate Jay has remained entirely disciplinary-free during the last 20 years of his incarceration. This is commendable. Drugs and alcohol are readily available in the institutional environment. However, he has significantly changed his life, and he has avoided any ~~environment~~ *INVOLVE-MENT* with drugs or alcohol during the last 20 years. In addition, he has participated extensively in therapy groups, self-help programming, and ongoing Alcoholics Anonymous. He also has helped the bishop in his church develop alcohol and drug abuse programs, which he hopes to become involved in in a more direct manner upon his parole. Due to the fact that drugs and alcohol are available, and he could have used them if he had chosen to, it is clear that drugs and alcohol are no longer a problem in his life. Therefore, this cannot be listed as a current diagnostic problem.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| *AXIS I:* | No contributory clinical disorder. |
| *AXIS II:* | No contributory personality disorder. |
| *AXIS III:* | Asthma. |
| *AXIS IV:* | Life-term incarceration. |
| *AXIS V:* | Current GAF = 90. |

XIII.    **REVIEW OF LIFE CRIME:**

In addressing the question of causative factors, the California Youth Authority psychiatric evaluation, dated 06/24/87, does lend some insight into his functioning at the time of the commitment offense. Quoting a prior psychiatric evaluation, the defendant was described as a passive-dependent personality, and there was evidence of a chronic childhood depression, which increased the demands of adolescence, and developed a strong dependence on drugs, which combined in a

*JAY, M.        D-55653        CTF-CENTRAL        12/15/05        gmj*

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE THREE*

spiraling psychiatric deterioration, resulting in an "apathetic, severely depressed, severely drug-dependent, and nonfunctioning adolescent." Drug use was seen as a significant precipitant of his behavior.

At the time of the commitment offense, inmate Jay was severely intoxicated on LSD, which he had taken for the first time in conjunction with hashish and alcohol. The psychiatrist noted that inmate Jay was very remorseful for the offense, and he is now very anti-drug, and would like to spend his life trying to help other people get off of drugs.

In the 10/11/95 psychological evaluation by Dr. McDill, it was noted that inmate Jay broke into tears in discussing the offense. His remorse appeared to be very genuine. When asked why he participated in such a crime, the inmate listed several factors. He stated that, at that time in his life, he did not have the ability to say no. He stated the drugs numbed him and disinhibited him. He was operating with a strong wish to help a friend and to please someone in a life where he seemed unable to please anyone. He also mentioned his basic immaturity and youthful stupidity. The psychologist stated that such a description pretty much tells the whole story.

The last psychological evaluation by Dr. Howlin on 10/15/02, reported that inmate Jay felt his heavy, ongoing drug use significantly interfered with his ability to know right from wrong. He stated he never thought the crime would happen, but when it did happen, it was too late. Prior to this offense, inmate Jay had been struggling with low self-esteem and occasional depression, coupled with heavy drug use.

When questioned by this evaluator, inmate Jay stated that, at that time in his life, as an 18-year-old, due to his chronic drug use, he could not think right. He had no appreciation of life's values. He stated that the heavy use of drugs had caused him to become an uncaring person who did not consider the consequences of his actions, or even what he was doing. In addition, he was immature, dependent on his friends, including the 16-year-old son of the victim. Inmate Jay accepted responsibility for his participation in this offense. He understands that, if it were not for his role in the crime, it probably would not have happened. He stated that

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

he saw his 16-year-old friend being abused by the victim, and he wanted to befriend and protect his friend. He stated that his extreme intoxication at the time caused severely impaired judgment.

He did accept responsibility for this offense, and stated that if he had not participated in it, it could not have happened. His feelings or remorse appear to be sincere and genuine. He was very happy with the victim's parents forgiving him, and he does correspond with them regularly.

XIV.    ASSESSMENT OF DANGEROUSNESS:

A.    In considering his potential for dangerous behavior in the institution, inmate Jay has remained entirely disciplinary-free. He has grown significantly over his 20 years of incarceration. He is no longer the immature, drug-dependant individual that he was at the time of the commitment offense. He demonstrates strong prosocial values. There are no antisocial values or thinking in this case. His violence potential is definitely below average in comparison to other inmates.

B.    In considering his potential for dangerous behavior if released on parole to the community, the Level of Service Inventory-Revised, was administered. This is an actuarial measure that assesses criminal history, substance abuse, educational attainment, vocational attainment, emotional problems, and several other factors. His score indicated a 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better than 98% of them. This indicates an extremely low risk level. As a result, his potential for violence is no more than the average citizen in the community, and is probably less than the average citizen in the community due to his life experiences.

C.    At the time of the commitment offense, risk factors were his immaturity and his severe substance dependence. After 20 years of drug and alcohol abuse programming, and maturity that comes with age and experience, this is no longer a factor. There are no significant risk factors at this time.

JAY, M.        D-55653        CTF-CENTRAL        12/15/05        gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

XV.    <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

There are no mental or emotional problems in this case that would interfere with parole planning. He has strong family support in the community. He also has strong community support. He has achieved vocational skills, and he does have job offers in the community. The prognosis for successful adjustment to the community is excellent in this case.


*M. Macomber, Ph.D.*

M. Macomber, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MM/gmj

D:   12/15/05
T:   12/17/05

C:\Documents and Settings\gjorgensen\My Documents\JAY, MATHEW  D-55653  01-06  MACOMBER.doc

# EXHIBIT

# 6

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
NOVEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 9, 2002

This is a psychological evaluation for the Board of Prison
Terms on inmate Mathew Jay, CDC# D-55653.  This report is
the product of a personal interview, conducted on 10/09/02,
as well as a review of his Central file and unit health
record.  This interview was a single contact with this
individual for the sole purpose of preparing this report.

PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Jay is a 35-year-old, single, Caucasian male.
His date of birth is 07/29/67.  He stated his religious
affiliation as being Christian, specifically
Episcopalian.  He presented with no unusual physical
characteristics, and denied the use of nicknames or
aliases.

II.   DEVELOPMENTAL HISTORY:

Inmate Jay denied any history of birth defects or
abnormalities of developmental milestones.  He denied a
history of cruelty to animals, a history of arson, or a
history of physical or sexual abuse as either a
perpetrator or a victim.

He stated that he had appendicitis as a child, and also
had seasonal asthma, beginning in childhood, which he
continues to take medication for on an intermittent
basis.

Inmate Jay stated that at about the age of 12, and
shortly after beginning to experiment with alcohol and
drugs, he was hospitalized for one to two days as a
result of an overdose of his brother's asthma
medication.  He stated that, at the time, he was having
difficulties with the building up of his emotions, and

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

some conflict with his family.  He stated that after discharge from the hospital, he received no additional mental health treatment, and did not take any psychotropic medication.  He denied any additional childhood medical concerns.

III.  EDUCATIONAL HISTORY:

Inmate Jay stated that he completed his high school diploma while in the county jail.  He has been involved in working on a bachelor of liberal studies degree through the University of Iowa, taking correspondence courses.  He explained that he started taking the courses when offered at CDC, but when that program was discontinued, started through correspondence.  He hopes to earn his bachelor's degree with a focus on social work and drug counseling.  He denied any history of special education.

IV.  FAMILY HISTORY:

Inmate Jay explained that his family is, overall, a warm, supportive and caring family.  His parents are still married.  His father is 69, and his mother is 61.  His father works as a teacher, and his mother is an Episcopalian minister.  He explained that both of his parents suffer from diabetes.

Inmate Jay has one older brother, age 37, who is married, and one sister, age 33, who is also married.

Inmate Jay denied any family history of drug or alcohol abuse.  He communicates with his family on a regular basis, receiving visits often, and letters from family members.  He explained that his father writes on a daily basis.  Inmate Jay described his relationship with his family currently as very positive.

V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Jay stated that he is a heterosexual male. He denied any history of high-risk sexual behavior, including sexual aggression.

JAY, M.      D-55653      CTF-CENTRAL      10/15/02      gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## VI.    MARITAL HISTORY:

Inmate Jay has never been married.  He was incarcerated
in the county jail at the age of 18 for the commitment
offense.  He has no children.

He described a long-term relationship with a woman,
whom he continues to communicate with frequently.  He
explained that he met this woman in church while he was
still in the community.  He has continued to
communicate with her, and described the relationship as
being positive.

## VII. MILITARY HISTORY:

Inmate Jay denied any history of military service.

## VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Jay explained that he worked in the food
industry prior to being incarcerated.  He worked for
about one year at Carl's Junior as a cook.  He said he
also worked for about six months at a restaurant called
Marie Calendar's, again as a cook.  He explained that
both of these jobs were while he was in school, so he
worked mostly after school.

Since his incarceration in CDC, he has worked in sewing
machine repair and in textiles, and has had various
porter jobs.  He worked in the bakery for about five
years, and is currently working as a shipping clerk for
PIA, where he is in charge of production.

Aside from working towards a bachelor's degree and
working as a shipping clerk, inmate Jay said that he
likes to write poetry.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Jay explained that he started experimenting
with alcohol at about age 12.  This progressed to the
use of marijuana.  He said that by about the age of 16,
he was using alcohol and marijuana on an almost daily
basis.  He said that he experimented with both LSD and
cocaine one time each.  He denied the use of any other
illicit substance.

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

Inmate Jay had no substance abuse treatment prior to being incarcerated. However, since entering CDC in 1987, he explained that he has had continuous attendance at both Alcoholics Anonymous and Narcotics Anonymous. For about the past year and a half, he has been mostly involved in AA since, he explained, it addresses recovery for both alcohol and drugs.

Inmate Jay demonstrated insight specifically related to factors about his own recovery. He has a sponsor arranged, who is a chaplain in the same community where his parents live, and hopes to follow through with this plan if paroled. He seems to realize that recovery from substance abuse oftentimes is an ongoing process.

Self-help-wise, he has been involved in several programs since being incarcerated. He has been involved in the Alternatives to Violence program, in Breaking Barriers, and was involved in a Life Skills group with Dr. Bakeman. He has also had occasional, individual counseling with a psychologist at a different institution. However, this is not documented in the file.

It should be noted that inmate Jay has zero disciplinary CDC-115s or CDC-128s related to allegations regarding substance use in prison.

X.   <u>PSYCHIATRIC AND MEDICAL HISTORY</u>:

As mentioned earlier in this report, inmate Jay was hospitalized as a teen for about two days related to an overdose of his brother's asthma medication. He denied any subsequent psychological treatment, including a history of suicidal gestures or attempts.

He denied any additional hospitalizations, including any psychiatric hospitalizations. He denied any history of serious accidents or head injuries, or a history of seizures or other neurological conditions. As noted, he uses an inhaler for asthma on an occasional basis.

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

## XI.  PLANS IF GRANTED RELEASE:

Inmate Jay stated that he hopes to live with his parents in Valencia if paroled.  He explained that they agreed to this plan for his transition back into the community.  He hopes to attend his mother's church, where she serves as an Episcopalian minister.  He stated that they also have regular AA meetings there that he will join.  He would like to eventually complete his bachelor's degree, and if he does not complete in within CDC, he hopes to continue it in the community.  He stated that he has had two job offers, one working for a bishop of the Episcopalian Church in Los Angeles, and the second working for a consulting firm, doing clerical work.  Additionally, he hopes to be able to utilize his degree in social work and drug counseling in either of these job offers, or in possible additional areas.

Based on what was discussed with this clinician, it appears that his parole plans are viable, and his prognosis for community living is positive.

## CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Jay is a 35-year-old, single, Caucasian male. He appeared his stated age.  He was appropriately dressed and groomed.  He was coherent, cooperative, calm and alert throughout the interview.  His speech, flow of thought and affect were all within the normal range.  His intellectual functioning was estimated to be slightly above average when compared to this Level II inmate population.  There was no evidence of a mood or thought disorder.  His judgment appeared to be sound.  He demonstrated good insight into his commitment offense.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Polysubstance Dependence, in sustained full remission in a controlled environment.
AXIS II:   No Contributory Personality Disorder.

JAY, M.     D-55653      CTF-CENTRAL     10/15/02     gmj

JAY, MATHEW
CDC NUMBER:   D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


AXIS III:   Asthma.
AXIS IV:    Incarceration.
AXIS V:     GAF = 85.

His prognosis is positive for being able to maintain
his current mental status in the community upon parole.

XIII. REVIEW OF LIFE CRIME:

Inmate Jay is serving a 15 year to life sentence for
Second Degree Murder.  He was 18 years old when
incarcerated for this crime, and spent about two years
in county jail before entering CDC in 1987.  Therefore,
he has been incarcerated for almost 17 years.

Inmate Jay described the circumstances surrounding the
commitment offense.  He admitted to being heavily
intoxicated preceding the crime, and had been using
marijuana, alcohol, and cocaine.  The crime consisted
of his participation in the strangling death of one of
the crime partners' mother, and then the subsequent
attempted murder of the crime partner's eight-year-old
half brother, who allegedly witnessed part of the
murder of the mother.

This reviewer agrees with the past psychological
evaluation, done by Dr. Reed:  the idea that the crime
was quite violent, and quite removed from both inmate
Jay's history and functioning since being incarcerated.

Inmate Jay explained his attempts at making sense of
what happened.  He stated that he feels it was his
heavy, ongoing drug use that significantly interfered
with his ability to know right from wrong.  He added
that he never really thought that the crime would
happen, and when it in fact did, it was too late.  He
also added that, prior to the crime, he had been
struggling with low self-esteem and on-and-off-again
depression, coupled with the heavy drug use.  Inmate
Jay also discussed an increasingly conflictual
relationship with family members preceding the crime.

The above-diagnosed psychopathology would likely be
directly related to the crime.  Inmate Jay demonstrated

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SEVEN

what appeared to be insight into his actions and the
crime, and remorse for the victim and the victim's
family members.

Since being incarcerated for a period of almost 17
years, the Central file notes zero CDC-115s or CDC-128
counseling chronos.  Inmate Jay did add that he
received one CDC-128 counseling chrono for smoking,
which was not found in the Central file by this
reviewer.

Inmate Jay denied any gang involvement either prior to
or since his incarceration.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  In consideration of several factors, including his
    lack of a criminal history prior to his commitment
    offense, his lack of a CDC-115 disciplinary
    history, and his insight and increased maturity
    since his incarceration, his violence potential
    within a controlled setting is estimated to be well
    below average relative to this Level II inmate
    population.

B.  If released to the community, his violence
    potential is estimated to be no more than the
    average citizen in the community.

C.  A possible risk factor for this inmate which could
    be a precursor to violence would be to choose to go
    back to the use of alcohol and/or drugs again.
    Should this inmate make the choice to use
    substances again, his violence potential would be
    considered higher than the average citizen in the
    community.  As noted earlier, however, inmate Jay
    does appear to have insight into his substance
    abuse history, and awareness of the idea that
    recovery from such a history is most likely going
    to be an ongoing process, and has made plans for
    the future addressing these issues.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
    behavior.  He has the capacity to abide by

JAY, M.      D-55653      CTF-CENTRAL      10/15/02      gmj

JAY, MATHEW
CDC NUMBER:   D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE EIGHT

institutional standards and has done so during his incarceration period.

B.   This inmate does not have a mental health disorder which would necessitate treatment, either during his incarceration period or following parole.

C.   As inmate Jay has acknowledged a significant history related to the abuse of alcohol and drugs, I would recommend upon parole:

1)   Continued abstinence from all illegal drugs and alcohol.

2)   Mandatory attendance at self-help groups, such as Alcoholics Anonymous or Narcotics Anonymous.


JEFF HOWLIN, Ed.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:   10/09/02
T:   10/15/02

# EXHIBIT

# 7

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
FEBRUARY 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
FEBRUARY 7, 2001

This is a psychological evaluation for the Board of Prison Terms for inmate Mathew Jay, CDC# D-55653. This report is based upon a personal clinical interview of the inmate, conducted on 02/07/01, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

PSYCHOSOCIAL ASSESSMENT

I.  IDENTIFYING INFORMATION:

Inmate Jay is a 33-year-old, single, Caucasian male whose date of birth is 07/29/67. English is his primary language and he is an American citizen. His stated religious preference is Christian. No obvious unusual physical characteristics were observed and he denies ever using any nicknames or aliases.

II. DEVELOPMENTAL HISTORY:

Inmate Jay denies any childhood history of physical or sexual abuse as either a perpetrator or a victim. Between the ages of seven to nine, he saw a psychiatrist for apparent relational problems with his siblings.

At about the age of 12 to 13, he began using drugs, including marijuana, alcohol, etc. Over the next several years, he became increasingly rebellious towards his parents and had developed a history of depression.

In 1983, he attempted suicide by overdosing on his brother's asthma medication. He ultimately dropped out of school in the 12th grade, primarily due to his heavy drug use. During his childhood, he suffered from chronic asthma, a condition which currently remains.

JAY      D-55653      CTF-CENTRAL      02/20/01      gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

In summary, heavy drug use significantly impacted his development as an adolescent.

III. EDUCATIONAL HISTORY:

Inmate Jay acknowledges that he attended public school and also a private Catholic school. He completed the 11th grade and ultimately attained his GED and high school diploma in the Los Angeles County Jail in 1986. He is currently working towards a BA degree in social work from the University of Iowa. The record indicated that in 1987, his measured grade point level ranged from 11.1 to 12.3. He has no history of special education in school. As noted previously, he dropped out of high school due to drug related problems.

IV. FAMILY HISTORY:

Records indicate this inmate has no significant family history of drug abuse or significant family history of crime. He generally describes his immediate relationships with his family members as very warm and supportive. He states he receives daily letters, phone calls and frequently receives visits. He reports that there is no history of abuse in these relationships.

V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Jay is a heterosexual male. He denies any history of sexual aggression or high-risk sexual behavior.

VI. MARITAL HISTORY:

Inmate Jay states that he has never been married and has no children.

VII. MILITARY HISTORY:

Inmate Jay has no history of military service.

VIII. EMPLOYMENT/INCOME HISTORY:

While this inmate was only 18 at the time of the instant offense, his preincarceration work history includes working two years as a restaurant cook and as a baker.

JAY    D-55653    CTF-CENTRAL    02/20/01    gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

His incarceration work history includes working five
years in a bakery and he has received numerous
laudatory chronos for his work.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Jay acknowledges having severely abused alcohol,
marijuana, LSD and cocaine in the past. He admitted
heavy drug usage during his teenage years. He states
that he has remained abstinent since 1985, the time of
his incarceration, and has remained drug-free since
that time.

He states that he began attending Alcoholics Anonymous
and Narcotics Anonymous in 1987 and has regularly
attended until the current date. He plans to continue
attending AA and NA. This inmate does have a
significant substance abuse history.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Jay's recent psychiatric diagnosis includes
Polysubstance Abuse (by history), in institutional
remission. He was hospitalized as a teenager in 1983
for the previously mentioned drug overdose. There were
no serious residual effects. He denies a history of
serious accidents, including head injuries. He has no
history of seizure or other neurological conditions.
He does have chronic asthma and currently takes
medication for this condition.

## XI.    PLANS IF GRANTED RELEASE:

If granted parole, inmate Jay plans to live in Los
Angeles County with his parents, who have agreed to
this arrangement. His financial and vocational plans
include working as a cook and baker, or in various
labor jobs. He also plans to continue attending
school.

## CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Jay was alert and
oriented to person, place and time. He was well
dressed and groomed. His speech was articulate and

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was in the average to above
average range.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     Polysubstance Dependence, in sustained full
            remission in a controlled environment (by
            history).
AXIS II:    No Contributory Personality Disorder.
AXIS III:   Asthma.

In addition to attending Alcoholics Anonymous and
Narcotics Anonymous, inmate Jay has completed a number
of other self-help groups.  In 1994, he completed the
Lifeskills group with Dr. Bakeman.  From 1990 until
1992, he attended Alternatives to Violence.  In 1990,
he completed Breaking Barriers, beginning and advanced
classes.  A chrono dated 1990 indicates that inmate Jay
completed personal, individual counseling from Dr.
Kennedy, a clinical psychologist, over a period of
several years.

XIII. REVIEW OF LIFE CRIME:

Inmate Jay described the circumstances surrounding
his commitment offense involving Second Degree Murder
and Attempted Murder.

In this crime, the inmate was a participant in the
strangling death of one of the crime partners' mother
and the attempted murder of this crime partner's eight-
year-old, half brother.  The crime did appear markedly
violent and is significantly inconsistent with the
inmate's current demeanor and nonviolent history within
CDC.

As reported in previous psychological evaluations, the
inmate stated that he was very immature and that his
judgment was drastically altered by chronic, heavy drug
usage.  He did demonstrate empathy towards the damage
done to the victims and appeared to be genuinely
penitent for his crime.  Heavy drug abuse does appear
to be directly related to the instant offense, and the

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


inmate appears to have an adequate understanding of
this relationship and the need to maintain abstinence
from drug and alcohol use.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting
is considered to be significantly below average
relative to this Level II inmate population.
Additionally, his level of dangerousness is
considered to be average to that of the average
citizen in the community.  These conclusions are
based upon several factors.

On the one hand, he heavily abused drugs from the
age of 12 or 13 until the age of 18.  Such heavy
drug usage during this development period likely
heavily impacted his cognitive, emotional and
social development.

On the other hand, however, he has no history of
juvenile crime or a history of adult criminal
behavior, other than the instant offense.  He also
has no history of gang involvement.  Significantly,
he has never received any CDC-115 violations during
his entire incarceration of 13 years within CDC.
Moreover, he has no disciplinaries for violent
behavior during this entire period.  No significant
psychopathic traits were observed during the
interview.  This inmate appears to have matured
greatly during his 13 years of incarceration within
CDC and to have profited from his participation in
the Lifeskills group and his individual counseling
with Dr. Kennedy.  However, it should be noted that
no report regarding his progress was found in
regards to his individual counseling with Dr.
Kennedy.  Nonetheless, he appears to have matured
greatly both from the self-help groups and therapy,
and from the structured programming within CDC.

Therefore, in light of these factors, his violence
potential is considered to be significantly below
average relative to this Level II inmate
population.


JAY      D-55653      CTF-CENTRAL      02/20/01      gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

    B.  If released to the community, his violence potential is considered to be no more than that of the average citizen in the community, if he remains free from substance abuse.

    C.  Substance abuse is a risk factor which may be a precursor to violence for this individual.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

    A.  This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has largely done so during his incarceration.

    B.  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

    C.  This inmate does appear to have a significant substance abuse history, and continued participation in Alcoholics Anonymous and Narcotics Anonymous is suggested both during his incarceration within CDC and as a contingency for parole.

JOE REED, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

R. (S.) COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

JR/gmj

D: 02/14/01
T: 02/20/01

JAY     D-55653     CTF-CENTRAL     02/20/01     gmj

# EXHIBIT



8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | |
|---|---|---|---|
| Date: | MAY 16, 2007 | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

| | |
|---|---|
| BH 004357 | |
| In re, | |
| MATTHEW ADAM JAY, | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on November 6, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on June 10, 1987 after a conviction for second-degree murder and attempted murder. He was sentenced to fifteen years to life. His minimum parole eligibility date was October 18, 1995. The record reflects that petitioner and two crime partners strangled to death the mother of one of the crime partners. The victim was lured into her son's room, where he and petitioner held her down while another man slipped a noose around her neck. During the fifteen-minute attack, the victim's eight-year-old son walked into the room. Petitioner's crime partners decided that they would have to kill the child since he was a witness. Petitioner bought rat poison, which was put in a snack for the child. He refused to eat it. Petitioner left the premises. He later rejoined the others and followed them to a location on Malibu Canyon. The victim's body was taken out of the trunk of her car and placed at the steering wheel. Her young son was tied up and blindfolded in the backseat. The men then threw gasoline in the car and rolled it off the edge. The child managed to survive the attack and get help.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on January 26, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on his commitment offense.

The Court finds that there is some evidence that "multiple victims were attacked, injured or killed in the same or separate incidents." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) One victim was killed while another was attacked and would have been killed had he not been able to untie himself and escape from a burning car.

The record reflects that there is some evidence that, "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*In re Scott* (2004) 119 Cal.App.4th 871,

1

| |
|---|
| Minutes Entered |
| 05-16-07 |
| County Clerk |


©COPY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 16, 2007 | | | | Deputy Clerk |
|---|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | | |
| | NONE | Bailiff | NONE | | Reporter |

(Parties and Counsel checked if present)

| | BH 004357 | | |
|---|---|---|---|
| | In re, | | Counsel for Petitioner: |
| | MATTHEW ADAM JAY, | | |
| | Petitioner, | | Counsel for Respondent: |
| | On Habeas Corpus | | |

891.) An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g. beating, clubbing stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Id.* at 892.) In this case, the victim was strangled by three men. The attack lasted fifteen minutes during which time she was screaming loudly enough to wake her son, who had been sleeping in another room. Additionally, they attempted to kill petitioner's crime partner's brother, an eight-year-old child, by tying him up and leaving him in a car, which they set on fire and push off a cliff. Based on these actions, there is some evidence that the crime was committed in a more aggravated and violent manner than that ordinarily shown in the commission of second-degree murder.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Steve M. DeFilippis, Esq.
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
Attorney for Petitioner Matthew Adam Jay

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL, TRUE, AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

ATTEST _____ JUN 1 5 2007 _____

JOHN A. CLARKE, Executive Officer/Clerk of the Superior Court of the State of California for the County of Los Angeles.

By _____, Deputy

JOSEPH M. PULIDO, S.C.C.
233219



| Minutes Entered |
|---|
| .05-16-07 |
| County Clerk |

<table>
<tr><td colspan="2">

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
  Clara Shortridge Foltz Criminal Justice Center
  210 West Temple Street
  Los Angeles, CA  90012

PLAINTIFF/PETITIONER:

  MATTHEW ADAM JAY

</td><td>

Reserved for Clerk's File Stamp

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 1 5 2007

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
    Joseph M. Pulido

</td></tr>
<tr><td>

**CLERK'S CERTIFICATE OF MAILING**
CCP, § 1013(a)
Cal. Rules of Court, rule 2(a)(1)

</td><td colspan="2">

CASE NUMBER:

BH004357

</td></tr>
</table>

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time          ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause            ☐ Order
☐ Order for Informal Response    ☐ Order re:
☐ Order for Supplemental Pleading  ☐ Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

June 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
        Joseph M. Pulido

Steve M. DeFilippis, Esq.
PICONE & DEFILIPPIS
625 N. First Street
San Jose, CA 95112
Attorney for Petitioner Matthew Adam Jay

Department of Justice
Office of the Attorney General of the State of
California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# EXHIBIT

9

LAW OFFICES OF

**Picone & Defilippis**

A PROFESSIONAL CORPORATION
625 NORTH FIRST STREET
SAN JOSE, CALIFORNIA 95112

93960+0689 B900

Matthew Jay – D55653, E-Dorm 15 Up
CTF Soledad
P.O. Box 689
Soledad CA 93960



LAW OFFICES OF

# Picone & Defilippis
A PROFESSIONAL CORPORATION

625 NORTH FIRST STREET

SAN JOSE, CALIFORNIA 95112

(408) 292-0441     Fax: (408) 287-6550

STEVE M. DEFILIPPIS

STEPHEN S. PICONE

RYAN A. RAMSEYER

TRACI S. MASON

**\*\*\* CONFIDENTIAL LEGAL MAIL - OPEN IN INMATE'S PRESENCE ONLY \*\*\***

July 3, 2007

Matthew Jay – D55653, E-Dorm 15 Up
CTF Soledad
P.O. Box 689
Soledad CA 93960

Dear Matthew:

Enclosed herewith please find a copy of the Order regarding your Writ of Habeas Corpus.

Should you have any questions, please do not hesitate to contact the office.

Very truly yours,

STEVE M. DEFILIPPIS

SMD/dh

Enclosure

Cc: Lynn Jay

# EXHIBIT
11

State of California

# Memorandum

Department of Corrections

Date: October 23, 1997

To:    Wardens
       Classification and Parole Representatives
       Classification Staff Representatives
       Correctional Counselor IIIs

cc:    CDW'S
       AW'S
       C&PR CCRM
       HCM
       LIT COOR

Subject: CLARIFICATION OF CALIFORNIA CODE OF REGULATIONS SECTION 3375.2 HOUSING FOR LEVEL I AND LEVEL II LIFE-TERM INMATES

This memorandum clarifies questions regarding the California Department of Corrections' policy for housing life-term inmates. The California Code of Regulations Section 3375.2 (a)(7)(A) explains an inmate serving any life term shall not be housed in a Level I or II facility if "...the commitment offense involved multiple murders, unusual violence, execution-type murders or received high notoriety."

Staff repeatedly question the meaning and intent of these exclusionary factors. Staff shall use the following definitions in applying this policy:

- "Multiple murders" means the inmate killed more than one victim during the commission of the crime for which the inmate is currently serving the life term. This does not include inmates who have killed more than one person during their criminal career. Serial killers shall be excluded from Level I or II placement even if the murders were prosecuted separately.

- "Unusual violence" means offenses wherein the inmate tortured the victim over a period of time or intentionally made the victim endure great pain and suffering. While stabbing, shooting, or beating the victim may be very violent, it is not necessarily "unusual violence."

- "Execution-type murders" include those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall. This does not include all crimes wherein the victim was killed to prevent testimony, killed in a "drive-by" shooting, or killed as an informant by orders of prison or street-gang leadership.

- "High notoriety" is meant to describe those cases that received, at least, statewide media coverage. Extensive coverage by local newspapers or television stations is not sufficient for exclusion.

DC 1217 (3/89)

# EXHIBIT

---

# 11

### Global Assessment of Functioning Scale (GAF Scale)

Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness. Do not include impairment in functioning due to physical (or environmental) limitations. See p. 37 for instructions on how to use this scale.

**Note:** Use intermediate codes when appropriate, e.g., 45, 68, 72.

**Code**

| | |
|---|---|
| 90<br>⎸<br>81 | **Absent or minimal symptoms** (e.g., mild anxiety before an exam), **good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns** (e.g., an occasional argument with family members). |
| 80<br>⎸<br>71 | **If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in school work). |
| 70<br>⎸<br>61 | **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** |
| 60<br>⎸<br>51 | **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with co-workers). |
| 50<br>⎸<br>41 | **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). |
| 40<br>⎸<br>31 | **Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). |
| 30<br>⎸<br>21 | **Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends). |
| 20<br>⎸<br>11 | **Some danger of hurting self or others** (e.g., suicide attempts without clear expectation of death, frequently violent, manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g., smears feces) **OR gross impairment in communication** (e.g., largely incoherent or mute). |
| 10<br>⎸<br>1 | **Persistent danger of severely hurting self or others** (e.g., recurrent violence) **OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death.** |

22

23

## PROOF OF SERVICE BY MAIL

CASE NAME:  JAY v. CURRY on habeas corpus

CASE NO. :  To be assigned (L.A. Supp. Ct. no. BH 004357)

I,  Matthew Adam Jay  , hereby declare that I am a party
to the above titled action and am over the age of eighteen (18),
and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS W/EXHIBITS

by placing a true copy in an envelope with first class postage fully
prepaid and said envelope surrendered to correctional staff at the
Correctional Training Facility for delivery to the prison mail room
and therefrom delivered to the local United States Post Office the
next business day from which there is postal service between the
place of mailing and the addressee:

Gregory J. Marcot
Deputy Attorney General
110 West "A" St., #1100
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true
and correct, doing so this  16th  day of  October  , 2007, at
Soledad, California.